JOSEPH A. YANNY, ESQ. (SBN 97979)
ELLIOT H. MIN, ESQ. (SBN 302597)
jyanny@yannylaw.com
YANNY & SMITH
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 551-2966
Facsimile: (310) 551-1949

Attorneys for Defendant Mongol Nation

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MONGOL NATION, an unincorporated association,<br><br>Defendants. | Case Number: CR 13-106 DOC<br><br>**DEFENDANT MONGOL NATION'S NOTICE OF MOTION; RENEWED MOTION TO DISMISS THE INDICTMENT AND FOR SANCTIONS; MEMORANDUM IN SUPPORT OF MOTION**<br><br>Date: August 3, 2015<br>Time: 2:00 p.m.<br>Hon. David O. Carter |

**TO THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES ATTORNEY:**

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that on <u>August 3, 2015</u> at <u>2:00 p.m.</u>, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable David O. Carter, Defendant Mongol Nation will bring on for hearing the following motion:

Defendant Mongol Nation hereby brings a renewed motion to dismiss the indictment for failure to state a claim and for selective prosecution; Defendant Mongol Nation additionally moves for sanctions against the government.

Defendant bases this motion on Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) and (iv), the First, Fifth, and Eighth Amendments to the United States Constitution, federal statutes, case law, this notice, the supporting memorandum, the pleadings and papers on file in this action, and upon such evidence and argument as may be presented before or at the hearing of this matter.

Respectfully submitted,
YANNY & SMITH

Dated: July 6, 2015          By:     __/s/ *Joseph Yanny*_____
                                              Joseph A. Yanny
                                              Elliot H. Min
                                              Attorneys for Defendant

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                                                    **PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION

II.   ARGUMENT

    A. GOVERNMENT'S THEORY OF FORFEITURE OF
       COLLECTIVE MEMBERSHIP MARK IS DEFECTIVE
       AS A MATTER OF LAW ……………………………….……………….. 6

       1. Forfeitability Of Collective Membership Mark ..……………… 6

       2. Trademark Law …………………………………………... 9

       3. Collateral Estoppel (Issue Preclusion) ……………………….. 14

       4. Fifth Amendment Due Process ..……………………………. 17

       5. First Amendment Free Speech and Association ……..……….. 18

       6. Eighth Amendment Excessive Fines Clause ………………….. 22

    B. GOVERNMENT FAILS TO ADEQUATELY PLEAD RICO ...……. 24

       1. Indictment Fails To Plead RICO Person/Enterprise
          Distinction  ……………………….………………………... 24

       2. An Entity Cannot Commit The Alleged Racketeering
          Acts In The Indictment ………………………………...…. 36

    C. SANCTIONS AGAINST THE GOVERNMENT ……………...…….. 38

       1. Selective Prosecution ………………………………………. 38

       2. 28 U.S.C. § 1927, And The Court's Inherent Power ………… 43

iii

3.  EAJA ………………………………………………………… 46

4.  Hyde Amendment …………………………………………… 48

5.  Request For Evidentiary Hearing …………………………….. 50

III.     CONCLUSION

1

## TABLE OF AUTHORITIES

2

3 **FEDERAL CASES** **PAGE**

4

5 *Aloe Creme Laboratories v. American Society*
*for Aesthetic Plastic Surgery, Inc.*
6      192 USPQ 170, 173 (TTAB 1976)……………………………………………… 9

7 *Ardestani v. INS*
8      502 U.S. 129, 138 (1991) ……………………………………………… 47

9 *Austin v. United States*
10      509 U.S. 544, 559 (1993) ……………………………………………… 22

11 *B.K.B. v. Maui Police Dept.*
12      276 F.3d 1091, 1107 (9th Cir. 2002) ……………………………………… 44

13 *Berger v. United States*
14      315 F.3d 1176, 1182 (1935) ……………………………………… 31, 33, 42

15 *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*
16      402 U.S. 313 (1971) ……………………………………………… 14

17 *Cedric Kushner Promotions, Ltd. v. King*
18      533 U.S. 158 (2001) …………………………………………... 26, 27, 28, 29

19 *Chambers v. NASCO, Inc.*
20      501 U.S. 32, 49 (1991) …………………………………………... 8

21 *Cohen v. California*
22      403 U.S. 15, 19 (1971) ……………………………………………… 19

23 *Constitution Party of Texas v. Constitution Ass'n USA*
24      152 USPQ 443 (TTAB 1966) ……………………………………… 9-10, 11

25 *Cornelius v. NAACP Legal Defense & Educ. Fund*
26      473 U.S. 788, 806 (1985) ……………………………………………… 20

27

28 *Ex parte Supreme Shrine of the Order of the White Shrine of Jerusalem*

109 USPQ 248 (Comm'r Pats. 1956) ……………………………………... 10

*F.R. Lepage Bakery, Inc. v. Roush Bakery Prods. Co., Inc.*
851 F.2d 351, 353 (Fed. Cir. 1988) …………………………………… 9

*F.R. Lepage Bakery, Inc. v. Roush Bakery Prods. Co., Inc.*
863 F.2d 43 (Fed. Cir. 1988) ………………………………………….. 9

*Gutierrez v. Barnhart*
274 F.3d 1255, 1258 (9th Cir. 2001) ………………………………… 47

*Hamilton v. State Farm Fire & Cas. Co.*
270 F.3d 778 (9th Cir. 2001) ………………………………………… 32

*Healy v. James*
408 U.S. 169, 186 (1972) …………………………………………… 20-21

*Huber Baking Co. v. Stroehmann Bros. Co.*
252 F.2d 945, 955 (2d Cir. 1958) …………………………………… 10

*In re Bose Corp.*
580 F.3d 1240, 1243 (Fed. Cir. 2009) ……………………………….. 11

In re Toyota Motor Corp.
785 F. Supp. 2d 883, 922 (C.D. Cal. 2011) ………………………… 30, 36, 38

*International Order of Job's Daughters v. Lindeberg & Co.*
633 F.2d 912, 917-20 (9th Cir. 1980) ……………………………….. 11

*Jund v. Town of Hempstead*
941 F.2d 1271 (2d Cir. 1991) …………………………………….....… 36

*Living Designs, Inc v. E.I. Dupont De Nemours and Co.*
431 F.3d 353 (9th Cir. 2005) ………………………………………… 30

*Marshak v. Green*
746 F.2d 927, 929 (2d Cir. 1984) …………………………………… 10

*NAACP v. Alabama ex rel. Flowers*
377 U.S. 288 (1963) …………………………………………………… 20

*NAACP v. Claiborne Hardward Co.*
    458 U.S. 886, 920 (1982) ………………………………………… 20

*Old Time Enters v. International Coffee Corp.*
    862 F.2d 1213, 1217 (5th Cir. 1989) …………………………… 30

*Orantes-Hernandez v. Holder*
    713 F. Supp. 2d 929, 949 (C.D. Cal. 2010) …………………… 48

*Pierce v. Underwood*
    487 U.S. 552, 565 (1988) ……………………………………… 47

*Planned Parenthood of Columbia/Williamette, Inc. v. American
Coalition of Life Activists*
    290 F.3d 1058, 1073 (9th Cir. 2002) …………………………… 20

*Religious Tech. Ctr. v. Wollersheim*
    971 F.2d 364, 367 n. 8 (9th Cir. 1992) ……………………….. 36

*Reves v. Ernst & Young*
    507 U.S. 170, 185 (1993) …………………………………….. 27

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*
    30 F.3d 339 (2d Cir. 1994) …………………...………………. 26, 28, 29, 30, 32

*Roadway Express, Inc. v. Piper*
    447 U.S. 752, 759 (1980) ……………………………………… 44

*Sammartano v. First Judicial District Court*
    303 F.3d 959, 972 (9th Cir. 2002) ……………………………. 19

*Spence v. Washington*
    418 U.S. 405, 409 (1974) ……………………………………… 19

*Thangaraja v. Gonzalez*
    428 F.3d 870, 874 (9th Cir. 2005) ……………………………. 45

*Turner v. Cook*
    362 F.3d 1219, 1231 n. 17 (9th Cir. 2004) …………………… 36

vii

1

2
*United Drug Co. v. Theodore Rectanus Co.*
3
    248 U.S. 90 (1918) ………………………………………………… 10, 11
4
*United States v. A&P Trucking Co.*
5
    358 U.S. 121, 127-28 (1958) (Douglas, J., dissenting) …………………….... 36
6
*United States v. Alexander*
7
    287 F.3d 811, 817-18 (9th Cir. 2002) ……………………………….…... 39
8
*United States v. Armstrong*
9
    517 U.S. 456, 465 (1996) …………………………………………………… 38
10
*United States v. Bajakajian*
11
    524 U.S. 321 (1998) ………………………………………………………… 22
12
*United States v. Baker*
13
    598 Fed.Appx. 165 (4th Cir. 2015) ……………………………………….. 39
14
*United States v. Bowman*
15
    302 F.3d 1228 (11th Cir. 2002) …………………………………………… 39
16
*United States v. Busher*
17
    817 F.2d 1409, 1412 (9th Cir. 1987) ……………………………………… 31
18
*United States v. Castillo-Basa*
19
    483 F.3d 890, 897 (9th Cir. 2007) …………………………………………… 14
20
*United States v. Donovan*
21
    539 Fed.Appx. 648 (6th Cir. 2013) ……………………………………….. 39
22
*United States v. Gardland*
23
    320 Fed.Appx. 295, 2008 WL 2939507 (6th Cir. 2008) …………………….. 39
24
*United States v. Henley*
25
    766 F.3d 893 (8th Cir. 2014) ……………………………………………… 39
26
*United States v. Jensen*
27
    93 F.3d 667, 669 (9th Cir. 1996) …………………………………………… 8
28

