JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.: CR 13-0106-DOC** |
|     **Plaintiff,** | |
| | |
|     **vs.** | **ORDER RE: RENEWED MOTION TO DISMISS THE INDICTMENT AND FOR SANCTIONS [105]** |
| **MONGOL NATION, an unincorporated association,** | |
|     **Defendant.** | |

Before the Court is Defendant's Renewed Motion to Dismiss the Indictment (Dkt. 105).

## I.    Background

Defendant Mongol Nation is an unincorporated association of "full patched" members of the "Mongols Outlaw Motorcycle Gang" (the "Mongols Gang"). Indictment (Dkt. 1) ¶¶ 1, 10-12, 36. The Mongols Gang has a national presence, with 68 identified chapters, most of which are located in Southern California, where approximately 400 full patched members reside. *Id.* ¶¶ 3, 9. The Government contends Defendant participated in and conducted the affairs of the Mongols Gang, including, among other acts, "murder, conspiracy to commit murder, attempted murder, conspiracy to traffic in narcotics, narcotics-trafficking, robbery, extortion, money laundering, and witness intimidation." *Id.* ¶¶ 1, 35.

On February 13, 2013, following criminal proceedings against 79 individual members of the Mongols Gang, a grand jury indicted Defendant on two counts: racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); and racketeering conspiracy in violation of RICO, 18 U.S.C. § 1962(d). *Id.* ¶ 1. Pursuant to the RICO forfeiture provisions, 18 U.S.C. § 1963(a)(1), the Government seeks the forfeiture of two trademarks registered to Defendant in the Indictment. *Id.* ¶¶ 105-109. The Government subsequently filed a Bill of Particulars that identified two other related trademarks (Dkt. 91).

By this Motion, Defendant seeks dismissal of the Indictment for defects in the Government's forfeiture theory and for failing to adequately plead a RICO violation. Defendant also seeks sanctions for the Government's conduct in this litigation.

## II.    RICO Overview

RICO renders criminally and civilly liable "any person" who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs "through a pattern of racketeering activity," § 1962(c); or who conspires to violate the first three subsections of § 1962, § 1962(d). The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "There is no restriction upon the associations embraced by the definition: an enterprise includes any union or

group of individuals associated in fact." *United States v. Turkette*, 452 U.S. 576, 580 (1981). A "person" includes any individual or entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3).

In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." "The enterprise is an entity, [defined as] a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

### III.    Facts Alleged in the Indictment

The following facts are drawn from the Indictment and are taken as true for the purposes of this Motion.

The Indictment refers to the RICO "enterprise" as the "Mongols Outlaw Motorcycle Gang," or "the Mongols Gang," and alleges that the enterprise "functioned as a continuing unit for a common purpose of achieving the objectives of the organization." Indictment ¶ 1. The Mongols Gang had an established hierarchy that included: its leadership; other "full patched" members; prospective and probationary members; and other associates (often referred to as "hang-arounds") (collectively, "Mongols"). *Id.* ¶¶ 1, 2. The Mongols Gang maintained a constitution and by-laws. *Id.* ¶ 2.

The Mongols Gang was led and controlled by and through its "Mother Chapter," which exercised authority over regional chapters and individual Mongols. *Id.* ¶ 4. The Mother Chapter collected taxes, fees, and dues from Mongols that were used to fund the organization and pay the legal fees of members. *Id.* The Mother Chapter also approved new members, resolved internal disputes, and issued incentives to members for "committing acts of violence on behalf of the Mongols Gang, incurring physical injury on behalf of the Mongols Gang, and performing specific sexual acts at Mongols Gang events." *Id.* The Mother Chapter's decisions were binding on the regional chapters, and it controlled a network of regional chapters. *Id.* ¶ 6.

Membership in the Mongols Gang was designated using "patches, tattoos and insignia that signified [members'] connection to and status within" the Mongols Gang. *Id.* ¶ 8. All national and regional officers of the Mongols Gang were required to be "full patched" members. *Id.* In addition to "full patched" members, the enterprise also consisted of probationary and prospective members. *Id.* ¶ 9. These potential members had to be sponsored by full patched members, and had to "demonstrate their obedience and loyalty to the Mongols Gang" by demonstrating their willingness to commit crimes on behalf of the Mongols Gang. *Id.* ¶ 9.[1]

As described below, the Mongols Gang used certain trademarked images registered with the United States Patent and Trademark Office ("USPTO"), specifically the "Word Image" and the "Rider Image," to identify its members and facilitate the coordination of criminal activity. *Id.* ¶¶ 8, 23-24. Full patched members were permitted to "wear leather vests with sewn-on patches that included: a 'top rocker' patch on the front with the word 'Mongols' . . . (the 'Word Image'); a patch on the front with the word 'Mongols,' most often in smaller capital letters; a 'center rocker' patch in the center of the back of the vest that consisted of the image of a Mongols Gang motorcycle rider, that is, a human head with a queue, facial hair, and sunglasses . . . (the 'Rider Image')." *Id.* ¶ 8. Many full patched members also displayed a "1%" patch,

