FILED
CLERK, U.S. DISTRICT COURT

MAY 1 7 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>MONGOL NATION,<br>an unincorporated association,<br><br>          Defendant. | CR No. 13-106(A)-DOC<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(c):<br>Racketeering;<br>18 U.S.C. § 1962(d):<br>Racketeering Conspiracy;<br>18 U.S.C. § 1963: Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(c)]

I.  INTRODUCTION

A.   THE MONGOLS GANG

1.   At all relevant times, the Mongols Outlaw Motorcycle Gang ("the Mongols Gang"), was an organization engaged in, among other things, murder, conspiracy to commit murder, attempted murder, conspiracy to traffic in narcotics, narcotics trafficking, robbery, extortion, money laundering, and witness intimidation.  At all relevant times, the Mongols Gang operated in the Central District of

California and elsewhere.  The Mongols Gang, including its
leadership, full patched members, prospective and probationary
members, and associates (often referred to as "hang arounds"),
constituted an "enterprise," as defined by Title 18, United States
Code, Section 1961(4), that is, a group of individuals associated in
fact.  The Mongols Gang engaged in, and its activities affected,
interstate and foreign commerce.  The Mongols Gang constituted an
ongoing organization whose leadership, full patched members,
prospective and probationary members, and associates (often referred
to as "hang arounds") (all hereafter referred to collectively as
"Mongols") functioned as a continuing unit for a common purpose of
achieving the objectives of the organization.

2.    The Mongols Gang maintained an established structure and
leadership.  The Mongols Gang maintained a written constitution and
by-laws, which set forth the rules of membership and code of conduct
for the Mongols Gang, as well as penalties for non-compliance with
the Mongols Gang's rules.

3.    The Mongols Gang was a nationwide organization and made
efforts to expand internationally.  The Mongols Gang was comprised of
approximately sixty-eight identified chapters.  The chapters were
located in different geographical regions, although most were located
within the Central District of California.  The Mongols Gang also had
chapters in other parts of California, as well as in, among other
places, Oklahoma, Florida, Nevada, Oregon, Utah, Arizona, Colorado,
Sweden, Norway, Italy, Germany, and Mexico.

4.    The leadership and governing body of the Mongols Gang was
its "Mother Chapter."  The Mother Chapter exercised authority over
the actions of the regional chapters, as well as the actions of

2

1  individual Mongols.  Mongols paid money to the Mother Chapter in the
2  form of fees, dues and taxes.  Those funds were used, in part, to
3  fund and promote the Mongols Gang and pay for the legal expenses of
4  Mongols when they were prosecuted for crimes committed on behalf of
5  the Mongols Gang.  The Mother Chapter collected and reviewed
6  membership applications and fees, resolved disputes within the
7  Mongols Gang, and issued incentives, such as tattoos and patches, to
8  honor Mongols for committing acts of violence on behalf of the
9  Mongols Gang, incurring physical injury on behalf of the Mongols
10 Gang, and performing specific sexual acts at Mongols Gang events.

11      5.    The Mother Chapter was comprised of the Mongols Gang's
12 national officers.  At relevant times, it included full patched
13 members Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez.

14      6.    Officers of the Mongols Gang's regional chapters were often
15 invited to present issues to the Mother Chapter for decision, but
16 these officers were not permitted to share in the deliberations of
17 the Mother Chapter, and the Mother Chapter's decisions were binding
18 on the regional chapters.  Lower-ranking full patched members and
19 prospective and probationary members of the Mongols Gang frequently
20 were required to patrol and provide armed security against the
21 presence of law enforcement and rival gang members outside Mother
22 Chapter meetings.  Those present at Mother Chapter meetings were
23 heavily armed, and the Mother Chapter maintained an arsenal of
24 firearms, including assault rifles, shotguns, and semi-automatic
25 handguns, as well as bullet-proof vests and knives, at the Mother
26 Chapter residence located in West Covina, California.

27      7.    Below the Mother Chapter, regional chapters of the Mongols
28 Gang were directed by chapter presidents and officers, including a

vice-president, a secretary/treasurer, and a sergeant-at-arms.  A

regional chapter's sergeant-at-arms maintained that chapter's weapons

and firearms and might also be required to maintain records of

membership applications and to oversee the evaluation of prospective

and probationary members by private investigators.

8.    All national and regional officers of the Mongols Gang were

required to be full patched members of the Mongols Gang.  Full

patched members of the Mongols Gang identified themselves with

patches, tattoos and insignia that signified their connection to and

status within the Mongols Gang.  Specifically, full patched members

of the Mongols Gang were authorized by the Mongols Gang to wear

leather vests with sewn-on patches that included: a "top rocker"

patch on the back containing the word "Mongols," most often in the

following form:



(the "Word Image"); a patch on the front with the word "Mongols,"

most often in smaller capital letters; a "center rocker" patch in the

center of the back of the vest that consisted of the image of a

Mongols Gang motorcycle rider, that is, a human head with a queue,

facial hair, and sunglasses, as follows:



(the "Rider Image"); and a "bottom rocker" patch below this bearing the name of the state of the chapter to which the member belonged. Many full patched members also displayed a patch with the designation "1%" to distinguish themselves from the "99%" of motorcycle club members who were legitimate and law-abiding and identify themselves as being within the "1%" who were not legitimate and did not adhere to the law or the rights of others. Full patched members of the Mongols Gang also often displayed the "MFFM" patch or tattoo to identify themselves as "Mongols Forever Forever Mongols." Full patched members who were officers also frequently wore patches that indicated their status as officers. The Mongols Gang had as many as 500 to 600 full patched members. Approximately 400 of those were located in Southern California.

9.   In addition to full patched members, the Mongols Gang was also comprised of prospective and probationary members working towards becoming full patched members. Leaders of the Mongols Gang recruited and initiated potential members into the organization through a structured application and vetting process that was directed through the Mother Chapter in West Covina, California.