*United States v. Kelso Co.*
  86 F. 304 (N.D. Cal. 1898) …………………………………………….. 37

*United States v. Lawson..*
  535 F.3d 434 (6th Cir. 2008) …………………………………………… 39

*United States v. Local 807*
  118 F.2d 684, 688 (2d Cir. 1941) (Clark, J., concurring) …………………… 36

*United States v. Manchester Farming Partnership*
  315 F.3d 1176, 1182 (9th Cir. 2003) ………………………………………… 49

*United States v. Nagi*
  541 Fed.Appx. 556 (6th Cir. 2013) ………………………………………… 39

*United States v. Starrett*
  55 F.3d 1525, 1533 (11th Cir. 1995) ………………………………………… 40

*United States v. Sutherland*
  2014 WL 4705028 (E.D. Mich. 2014) ………………………....…………….. 39

*Werth v. United States*
  493 Fed.Appx. 361, 2012 WL 3136919 (4th Cir. 2012) …………………….. 39

**STATE CASES**

*Commonwealth v. Punxsutawney St. Passenger Ry.*
  24 Pa.C. 25 (1900) ……………………………………………………... 37

*State of South Dakota v. Kandaras for Senate Comm.*
  264 N.W.2d 902, 903-04 (S.D. 1978) ……………………………………… 36

**DOCKETED CASES**

*Ramon Rivera v. Ronnie A. Carter, et al.*
     Case No. 09 CV 0480 ……… 3, 10-11, 12, 13, 14, 15, 16, 17-18, 21, 23, 44, 45

*United States v. Cavazos, et al.*
     Case No. CR 08-1201 …………………….…1, 2, 3, 4, 13, 20, 23, 43, 34, 44

**UNITED STATES CONSTITUTION**

United States Constitution, Amendment I ……………………………………...… 18

United States Constitution, Amendment V …………………………………………. 17

United States Constitution, Amendment VIII …………………………………… 18

**FEDERAL STATUTES AND RULES**

15 U.S.C. § 1118 ……………………………………………………………… 18

15 U.S.C. § 1127 ……………………………………………………………….. 9

18 U.S.C. § 1961(3) ………………………………………………………… 24

18 U.S.C. § 1961(4) ……………………………………………………… 24, 30

18 U.S.C. § 1962(c) …………………………………………………………… 24, 25

18 U.S.C. § 1962(d) …………………………………………………...……… 24, 25

18 U.S.C. § 1963 ……………………………………………………………….. 7

18 U.S.C. § 3006A ……………………………………………………………... 38, 48

21 U.S.C. § 841 ……………………………………………………………….. 37

28 U.S.C. § 1927 ……………………………………………………………… 38, 42, 43

28 U.S.C. § 2412 …………………………………………….……… 38, 47

Fed. R. Crim. P. 12 ………………………………….……….…...…… 1, 38, passim

Fed. R. Crim. P. 32.2 …………………………………………...…… 7, 31


**STATE STATUTES**

California Penal Code  § 187 ………………………………………… 37

California Penal Code § 664 ………………………………………... 37


**MISCELLANEOUS**

7 C.J.S. Associations § 38, at 88-89 (1980) ………………………………... 38

ATF Undercover Investigation Leads to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, The United States Attorney's Office Central District of California, Release No. 08-142, October 21, 2008 ……………………………………………………..………… 1, 2, 40

Gary L. Wright, FBI leads crackdown on Hells Angels in N.C. and S.C., Winston-Salem Journal, Dec. 6, 2012, http://www.journalnow.com/news/local/article_582d987b-07ff-54bf-95ac-ee4b0b95c93e.html?mode=jqm ………………………………………. 40

Inessa Shalevich, Protection of Trademarks and Geographical Indications, 6 Buff. Intell. Prop. L.J. 67, 72 (2008) …………………………………... 13

Nigel Duara, 7 Motorcycle Clubs Feds Say Are Highly Structured Criminal Enterprises, Los Angeles Times, May 15, 2015, http://www.latimes.com/nation/nationnow/la-why-the-feds-are-worried-about-these-biker-gangs-20150518-htmlstory.html ………………………………… 40-41

S. Rep. No. 91-617, p. 77 (1969) …………………………………………... 27

Trademark Manual of Examining Procedure (TMEP) Section 1303 …..…… 12, 18, 21

U.S. Trademark No. 1,136,494 ………………………………………………….. 39

Webster's Third New International Dictionary 132 (1993) ………………………... 27

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Mongol Nation Motorcycle Club (hereinafter "Mongol Nation") hereby brings this renewed motion, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) and (iv), the First, Fifth, and Eighth Amendments to the United States Constitution, federal statutes, and case law, to dismiss the indictment on the grounds that it fails to state a valid claim, and that Mongol Nation has been selectively prosecuted. Defendant Mongol Nation additionally moves for sanctions against the government.

## I.   <u>INTRODUCTION</u>

### <u>The Government's Novel Failure</u>

On October 9, 2008, the government brought an indictment against 79 individual persons alleged to be members of the Mongol Nation Motorcycle Club alleging violations, among other charges, of 18 U.S.C. §§ 1962(c) and (d), and seeking the forfeiture of several trademarks registered by Mongols MC. <u>See</u> <u>United States v. Cavazos, et al.</u>, CR 08-1201-ODW, Dkt. 1.

Shortly thereafter on October 21, 2008, the United States Attorney's Office of the Central District of California issued a press release in which then United States Attorney Thomas P. O'Brien boasted: "in addition to pursuing the criminal charges set forth in the [CR 08-1201] indictment, *for the first time ever, we are seeking to forfeit the intellectual property of a gang.*" <u>See</u> ATF Undercover Investigation Leads

1

to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, The United States Attorney's Office Central District of California, Release No. 08-142, October 21, 2008 (emphasis added). Mr. O'Brien continued: "The indictment alleges that this trademark is subject to forfeiture. We have filed papers seeking a court order that will prevent gang members from using or displaying the name 'Mongols.' *If the court grants our request for this order, then if any law enforcement officer sees a Mongol wearing his patch, he will be authorized to stop that gang member and literally take the jacket right off his back*." See id. (emphasis added).

The government's novel theory of forfeiture not only demonstrated a callous and alarming disregard for the Constitutional rights of hundreds if not thousands of innocent, law abiding citizens, but also a fundamental misunderstanding of intellectual property law.

The government moved swiftly to test its novel forfeiture theory. A little over a week after the Cavazos indictment was filed, the government applied *ex parte* for a post-indictment retraining order to (1) proscribe subsequent sale of the Mongols mark; and (2) enjoin use or display of the Mongols mark by defendants "and those acting on their behalf or in concert with them." See CR 08-1201, Dkt. 248. The government never disclosed to then presiding Judge Florence-Marie Cooper that the trademarks allegedly subject to forfeiture were in fact collective membership marks. Based on

2

1    this misrepresentation, Judge Cooper granted the government's application for a

2    restraining order. See id., Dkt. 249.

3         It was not long, however, before the government's forfeiture theory began to

4    fall apart. First, a law-abiding, unindicted member of the Mongols MC, Ramon

5

6    Rivera, filed a civil suit on March 10, 2009, seeking to enjoin the government's

7    enforcement of the above post-indictment restraining order. See Ramon Rivera v.

8

9    Ronnie A. Carter, et al., CV 09-2435, Dkt. 1. Rivera asserted that enforcement of that

10   order against him directly violated his First Amendment Free Speech and Fifth

11

12   Amendment Due Process rights under the United States Constitution. See id. This

13   Court agreed, and the government lost that suit. See id., Dkt. 90. Furthermore, Rivera

14

15   subsequently moved for attorneys fees and expenses under the Equal Access to Justice

16   Act (EAJA) and, on this Court's finding that the government's litigation position with

17

18   respect to the post-indictment restraining order was not justified in law or fact, this

19   Court awarded Rivera, and sanctioned the government, $253,206.78 in attorneys fees,

20

21   expenses, and costs. See id., Dkt. 113.

22        On June 28, 2011, the honorable Judge Otis D. Wright II[1] cut the last remaining

23   thread on which the government's novel but inherently faulty theory of forfeiture

24

25   hung when he finally vacated a "preliminary order of forfeiture", that had earlier been

26   _____

27   [1] Upon the unfortunate death of the late Judge Florence-Marie Cooper in January 2010,
     CR 08-1201 was assigned in parts to both Judge Otis D. Wright II, and Judge David O.
28   Carter.

granted in CR 08-1201, on the basis that none of the charged defendants actually had an ownership interest in the trademarks subject to criminal forfeiture. See CR 08-1201-ODW, Dkt. 4481.

All of the 78 individual defendants charged in Cavazos, except for an individual who died in custody and another deemed incompetent, entered into a plea agreement with the government, and nearly all of those individuals pled guilty to one count of 18 U.S.C. § 1962(d) (RICO Conspiracy).

Meanwhile, the government spectacularly failed in its first attempt to forfeit the Mongols collective membership mark from the entire Mongol Nation, which was then and is still now comprised overwhelmingly of unindicted, law-abiding members.

**The Government Fails Again**

After this initial fiasco, the government brought on February 13, 2013 the instant indictment in which the government gave notice that it will once again attempt the exact same forfeiture of the exact same Mongols MC collective membership marks. See Dkt. 1. The only difference between Cavazos and the instant indictment is that in this case the government names the entity Mongol Nation as the sole defendant. See id. As explained in detail in this motion, this attempt to circumvent RICO and intellectual property law once again falls flat on its face. The government's theory seems to be that, since the Mongol Nation is the registered owner of the collective membership marks the government intends to forfeit, and since certain

4

individuals alleged to have been members of the Mongol Nation have previously been convicted, the government can simply impute the actions of those individuals onto the entity Defendant to find the entire organization guilty of RICO and strip every single one of its members, including the law-abiding ones who have never had their day in court, of his right to display the Mongols collective membership mark.