_____

[1] Prospective members, or "Prospects" were "given the bottom rocker patch, a small rectangular front patch of the word 'PROSPECT,' and a small rectangular 'Chapter' tab patch indicating the chapter the prospective member was seeking to join." Indictment (Dkt. 1) ¶ 10. They were required to perform tasks for full patched members including providing security, storing weapons, and providing transportation. *Id.* "After a period of time as a prospect, the individual received his center rocker patch bearing the Rider Image. *Id.* This indicated that the prospect was one step closer to becoming a full member," though still on-call to perform tasks for full patched members 24 hours a day. *Id.* Probationary members received all three back patches: bottom rocker, center rocker (Rider Image), and top rocker (Word Image), from the outset, but were also required to wear a probationary patch, a small diamond-shaped patch with a black 'P' against a white background, to identify them as probationary members. *Id.* ¶ 11. Probationary member typically maintained their probationary status for approximately a year before being allowed to remove the probationary patch. *Id.*

which distinguished them from the 99% of motorcycle club members who were law-abiding, as well as an "MFFM" patch, which stood for "Mongols Forever Forever Mongols." *Id.* In addition to membership and status patches, Defendant also awarded patches to members indicating that they had engaged in a specific act that demonstrated their loyalty, for example, by committing acts of violence or engaging in sex acts at Mongols Gang functions. *Id.* ¶ 13.

The Government contends the Mongols Gang is a group of individuals associated in fact, and, therefore, an "enterprise" for purposes of 18 U.S.C. § 1961(4). *Id.* ¶ 1. The Government further alleges that Defendant Mongol Nation, "an unincorporated association consisting of full patched members of the Mongols Gang criminal enterprise," was "employed by and associated with the Mongols Gang criminal enterprise" and acted on behalf of the Mongols Gang "under the authority conveyed by their display of the Word and Rider images" to commit acts of violence and drug trafficking, described below. *Id.* ¶¶ 34-36.

The Indictment states that the purposes of the enterprise included, but were not limited to: enriching Mongols Gang through the sale of narcotics; maintaining control over territory controlled by the Mongols Gang; and protecting and expanding the authority of the Mongols Gang and its members through "intimidation, violence, threats of violence, assault, and murder." *Id.* ¶ 34(a)-(d).

Leaders of the Mongols Gang controlled the group by encouraging certain activities, such as sex acts and acts of violence, as well as internal disciplinary measures including "killing, attempting to kill, conspiring to kill, assaulting, and threatening Mongols and others who were deemed to present a threat to the Mongols Gang or its leadership." *Id.* ¶ 14. The Government alleges that Mongols committed crimes including theft of credit card information, money laundering, weapons trafficking, extortion, hate crimes directed against African Americans, as well as other violent crimes ranging from battery to murder. *Id.* ¶ 15.

It is alleged that Defendant "actively engaged in drug-trafficking, especially the distribution of methamphetamine and cocaine, both within the Mongols Gang and to outside customers, as a source of income." *Id.* ¶ 16. "Portions of the proceeds from drug-trafficking activities were owed to the Mongols Gang leadership and Mother Chapter and were collected in

the form of dues, membership fees, and taxes." *Id.* Tension and violence between Defendant and local street gangs was common. *Id.* ¶ 17. The Mongols Gang leaders and full patched members encouraged Mongols to violently attack rival motorcycle clubs such as the Hell's Angels and the Sons of Silence. *Id.* ¶ 18. The Mongols Gang enforced the group's authority by ordering attacks on members of the general public that disrespected or defied the Mongols Gang, as well as law enforcement officers and witnesses who were willing to testify against Defendant or its members. *Id.* ¶¶ 19-20.

It is alleged that, "[b]eginning on a date unknown but at the latest by on or about March 16, 2002, and continuing to at least on or about May 25, 2012," Defendant, an unincorporated association consisting of full patched members of the Mongols Gang, committed ten RICO predicate acts,[2] including drug distribution, murder, and attempted murder. *Id.* ¶¶ 36-47.

It is also alleged that Defendant conspired with "others known and unknown to the Grand Jury, being persons employed by and associated with the Mongols Gang criminal enterprise," to violate RICO § 1962(c), by conducting the affairs of the enterprise through a pattern of racketeering activities including acts of murder, attempted murder, and distribution of controlled substances. *Id.* ¶ 49. Mongols Gang leaders and officers allegedly furthered this conspiracy in a variety of ways, including holding meetings to discuss the criminal enterprise, distributing drugs, obtaining firearms, engaging in narcotics-trafficking, and maintaining and strategically displaying the Mongols marks. *Id.* ¶¶ 51-59.

It is alleged that Defendant Mongol Nation held and maintained the "Word and Image Marks" in order to "ensur[e] that the display of the Word and Image Marks by Mongols engaged in the criminal activities described in [the Indictment] conveyed that those criminal activities were being carried out on behalf of the Mongols Gang." *Id.* ¶ 59.

In support of the RICO conspiracy count, the Indictment contains numerous overt acts committed by Defendant and its co-conspirators "[i]n furtherance of the conspiracy [to violate RICO], and to accomplish the objects of the conspiracy." *Id.* ¶¶ 60-104. For example, the

---

[2] "Racketeering activity" is defined at 18 U.S.C. § 1961(1) and includes the acts alleged in the Indictment.

Indictment alleges that individual Mongols provoked a riot, Mongols leaders cautioned members about a federal investigation at a meeting, and that Mongols leaders discussed and engaged in violent acts for the Mongols Gang. *Id.* It is also alleged that Mongols were wearing the Word and/or Rider Images when they committed these acts. *Id.* ¶¶ 62-64, 69, 70, 73.