Potential members had to be sponsored by existing full patched members and were required to demonstrate their obedience and loyalty to the Mongols Gang. They were then required to complete a written application, which was reviewed and researched by private investigators, and then might be subject to a polygraph examination arranged by the Mongols Gang if they were suspected of being a member of law enforcement or an informant for law enforcement. The focus of the investigation conducted before a potential member could become a prospective or probationary member of the Mongols Gang was to establish the potential member's willingness to commit crimes on behalf of the Mongols Gang and to preclude prospective membership of individuals with any connection to law enforcement or who might expose the crimes of the Mongols Gang to law enforcement. Once a potential member passed the initial application process, the potential member could be accepted as a prospective or probationary member.

10. When an individual first became a prospective member, referred to as a "prospect," he was given the bottom rocker patch, a small rectangular front patch of the word "PROSPECT," and a small rectangular "Chapter" tab patch indicating the chapter the prospective member was seeking to join. The prospect was then assigned to perform duties for full patched members of the Mongols Gang, including providing armed security, storing weapons and narcotics, and transporting Mongols Gang leaders. After a period of time as a prospect, the individual received his center rocker patch bearing the Rider Image. This indicated that the prospect was one step closer to becoming a full member, but still remained required to perform the tasks above, and to be on call to Mongols members to

6

1  perform such duties 24 hours a day.  The amount of time spent as a

2  prospect before becoming a full patched member of the Mongols gang

3  and receiving a top rocker patch (the Word Image) varied by prospect

4  and was contingent on approval of the prospect's membership by the

5  Mother Chapter.

6       11.  An alternative path to full patched membership was as a

7  probationary member.  Probationary members received all three back

8  patches, bottom rocker, center rocker (Rider Image), and top rocker

9  (Word Image) from the outset, but were also required to wear a

10 probationary patch, a small diamond-shaped patch with a black "P"

11 against a white background, to identify them as probationary members.

12 Probationary members typically remained on probation for one year

13 before becoming full patched members and being authorized to remove

14 the probationary patch.  Whether potential members went through a

15 "prospect" or "probationary" phase before becoming full patched

16 members varied depending on the chapter the individual was seeking to

17 join.

18      12.  In addition to full patched members and prospective and

19 probationary members, the Mongols Gang also included male associates,

20 often referred to as "hang arounds," who were not on a membership

21 track and did not receive any gang patches.  Women were not eligible

22 to be either full patched or prospective or probationary members.

23 Women could, however, be permitted by full patched members to wear a

24 Mongols Gang jacket or vest, but were required to display on the

25 jacket or vest a "property of" patch identifying the full patch or

26 prospective or probationary member to whom they were connected.

27      13.  In addition to patches indicating their status within the

28 Mongols Gang, Mongols could be awarded special patches based on acts

engaged in to demonstrate their loyalty to the Mongols Gang. Full
patched members were eligible to earn patches issued by the Mother
Chapter, including: the skull and crossbones patch, awarded for
killing someone on behalf of the Mongols Gang; the "Respect Few Fear
None" patch, awarded for having engaged in a violent altercation with
a rival gang; and the Black Heart patch, awarded for having been
wounded during a Mongols Gang confrontation. Full patched members
and prospective and probationary members were encouraged and expected
to engage in sex acts at Mongols Gang functions or when pre-arranged
"wing parties" were held, and those who did so were rewarded with
different-colored "wings patches" that identified the sex acts
performed.

14. Mongols Gang leaders controlled Mongols activities not only
through rewards, but also through internal discipline, including
killing, attempting to kill, conspiring to kill, assaulting, and
threatening Mongols and others who were deemed to present a threat to
the Mongols Gang or its leadership. Mongols who were "out bad," that
is, who attempted to leave the Mongols Gang or acted in ways contrary
to the desires of Mongols Gang leaders, could be required to forfeit
their property, including their motorcycles, and were subject to
attack by other Mongols.

B. THE CRIMINAL ACTIVITIES OF THE MONGOLS GANG

15. Crimes committed by Mongols on behalf of the Mongols Gang
included acts of violence ranging from battery to murder, as well as
drug-trafficking offenses, money laundering, weapons trafficking,
extortion, and hate crimes directed against African-Americans.
Mongols also frequently conducted robberies, stole motorcycles, and
engaged in the theft of credit card account information as a means to

8

obtain funds for themselves and the Mongols Gang.  Mongols often
committed their crimes and acts of violence with the conviction that
they could not be prosecuted because victims and witnesses would
refuse to testify against them or to cooperate with law enforcement
for fear of retaliation by the Mongols Gang.  Mongols frequently used
the reputation of the Mongols Gang, especially its history of large-
scale violence and riots, as a means to threaten and intimidate the
victims and witnesses to their crimes and protect Mongols from
prosecution by local law enforcement.

16.    The Mongols Gang actively engaged in drug trafficking,
especially the distribution of methamphetamine and cocaine, both
within the Mongols Gang and to outside customers, as a source of
income.  Portions of the proceeds from drug-trafficking activities
were owed to the Mongols Gang leadership and Mother Chapter and were
collected in the form of dues, membership fees, and taxes.  Large-
scale drug traffickers within the Mongols Gang were often taxed at a
higher rate by the Mongols Gang, with the payments used to support
the drug traffickers' protection from penalties and taxes that would
ordinarily be claimed by rival street gangs and Mexican Mafia (aka
"La Eme") representatives for drug trafficking that occurred in the
areas controlled by those rival gangs.  Mongols were also authorized
to call on other Mongols and Mongols Gang leadership to enforce the
collection of proceeds owed from their narcotics customers.

17.    Many Mongols were current or former members of a large
number of Los Angeles County street gangs, including "the Avenues,"
"18th Street," "San Gabriel Valley," "South Side Montebello," "Lott
Stoner," "Maravilla," and "Varrio Nuevo" street gangs, and maintained
their connections to those gangs, particularly with regard to the

9

distribution of narcotics and firearms.  These Mongols often claimed immunity from the collection of taxes on their drug trafficking activities by Mexican Mafia representatives.  This created tension between the Mongols Gang and the established authority of the Mexican Mafia over drug trafficking.  Mongols Gang leaders, including Ruben Cavazos, Sr., and Hector Gonzalez, periodically attempted to negotiate a resolution of their disputes with the Mexican Mafia over the control of drug trafficking in particular territories by paying Mexican Mafia representatives in exchange for their recognition of the Mongols Gang's right to traffic narcotics in Southern California.