The government once again ignores the reality that it has absolutely no right to take away the fundamental and Constitutional rights to free expression and free association of hundreds if not thousands of law-abiding citizens, like Ramon Rivera, who had nothing to do with the alleged illicit acts of those prosecuted in CR 08-1201, and never had their day in court.

Furthermore, the government once again demonstrates a fundamental misunderstanding of trademark law by purporting to strip every member of an association of their right to display a collective membership mark by attempting to find the registered owner of that mark criminally liable.

Finally, the government falls woefully short of adequately pleading the requisite elements of a RICO claim.

This case is a sorry remnant of a spectacular abuse committed by the government and it has become painfully obvious that the government is grasping at straws in this futile attempt to have another bite of the apple. Enough is enough. Not only is the government's theory futile but there is ample evidence to suggest that the

government has brought this suit against the Mongol Nation, an entity comprised primarily of working class Hispanic members, selectively and vindictively such that sanctions are warranted against the government.

For the reasons set forth above and detailed below, Defendant respectfully moves this Court to dismiss the indictment entirely and/or dismiss or strike the forfeiture remedy to finally put an end to the government's abuse before further waste is committed of taxpayer dollars and the limited funds of the blue-collar, working class, minority citizens who overwhelmingly comprise the Defendant entity.

## II.   **ARGUMENT**

### A.   **GOVERNMENT'S THEORY OF FORFEITURE OF COLLECTIVE MEMBERSHIP MARK IS DEFECTIVE AS A MATTER OF LAW**

For the reasons detailed below, Mongol Nation respectfully moves to dismiss the indictment on the grounds that the government's sole remedy sought in the indictment and purpose for bringing this case (the forfeiture of the Mongols collective membership mark) is defective as a matter of law.

#### 1.   **Forfeitability of Collective Membership Mark**

As a threshold matter, Mongol Nation respectfully moves this Court to determine the forfeitability of the collective membership mark in the interest of achieving an orderly and expeditious disposition of this case. Additionally, as the Court has noted, as a result of this "criminal prosecution" no one is going to jail even

if the government is successful since all of the defendants who committed the acts complained of in the indictment have already been convicted, imprisoned, and, as the government admitted in the last hearing, had their "patches" (each individual defendant's copy of the mark) confiscated by the government. It should also be noted at the outset that even if the government's theory of the current prosecution is correct, Mongol Nation MC could have and should have been added to the prior <u>Cavazos</u> indictment, instead of improperly and unduly multiplying the number of proceedings with the current indictment.

      Although both 18 U.S.C. § 1963 and Federal Rule of Criminal Procedure 32.2, the substantive and procedural forfeiture rules which govern this case, mandate forfeiture proceedings following a conviction[2], the rules do not preclude a determination of the non-viability of forfeitability at the pleading stage and prior to conviction. The sole remedy pled in the indictment is forfeiture of the collective membership mark. If that unconstitutional remedy were to be struck, there is a high likelihood that the prosecution would not even continue, and the taxpayers, the Court, and this defendant could be spared abusive waste by overzealous prosecutors with an unlimited budget.

---

[2] <u>See</u> 18 U.S.C. § 1963 ("Whoever violates any provision of section 1962 of this chapter . . . shall forfeit to the United States . . ."); Fed. R. Crim. P. 32.2 ("As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contender is accepted . . . the court must determine what property is subject to forfeiture . . .")

Furthermore, since the government has detailed in the indictment its intention to seek forfeiture of the collective membership mark (see Indictment, ¶¶ 108-109), that portion is subject to a Rule 12(b)(3)(B) motion to dismiss a defective indictment. See United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) ("A Rule 12(b) motion to dismiss the indictment is a tool which affords Defendant an opportunity to challenge the sufficiency of the indictment as pled by the government.")

Finally, where, as here, the primary if not only remedy actually sought by the government is forfeiture of the above-mentioned collective membership mark, a pre-trial determination of the forfeitability of that mark would serve the interest of achieving an orderly and expeditious disposition of this case. Indeed, this Court possesses the inherent power, "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs" to conduct the proceedings accordingly. Chambers v. NASCO, Inc., 501 U.S. 32, 49 (1991).

Therefore, in the interest of an orderly and expeditious disposition of this case, Mongol Nation respectfully moves this Court to render a pre-trial determination, in light of the following arguments, regarding the forfeitability of the collective membership mark.

///

///

///

## 2.    **Trademark Law**

As the government's theory of forfeiture is fatally flawed under trademark law, Mongol Nation respectfully moves to strike the forfeiture remedy and dismiss the indictment as defective and futile.

### a.    **Forfeiture of marks would merely result in unrestricted use of mark in the public domain.**

The government operates under the assumption that by obtaining forfeiture of the collective membership mark the government becomes the owner of those marks and can regulate their use as the government pleases. Apart from egregiously violating the Constitutional rights of unindicted third party individuals (discussed in detail in later sections), the government's theory demonstrates a fundamental misunderstanding of the function of collective membership marks.

The sole function of a collective membership mark is to indicate that the person displaying the mark is a member of the organized collective group. Aloe Creme Laboratories v. American Society for Aesthetic Plastic Surgery, Inc., 192 USPQ 170, 173 (TTAB 1976). Even though the collective membership mark is owned by the collective entity, only members of the collective can use the mark. 15 U.S.C. § 1127; see F.R. Lepage Bakery, Inc. v. Roush Bakery Prods. Co., Inc., 851 F.2d 351, 353 (Fed. Cir. 1988), modified on other grounds, 863 F.2d 43 (Fed. Cir. 1988). A collective membership mark is protected insofar as it is being *used* to indicate membership in the registrant. See Constitution Party of Texas v. Constitution Ass'n

USA, 152 USPQ 443 (TTAB 1966); <u>see also</u> <u>Huber Baking Co. v. Stroehmann Bros.</u>

<u>Co.</u>, 252 F.2d 945, 955 (2d Cir. 1958) ("Trademark rights are acquired by *use* . . . and

registration alone of the trademark does not increase the scope of such substantive

rights"). Protection of a collective membership mark means the member users of the

mark enjoy the right to use and display it at the exclusion of non-members. <u>See</u> <u>Ex</u>

<u>parte Supreme Shrine of the Order of the White Shrine of Jerusalem</u>, 109 USPQ 248

(Comm'r Pats. 1956).

      In other words, the mark enjoys protection under trademark law insofar as the

mark is being used by specific members to display membership in a specific registrant

organization to express constitutionally protected speech regarding membership. <u>See</u>

<u>id.</u> Thus under trademark law the relationship between registrant and member user of

a collective membership mark is unique and inseparable. A collective membership

mark cannot be transferred to another entity and enjoy the same trademark protection.

<u>See</u> <u>United Drug Co. v. Theodore Rectanus Co.</u>, 248 U.S. 90 (1918) (Right or interest

in a trademark is "appurtenant to an established business or trade"); <u>see also</u> <u>Marshak</u>

<u>v. Green</u>, 746 F.2d 927, 929 (2d Cir. 1984) ("a trademark cannot be sold or assigned

apart from [the] goodwill it symbolizes[.] There are no rights in a trademark apart

from the business with which the mark has been associated; they are inseparable.").

As this Court has already held in <u>Rivera</u>, "preventing Mongols from wearing a leather

patch bearing the word "MONGOLS" *eviscerates the mark's purpose of signifying*

*membership.*" CV 09-2435, Dkt. 90, 10:28-11:3 (emphasis added) (citing

International Order of Job's Daughters v. Lindeberg & Co., 633 F.2d 912, 917-20 (9th

Cir. 1980)). This is particularly relevant in this case where the government has

admitted at the last hearing that all of those allegedly guilty of the wrongdoings which

form the basis of this suit have already been punished and forfeited their copies of the

registered collective membership mark. Defendant Mongol Nation would request the

Court to take notice of its own files in Cavazos (including plea agreements) to verify

this fact.

Once a mark's purpose is not being fulfilled, either because it is no longer

being used to signify membership, or the relationship between registrant and users is

severed, then the mark is abandoned and cancelled. See Constitution Party of Texas,

152 USPQ 443 (TTAB 1966). Abandonment of a trademark results in *unrestricted use*

*in the public domain*. See International Order of Job's Daughters v. Lindeburg & Co.,

727 F.2d 1087 (Fed. Cir. 1984); see also In re Bose Corp., 580 F.3d 1240, 1243 (Fed.

Cir. 2009). This of course is the direct opposite to the result that the government

hopes to achieve in obtaining forfeiture of the collective membership marks. Instead

of suppressing the use and display of the marks, the government's forfeiture theory

would actually result in an unrestricted use of the collective membership mark being

thrust into the public domain. Therefore, since the sole remedy which the government

desires is futile, the case is futile and should be dismissed, especially given the fact

the allegedly guilty individuals have already been punished, and as the Court noted many times, even if the government were successful in this suit, no one is going to jail. No further waste of taxpayer dollars, defendant's monies, or the Court's time is required.

**b.    An owner of a collective membership mark cannot make a negative prohibition.**

Even if the government could somehow take ownership of the collective marks, the government, as this Court already held in <u>Rivera,</u> cannot silence the use and display of it. <u>See generally</u> <u>United Drug v. Theodore Rectanus Co.</u>, 248 U.S. 90, 97-98 (1918) ("The owner of a trademark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly."). To simply preclude use would result in an abandonment. There is no way that the innocent members of this Defendant would ever consent to the transfer of the goodwill associated with this mark to the United States government. Any attempt at such a transfer would be what is known as "a naked transfer" and result in the destruction of the mark.