Based upon the facts described above, it is alleged that Defendant violated RICO, 18 U.S.C. § 1962(c), and conspired to violate RICO, 18 U.S.C. § 1962(d). As a result, the United States seeks forfeiture of all rights of any kind associated with the Word and Rider Images under 18 U.S.C. § 1963(a). *Id.* ¶¶ 105-109.

### IV. Procedural History and Related Proceedings

#### A. Registration of the Marks

As described above, much of the underlying proceedings and the present matter involve certain registered marks: the patches worn by Mongols. Ruben Cavazos, Sr. ("Cavazos"), the former president of the Mongols Gang, submitted two trademark applications on behalf of Defendant. On or about January 11, 2005, the USPTO granted Defendant registration of the Word Image as a collective membership mark. *Id.* ¶ 24. On or about April 4, 2006, Defendant was granted registration of the Rider Image as a trademark/service mark. *Id.* ¶ 25. On or about March 26, 2008, Cavazos caused Defendant to assign its interests in the marks to a third-party LLC that he wholly owned. *Id.* ¶ 26. Cavazos was removed as President of the Mongols Gang between April and October 2008. *Id.* ¶ 27. Thereafter, Hector Gonzalez took over as president. *Id.* On or about October 13, 2008, Gonzalez filed a "corrective assignment" of the Word and Rider Images back to Defendant. *Id.* The USPTO recorded the corrective assignment on or about October 14, 2008. *Id.* On or about December 17, 2008, Martin Guevara ("Guevara"), then a member of the Mongols Gang, formally incorporated Mongols Nation Motorcycle Club, Inc., in the State of California. *Id.* ¶ 28. On or about January 21, 2009, Guevara, then acting as President of the Mongols Gang, assigned the entire interest in the Word and Rider Marks from Defendant to Mongol Nation Motorcycle Club, Inc. *Id.* ¶ 29. On or about January 22, 2009, the USPTO recorded this assignment. *Id.*

### B.  Related Proceedings

There are two prior proceedings that relate to the present case: a criminal matter against individual members of the Mongols Gang and a civil matter involving the potential forfeiture of the property of an unindicted member of the Mongols, Ramon Rivera.

### 1.  Underlying Criminal Case Filed

On October 9, 2008, 79 individuals alleged to be Mongols Gang members, including Cavazos, were indicted on a various counts, including RICO violations. *United States v. Cavazos et al.*, CR08-1201-DOC (C.D. Cal. Oct. 9, 2008). The case was assigned to Judge Florence-Marie Cooper. *Id.* Minutes of Post-Indictment Arraignment (Dkt. 357). On October 21, 2008, Judge Cooper granted in part the Government's ex parte application for an order restraining the transfer or sale of the Word and Rider Images. *Id.* Orders (Dkts. 248-49). On October 22, 2008, the order was amended on the Government's motion. *Id.* Amended Order (Dkt. 235). The Amended Order authorized, *inter alia*, the seizure of all "products, clothing, vehicles, motorcycles, books, posters, merchandise, stationery, or other materials bearing the Mongols trademark" from "the defendants in this criminal action, and any of their agents, servants, employees, family members, and those persons in active concert or participation with them." Amended Order at 3.

### 2.  Related Civil Proceeding

On March 10, 2009, Ramon Rivera filed a civil complaint in the Central District of California for declaratory and injunctive relief against the Government. *Rivera v. Carter*, CV09-2435-DOC (JCx), Compl. (Dkt. 1) (C.D. Cal. Mar. 10, 2009). Rivera contended that he was an unindicted Mongols member who wore clothing that displayed the marks subject to the Amended Order in the criminal case. *Id.* ¶ 19. Rivera alleged that law enforcement agents had seized items subject to the Amended Order from unindicted individuals who had not been judicially determined to be acting in concert or participation with the indicted individuals. *Id.* ¶¶ 12-16. Rivera contended these practices violated his First Amendment and due process rights, and sought a declaration and injunction prohibiting the Government from seizing items subject to the Amended Order from him and similarly situated individuals. *Id.* at 6. On July 31,

2009, Judge Cooper granted Rivera's motion for a preliminary injunction. CV09-02435-DOC (JCx), Order Granting Motion for Preliminary Injunction (Dkt. 39).[3]

On January 4, 2011, this Court granted Rivera's motion for summary judgment. *Id.* Summary Judgement Order (Dkt. 90). The Court determined that the seizure of the marks violated the Due Process Clause and the statutory provisions of RICO that authorize forfeiture. *Id.* at 6, 8-13. It concluded,

> The marks are a collective use mark, the rights to which could not have been assigned in gross to the entity controlled by Cavazos. Even if Cavazos had an enforceable interest in the marks, that right was not forfeitable to the government. And even if Cavazos had a forfeitable interest in the marks, Rivera's use of clothing bearing the marks did not diminish the marks' availability for forfeiture.

*Id.* at 13.