18.  Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez, and Mongols Gang full patched members also enforced the authority of the Mongols Gang by directing attacks against rival motorcycle gangs, such as the "Hells Angels" and the "Sons of Silence."  Mongols identified persons supporting rival gangs and threatened to beat or kill them if they did not surrender indicia (such as red and white colored t-shirts, patches, jackets or sports jerseys bearing the number "81") identifying support for a rival gang.

19.  The Mongols Gang also enforced its authority by directing attacks against members of the general public who defied or unwittingly came into contact with Mongols in a way that was deemed "disrespectful" to the Mongols Gang.  Persons in conflict with, or who might be perceived to have shown disrespect to, Mongols were often beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot.

20.  The Mongols Gang also directed attacks against law enforcement officers and witnesses who were willing to cooperate with

10

1   law enforcement for the prosecution of crimes committed by Mongols,

2   and frequently paid for the legal representation of Mongols who

3   committed crimes, such as assaults and murders, on behalf of the

4   Mongols Gang.

5        21.   The Mongols Gang did not allow African-Americans to be

6   members.   The Mongols Gang was also hostile to the presence of

7   African-Americans in bars or clubs where Mongols were present or in

8   proximity to female associates of the Mongols Gang.

9        22.   The Mongols Gang maintained a ready supply of firearms,

10  including handguns, shotguns, automatic and semi-automatic assault

11  rifles, and machine-guns, to enforce its authority.   These firearms

12  often were stolen or unregistered so that their use could not be

13  readily connected to the Mongols who used and maintained them.

14  Mongols often discarded or destroyed firearms after their use in

15  incidents related to the Mongols Gang.   The Mongols Gang, therefore,

16  maintained a steady source of supply for additional unregistered or

17  non-traceable firearms.

18  C.   DEFENDANT AND ITS REGISTRATION OF THE WORD AND RIDER MARKS

19       23.   At all relevant times, defendant MONGOL NATION was an

20  unincorporated association comprised of full patched members of the

21  Mongols Gang who, among other things, maintained authority to control

22  the use and display of the Word Image and Rider Image.   Defendant

23  MONGOL NATION controlled the use and display of the Word Image and

24  the Rider Image.

25       24.   On or about January 11, 2005, as the result of an

26  application caused to be submitted by Ruben Cavazos, Sr., at the time

27  the President of the Mongols Gang, defendant MONGOL NATION was

28  granted registration of the Word Image with the United States Patent

and Trademark Office ("USPTO") as a collective membership mark (the "Word Mark") (registration number 2916965).

25. On or about about April 4, 2006, as the result of an application caused to be submitted by Ruben Cavazos, Sr., at the time the President of the Mongols Gang, defendant MONGOL NATION was granted registration of the Rider Image with the USPTO as a trademark/service mark (the "Rider Mark") (registration number 3076731).

26. On or about March 26, 2008, Ruben Cavazos, Sr., at the time the President of the Mongols Gang, purported to cause defendant MONGOL NATION to assign its entire interests in the Word and Rider Marks to Shotgun Production, LLC, a company wholly and solely owned and controlled by Ruben Cavazos, Sr. The USPTO recorded this assignment on or about April 3, 2008.

27. Between April 3, 2008 and October 2008, Ruben Cavazos, Sr., was removed as President of the Mongols Gang and replaced by Hector Gonzalez, who disputed the validity of the assignment of defendant MONGOL NATION's entire interests in the Word and Rider Marks to Shotgun Production, LLC. On or about October 13, 2008, Hector Gonzalez, at the time the President of the Mongols Gang, caused to be filed with the USPTO a "corrective assignment" of the Word and Rider Marks from Shotgun Production, LLC back to defendant MONGOL NATION, asserting, among other things, that: (a) "Mongol Nation has invested substantial effort over the years in the advertising and promotion of its products and services to develop goodwill associated with" the Word and Rider Marks; (b) "[m]embers of Mongol Nation are recognized by their jackets which prominently display the [Word and Rider Marks] on the back"; (c) the Word and Rider Marks "are, and have always

been, owned by Mongol Nation"; (d) defendant MONGOL NATION "controls the use and quality of the services and goods provided under these marks"; (e) the "over 800 members of Mongol Nation recognize the [Word and Image Marks] as belonging to Mongol Nation"; (f) Ruben Cavazos, Sr., and Shotgun Productions LLC "fraudulent[ly] created and filed the assignment in an attempt to appropriate Mongol Nation's intellectual properties"; (g) "Shotgun's recordation of the assignment was without knowledge or authorization of Mongol Nation"; and (h) "[a]t no time did Mongol Nation assign any rights in its marks to Mr. Cavazos or Shotgun Productions." The USPTO recorded the "corrective assignment" on or about October 14, 2008.

28. On or about December 17, 2008, Martin Guevara, at the time a member of the Mongols Gang, caused Mongols Nation Motorcycle Club, Inc., to be formally incorporated in the State of California.

29. On or about January 21, 2009, Martin Guevara, at the time the president of the Mongols Gang, purported to assign the entire interest in the Word and Rider Marks from defendant MONGOL NATION to Mongols Nation Motorcycle Club, Inc. The USPTO recorded this assignment on or about January 22, 2009.

30. On or about June 28, 2011, in ruling on a petition filed by Mongols Nation Motorcycle Club, Inc., in United States v. Ruben Cavazos, Sr., aka "Doc," et al., No. CR 08-1201-ODW, the United States District Court for the Central District of California held that the purported assignment by Ruben Cavazos, Sr., of defendant MONGOL NATION's rights to the Word and Rider Marks "to Shotgun Productions[, LLC], an entity under Cavazos' sole control was invalid."