**c.    Collective mark owner holds the mark for the benefit of members only.**

Finally, the registered owner of a collective mark holds the mark's title in trust for the benefit of the members. <u>See</u> Trademark Manual of Examining Procedure (TMEP) Section 1303 ("The mark is used by all members of the group; therefore, no

one member can own the mark, and the collective organization holds the title to the collectively used mark for the benefit of all members of the group."); see also Inessa Shalevich, Protection of Trademarks and Geographical Indications, 6 Buff. Intell. Prop. L.J. 67, 72 (2008). This relationship is analogous to an attorney holding legal title to client money in a trust account but solely for the benefit of the client. Just as the government could not obtain forfeiture of client funds by convicting the attorney, the government cannot take away unindicted members' right to use and display the marks by holding Mongol Nation criminally or civilly liable. To do so would again be a naked transfer.

> **d.   Government's forfeiture theory is defective under trademark law and therefore the indictment must be dismissed.**

The government should have realized long before instituting this action that trademark law precludes the government from obtaining forfeiture of a collective membership mark. If the government obtains forfeiture of the mark, the mark would be abandoned and its use would be unrestricted in the public domain. Also, even if the mark is not cancelled and the government somehow obtained ownership of the mark, the government is precluded from silencing that mark. Finally, even if Mongol Nation holds legal title to the mark, it does so solely for the benefit of individual members of the Mongol Nation who each by virtue of membership possesses a right to use and display the mark—something the government cannot take without prosecuting that

individual (discussed below). Based on the foregoing, Mongol Nation respectfully moves to strike the government's forfeiture remedy and dismiss the indictment as defective and futile.

### 3.    Collateral Estoppel (Issue Preclusion)

Mongol Nation respectfully moves to dismiss the indictment on the ground that the government is collaterally estopped from re-litigating the issue of whether the government can regulate the use of a collective membership mark, which was previously litigated between the government and an unindicted third party member of Mongol Nation, Ramon Rivera, in Rivera, CV 09-2435.

The Ninth Circuit adopted a three-part test to determine whether collateral estoppel applies: (1) an identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was "litigated" in the first case; and (3) an examination of the record of the prior proceeding to ascertain whether the issue was necessarily decided in the first case. United States v. Castillo-Basa, 483 F.3d 890, 897 (9th Cir. 2007); see also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313 (1971).

///

///

14

### a.    Issues are sufficiently similar and material in both actions.

The dispositive issue in <u>Rivera</u> was whether the government, through the enforcement of a "post indictment restraining order" obtained (and later overturned) in the collateral case <u>U.S. v. Cavazos</u>, *supra*, could regulate (i.e., seize or suppress) the use and display of the Word and Rider collective membership marks by an unindicted third party member of Mongol Nation. <u>See</u> <u>Rivera</u>, CV 09-2435, Dkt. 90. The <u>Rivera</u> decision is final for all purposes and was so the moment that the District Court decision was entered. That principle of law is axiomatic.

Similarly, the government in this case purports to suppress, by first obtaining the forfeiture of the ownership rights of the same collective membership mark, the use and display of the mark by unindicted third party Members of Mongol Nation identically situated to Ramon Rivera.

### b.    Issue was litigated in the first case.

The above-stated issue in <u>Rivera</u> was fully litigated for nearly a year leading to Rivera's motion for summary judgment. <u>See</u> <u>id.</u> at 5:11 ("Rivera filed the instant action on March 10, 2009 . . ." (summary judgment opinion was filed January 4, 2011)) Rivera ultimately filed his motion for summary judgment, the government filed an opposition, replies were filed, and oral arguments were heard before this Court issued a final written order granting summary judgment in favor of Rivera. <u>See</u> <u>id.</u> at 1:22-23. In a related matter, the government was sanctioned in excess of

$250,000 for maintaining a position that was based in neither law nor fact. <u>See</u> CV

09-2435, Dkt. 113 (Order Granting Plaintiffs' Motion for Attorneys Fees Under 28

U.S.C. 2412). That determination as well is final for all purposes. For the government

to now resurrect this failed theory is nothing shy of a vexatious and harassing undue

multiplication of proceedings that is based in neither law nor fact. For the government

to have made the mistake the first time may have arguably been excusable. However,

for the same lawyers to have repeated that mistake in a subsequent action after

attempting to judge shop so as to steer the case to a more favorable forum is

reprehensible and sanctionable, as explained below.

### c.    Issue was necessarily decided in the first case.

This Court necessarily decided that the government could not regulate the use

and display of collective membership marks by unindicted members on the basis of,

among other grounds, Fifth Amendment Due Process (<u>see</u> <u>id.</u> at 6:9-20 ("The

government operates under the theory that, by obtaining any rights in the marks, it has

achieved the ability to seize without prior notice any infringing uses of the mark. The

government is not free to make its own determinations about whether Rivera has

committed infringement by wearing articles of clothing that bear the marks; that

finding must be made in an adversary proceeding. [citation omitted]")), and First

Amendment Freedom of Speech (<u>see</u> <u>id.</u> at 6:22-8:20 ("The undisputed facts establish

that the government's seizure of items bearing the Mongols mark and/or Image mark

16

would also violate Rivera's rights under the First Amendment to the United States Constitution.")). This necessary decision was the basis of the Court's finding in favor of Rivera. See id. 13:26-14:3.

### d. Government is estopped from seeking forfeiture of the collective membership mark

For the foregoing reasons, the Mongol Nation respectfully moves this Court to dismiss the indictment, on the basis that the government is estopped from re-litigating the dispositive issue of whether it can suppress the use and display of collective membership marks by unindicted third party members of the Mongol Nation.

### 4. Fifth Amendment Due Process

Mongol Nation respectfully moves to dismiss the indictment on the grounds that the sole remedy sought by the government, forfeiture of Mongol Nation's collective membership marks, violates the rights of hundreds of unindicted citizens without affording them due process of law as required by the Fifth Amendment to the United States Constitution. U.S. Const. Amend V.

By obtaining forfeiture of collective membership marks through the conviction of one named entity defendant, the government purports to strip away the freedom to express and associate from "hundreds" (see Indictment, ¶ 8) of unindicted, uncharged, law-abiding citizen members of the Mongol Nation in one fell swoop without ever hailing any of these innocent individuals into court. As this Court held in Rivera, "the government is not free to make its own determinations" about whether innocent

citizens "committed infringement by wearing articles of clothing that bear the marks.. ." CV 09-2435, Dkt. 90, 6:13-15 (emphasis added) (citing 15 U.S.C. § 1118).

As discussed above, each individual member of Mongol Nation has the right to use and display the Word and Rider collective membership marks as a means to demonstrate his membership in the Mongol Nation. This right is enjoyed independent of the ownership interests of the marks held by the Mongol Nation, which holds the marks in trust for the benefit of its members. See Trademark Manual of Examining Procedure (TMEP) Section 1303. If the government purports to strip an individual's Constitutional right to use and display these marks, it must afford that person the opportunity to be heard and tried.

For the foregoing reasons, the Mongol Nation respectfully moves to dismiss the indictment on the grounds that the forfeiture remedy would violate the Fifth Amendment due process rights of hundreds of unindicted, innocent third party citizens.

### 5.     First Amendment Free Speech and Association

Mongol Nation respectfully moves to dismiss the indictment on the grounds that the only remedy sought by the government, forfeiture of the Mongol Nation's collective membership mark, suppresses the free speech and association rights of hundreds of unindicted innocent citizens in violation of the First Amendment to the United States Constitution. U.S. Const. Amend I.

1    In addition to protecting speech, the First Amendment protects conduct

2  "imbued with elements of communication." <u>Spence v. Washington</u>, 418 U.S. 405, 409

3  (1974). This Court has previously held that both the collective membership mark

4  "convey[s] a message". <u>Rivera</u>, CV 09-2435, Dkt. 90 at 7:13-14. Furthermore, the

5  Ninth Circuit has held that patches and symbols signifying membership in a

6  motorcycle organization communicate "the fact of [members'] association with this

7  particular kind of organization." <u>Sammartano v. First Judicial District Court</u>, 303 F.3d

8  959, 972 (9th Cir. 2002). Indeed, this Court found in <u>Rivera</u> that the government

9  conceded that the collective membership mark have a "communicative effect" which

10 the government contended (as it does now) was "worthy of suppression." CV 09-

11 2435, Dkt. 90 at 7:22-23. This Court has already found the government's theory to be

12 faulty and a final determination which is binding in this collateral proceeding.

13      In this case, the government purports to restrict and suppress the use and

14 display of the collective membership mark by obtaining forfeiture of that mark from

15 the Mongol Nation. Unfortunately, by doing so the government will suppress the

16 speech of hundreds of unindicted third party citizens who enjoy the right to use and

17 display the collective membership mark. Restrictions "aimed at suppressing the

18 'substantive message [] convey[ed]' by a particular symbol generally run afoul of the

19 First Amendment", <u>Cohen v. California</u>, 403 U.S. 15, 19 (1971), and are generally

20 permissible only if they are (1) reasonable in light of the forum's purpose and (2)

19

viewpoint neutral. See Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806 (1985). The government has no legitimate purpose to strip hundreds of unindicted innocent third party members of their right to express and associate themselves freely, and even if the government had some purpose, outright denying these hundreds of innocent citizens from voicing their association with the Mongol Nation would be solely for the purpose of "suppressing that point of view on an otherwise includible subject." See Id. This is simply impermissible.

Furthermore, the right of individuals to associate with one another "has been granted constitutional status, largely because that right furthers the right of self-expression. See, e.g., NAACP v. Alabama ex rel. Flowers, 377 U.S. 288 (1963). The government purports to hold innocent citizens guilty for the past criminal acts of a few (See generally U.S. v. Cavazos, CR 08-1201). The Ninth Circuit specifically held this to be impermissible when it stated "liability could not be imposed consistent with the First Amendment solely on account of the individual's association with others who have committed acts of violence; he must have incited or authorized them himself." Planned Parenthood of Columbia/Williamette, Inc. v. American Coalition of Life Activists, 290 F.3d 1058, 1073 (9th Cir. 2002); see also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 920 (1982) (The First Amendment does not permit restrictions on an individual's speech merely because an individual belongs to a group, some members of which committed acts of violence); cf. Healy v. James, 408

20

U.S. 169, 186 (1972)("First Amendment rights cannot be infringed based on 'guilt by association;).