The Court also noted that serious First Amendment concerns were raised by the Government's seizure of expressive materials bearing the marks, which were "prior restraints on speech," and did not find "convincing" the Government's arguments to the contrary. *Id.* at 7-8. The Court also subsequently granted Rivera's motion for attorney's fees pursuant to 28 U.S.C. § 2413. CV09-02435-DOC (JCx), Order Re: Fees, Feb. 28, 2012, (Dkt. 113). The Court determined that the Government's "litigation position in the original action seeking a Restraining Order was not substantially justified because it was contrary to established First Amendment and trademark law." *Id.* at 9. Rivera recovered $252,466.00 in attorney's fees and $740.78 in costs. *Id.* at 15.

### 3.    Resolution of Forfeiture in the Criminal Case

In January 2010, following the death of Judge Cooper, the criminal matter was reassigned to Judges Otis Wright and David O. Carter, and each was assigned to preside over the proceedings for roughly half of the defendants. CR08-1201-DOC, Notices of Reassignment

---

[3] The case was subsequently reassigned to Judge Carter. *Id.* Notice of Reassignment, January 27, 2010 (Dkt. 60).

(Dkts. 3334, 3339). During the course of those proceedings, one defendant died, and another was found not competent to stand trial; the counts against these defendants were dismissed. *Id.* Judgment of Discharge as to Defendant Cottini (Dkt. 1467); Minutes of Status Conference Re: Competency (Dkt. 4745). All of the other defendants pleaded guilty, and Defendant Mongol Nation contends that they "reached plea agreements for lesser prison time in exchange for statements against Defendant." Status Report, June 8, 2015, (Dkt. 95) at 4. Judge Wright was assigned the proceedings against Cavazos. On June 5, 2010, in connection with Cavazos' plea of guilty and plea agreement, Judge Wright ordered the Word and Rider Images preliminarily forfeited to the United States. CR08-1201-DOC, Preliminary Order of Forfeiture (Dkt. 3854). However, on July 20, 2010, Mongol Nations Motorcycle Club, Inc. moved to vacate this order of forfeiture, contending that it, and not Cavazos, owned all rights in the Word and Rider Images. *Id.* Petition to Vacate (Dkt. 3946). On September 21, 2010, based in part on the findings in the Rivera proceedings, Judge Wright granted this motion and vacated the preliminary order of forfeiture so further evidentiary proceedings could be held. *Id.* Dkt. 4115. On June 28, 2011, Judge Wright entered a final order vacating the preliminary order of forfeiture. CR08-1201-DOC, Order (Dkt. 4481). The Order noted that the court "regrettably" concluded Cavazos did not have an ownership interest in the marks, and "[t]he club maintains exclusive ownership of the Marks." *Id.* at 7. Because "Mongols Nation" was not indicted in *United States v. Cavazos* nor named "as a RICO defendant under § 1962(a)," its ownership interest in the marks was not forfeitable in those proceedings. *Id.* at 7-8. Judge Wright's June 28, 2011 Order did not address any First Amendment or trademark issues that might have been raised if the club itself had been indicted in the *Cavazos* action.

### C. Present Proceedings

Defendant Mongol Nation, an unincorporated association, was indicted on February 13, 2013 (Dkt. 1). On October 21, 2013, Judge Wright denied from the bench Defendant's motion to dismiss the Indictment pursuant to Fed. R. Crim. P. 12(b) (Dkts. 22, 31). Judge Wright determined that a Rule 12 motion "directed at the forfeiture provision just seems to be

inappropriate. It is not a count. It is not a cause of action. It is not a claim." Transcript (Dkt. 31) at 20-21.

On February 14, 2014, Defendant moved to disqualify Judge Wright (Dkt. 38). Defendant argued that Judge Wright had evidenced bias against it in the *Cavazos* proceedings and at the October 21, 2014 hearing on its motion to dismiss the indictment. *Id.* at 6-9. On February 26, 2014, Judge Manuel L. Real denied Defendant's motion for disqualification (Dkt. 40). On March 28, 2014, Defendant filed before the Ninth Circuit a petition for a "writ of mandamus and/or prohibition reversing Judge Manuel Real's order, which denied Petitioner's recusal motion." *Mongols Nation Motorcycle Club, LLC v. U.S. Dist. Court*, No. 14-70912 (Dkt. 1), at 7 (9th Cir. Mar. 28, 2014). The petition was denied, because "the issues raised in this petition can be effectively reviewed upon direct appeal of a final judgment." Order, June 12, 2014 (Dkt. 41).

Following additional proceedings, a jury trial was scheduled for June 2, 2015 (Dkt. 47). On May 26, 2015, a pretrial status conference was held at which Judge Wright recused himself (Dkt. 88). On May 26, 2015, this matter was reassigned to Judge Kronstadt, and subsequently, to this Court (Dkts. 89, 102).

The Court held a status conference on June 22, 2015 (Dkt. 104). At the status conference, the Court rescheduled the trial for January 5, 2016. *Id.* It also set deadlines for briefing and argument on a renewed motion to dismiss the indictment. *Id.* Pursuant to that order, on July 5, 2015, Defendant filed the present Renewed Motion to Dismiss the Indictment (Dkt. 105). Defendant Mongol Nation moves to dismiss the Indictment pursuant to Rule 12(b)(3)(B) and various constitutional provisions. Mot. at 1. The Government filed an Opposition on July 20, 2015 (Dkt. 109). Defendant filed a Reply on July 27, 2015 (Dkt. 110). Oral arguments were heard on August 3, 2015 (Dkt. 113).