1    31.  On or about September 19, 2011, Mongols Nation Motorcycle
2  Club, Inc., was voluntarily dissolved.  In its Certificate of
3  Dissolution filed with the California Secretary of State, it verified
4  that it never incurred any known debts or liabilities and never
5  acquired any known assets.

6    32.  As a result of the invalidity of the purported intervening
7  assignment of rights to the Word and Rider Marks to Shotgun
8  Production LLC, and the voluntary dissolution and disavowal of
9  ownership of any assets by Mongols Nation Motorcycle Club, Inc., at
10  all relevant times since their registration with the USPTO, all
11  rights in the Word and Rider Marks have been held by defendant MONGOL
12  NATION.

13    33.  In registering and holding the rights to the Word and Rider
14  Marks, defendant MONGOL NATION furthered the criminal purposes of the
15  Mongols Gang by furthering its control of the symbols, namely the
16  Word Image and the Rider Image, that the Mongols Gang used both to
17  identify Mongols who would participate in criminal activity on behalf
18  of the Mongols Gang and to intimidate others by identifying Mongols
19  who would take criminal action against them on behalf of the Mongols
20  Gang if they took action contrary to the interests of the Mongols
21  Gang.  In so acting, defendant MONGOL NATION conducted and
22  participated in the conduct of the affairs of the Mongols Gang.

23  D.    PURPOSES OF THE ENTERPRISE

24    34.  The purposes of the Mongols Gang, including its leaders,
25  full patched members, prospective and probationary members, and
26  associates, included, but were not limited to, the following:

27

28

a. Enriching the Mongols Gang through, among other things, control of and participation in the distribution of narcotics in territory controlled by the Mongols Gang.

b. Maintaining the control and authority of the Mongols Gang over territory claimed by the Mongols Gang.

c. Preserving, protecting, and expanding the power of the Mongols Gang through the use of intimidation, violence, threats of violence, assault, and murder.

d. Promoting and enhancing the authority of the Mongols Gang and of its full patched members, prospective and probationary members, and associates.

E.   MEANS AND METHODS OF THE ENTERPRISE

35. The means and methods by which defendant MONGOL NATION and its co-racketeers conducted and participated in the conduct of the affairs of the Mongols Gang included:

a. Acting on behalf of the Mongols Gang under the authority conveyed by their display of the Word and Rider Images as authorized by defendant MONGOL NATION, Mongols committed, and attempted and threatened to commit, acts of violence, including murder, to protect and expand the Mongols Gang's criminal operations, which included assaults, murders, intimidation, robberies, drug-trafficking and threats of violence directed against rival gang members, law enforcement, and potential witnesses to the crimes of the enterprise.

b. Acting on behalf of the Mongols Gang under the authority conveyed by their display of the Word and Rider Images as authorized by defendant MONGOL NATION, Mongols promoted a climate of fear through intimidation, violence and threats of violence intended

to promote the authority of the Mongols Gang and insulate Mongols from liability for the drug-trafficking and violent crimes of the Mongols Gang.

c.  Acting on behalf of the Mongols Gang under the authority conveyed by their display of the Word and Rider Images as authorized by defendant MONGOL NATION, Mongols murdered, attempted to murder, assaulted, and threatened those who posed a threat to the Mongols Gang.

d.  Acting on behalf of the Mongols Gang, in accordance with agreements with rival gangs negotiated by Mongols Gang leaders under the authority conveyed by their display of the Word and Rider Images as authorized by defendant MONGOL NATION, Mongols engaged in trafficking of controlled substances as a means to generate income for themselves and the Mongols Gang.

## II. THE RACKETEERING OFFENSE

36.  Beginning on a date unknown but at the latest by on or about March 16, 2002, and continuing to at least on or about May 15, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant MONGOL NATION, an unincorporated association consisting of full patched members of the Mongols Gang criminal enterprise, being a person employed by and associated with the Mongols Gang criminal enterprise, which was a criminal enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly did conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of the racketeering acts set forth below.

III. PATTERN OF RACKETEERING ACTIVITY

37.   The pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisted of the following acts:

38.   Racketeering Act One (Conspiracy to Distribute Cocaine and Methamphetamine): Beginning on a date unknown to the Grand Jury and continuing through at least on or about May 15, 2018, within the Central District of California and elsewhere, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, together with prospective and probationary members and associates of the Mongols Gang and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.   To distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii); and

b.   To distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

39.   Racketeering Act Two (Attempted Murder): On or about December 4, 2005, in Riverside County, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought D.F., J.V., and S.G., in violation of California Penal Code Sections 187 and 664.

40.   Racketeering Act Three (Distribution of Methamphetamine): On or about November 26, 2006, in Los Angeles County, within the

17

Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

41. Racketeering Act Four (Murder): On or about February 14, 2007, in Los Angeles County, within the Central District of California, defendant MONGOL NATION, acting by and through a full patched member of the Mongols Gang and in concert with an associate of the Mongols Gang, with malice aforethought killed L.H., in violation of California Penal Code Section 187.

42. Racketeering Act Five (Attempted Murder): On or about April 8, 2007, in Los Angeles County, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought M.G. and Z.S., in violation of California Penal Code, Sections 187 and 664.

43. Racketeering Act Six (Attempted Murder): On or about April 6, 2008, in Pasadena, California, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought R.H. and J.H., in violation of California Penal Code Sections 187 and 664.

44. Racketeering Act Seven (Distribution of Methamphetamine): On or about April 10, 2008, in Montebello, California, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, knowingly and intentionally distributed methamphetamine, a Schedule II controlled

1 │ substance, in violation of Title 21, United States Code, Section

2 │ 841(a)(1).