In examining the First Amendment question, we must revisit the pertinent trademark law which is discussed in previous sections above and which the government consistently disregards. The nature of a collective membership mark is such that the individual member's right to use and display that mark is separate and distinct from the owner of that mark who merely holds the mark in trust and for the benefit of the members. See Trademark Manual of Examining Procedure (TMEP) Section 1303. It therefore does not follow, as the government purports, that by taking over the ownership rights of the marks (assuming *arguendo* that the government could do so), the government can sweep away the individual members' rights to enjoy the use and display. If the First Amendment to the United States Constitution does not preclude such an impermissible taking in the first instance, then applicable trademark law forecloses the government's theory.

This Court has already held that "the government's seizure of items bearing the Mongols mark and/or Image mark would violate Rivera's rights under the First Amendment to the United States Constitution." Rivera, CV 09-2435, Dkt. 90, 6:22-24. The government now brings the same theory to strip hundreds of innocent citizens like Rivera of their right to use and display the Word and Rider collective membership marks. Mongol Nation respectfully request that the government's theory

21

1   once again be denied on the basis that it violates the First Amendment rights of

2   innocent citizens, and the indictment be dismissed for failure to state a claim.

3
4        **6.    Eighth Amendment Excessive Fines Clause**

5        Mongol Nation respectfully moves to dismiss the indictment on the grounds

6
7   that the only remedy sought by the government, forfeiture of Mongol Nation's

8   collective membership marks, constitutes an excessive fine in violation of the Eight

9   Amendment to the United States Constitution. U.S. Const. Amend VIII.

10
11       The Eighth Amendment provides: "Excessive bail shall not be required, *nor*

12   *excessive fines imposed*, nor cruel and unusual punishment inflicted. Id. (emphasis

13   added). The Supreme Court has specifically held that the word "fines" (in the

14
15   excessive fines clause) includes "forfeiture". United States v. Bajakajian, 524 U.S.

16   321, 328 (1998) ("Forfeitures—payments in kind—are thus "fines" if they constitute

17   punishment for an offense.").

18

19       When the forfeiture is punitive, as it is here, "the test for excessiveness of a

20   punitive forfeiture involves solely a proportionality determination." Id. at 333-34. The

21
22   amount of the forfeiture must "bear some relationship to the gravity of the offense it is

23   designed to punish." Id. at 334 (citing Austin v. United States, 509 U.S. 544, 559

24   (1993)).

25
26       Here, the government purports to seek forfeiture of the collective membership

27   marks as punishment for Mongol Nation's alleged RICO Act violations. The problem

28

is, such a punishment is not limited to Mongol Nation alone; rather, it directly punishes hundreds (See Indictment, ¶ 8) of innocent, unindicted members within that entity by robbing each of them of their Constitutional right to free expression and association without an opportunity to be heard. This is particularly egregious in light of the fact that the government has already had an opportunity to prosecute individual persons alleged to be have been past members of Mongol Nation for RICO Act violations (See generally, U.S. v. Cavazos, CR 08-1201); in other words the government has had an opportunity to fulfill the RICO Act's purpose, as this Court has stated, of "extrication of criminal elements from legitimate enterprises" like Mongol Nation. See Rivera, CV 09-2435, Dkt. 90, 1:27-28. Now the government has brought fresh RICO Act claims against the same entity from which it has already extricated the criminal elements and now seeks to punish innocent members of that entity for the illicit actions of past rogue members. This is simply unacceptable and constitutes a grossly disproportionate punishment for acts that already once been punished (in Cavazos).

For the foregoing reasons, Mongol Nation respectfully moves to dismiss the indictment on the grounds that the sole remedy sought by the government constitutes a violation of the Eighth Amendment Excessive Fines Clause.

///

///

**B.    GOVERNMENT FAILS TO ADEQUATELY PLEAD  RICO**

For the reasons detailed below, Mongol Nation respectfully moves to dismiss the indictment on the grounds that the government has failed to adequately plead the RICO elements.

**1.    Indictment Fails to Plead RICO Person/Enterprise Distinction**

Mongol Nation respectfully moves to dismiss the indictment on the grounds that it fails to adequately set forth a distinction between RICO person and RICO enterprise, and therefore fails to state a claim.

**a.    RICO Definitions.**

Title 18, United States Code, Section 1962(c) states: "It shall be unlawful for any *person employed or associated with* any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (emphasis added). Section 1961(3) defines "*person*" as including "any individual or entity capable of holding a legal or beneficial interest in property." Section 1961(4) defines "*enterprise*" as including "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact* although not a legal entity." (emphasis added).

///

**b.      RICO, as pled in the Indictment.**

The indictment charges Mongol Nation with one count of violation of 18 U.S.C. § 1962(c), colloquially "substantive RICO", and a second count of violation of 18 U.S.C. § 1962(d), referred to as "RICO conspiracy". See Indictment.

The indictment alleges that the sole defendant, Mongol Nation, unincorporated association, is the RICO "person." Indictment, ¶ 36 ("[D]efendant MONGOL NATION, an unincorporated association consisting of full patched members of the Mongols gang criminal enterprise, being a *person* employed by and associated with the Mongols Gang criminal enterprise . . ." (emphasis added)).

Furthermore, the indictment alleges that the "Mongols Gang" is the RICO "associated in fact" "enterprise." Indictment ¶ 1 ("The Mongols Gang, including its leadership, full patched members, prospective and probationary members, and associates (often referred to as 'hang arounds'), constituted an '*enterprise*' as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals *associated in fact*." (emphasis added)).[3]

In summary, the indictment alleges that the RICO enterprise ("Mongols Gang") is the RICO "person" Mongol Nation, unincorporated association, ("leadership and full patched members" of the Mongols Motorcycle Club) "associated in fact" with

_____

[3] Interestingly, in the Cavazos indictment, the government pled the same "Mongols Gang" enterprise to consist only of "leadership, membership, and associates". See Cavazos, CR 08-1201, Dkt. 1, ¶ 1.

25

prospective and probationary members and "hang around" associates of the Mongols Motorcycle Club.

As further explained below, the indictment fails to plead nor can the government make out the required distinction between "Mongol Nation" and the "Mongols Gang", because they are in fact one and the same. In fact, the government on several occasions in the indictment inadvertently concedes that there is no distinction between one and the other. Fatally for the indictment and the government, our Supreme Court has specifically rejected the manner by which the indictment names an entity as the RICO "person", and the entity plus its employees and associates as the RICO "enterprise". See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001); see also Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339 (2d Cir. 1994) (cited and adopted by the Supreme Court in Cedric Kushner).

### c.    Cedric Kushner and the RICO person/enterprise distinctness requirement.

In 2001 our Supreme Court addressed a question that had already been answered affirmatively by all the Circuit Courts: does 18 U.S.C. § 1962(c) require a distinction between RICO person and enterprise? The Court in Cedric Kushner, 533 U.S. 158, agreed with the Circuits and answered that it did. See id. at 160, 161.

The Cedric Kushner Court carefully examined the language of Section 1962(c) and Congress's original intent in passing the RICO Act to determine that 1962(c)

26

required a distinction between RICO person and enterprise. The Court held: "The [1962(c)] language suggests, and lower courts have held, that this provision *foresees two separate entities, a 'person' and a distinct 'enterprise.'*" Id. at 160 (emphasis added). The Court went on: "We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name" Id. at 161.

Furthermore, the Supreme Court found: "In ordinary English one speaks of employing, being employed by, or associating with others, not oneself." Id. (citing Webster's Third New International Dictionary 132 (1993)). The Court continued: "In addition, the Act's purposes are consistent with that principle. Whether the Act seeks to prevent a person from victimizing, say, a small business, S. Rep. No. 91-617, p. 77 (1969), or to prevent a person from using a corporation for criminal purposes [citation omitted], the person and the victim, or the person and the tool, are different entities, not the same." Cedric Kushner, 533 U.S. at 162. Lastly, the Supreme Court held: "Indeed, this Court previously has said that liability 'depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." Id. at 163 (citing Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)).

27

Therefore, there is no question that § 1962(c) requires the indictment to plead RICO person and RICO enterprise as two separate and distinct entities.

### d. <u>Cedric Kushner</u> facts inapposite; <u>Riverwoods v. Chappaqua</u> on point.

Although the person/enterprise distinction rule set forth in <u>Cedric Kushner</u> is binding, its facts are inapposite, while the <u>Riverwoods v. Chappaqua</u> holding, which the <u>Cedric Kurshner</u> Court adopted, is binding.

The <u>Cedric Kushner</u> Court held that a "corporate owner/employee, a natural person" is "distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." 533 U.S. at 163. That Court held "[i]t is natural to speak of a corporate employee as a "person employed by" the corporation. <u>Id.</u> at 164. Conversely in the instant case, the indictment alleges that the RICO person is an *entity* (unincorporated association) which is "employed by or associated with" that entity plus its employees and associates. <u>See</u> <u>Indictment</u>, ¶ 1. In essence the government alleges that Mongol Nation is associated with or employed by Mongol Nation. <u>See</u> <u>Cedric Kushner</u>, 533 U.S. at 161 ("[O]ne must allege and prove the existence of two distinct entities (1) a 'person'; and (2) an 'enterprise' *that is not simply the same 'person' referred to by a different* name." (emphasis added)). This is the exact result that the <u>Cedric Kushner</u> Court specifically renounced when it cited an earlier Second Circuit case and adopted its holding:

"The earlier Second Circuit precedent concerned a claim that a corporation was the 'person' and the *corporation, together with all its employees and agents, were the 'enterprise.'* See <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,</u> 30 F.3d 339, 344 (1994) (affirming dismissal of complaint). *It is less natural to speak of a corporation as 'employed by' or 'associated with'" this latter oddly constructed entity."* <u>Cedric Kushner</u>, 533 U.S. at 164 (emphasis added).