## V.    Legal Standard

Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings on "a motion alleging a defect in the indictment."

1    "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as

2    to ensure the right of the defendant not to be placed in double jeopardy and to be informed of

3    the offense charged." *United States v. Fernandez*, 388 F.3d 1199, 1217-18 (9th Cir. 2004)

4    *modified,* 425 F.3d 1248 (9th Cir. 2005) (citing *United States v. Rodriguez*, 360 F.3d 949, 958

5    (9th Cir. 2004)). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an

6    offense, the district court is bound by the four corners of the indictment." *United States v.*

7    *Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (citing *United States v. Jensen*, 93 F.3d 667, 669 (9th

8    Cir. 1996); *United States v. Caicedo*, 47 F.3d 370, 371 (9th Cir.1995); *United States v. Buckley*,

9    689 F.2d 893, 897 (9th Cir. 1982); *United States v. Thordarson*, 646 F.2d 1323, 1337 n. 25 (9th

10   Cir. 1981)). The court must accept the truth of the allegations in the indictment in analyzing

11   whether a cognizable offense has been charged. *See Jensen,* 93 F.3d at 669. The "unavailability

12   of Rule 12 in determination of general issues of guilt or innocence . . . helps ensure that the

13   respective provinces of the judge and jury are respected . . . ." *United States v. Nukida*, 8 F.3d

14   665, 670 (9th Cir. 1993).

15       **VI.    Analysis**

16       Defendant contends that the Indictment fails for three reasons. First, it raises a flurry of

17   arguments that the forfeiture sought is invalid under trademark law and the Constitution and

18   that the Indictment therefore fails. Mot. at 6-24. Second, it also asserts that the Indictment fails

19   to state an offense because it does not allege a "person" distinct from the "enterprise" under 18

20   U.S.C. § 1962(c). *Id.* at 24-36. Finally, Defendant argues that it is legally incapable of

21   committing the racketeering acts set forth in the Indictment, and therefore no criminal liability

22   can attach. *Id.* at 36-38.

23       As a result of the Government's allegedly spurious position, Defendant seeks sanctions

24   against the Government for "selective prosecution, and bringing a frivolous, malicious, and

25   vexatious indictment against Mongol Nation." *Id.* at 38.

26       **A.  Forfeitability of the Marks**

27       Defendant asserts that the forfeiture sought is impermissible under trademark law and is

28   unconstitutional under the First, Fifth, and Eighth Amendments of the United States

-12-

Constitution. Therefore, it argues, the Indictment should be dismissed or, in the alternative, the forfeiture allegation should be stricken.

First, as Judge Wright determined, a pretrial motion to dismiss is not the appropriate time to determine the viability of a potential forfeiture of property after a potential conviction of Defendant Mongol Nation. Defendant has not provided any legal support for the proposition that dismissal of the Indictment or striking the request is the appropriate remedy for a flawed criminal forfeiture allegation. Further, there are many possible outcomes in the course of trial, conviction, and enforcement of any potential forfeiture, such that any adjudication of the constitutional issues would essentially constitute an advisory opinion.

Defendant also seeks a determination that "the government is collaterally estopped from re-litigating the issue of whether the government can regulate the use of a collective membership mark" which was allegedly addressed in the *Rivera* proceeding, discussed above. Mot. at 14. In relevant part, Defendant is of the opinion that because the Government previously sought forfeiture of the marks, and the Court in *Rivera* determined that the preliminary order of forfeiture was improper under the First Amendment, the Government cannot now seek forfeiture of the marks in this case.

Defendant's "estoppel" arguments are without merit. Defendant argues that the issue of the forfeitability of the marks has already been finally decided in the *Rivera* proceeding. However, "[t]he party asserting collateral estoppel must first show that the estopped issue is identical to an issue litigated in a previous action." *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997). The issues presented to the Court in the *Rivera* proceeding did not involve the issues alleged in the Indictment. Namely, much of the reasoning in *Rivera* was centered around the fact that Mongol Nation owned the marks at issue, not the individual *Cavasos* defendants, such that the marks could not be forfeited upon the indictment of the individual club members. *See* CV09-2435-DOC(JCx), Order Granting Motion for Summary Judgment (Dkt. 90) at 12. Further, in *Rivera*, the case was predicated on the existence of a post-indictment restraint found to be unnecessary to preserve the availability of the marks for forfeiture. *Id.* at 9. Now, Mongol Nation is the defendant, and the Government is attempting to

1    indict it directly under RICO. No restraining order has been issued. The issues are dissimilar.

2    The estoppel arguments fail for this reason alone.

3         In general, the Court finds that Defendant's arguments regarding the forfeiture are

4    premature, do not go to the sufficiency of the Indictment, and should not be considered at this

5    stage. In any event, the Court finds that the Indictment fails for independent reasons.

6    **B. RICO**

7         More compelling are Defendant's arguments predicated on the RICO statute itself.

8    Defendant asserts that the Indictment fails to specify any *entity* that is distinct from the RICO

9    *person* being charged with the crime.[4] Defendant also argues that it is legally incapable of

10   committing the charges alleged.

11   **1.       Substantive RICO Elements**

12   Section 1962(c) provides that it shall be unlawful:

13        for any *person* employed by or associated with any *enterprise* … to conduct

14        or participate, directly or indirectly, in the conduct of such enterprise's

15        affairs through a pattern of racketeering activity….