3 │     45.  Racketeering Act Eight (Distribution of Methamphetamine):

4 │ On or about June 19, 2008, in Los Angeles, California, within the

5 │ Central District of California, defendant MONGOL NATION, acting by

6 │ and through full patched members of the Mongols Gang, knowingly and

7 │ intentionally distributed methamphetamine, a Schedule II controlled

8 │ substance, in violation of Title 21, United States Code, Section

9 │ 841(a)(1).

10 │     46.  Racketeering Act Nine (Murder):  On or about September 2,

11 │ 2008, in San Francisco, California, defendant MONGOL NATION, acting

12 │ by and through a full patched member of the Mongols Gang, with malice

13 │ aforethought killed M.G., in violation of California Penal Code

14 │ Section 187.

15 │     47.  Racketeering Act Ten (Murder):  On or about November 6,

16 │ 2009, in Merced County, California, defendant MONGOL NATION, acting

17 │ by and through full patched members of the Mongols Gang, with malice

18 │ aforethought killed B.J., in violation of California Penal Code

19 │ Section 187.

20 │     48.  Racketeering Act Eleven (Murder):  On or about May 21,

21 │ 2017, in Riverside, California, within the Central District of

22 │ California, defendant MONGOL NATION, acting by and through full

23 │ patched members of the Mongols Gang, with malice aforethought killed

24 │ J.D., in violation of California Penal Code Section 187.

25 │

26 │

27 │

28 │

COUNT TWO

[18 U.S.C. § 1962(d)]

49.   The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 35 and 37 through 48 of this First Superseding Indictment.

A.   THE RACKETEERING CONSPIRACY

50.   Beginning on a date unknown but at the latest by on or about March 16, 2002, and continuing to at least on or about May 15, 2018, in Los Angeles and Riverside Counties, within the Central District of California and elsewhere, defendant MONGOL NATION, an unincorporated association consisting of full patched members of the Mongols Gang criminal enterprise, together with others known and unknown to the Grand Jury, being persons employed by and associated with the Mongols Gang criminal enterprise, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of: (a) multiple acts chargeable under the following provisions of California state law: murder, attempted murder, and conspiracy to commit murder, in violation of California Penal Code Sections 182, 187, and 664; and (b) multiple acts involving conspiracy to distribute and distribution of controlled substances, including methamphetamine and cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and

20

846. It was a further part of the conspiracy that defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

B. MEANS BY WHICH THE OBJECT OF THE RACKETEERING CONSPIRACY WAS ACCOMPLISHED

51. The object of the racketeering conspiracy was accomplished in substance as set forth below.

52. Mongols Gang leaders and officers, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez, conducted organizational meetings and directed Mongols to conduct and engage in robberies, assaults, murders, extortion, and drug trafficking, as well as the collection and management of money, including proceeds generated from unlawful activity by Mongols, to promote and further the activities of the Mongols Gang.

53. Mongols Gang leaders, officers, full patched members, and prospective members, including Andres Rodriguez, Enrique Munoz, Joe Garcia, Manuel Armendarez, Rafael Lozano, Alex Lozano, Manuel Vasquez, Edward Ramirez, Alberto Madrigal, Oscar Hernandez, and others obtained and distributed methamphetamine and cocaine to Mongols and other narcotics customers.

54. Mongols Gang leaders and officers, including Ruben Cavazos, Sr. and Hector Gonzalez, negotiated with Mexican Mafia representatives concerning the collection of tax payments for the narcotics-trafficking activities of Mongols in areas otherwise controlled by the Mexican Mafia.

55. Mongols Gang leaders, officers, full patched members, prospective members, and associates, including Ruben Cavazos, Sr.,

Ruben Cavazos, Jr., Hector Gonzalez, and Arthur Roseli, obtained firearms, knives, bullet-proof vests and explosives to be used to enforce the authority of the Mongols Gang against rival gang members, the general public and law enforcement.

56.  Mongols Gang leaders and officers, including Ruben Cavazos, Sr., Hector Gonzalez, William Michael Munz, and Lawrence Wilson directed Mongols to travel to different locations and commit acts of violence, including murder, against rival gang members, law enforcement or other persons who challenged the authority of the Mongols Gang.

57.  Mongols Gang leaders, officers, full patched members, prospective members, and associates, including Ruben Cavazos, Sr., William Michael Munz, Walter Ramirez, Andres Rodriguez, Enrique Munoz, Shawn Buss, Manuel Armendarez, Rafael Lozano, Alex Lozano, Denis Maldonado, Jose Norberto Montes, Austin Melcer, Christopher Loza, John Newman, Thomas Savala, Christopher Ablett, and others committed acts of violence, including murder and attempted murder, against rival gang members, law enforcement, and other persons who challenged the authority of the Mongols Gang.

58.  Mongols Gang leaders, including Ruben Cavazos, Sr., and Hector Gonzalez, and others acting at their direction, conducted financial transactions to conceal the proceeds derived from the crimes of the Mongols Gang and convert those proceeds to promote the crimes of the Mongols Gang and enrich themselves.

59.  Mongols Gang leaders and officers, including Ruben Cavazos, Sr., and Ruben Cavazos, Jr., recruited new individuals to become Mongols and directed their initiation into the Mongols Gang.

1    60.   Defendant MONGOL NATION held and maintained trademark

2    rights in the Word and Image Marks, in order to limit and control the

3    use of the Word and Image Marks as a means of, among other things,

4    ensuring that the display of the Word and Image Marks by Mongols

5    engaged in the criminal activities described in paragraphs 51 through

6    59 above conveyed that those criminal activities were being carried

7    out on behalf of the Mongols Gang.

8    C.    OVERT ACTS

9        61.   In furtherance of the conspiracy, and to accomplish the

10   object of the conspiracy, the following overt acts were committed by

11   the following co-conspirators, acting together with others known and

12   unknown to the Grand Jury, on or about the following times and dates,

13   within the Central District of California and elsewhere, at a time

14   when the co-conspirators identified were acting in their capacity as

15   leaders, officers, full patched members, prospective and probationary

16   members, or associates of the Mongols Gang, and with the intent to

17   benefit the Mongols Gang:

18       62.   On or about March 16, 2002, in Riverside County,

19   California, Mongols, including Walter Ramirez, attended an "ultimate

20   fighting" match at the Morongo Casino in Cabazon, California, dressed

21   in Mongols Gang vests displaying the Word and Rider Images, and

22   provoked a riot, during which Walter Ramirez and other Mongols

23   attacked J.D., P.S., W.C., J.G., A.L., M.L., and numerous other

24   victims with knives, struck victims with chairs, and kicked them with

25   steel-toed boots.