The <u>Riveroods Chappaqua</u> holding, as adopted by the Supreme Court in <u>Cedric Kushner</u>, is directly analogous to our case and therefore warrants dismissal of the indictment.

### e.   **<u>Riverwoods Chappaqua</u> sets forth the dispositive RICO person/enterprise distinction rule.**

The <u>Riverwoods Chappaqua</u> holding is dispositive of our case and therefore requires dismissal of the indictment.

As discussed above, the <u>Riverwoods Chappaqua</u> Court held that where an entity was pled to be a RICO person, and that entity plus its employees or agents were pled to be the RICO enterprise, there was no real distinction between RICO person and enterprise, and the case required dismissal on those grounds. 39 F.3d at 344. That Court provided its rationale for that holding: "Because a corporation can only function through its employees or agents, any act of the corporation can be viewed as an act of such an enterprise, *and the enterprise is in reality no more than the defendant itself.*" <u>Id.</u> (emphasis added). Thus, the Court continues, "where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, *the employees in association with the*

29

*corporation do not form an enterprise distinct from the corporation.*" Id. (citing Old Time Enters v. International Coffee Corp., 862 F.2d 1213, 1217 (5th Cir. 1989) (emphasis added)). There is no logic in holding for purposes of RICO that there is any distinction between a corporation, a partnership, or an association. 18 U.S.C. § 1961(4).

Both this Court and the Ninth Circuit has specifically adopted the Riverwoods Chappaqua holding in also finding lack of distinctness[4].

### f. Applying Riverwoods Chappaqua.

Like Riverwoods Chappaqua, the indictment alleges that Mongol Nation, unincorporated association, is the RICO "person" defendant (Indictment, ¶ 36), and that Mongol Nation, in association with its employees or agents, constitutes the RICO enterprise (Indictment, ¶ 1). There are no other named defendants. Without question, Mongol Nation can only act by and through its employees or agents.

Specifically, the indictment alleges that Mongol Nation is comprised of "full patched members" (Id. at ¶ 36), while the arbitrarily named "Mongols Gang"

---

[4] See, e.g., In re Toyota Motor Corp., 785 F. Supp .2d 883, 922 (C.D. Cal. 2011) ("The instant case is much more similar to Riverwoods Chappaqua than Cedric Kushner Promotions . . . Plaintiffs in the instant case allege that the corporate family of Toyota Defendants constitute both the "person" and the "enterprise" for the purpose of RICO . . . Although Plaintiffs identify conduct committed by certain individual employees, none of the employees are named as defendants . . . Instead, Plaintiffs explicitly allege that the Toyota "defendants are 'persons' . . . and the Toyota 'Defendants, [their] worldwide affiliates, and their salespersons' constitute the 'enterprise' [citation omitted] Plaintiffs therefore have not satisfied the distinctness requirement"); Living Designs, Inc. v. E.I. Dupont De Nemours and Co., 431 F.3d 353 (9th Cir. 2005).

"enterprise" is comprised of "leadership, full patched members, prospective and probationary members, and associates (often referred to as 'hang arounds')" (Id. at ¶ 1). Since the indictment alleges "all national and regional officers", i.e. "leadership", were "required to be full patched members" (Id. at ¶ 8), "leadership" is incorporated into the definition of "full patched member". Therefore, in effect the indictment alleges that Mongol Nation is the RICO "person" defendant, and Mongol Nation plus its probationary and prospective members and hang arounds all constitute the RICO "enterprise". This cannot be in good faith established or pled. The object of the government's exercise should be justice, not a win on a novel theory. See Berger v. United States, 315 F.3d 1176, 1182 (1935)

The indictment sets forth no basis for this arbitrary demarcation of where membership in Mongol Nation ends and membership in the Mongols Gang begins. The more sensible interpretation is that Mongol Nation encompasses all members of the association, including prospective and probationary members and hang arounds. However, looking at the real purpose of the indictment is illuminating. As the indictment alleges, "at all relevant times since their registration with the USPTO, all rights in the Word and Rider Marks have been held by defendant MONGOL NATION." Id., ¶ 32. Since only property of a RICO defendant is subject to forfeiture under section 1963(a) (RICO forfeiture provision) (see United States v. Busher, 817 F.2d 1409, 1412 (9th Cir. 1987)), The government realized that it had to name

31

Mongol Nation the entity as the RICO "person" to attempt its forfeiture of that entity's collective membership mark.[5]

The problem was, the government did not have anyone else, for example a separate corporate entity or outside individual(s), to name to plead an adequate RICO "enterprise" consisting of Mongol Nation in conjunction with other entities. The government therefore made a clever attempt to parse out the several components of the one entity by deciding that "Mongol Nation, unincorporated association" consisted only of full-patched members, and everyone else was suddenly not part of that entity but only associated with it. This deft and convenient construction unfortunately does not get past the strictures of <u>Riverwoods Chappaqua</u>; <u>Riverwoods Chappaqua</u> specifically wanted to avoid this type of circumvention. <u>See</u> 39 F.3d at 344.

The taxpayers, courts, and private litigants should not be unduly burdened by attempts at clever pleading that is barred by the doctrine of judicial estoppel. See <u>Hamilton v. State Farm Fire & Cas. Co.</u>, 270 F.3d 778 (9th Cir. 2001). The court should contrast the definition used by the government in the <u>Cavazos</u> indictment (CR 08-1201, Dkt. 1, ¶ 1 ("Mongols Gang, including its leadership, membership, and associates, constituted an 'enterprise' . . .")) and the current indictment (<u>Indictment</u>, ¶

---

[5] The government also made this realization after failing to obtain forfeiture of the collective membership mark from the 79 individually named alleged Mongol Nation members in the prior RICO case since none of those individuals had an ownership interest in the collective membership mark. <u>See</u> <u>Cavazos</u>, CR 08-1201-ODW, Dkt. 4481.

1   20 ("Mongols Gang, including its leadership, full patched members, prospective and

2   probationary members, and associates . . .")). Coupled with the government's duty of

3

4   good faith pleading (Berger v. U.S., 315 F.3d at 1176) the government's maneuvering

5   around pleading rules is unacceptable and sanctionable. The clear language of §

6
    1962(c) evidences an intention to prevent the victimization of innocent entities like
7

8   Mongol Nation. If there were any RICO enterprise, that enterprise would be the

9   "Cavazos" enterprise, not the so-called "Mongol Gang" enterprise.

10

11           **g.     Applying <u>Riverwoods Chappaqua</u> cont'd: the
                      government's pleading blunders.**
12

13          The government's pleading is flawed on several occasions in the indictment,

14  strongly demonstrating that even the government does not fully realize a distinction

15
    between Mongol Nation and the so-called "Mongols Gang" enterprise.
16

17          The indictment alleges "lower-ranking full patched members and prospective

18  and probationary members were frequently required to patrol and provide armed

19
    security against the presence of law enforcement and rival gang members outside
20

21  Mother Chapter meetings." <u>See</u> <u>Indictment</u> ¶ 6; <u>see also</u>, ¶ 10. Regardless of whether

22  the substance of these allegations is true, it is clear that prospective and probationary

23
    members and "lower ranking full patched members" often had overlapping
24

25  responsibilities that were fulfilled on behalf of the entity Mongol Nation. In short, the

26  indictment itself alleges that these "members" were nothing more than agents or

27

28

                                              33

employees of that entity, and therefore there is no distinction between the entity Mongol Nation and these members; these members are part of the Mongol Nation.

Furthermore, and perhaps most fatally, the indictment states "On or about January 11, 2005, as the result of an application caused to be submitted by Ruben Cavazos, Sr., *at the time the President of the Mongols Gang,* defendant MONGOL NATION was granted registration of the Word Image with the . . . USPTO" (emphasis added). Indictment, ¶ 24. The actual trademark application, as provided by the government in its discovery material to Mongol Nation, actually states that Ruben Cavazos, Sr. signed the application as *President of Mongol Nation, unincorporated association*. See Cavazos, CR 08-1201, Dkt. 4463-2 (Application for Trademark Registration No. 2,916,965).

Similarly, the indictment states: "On or about April 4, 2006, as the result of an application caused to be submitted by *Ruben Cavazos, Sr., at the time the President of the Mongols Gang*, defendant MONGOL NATION was granted registration of the Rider Image with the USPTO . . ." Indictment, ¶ 25. And again, the actual trademark application, as provided by the government to Mongol Nation, states that Ruben Cavazos, Sr., submitted the application as *President of Mongol Nation, unincorporated association*. See Cavazos, CR 08-1201, Dkt. 4463-4 (Application for Trademark Registration No. 3,076,731).

34

First, that the indictment alleges Ruben Cavazos, Sr., was the "president of the Mongols Gang" demonstrates that the Mongols Gang "associated in fact enterprise" is in fact one singular entity with the Mongol Nation defendant herein (since it has one "President"). Furthermore, the fact that the government itself cannot distinguish between the Mongols Gang and the Mongols Nation in naming Ruben Cavazos, Sr., as the President of Mongols Gang in the indictment when in fact he was President of Mongol Nation, unincorporated association, evidences an alarming and dispositive failure to adequately plead the distinction between RICO person and enterprise, and also demonstrates the government's concession that Mongol Nation, unincorporated association, and the so-called "Mongols Gang" is actually one and the same and that there is no distinction between RICO person and enterprise as required by <u>Cedric Kushner</u>. The only reasonable interpretation is that the so-called "Mongols Gang" is just Mongol Nation with another name and therefore there is no distinction between the two.