16   (emphasis added).

17        Under the RICO statute, a "person" includes "any individual or entity capable of holding

18   a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" includes "any

19   individual, partnership, corporation, association, or other legal entity, and any union or group of

20   individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

21        "To establish liability under § 1962(c) one must allege and prove the existence of two

22   distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

23   referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161

24   (2001). "Under the 'non-identity' or 'distinctness' requirement, a corporation may not be liable

25

26   _____

27   [4] If the 1962(c) count fails, so does the conspiracy count. *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007);

28   *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). The Court therefore addresses the charge under § 1962(c).

1   under section 1962(c) for participating in the affairs of an enterprise that consists only of its

2   own subdivisions, agents, or members." *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367,

3   377 (6th Cir. 1993). However, "the need for two distinct entities is satisfied; hence, [§ 1962(c)

4   applies] when a corporate employee unlawfully conducts the affairs of the corporation of which

5   he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope,

6   of corporate authority." *Cedric Kushner*, 533 U.S. at 166. Thus, an individual employee or

7   officer may always be named as the RICO person distinct from the corporate enterprise. This

8   holding does nothing to minimize the distinctness requirement, in that the RICO statute requires

9   charging a person that is distinct from an enterprise under § 1962(c). *See, e.g.*, *Cruz v.

10   FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (distinguishing *Cedric*, holding that an

11   enterprise composed of a subsidiary (the person), employees, and the corporate parent that were

12   alleged to operate as part of a single, unified corporate structure were not sufficiently distinct

13   from the subsidiary person).

14        Most courts have recognized that the distinctness requirement "would be eviscerated if a

15   plaintiff could successfully plead that the enterprise consists of a defendant corporation in

16   association with employees, agents, or affiliated entities acting on its behalf." *Brittingham v.

17   Mobil Corp.*, 943 F.2d 297, 301 (3d Cir. 1991); *see also Cruz*, 720 F.3d at 121 n.3; *In re

18   ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013) (collecting cases, and noting

19   that "[m]ost courts have rejected the separate-legal-identity theory . . . , reasoning that if a

20   corporate defendant can be liable for participating in an enterprise comprised only of its

21   agents—even if those agents are separately incorporated legal entities—then RICO liability will

22   attach to any act of corporate wrong-doing and the statute's distinctness requirement will be

23   rendered meaningless"); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 897 (8th Cir. 1999)

24   (reviewing cases, and concluding that "to impose liability on a subsidiary for conducting an

25   enterprise comprised solely of the parent of the subsidiary and related businesses would be to

26   misread the statute"); *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d

27   Cir. 1995) ("a corporation would be liable under § 1962(c), only if *it* engages in racketeering

28

1  activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating

2  § 1962(c)").

3        The Ninth Circuit has explicitly recognized that: "if [a RICO] 'enterprise' consist[s] only

4  of [a corporation] and its employees, the pleading [fails] for lack of distinctiveness." *Living*

5  *Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361-62 (9th Cir. 2005). In *Living*

6  *Designs,* the Ninth Circuit found distinctness between a corporation and an associated-in-fact

7  enterprise composed of that corporation, the law firms it retained, and certain expert witnesses

8  involved in prior litigation between that corporation and the plaintiffs. *Id.* The court noted the

9  fundamental difference between the business of the corporation and the law firms it employed,

10 relying on compelled independence of the law firms, dictated by rules of professional conduct.

11 *Id.* This holding thus hinged on the fact that the law firms had an independent legal duty and

12 existence separate from the corporation. *See In re Toyota Motor Corp. Unintended Acceleration*

13 *Mktg., Sales Practices, & Products Liab. Litig.*, 826 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011).

14 They were not merely nominally or semantically distinct, the entities and individuals were

15 distinctive. *Living Designs*, 431 F.3d at 361*; see also Securitron Magnalock Corp. v.*

16 *Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995) ("a corporate entity [may be] held liable as a

17 defendant under section 1962(c) where it associates with others to form an enterprise that is

18 sufficiently distinct from itself" (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank,*

19 *N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)). Thus, if an entity is named as a defendant in a RICO

20 action, the enterprise it participates in cannot merely be a reframing of the same entity that is

21 the target of the indictment.

22       The statutory purposes of RICO support this reading. The Supreme Court has held that

23 RICO both protects a legitimate "enterprise" from those who would use unlawful acts to

24 victimize it and also protects the public from those who would unlawfully use an "enterprise"

25 (whether legitimate or illegitimate) as a "vehicle" through which "unlawful ... activity is

26 committed." *Cedric Kushner*, 533 U.S. at 164-65 (citing *United States v. Turkette*, 452 U.S.

27 576, 591 (1981); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994)). "A

28 corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern

1    ... of activity,' . . . uses that corporation as a 'vehicle,'" *id.*, an entity that associates with or

2    manages itself does not. *See United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190

3    (4th Cir. 1982) *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th

4    Cir. 1990) ("To be sure, the analogy between individuals and fictive persons such as

5    corporations is not exact. Still, we would not take seriously . . .  an assertion that a defendant

6    could conspire with his right arm, which held, aimed and fired the fatal weapon. A corporation,

7    in common parlance, is not regarded as distinct from its unincorporated divisions either.").