26       63.   On or about April 27, 2002, Mongols, including Ruben

27   Cavazos, Sr., Walter Ramirez, and Benjamin Leyva, wearing Mongols

28   Gang vests displaying the Word and Rider Images, engaged in an armed

confrontation with "Hells Angels" gang members at the Harrah's Casino in Laughlin, Nevada, during which Hells Angels gang members R.T. and J.B. and Mongol S.B. were killed.

64. On or about December 4, 2005, Mongols, including Andres Rodriguez, Rafael Lozano, Alex Lozano, and Ricardo Gutierrez, wearing Mongols gang vests displaying the Word and Rider images, attacked rival gang members and members of the public, including an off-duty fire department officer, as they attempted to collect donations at a "Toys for Tots" event in Norco, California.

65. On or about March 11, 2006, at a Mongols Gang "All Members" meeting in Los Angeles County, California, Mongols Gang president Ruben Cavazos, Sr., wearing a Mongols Gang vest displaying the Word and Rider Images, advised approximately 200 Mongols, many of whom were also wearing Mongols Gang vests displaying the Word and Rider Images, that they should be alert to the possibility of wiretap monitoring by federal law enforcement agents and should be careful not to discuss incriminating matters on the telephone. Ruben Cavazos, Sr. also discussed criminal investigations conducted by the Bureau of Alcohol, Tobacco and Firearms, as well as the risk to the Mongols Gang of prosecution for its racketeering crimes.

66. On or about May 18, 2006, Mongols Gang leader William Michael Munz recruited Mongols to retaliate against rival "Hells Angels" gang members following an attack on a Mongol and that Mongol's girlfriend.

67. On or about August 17, 2006, Mongols Gang full patched members Manuel Armendarez and Rafael Lozano sold approximately 57.2 grams of methamphetamine to an undercover law enforcement officer.

68.  On or about November 6, 2006, in San Bernardino, California, Mongols Gang full patched member Rafael Lozano sold approximately 113.7 grams of actual methamphetamine to an undercover law enforcement officer.

69.  On or about November 26, 2006, in Los Angeles County, Mongols Gang full patched members Andres Rodriguez and David Edward Gil sold approximately 56.7 grams of actual methamphetamine to an undercover law enforcement officer.

70.  On or about December 4, 2006, at a Mongols Gang "Mother Chapter" meeting in West Covina, California, Mongols Gang president Ruben Cavazos, Sr., wearing a Mongols Gang vest displaying the Word and Rider Images, advised other Mongols present at the meeting, many of whom were also wearing Mongols Gang vests displaying the Word and Rider Images, that he had identified 20 to 25 "front-line warriors" for the Mongols Gang who would be responsible for addressing the most significant violent confrontations for the organization.  Cavazos also directed Mongols to leave their weapons at his residence in order to prevent them from being identified and seized by law enforcement after the meeting.

71.  On or about December 10, 2006, Mongols, including Shawn Buss, Abram Wedig, and Joseph Braden, wearing Mongols Gang vests displaying the Word and Rider Images, attacked and beat an African-American patron at the Tokio Lounge in Hollywood, California, while shouting racist slurs at the victim.

72.  On or about February 14, 2007, Mongols Gang full patched member Jose Norberto Montes and Mongols Gang associate Austin Melcer beat L.H. to death at "Young's Tavern" in Lancaster, California.

25

73. On or about March 23, 2007, Mongols Gang full patched member Manuel Armendarez sold approximately 55.5 grams of methamphetamine to an undercover law enforcement officer.

74. On or about April 8, 2007, Mongols Gang member Denis Maldonado, wearing Mongols Gang clothing displaying the Word and Rider Images, shot rival Maravilla gang members M.G. and Z.S. at the "Nicola's" bar in Los Angeles, California.

75. On or about April 8, 2007, Mongols Gang members drove Denis Maldonado to San Diego, California, in order to prevent Maldonado from being identified and apprehended by law enforcement after Maldonado shot two victims at the "Nicola's" bar in Los Angeles.

76. In or about April 2007, in Los Angeles, California, Mongols Gang leaders Ruben Cavazos, Sr. and William Michael Munz rewarded Denis Maldonado with authorization to display a Mongols Gang full patch insignia, including the Word and Rider Images, tattooed on his head for having shot two members of the rival Maravilla gang on April 8, 2007.

77. On or about June 23, 2007, in San Diego County, California, Mongols Gang leader William Michael Munz directed an unidentified co-conspirator to administer a polygraph examination to three undercover law enforcement officers as a condition to their prospective membership in the Mongols Gang.

78. On or about July 19, 2007, Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., Hector Gonzalez, and others, conducted a Mongols Gang "Presidents" and "Sergeant-at-Arms" meeting in Los Angeles County, California, at which Cavazos told those present, many wearing Mongols Gang vests displaying the Word and Rider Images, that they needed to demonstrate the "strength and

muscle" of the Mongols Gang; described the expansion of the Mongols Gang into other states across the nation; and discussed the need to use violence to expand the authority of the Mongols Gang into new areas not previously controlled by the Mongols Gang.

79. On or about August 18, 2007, Mongols from Indiana, Oklahoma, and California, many wearing Mongols Gang vests displaying the Word and Rider Images, used guns, knives, brass knuckles, bullet-proof vests, and baseball bats to seize control of bars and bar patrons and to then attack rival "Sons of Silence" Motorcycle gang members at those bars in Indianapolis, Indiana.