> **h.   As the indictment fails to set forth a RICO person distinct from the RICO enterprise, both Counts of §§ 1962(c) and 1962(d) fail to state a claim, and the indictment must be dismissed.**

Based on the foregoing, it is clear that the indictment fails to adequately plead a distinction between the RICO "person" and RICO "enterprise". For that reason, Count One, violation of 18 U.S.C. § 1962(c) must be dismissed. Furthermore, when the indictment fails to state a claim under § 1962(c), any claims under § 1962(d) (i.e.

Count Two) likewise fails. In re Toyota Motor Corp., 785 F.Supp.2d 883, 922 (C.D. Cal. 2011) (citing Turner v. Cook, 362 F.3d 1219, 1231 n. 17 (9th Cir. 2004); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n. 8 (9th Cir. 1992)). Therefore, since both counts in the indictment fail to state a claim, the indictment must be dismissed.

### 2. An Entity Cannot Commit The Alleged Racketeering Acts In The Indictment

As an entity is legally incapable of committing the "racketeering acts" set forth in the indictment, the indictment must be dismissed for failure to state a claim.

In Jund v. Town of Hempstead, 941 F.2d 1271 (2d Cir. 1991), the Court faced, seemingly as a matter of first impression, a challenge from an unincorporated association defendant that it was legally incapable of committing the predicate acts which formed the basis of the 1962(c) violation claim against it. See id. at 1284. That Court held: "Generally in the absence of a clear legislative intent to impose criminal responsibility, an unincorporated association of persons as an entity *cannot be indicted and convicted of a crime*, since, if a crime is committed, it must be committed by them as individuals. Id. (emphasis added) (citing 7 C.J.S. Associations § 38, at 88-89 (1980); United States v. A&P Trucking Co., 358 U.S. 121, 127-28 (1958) (Douglas, J., dissenting); United States v. Local 807, 118 F.2d 684, 688 (2d Cir. 1941) (Clark, J., concurring); State of South Dakota v. Kandaras for Senate Comm., 264 N.W.2d 902, 903-04 (S.D. 1978)).

36

The indictment alleges that Mongol Nation, unincorporated association, committed ten "racketeering acts" which constitute the predicate acts required for a § 1962 (c) violation. See Indictment, ¶¶ 38-47.

The racketeering acts allegedly committed by Mongol Nation, unincorporated association, are as follows: (1) Conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(A) (id. at ¶ 38); (2) Distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(A) (id. at 40, 44, 45); (3) Attempted Murder in violation of California Penal Code §§ 187 and 664 (id. at ¶¶ 39, 42, 43); and (4) Murder in violation of California Penal Code § 187 (id. at ¶ 41, 46, 47).

Nowhere in each of the aforementioned statutes is there language that specifically holds an entity criminally liable for crimes that require specific *mens rea* that results in an act which is *malum in se* as opposed to *malum prohibitum*. See 21 U.S.C. § 841; California Penal Code §§ 664, 187. In fact, it is strange to even ponder a situation where an entity can be found guilty of murder, attempted murder, or distribution of narcotics. It is axiomatic that such is not the case. See United States v. Kelso Co., 86 F. 304 (N.D. Cal. 1898) ("Of course, there are certain crimes of which a corporation cannot be guilty; as, for instance, bigamy, perjury, rape, murder, and other offenses, which will readily suggest themselves to the mind."); Commonwealth v. Punxsutawney St. Passenger Ry., 24 Pa.C. 25 (1900).

37

Therefore, since Mongol Nation, unincorporated association, is legally incapable of committing any of the "racketeering acts" set forth in the indictment, both charges must be dismissed (see In re Toyota Motor Corp., supra (when the indictment fails to state a claim under § 1962(c), any claims under § 1962(d) likewise fails)), and the indictment must be dismissed for failure to state a claim.

## C.   **SANCTIONS AGAINST THE GOVERNMENT**

Mongol Nation respectfully moves, on the basis of 28 U.S.C. § 1927, the Hyde Amendment (18 U.S.C. § 3006A), and the Equal Access to Justice Act (EAJA) (28 U.S.C. § 2412), for sanctions against the government for selective prosecution, and bringing a frivolous, malicious, and vexatious indictment against Mongol Nation.

### 1.   **Selective Prosecution**

Pursuant to Fed. R. Crim. P. 12(b)(3)(A)(iv), Defendant Mongol Nation respectfully moves this Court to dismiss the Indictment on the grounds that the government has selectively prosecuted Defendant Mongol Nation on the basis of the Hispanic ethnic composition of the Mongol Nation. This selective prosecution violates Defendant's equal protection rights under the Fifth Amendment of the United States Constitution. See United States v. Armstrong, 517 U.S. 456, 465 (1996).

To make a prima facie case of selective prosecution, Defendant must present evidence that (1) others similarly situated were not prosecuted, and (2) the prosecution

was based on an impermissible motive. United States v. Alexander, 287 F.3d 811, 817-18 (9th Cir. 2002).

### a.    Others Similarly Situated Were Not Prosecuted.

Defendant Mongol Nation is an entity which is a motorcycle club comprised of hundreds of members (see Indictment, ¶ 8) and is one of hundreds, if not thousands, of motorcycle clubs that operate within the United States.

In recent times, the government has prosecuted members of various other similarly situated motorcycle clubs under the same theory of RICO Act violations. See, e.g., Werth v. United States, 493 Fed.Appx. 361, 2012 WL 3136919 (4th Cir. 2012) (Outlaw Motorcycle Club), United States v. Lawson, 535 F.3d 434 (6th Cir. 2008) (Outlaws Motorcycle Club), United States v. Gardland, 320 Fed.Appx. 295, 2008 WL 2939507 (6th Cir. 2008) (Outlaw Motorcycle Club), United States v. Bowman, 302 F.3d 1228 (11th Cir. 2002) (Outlaw Motorcycle Club), United States v. Baker. 598 Fed.Appx. 165 (4th Cir. 2015) (Hell's Angels Motorcycle Club), United States v. Donovan, 539 Fed.Appx. 648 (6th Cir. 2013)  (Highwaymen Motorcycle Club), United States v. Nagi, 541 Fed.Appx. 556 (6th Cir. 2013) (Highwaymen Motorcycle Club), United States v. Sutherland, 2014 WL 4705028 (E.D. Mich. 2014) (Devil's Disciples Motorcycle Club), United States v. Henley, 766 F.3d 893 (8th Cir. 2014) (Wheels of Soul Motorcycle Club).

1    Similar to Defendant Mongol Nation, the members of the other motorcycle

2    clubs recently prosecuted under the RICO Act have distinctive membership marks

3    that are also registered trademarks. See, e.g., U.S. Trademark No. 1,136,494 (Hell's

4    Angels Motorcycle Club).

5

6    Furthermore, all of the other motorcycle clubs recently prosecuted under the

7    RICO Act are predominantly comprised of white male members. See, e.g., Gary L.

8    Wright, FBI leads crackdown on Hells Angels in N.C. and S.C., Winston-Salem

9    Journal, Dec. 6, 2012, http://www.journalnow.com/news/local/article_582d987b-07ff-

10   54bf-95ac-ee4b0b95c93e.html?mode=jqm ("The [Hell's Angels] indictment outlined

11   the inner workers of the Hells Angels . . . Membership is limited to white males"),

12   United States v. Starrett, 55 F.3d 1525, 1533 (11th Cir. 1995) ("Only white males are

13   allowed to become members of the Outlaws [Motorcycle Club]").

14

15   In none of these recent RICO prosecutions did the government seek forfeiture

16   of trademarks. See USAO Release No. 08-142 ("For the first time ever, we are

17   seeking to forfeit the intellectual property of a gang" (in reference to the Mongols

18   Motorcycle Club)). Again it is important to understand that according to the

19   indictment in this case the Mongol Nation, the defendant herein, was at all times a

20   nameable defendant in the Cavazos indictment but was not named until the

21   government failed to impermissibly capture the Mongols collective membership

22   mark, thereby unduly multiplying the number of proceedings in a harassing and

vexatious fashion. Indeed in none of these prior prosecutions listed were any of the clubs actually named as defendants.

The government fully understands that Defendant Mongol Nation is an organization of primarily Hispanic members. See Nigel Duara, 7 Motorcycle Clubs Feds Say Are Highly Structured Criminal Enterprises, Los Angeles Times, May 15, 2015, http://www.latimes.com/nation/nationnow/la-why-the-feds-are-worried-about-these-biker-gangs-20150518-htmlstory.html ("According to a [Justice Department] report . . . 'A majority of Mongols membership consists of Hispanic males who live in the Los Angeles area . . .'"). The government also believes that successful forfeiture of the Mongols collective membership mark would be equivalent to the death sentence to the Club; presumably this is why they are attempting this novel theory of forfeiture against this organization of primarily Hispanic men.

### b.      Prosecution Based On Ethnically Discriminatory Motive.

The only distinction between Defendant Mongol Nation and the other similarly situated motorcycle clubs the government has prosecuted under the RICO Act is that Mongol Nation is comprised of mostly Hispanic members whereas the other motorcycle clubs are comprised of mostly White members.

In light of the above it is clear the government has selectively chosen to attempt this novel, duplicative, and vexatious prosecution on an entire organization based on this organization's Hispanic composition. The government has had opportunities in

the past to attempt forfeiture of the collective membership marks of other motorcycle clubs but never did.

The government has brought this case to either: (a) strip the collective membership mark rights of a predominantly Hispanic organization and its individual members, or (b) vexatiously exhaust the funds of that predominantly Hispanic organization and its individual members by forcing it to defend this complex, pseudo-criminal (who is going to jail?) lawsuit. In either case, the government is successfully oppressing this predominantly Hispanic organization. This is not only selective and malicious prosecution but is downright reprehensible.

In bringing this selective prosecution, the government, and specifically its prosecuting officials, have failed their roles as:

> "[T]he representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that *justice shall be done*. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilty shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a *just one*." Berger v. U.S., 295 U.S. 78, 88 (1935) (emphasis added).