8        Clear legal rules are difficult to discern from the morass of legal precedent addressing

9    the distinctness requirement in the context of entity defendants. Addressing this conundrum, the

10   Sixth Circuit recently found, "[o]ut of the meandering and inconsistent case law from this and

11   other circuits, as well as the Supreme Court's decision in *Cedric Kushner*," two important

12   principles emerge:

13           (1) individual defendants are always distinct from corporate enterprises

14           because they are legally distinct entities, even when those individuals own

15           the corporations or act only on their behalf; and (2) corporate defendants

16           are distinct from RICO enterprises when they are functionally separate, as

17           when they perform different roles within the enterprise or use their separate

18           legal incorporation to facilitate racketeering activity

19   *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013). Such guidelines are of

20   assistance here.

21           **2.    Analysis**

22       Here, the Government is charging the *person* Mongol Nation, an unincorporated

23   association composed of full patched members of the Mongols Gang criminal enterprise,

24   Indictment ¶ 36, alleging that it participated in the affairs of the *enterprise* the Mongols Gang,

25   Indictment ¶ 1, an enterprise composed of its full patched members, prospective and

26   probationary members, and associates. *See* Figure 1. As explained below, there is no

27   meaningful distinction between the association Mongol Nation and the enterprise of the

28   Mongols Gang. The indictment therefore fails.

*Figure 1: "Mongols Gang" Enterprise*



The Government argues that the indictment is cured because it alleges that Mongol Nation non-members associated with Mongol Nation to form the Mongols Gang enterprise. For example, in oral arguments, the Government directed the Court to several paragraphs of the Indictment:

- Paragraph 9 of the Indictment alleges: "In addition to full patched members [the Defendant], the Mongols Gang was also comprised of prospective and probationary members."

- Paragraph 12 of the Indictment alleges: "Women [could not be] full patched or prospective or probationary members [but could] be permitted by full patched members to wear a Mongols Gang jacket or vest."

- Paragraph 23 of the Indictment alleges: "[D]efendant Mongol Nation was an unincorporated association comprised of full patched members of the Mongols Gang [who] controlled the use and display of the World Image and the Rider Image."

The alleged separate membership and purpose is a distinction without a difference. For the purposes of this Indictment, the prospective members, probationary members, and associates are defined by, and owe their existence to, the unincorporated association Mongol Nation. Taking the allegations as true, all non-members involved in the Mongols Gang enterprise are acting within the Mongol Nation/Mongols Gang association structure, analogous in all meaningful respects to corporate employees acting within the scope of their employment. Most courts, including the Ninth Circuit, have explicitly recognized that an enterprise that consists only of a corporate defendant and its employees fails for lack of distinctness. *See, e.g.*, *Living Designs*, 431 F.3d at 362. Although an unincorporated allegedly criminal organization cannot have "employees," the roles of the prospective members, probationary member, and "hang-arounds" are the functional equivalent. *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 141 (D.C. Cir. 1989) *on reh'g in part,* 913 F.2d 948 (D.C. Cir. 1990) (citing cases) ("Several courts, however, have disallowed a § 1962(c) claim where the relationship among the members of the enterprise association is the relationship of parts to a whole. That is, while the corporate or organizational defendant may itself be a member of the enterprise association, the member of the enterprise association may not simply be subdivisions, agents, or members of the defendant organization."). There is simply no substance to the Mongols Gang enterprise independent of Mongol Nation, an association of its leadership and official membership. *See Davis*, 638 F.3d at 377.

*Yellow Bus* succinctly presents the logic as to why word games should not be allowed to vitiate the distinctness principle.

> [A]n organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself. Where, as here, the organization is named as defendant, and the organization associates with its member to form the enterprise 'association-in-fact,' the requisite distinctness does not obtain....[A]llowing plaintiffs to generate . . . 'contrived partnerships' consisting of an umbrella organization

1      and its subsidiary parts, would render the non-identity requirement of

2      section 1962(c) meaningless.

3  *Yellow Bus Lines*, 883 F.2d at 141. The D.C. Circuit "declined to permit such an 'end run'

4  around the statutory requirements." *Id.*

5      Mongol Nation, when combined with its unofficial members, is the Mongols Gang. The

6  two are one in the same. Scraping away certain of the Mongol Gang's affiliates, essentially

7  agents of the Mongols Gang/Mongol Nation, does not render Mongol Nation ("official"

8  members) meaningfully different from the Mongols Gang (members and associates). Defendant

9  is the enterprise and the enterprise is (essentially) Defendant.

10      The Government also argues that Defendant is distinct from the enterprise it controls

11  because that Defendant held a unique legal position within the enterprise. Specifically,

12  Defendant controlled the use and display of the Word Image and Rider Image marks. Thus, the

13  Government reasons, Defendant (unincorporated association of full patched members) enjoys a

14  legal separation from the enterprise, which includes associates of Defendant that cannot control

15  the intellectual property underlying the Indictment.

16      The Government carved away from the Mongols Gang what it considers to be a discrete

17  faction – the faction capable of holding the Mongols Gang's property. This technical separation

18  does not establish that Mongol Nation itself was performing a different role within the

19  enterprise to facilitate racketeering activity. Rather, individual Mongols leaders (as alleged in

20  the Indictment) asserted their authority to control the use of the Marks, while Defendant

21  Mongol Nation simply, technically, holds a proprietary interest in the Marks. Therefore, this

22  quality does not render Mongol Nation sufficiently distinct from the Mongols Gang.