80. On or about October 6, 2007, in Palm Springs, California, Mongols Gang leaders, including Ruben Cavazos, Sr., awarded Mongols "Respect Few Fear None" patches to Mongols, including Hector Gonzalez, Lawrence Wilson, Robert Rios, and Daniel Medel, for having committed acts of violence on behalf of the Mongols Gang.

81. On or about October 6, 2007, in Palm Springs, California, Mongols Gang leaders, including Ruben Cavazos, Sr., William Michael Munz, and Lawrence Wilson, issued a "Respect Few Fear None" patch and a "Black Heart" patch to a Mongol as a reward for that Mongol having engaged in a confrontation with a rival gang member on behalf of the Mongols Gang in Indianapolis, Indiana.

82. On or about November 21, 2007, in Los Angeles, California, Mongols Gang full patched member Enrique Munoz possessed and attempted to transport approximately 66.8 grams of methamphetamine.

83. On or about December 22, 2007, Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez, and other Mongols Gang members, wearing Mongols Gang clothing displaying the Word and Rider Images, conducted a Mongols

Gang "Mother Chapter" meeting at Cavazos, Sr.'s residence in West Covina, California, while Mongols Gang Prospects were required to maintain an armed presence outside the residence.

84. On or about December 27, 2007, by telephone using coded language, Mongols Gang leaders Hector Gonzalez and Ruben Cavazos, Sr., discussed plans to collect $40 from all Mongols to pay legal costs for Mongols who were facing charges for crimes committed on behalf of the Mongols Gang.

85. On or about December 28, 2007, at the shop of Mongols Gang leader Hector Gonzalez in El Monte, California, Mongols Gang leaders Hector Gonzalez, Ruben Cavazos, Jr., and Anthony Tinoco collected monthly dues from members of various Mongols chapters while prospective members provided security.

86. On or about February 5, 2008, by telephone using coded language, Mongols Gang leaders Ruben Cavazos, Sr. and William Michael Munz discussed the Mongols Gang's conflicts with the Mexican Mafia based on the Mongols Gang's refusal to pay "taxes" to "La Eme" for its narcotics trafficking and the consequences of Mongols entering protective custody while in prison.

87. On or about February 11, 2008, Mongols attacked rival "Hells Angels" gang members at the "Parkway Bowl" in El Cajon, California, and admonished the victims that they were in Mongols Gang territory.

88. On or about February 14, 2008, by telephone, Mongols Gang leaders Ruben Cavazos, Sr., and Ruben Cavazos, Jr., discussed obtaining the Image Mark.

89. On or about February 17, 2008, in West Covina, California, Mongols Gang leader Ruben Cavazos, Jr., wearing a Mongols Gang vest

28

1  displaying the Word and Rider Images, directed undercover law

2  enforcement officers posing as Mongols Gang Prospects to store

3  firearms in Ruben Cavazos, Jr.'s car.

4      90.  On or about February 17, 2008, in West Covina, California,

5  Mongols Gang full patched members Andres Rodriguez and Juan Nieves

6  discussed retaliating against rival gang members who had shot at

7  Nieves on February 1, 2008.

8      91.  On or about March 17, 2008, in West Covina, California,

9  Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos,

10  Jr., Hector Gonzalez, and Arthur Roseli possessed on behalf of the

11  Mongols Gang a loaded .22 caliber rifle, a Sturm Ruger mini-thirty

12  rifle, a 12-gauge shotgun, a .30 caliber rifle, two Taurus 9 mm

13  handguns, five .45 caliber handguns, a .223 caliber rifle, a loaded

14  5.56 caliber rifle, and two .38 caliber revolvers.

15      92.  On or about April 6, 2008, Mongols Christopher Loza and

16  John Newman stabbed R.H. and beat J.H. at a Mobil gas station in

17  Pasadena, California.

18      93.  On or about April 10, 2008, in Montebello, California,

19  Mongols Gang full patched member Ricardo Gutierrez sold approximately

20  107.1 grams of methamphetamine to an undercover law enforcement

21  officer.

22      94.  On or about April 12, 2008, in Maywood, California, Mongols

23  Gang leader William Michael Munz, wearing a Mongols Gang vest

24  displaying the Word and Rider Images, addressed Mongols at an "all

25  members" meeting, many wearing Mongols Gang vests displaying the Word

26  and Rider Images, and told them that he believed Mongols Gang leader

27  Ruben Cavazos, Sr., was being investigated for "terrorist

28  recruitment." At the same meeting, Mongols Gang leaders William

29

Michael Munz and Ruben Cavazos, Jr., directed Mongols to contribute to a fund for Ruben Cavazos, Sr.'s legal fees.

95. On or about May 24, 2008, Mongols, some of whom were wearing Mongols Gang vests displaying the Word and Rider Images, displayed a .45 caliber semi-automatic handgun belonging to Mongols Gang leader Ruben Cavazos, Jr., and threatened D.Q. in the parking lot of the "Ordonez" restaurant in Montebello, California, stating to D.Q. that he was "f***ing with Mongols" and that he would know who the Mongols were as a result. Cavazos, Jr., hid the gun after the confrontation.

96. On or about June 6, 2008, at the Mongols Gang's "National Run" in San Diego County, Mongols Gang leader Ruben Cavazos, Sr., awarded the "Respect Few Fear None" patch to Mongols Christopher Loza and John Newman to reward them for the attack on R.H. and J.H. in Pasadena, California, on April 6, 2008.

97. On or about June 19, 2008, Mongols Gang full patched members Alex Lozano and Rafael Lozano distributed approximately 62.5 grams of methamphetamine to an undercover law enforcement officer.

98. On or about July 26, 2008, Mongols Gang full patched member Shawn Buss participated in a Mongols National Presidents Meeting at which Mongols Gang members were advised to use caution speaking on the phone or writing on the internet in order to make it more difficult for law enforcement to detect criminal conduct by Mongols Gang members.

99. On or about August 30, 2008, in Vernon, California, Mongols Gang leader Hector Gonzalez, wearing a Mongols Gang vest displaying the Word and Rider Images, advised Mongols, many wearing Mongols Gang vests displaying the Word and Rider Images, that Gonzalez had met

1   with Mexican Mafia representatives in order to resolve conflicts

2   between the Mexican Mafia and the Mongols Gang.

3       100. On or about September 2, 2008, in San Francisco,

4   California, Mongol Christopher Ablett, wearing a Mongols Gang vest

5   displaying the Word and Rider Images, stabbed "Hell's Angels" gang

6   member M.G. repeatedly and shot M.G. in the head and chest, killing

7   him.

8       101. On or about September 17, 2008, in Los Angeles County,

9   California, Mongol Manuel Vasquez possessed with intent to distribute

10  approximately 7.9 grams of methamphetamine.

11      102. On or about October 10, 2008, at a Mongols Sergeants-at-

12  Arms meeting held in El Monte, California, Mongols Gang leader Hector

13  Gonzalez discussed the arrest of a Mongols member for the recent

14  killing of the president of the Hells Angels San Francisco chapter

15  and stated that the Mongols would back that Mongols member by paying

16  his legal fees, which could be substantial.

17      103. On or about May 7, 2009, in Los Angeles County, California,

18  Mongols Edward Ramirez and Alberto Madrigal possessed approximately

19  13 kilos of cocaine, kilo packaging materials, vacuum seal bags, an

20  electric vacuum sealer, and Mongols Gang clothing and paraphernalia

21  displaying the Word and Rider Images.

22      104. On or about November 6, 2009, in Merced County, California,

23  a group of 10-12 Mongols entered a bar and, while shouting "Mongols,"

24  stabbed to death B.J.

25      105. On or about May 25, 2012, in Wilmington, California,

26  Mongols Gang member Carlos Mercado and Mongols Gang associate Aaron

27  Collins shot at members of the Los Angeles County Sheriff's

28

1   Department who were attempting to execute a search warrant at
2   Mercado's residence.

3        106. On or about January 11, 2015, in La Mirada, California,
4   Mongols Gang members Mike Cruz and Abram Navarette and Mongols Gang
5   associates Adam Pantoja and Yvonne Cruz attacked G.R. and attempted
6   to kill G.R. by punching and kicking G.R. in his head outside the
7   Sportsman's Lounge.

8        107. On or about April 22, 2015, in Cathedral City, California,
9   Mongols Gang members Kurt Rojo, Jason Romero, and Edwin Vicente
10  Garcia attacked and threatened to kill J.N. and J.N.'s father at an
11  AM/PM store.

12       108. On or about December 6, 2015, in La Mirada, California,
13  Mongols Gang member Sergio Vasquez attacked J.C. and stabbed J.C. in
14  the face at the Torch Room bar.

15       109. On or about June 30, 2016, in Riverside, California,
16  Mongols Gang member Thomas Zon and associate Nikki Vega possessed
17  three bags containing approximately 34.7 grams of methamphetamine,
18  $772 in cash, and personal identifying information and bank account
19  numbers for approximately ten different people.

20       110. On or about August 21, 2016, in Riverside, California,
21  Mongols Gang member Vincent Dominguez wore a knife and concealed a
22  firearm inside his Mongols vest.

23       111. On or about May 21, 2017, in Riverside, California, Mongols
24  Gang members shot and killed J.D. at a Shell gas station.

25       112. On or about March 12, 2018, in Riverside, California,
26  Mongols Gang members Francisco Paredes and Michael Varela and Mongols
27  associate Daniel Florez assaulted and attempted to kill E.H. outside
28  "Slick's" restaurant.

FORFEITURE ALLEGATION

[18 U.S.C. § 1963]

113. The allegations in Counts One and Two of this First Superseding Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

114. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to defendant MONGOL NATION that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of defendant's conviction on either of the two racketeering violations charged in this First Superseding Indictment.

115. Defendant MONGOL NATION:

a. has acquired and maintained interests in property in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), including interests in the Word and Rider Images, which are described more specifically below;

b. has an interest in, security of, claims against, and property and contractual rights that afford a source of influence over the enterprise named and described herein, which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2), including the Word and Rider Images, which are described more specifically below; and

c.   has property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3), including the Word and Rider Images, which are described more specifically below.

116. The interests of defendant MONGOL NATION subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1), (a)(2), and (a)(3) include but are not limited to:

a. All rights of any kind or nature associated with or appurtenant to the trademark/service mark/association mark consisting of the word "Mongols" that, at one time, was registered with the USPTO under Registration No. 2916965, whether used for purposes of commerce, associative purposes, or any other purpose, whether in connection with promoting the interests of persons interested in the recreation of riding motorcycles or otherwise, and which has been used by defendant MONGOL NATION in the following form, the Word



Image, among others:

b.    All rights of any kind or nature associated with or appurtenant to the trademark/service mark/association mark consisting of the Rider Image reproduced immediately below that, at one time, as registered with the USPTO under Registration No. 3076731, whether used for purposes of commerce, associative purposes, or any other purpose, whether in connection with promoting the interests of persons interested in the recreation of riding motorcycles or otherwise, and which has been used by defendant MONGOL NATION in the following form:



117. If any of the property described above, as a result of any act or omission of defendant MONGOL NATION,

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without difficulty, the court shall order the forfeiture of

1   any other property of defendant MONGOL NATION up to the value of any

2   property described above.

3                                         A TRUE BILL

4

5                                         _____/S/_____
                                              Foreperson

6

7   NICOLA T. HANNA
    United States Attorney

8

9   LAWRENCE S. MIDDLETON

10  Assistant United States Attorney
    Chief, Criminal Division

11

12  JUSTIN R. RHOADES
    Assistant United States Attorney

13  Chief, Violent and Organized Crime Section

14

15  STEVEN WELK
    Assistant United States Attorney

16  Chief, Asset Forfeiture Section

17  CHRISTOPHER BRUNWIN
    Assistant United States Attorney

18  Violent and Organized Crime Section

19

20

21

22

23

24

25

26

27

28