For the foregoing reasons, Defendant Mongol Nation respectfully moves this Court to dismiss the indictment on the grounds that it has been brought selectively and impermissibly against it and would request an evidentiary hearing on the issue.

## 2.   28 U.S.C. § 1927, And The Court's Inherent Power

Pursuant to 28 U.S.C. § 1927, and the Court's inherent power, Defendant Mongol Nation respectfully moves the Court for sanctions against the prosecuting attorneys in this case on the grounds that they have unreasonably and vexatiously multiplied the number of proceedings recklessly and/or in bad faith. If the government's theory of prosecution is correct, the Mongol Nation should have been added to the <u>Cavazos</u> prosecution as an additional defendant was not. It is again important and significant that only when the government was unsuccessful in destroying the identity of this predominantly Hispanic organization that it unduly multiplied the proceedings by bringing the current prosecution.

The prosecuting attorneys in this case have unreasonably, vexatiously, and recklessly multiplied the number of proceedings such that Defendant is entitled to sanctions against them personally under both 28 U.S.C. § 1927, and this Court's inherent power.

28 U.S.C. § 1927 states: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Section 1927 was originally enacted "to prevent multiplicity of suits or processes, where a single suit or process might suffice."

Roadway Express, Inc. v. Piper, 447 U.S. 752, 759 (1980). In the Ninth Circuit, the district court's finding of the offending attorney's "recklessness plus knowledge" is sufficient to justify the imposition of § 1927 sanctions. B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1107 (9th Cir. 2002). Again, for the prosecution to have lost under a flawed theory in the Cavazos and Rivera cases might be excusable under section 1927. However, to repeat that mistake being collaterally estopped from further pursuit of a remedy is inexcusable and precisely the type of conduct section 1927 was intended to prevent.

While recklessness suffices for § 1927 sanctions, "bad faith" is required for "sanctions under the court's inherent power." See id.. As there is ample evidence that the prosecuting attorneys have exercised bad faith and recklessness in instituting this suit, Mongol Nation moves for sanctions under both § 1927 and this Court's inherent power to issue sanctions so as to prevent undue burden upon innocent organizations such as the Mongol Nation Motorcycle Club and its individual members who must ultimately bear the burden of such governmental misconduct.

As stated in numerous instances within this same motion, the instant case is a remnant of an earlier prosecution, U.S. v. Cavazos, CR 08-1201, where the same prosecuting attorneys attempted *the same exact forfeiture* of the Mongols collective membership and failed; that fact should not be forgotten by the Court.

In fact, the prosecuting attorneys also litigated the government's position in the related, collateral proceeding <u>Rivera v. Carter, et al.</u>, CV 09-2435,[6] in which an innocent, unindicted third party member of Mongol Nation brought suit against the government on the grounds that the government's forfeiture attempt violated his constitutional rights. <u>See id.</u>, Dkt. 1. This Court further denounced the government's theory that "by obtaining any rights in the marks, it has achieved the ability to seize without prior notice any infringing uses of the mark." <u>Id.</u> at 6:11-13. Additionally, this Court later found that the government's litigation against Rivera and its attempt to forfeit the Mongols collective membership mark had "no reasonable basis in law and fact" (<u>Rivera</u>, CV 09-2435, Dkt. 113, p. 5 (citing <u>Thangaraja v. Gonzalez</u>, 428 F.3d 870, 874 (9th Cir. 2005)) and sanctioned the government $253,206.78 in attorneys fees, expenses, and costs. <u>See Rivera</u>, CV 09-2435, Dkt. 113, p. 15.

It therefore is incredible that the government would once again bring another indictment, under an identical forfeiture theory, which purports to obtain the very same result, stripping innocent third parties of their right to use and display the collective membership mark, that this Court explicitly held is impermissible in prior cases. The only difference with this case is that Mongol Nation, the alleged registered owner of the Marks, is now the named defendant in this suit, but this is merely a

---

[6] <u>See Rivera v. Carter, et al.</u>, CV 09-2435, Dkt. 90, 9:3 ("Collateral proceedings—such as this one—may be used to remedy the harm caused by the wrongfully issued preliminary injunction in the criminal matter. [citation omitted]")

45

difference in form, not substance. As discussed in detail above, the binding trademark and Constitutional laws which preclude such unrestrained violations of the Constitutional rights of innocent third party citizens have not changed since the government's failures in U.S. v. Cavazos, and U.S. v. Rivera. They have hardly changed since the Constitution and its Amendments were drafted.

The only explanation of the government's conduct that remains is that the government has brought this suit in bad faith to force an entity comprised primarily of working class Hispanic individuals to exhaust its time and resources on a frivolous and vexatious lawsuit until they are forced to submit to the unrelenting and seemingly limitless resources of the government. The government makes a mockery of our judicial system and it has come time to put an end to it; and the only way to achieve a just result for Mongol Nation and to prevent future abuses by prosecuting attorneys in similar situations is to sanction the prosecuting attorneys personally for their egregious misconduct in this suit.

### 3.   EAJA

Defendant respectfully moves for sanctions against the government under the Equal Access to Justice Act (EAJA), on the grounds that this suit is a psuedo-criminal action and in actuality is a civil forfeiture suit based upon the liability of distinctly different defendants clothed in a criminal indictment. As this Court noted on multiple occasions, even if the government were successful, no one is going to jail, since all of

the alleged wrongdoers have already been indicted, entered plea agreements, or been convicted, imprisoned, and forfeited their right to their patches which bear the collective membership mark. The Court should again take judicial notice of its own files and records in both the Cavazos case before itself, and the one in front of Judge Otis D. Wright II, and the plea agreements entered therein which specifically provided for that remedy against men who admitted to their wrongdoing.

The purpose of Equal Access to Justice Act (EAJA) "is to eliminate financial disincentives for those who would defend against unjustified governmental action and thereby to deter the unreasonable exercise of Government authority." Ardestani v. INS, 502 U.S. 129, 138 (1991). The Court must award fees and expenses unless the government proves that its position was "substantially justified" or that "special circumstances" exist. 28 U.S.C. § 2412(d)(1)(A). The issue of substantial justification "shall be determined on the basis of the record . . . which is made in the . . . action for which fees and other expenses are sought." 28 U.S.C. § 2412(d)(1)(B).

To overcome the presumption in favor of a fee award, the government's position must be "justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Court analyzes whether the government was substantially justified both "in taking its original action" and "in defending the validity of the action in court." Gutierrez v. Barnhart, 274 F.3d 1255, 1258 (9th Cir. 2001). "A finding that either the government's underlying conduct or

its litigation position was not substantially justified is sufficient to support a fee award under the EAJA." Orantes-Hernandez v. Holder, 713 F. Supp. 2d 929, 949 (C.D. Cal. 2010).

This suit is clearly a civil forfeiture claim cloaked as a criminal prosecution since as the Court has noted, even if the government is successful, no one is going to jail in this case, and the alleged guilty have already been convicted in prior prosecutions. The government's sole intention in instituting this suit is to make a second attempt at taking thee Mongol Nation's collective membership marks which the government failed to obtain in U.S. v. Cavazos. As this is in reality a civil suit, Mongol Nation respectfully requests this Court to treat it as such and allow Mongol Nation to move for sanctions against the government under EAJA.

Under EAJA, Mongol Nation would readily prove, as discussed in detail in above sections, that the government's litigation position was not substantially justified to a degree that would satisfy a reasonable person.

Therefore, Mongol Nation respectfully moves for sanctions against the government under the Equal Access to Justice Act.

### 4. **Hyde Amendment**

Mongol Nation respectfully moves for sanctions against the United States Attorneys Office ("USAO") under the Hyde Amendment (18 U.S.C. § 3006A) on the grounds that this suit is vexatious, frivolous, and/or in bad faith.

The Hyde Amendment was enacted as a method through which to sanction the government for "prosecutorial misconduct." <u>United States v. Manchester Farming Partnership</u>, 315 F.3d 1176, 1182 (9th Cir. 2003). The Hyde Amendment provides, in relevant part: "The court, in any criminal case . . . may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States." <u>Id.</u>

"Vexatious" has "both a subjective and objective element: subjectively, the government must have acted maliciously or with an intent to harass [defendant]; objectively, the suit must be deficient or without merit . . . [t]o prove vexatiousness, the defendant must show the government had some 'ill intent.'" <u>Id.</u>

As discussed in detail above, in light of applicable law and the fact that the government has previously tried and failed the same theory behind this suit, together with obvious judge shopping, the only explanation for their motives which remains is that they have brought this frivolous action solely for the purpose of harassing the Mongol Nation and to maliciously burden it with the cost of defending this frivolous and vexatious suit. As such, Mongol Nation respectfully moves for sanctions against the government under the Hyde Amendment.

///

49

### 5.   Request For Evidentiary Hearing

The Mongol Nation respectfully requests an evidentiary hearing for all of the above bases for sanctions, at which it will present its fees and costs bill and meet its burden of proof as to any issues the Court believes remains as the sanctions requested.

## III.   CONCLUSION

For the foregoing reasons the Defendant Mongol Nation MC on behalf of its members respectfully request that the indictment be dismissed in its entirety with prejudice, that the forfeiture remedy be stricken as unconstitutional and a matter about which the government is collaterally estopped from arguing, that an appropriate order be entered setting a hearing for sanctions against the United States Attorneys Office for the Central District of California, and specifically the prosecuting attorneys who should have known better than to ignore their duties to this Defendant and its membership, and any other and further relief that this Court believes is just and proper. Mongol Nation respectfully requests the opportunity to submit billing statements and summaries, and other evidence to prove its damages suffered as a result of this frivolous and vexatious law suit which has no basis in law or fact.

///
///
///
///
///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
YANNY & SMITH

Dated: July 6, 2015              By:      _/s/ Joseph A. Yanny__
Joseph A. Yanny
Elliot H. Min
Attorneys for Defendant Mongol Nation