23      The Government relies on the Fourth Circuit case of *Najjar* and the Eleventh Circuit

24  case of *Mowhak Industries* to argue that the asserted distinction between Defendant and the

25  enterprise is sufficient. Neither case is particularly persuasive under the facts before this court.

26  In *Najjar*, the government alleged an association in fact enterprise comprising several

27  individuals and two corporations. *United States v. Najjar*, 300 F.3d 466, 484 (4th Cir. 2002).

28  "Thus, the corporation was only one piece of the enterprise, not the enterprise itself." *Moses v.*

*Martin*, 360 F. Supp. 2d 533, 550 (S.D.N.Y. 2004). In *Mohawk*, the complaint alleged that "Mohawk and third-party temp agencies/recruiters have conspired to violate federal immigration laws, destroy documentation, and harbor illegal workers." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006). In both cases the enterprise consisted of multiple distinct legal entities, which existed and had a purpose independent of the defendant itself.

The Government also relies heavily on *Cedric* and similar cases, which hold that an individual person is always distinct from a corporate enterprise, without adequately acknowledging the legal import of charging an individual "person" versus an entity "person." *See, e.g.*, *Fogie*, 190 F.3d at 897-98 (citing cases); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) ("[T]the inability of a corporation to operate except through its officers is not an impediment to section 1962(c) suits. That fact poses a problem only when the *corporation* is the named defendant—when it is both the "person" and the "enterprise." In this case, however, Sever named the several individual officers as defendants/persons, and APC as the enterprise. Therefore, he has satisfied this allegation requirement."). Under RICO, individuals are necessarily treated differently when courts address whether they are distinct from the enterprise they compose. Individuals are always legally distinct from the enterprise. The Government has already indicted 79 individuals who composed the leadership of Mongol Nation/Mongols Gang, many of whom are serving significant time in prison. Of course these indictments presented no distinctness problem. For the multitude of reasons noted above, the same logic simply does not extend to entity defendants. Defendant Mongol Nation is not distinct from the Mongols Gang enterprise.

Having decided the Indictment fails for lack of distinctness, the Court does not reach Defendant's arguments concerning whether it is proper to premise liability on predicate acts an unincorporated association it is not legally capable of committing itself, including murder and attempted murder. Indictment ¶¶ 39, 41, 42, 43, 46, 47. The Court will note that the Government could identify no other case where an unincorporated association, or other entity defendant, was held liable for predicate acts of violent crime. However, as the Indictment is

-21-

otherwise flawed, the Court need not reach this issue to which the parties devoted only cursory attention in the briefing.

### VII.    Sanctions

Defendant also moves for sanctions under 28 U.S.C. § 1927; the Hyde Amendment, 18 U.S.C. § 3006A; and the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.[5] Defendant has not demonstrated that an award of sanctions is appropriate.

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions pursuant to § 1927 are properly imposed only upon a showing of recklessness or bad faith. *Goehring v. Brophy*, 94 F.3d 1294, 1306 (9th Cir. 1996). There is insufficient evidence on the record to establish that there has been improper conduct by the Government attorneys in this case simply because of the existence of the separate *Cavazos* action.

Under the EAJA, costs "may be awarded to the prevailing party in *any civil action* brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action." 28 U.S.C. § 2412 (emphasis added). This is a criminal, not a civil, action. The argument fails out of hand.

Finally, Defendant argues costs and fees should be awarded under the Hyde Amendment. The Hyde Amendment was enacted as a method through which to sanction the Government for "prosecutorial misconduct." *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1182 (9th Cir.) *opinion amended on denial of reh'g,* 326 F.3d 1028 (9th Cir. 2003). It provides in relevant part:

> [T]he court, in any criminal case ... may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was

---

[5] Defendant also asserts that the Government has engaged in selective prosecution. Defendant has not meaningfully supported this argument so as to merit further analysis. The request for dismissal or sanctions on this basis is DENIED.

vexatious, frivolous, or in bad faith, unless pursuant to the procedures and
limitations (but not the burden of proof) provided for an award under
section 2412 of title 28, United States Code.

*Id.* The defendant bears the burden of proving that the government's position was vexatious, frivolous, or in bad faith. *United States v. Lindberg*, 220 F.3d 1120, 1124 (9th Cir. 2000).

Here, Defendant has not met its burden in establishing that the Government's position was vexatious, frivolous, or in bad faith. The only concrete basis for this request is that this case is similar to prior actions and that the Government engaged in "judge shopping." Mot. at 49. This action is materially different from the *Cavazos* action in that it indicts a separate person. While the indictment is legally deficient for the reasons explained above, this does not demonstrate that the action is vexatious, meaning that the Government acted with "ill intent." *Manchester*, 315 F.3d at 1182. Nor has Defendant demonstrated that the Government engaged in "judge shopping." This action was properly assigned to Judge Wright, and subsequently reassigned to this Court.

## IV. Disposition

For the reasons set forth above, the Court GRANTS Defendant's Renewed Motion to Dismiss the Indictment. Defendant's request for sanctions is DENIED.

DATED:          September 16, 2015

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE