NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
CHRISTOPHER BRUNWIN (Cal. Bar No. 158939)
Assistant United States Attorney
Violent and Organized Crime Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-6166/4242
    Facsimile:    (213) 894-3713
    E-mail:    Steven.Welk@usdoj.gov
        Christopher.Brunwin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 13-106(A)-DOC |
| Plaintiff, | |
| vs. | **GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES RE: TIMING OF CONSTITUTIONAL ISSUES RELATING TO CRIMINAL FORFEITURE; DECLARATION OF AUSA STEVEN R. WELK** |
| MONGOL NATION, an unincorporated association, | |
| Defendant. | |

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ................................................................. 1

II.  CONVICTION AND THE FORFEITURE PHASE ...................................... 2

    A.   The Conviction of Defendant ............................................. 2

    B.   The Forfeiture Phase of the Trial ....................................... 4

        1.   The Jury's Determination of What Property is Forfeitable and Entry of the Preliminary Order of Forfeiture ...................... 4

        2.   Defendant's Potential Objections to the Entry of the POF ......... 6

    C.   The Ancillary Proceeding and Entry of the Final Order of Forfeiture ..................................................................... 8

        1.   The Ownership Determination .................................... 8

        2.   Determining Defendant's Ownership Interest .................. 9

            a.   Defendant's shifting position on ownership of the Marks ................................................... 9

            b.   Defendant's shifting corporate form ............... 11

        3.   Determination of Potential Third Party Ownership Claims ..... 12

    D.   The Constitutional Issues Are Not Yet Ripe, and Will Not Be Until Both Entry of an FOF and the Commencement of Enforcement Proceedings By the Government in Furtherance of that Order ............................................................... 16

        1.   Article III and Prudential Standing ........................... 16

III. CONCLUSION ................................................................ 22

i

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE**

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ............................................................... 18, 21

*Alexander v. United States*,
    509 U.S. 544 (1993) ..................................................................... 8

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) .................................................................... 19

*Diamond v. Charles*,
    476 U.S. 54 (1986) ..................................................................... 22

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) .................................................................... 21

*Hydranautics v. FilmTec Corp.*,
    204 F.3d 880 (9th Cir. 2000) ......................................................... 9

*In re Berr*,
    172 B.R. 299 (9th Cir. BAP 1994) .................................................. 9

*Libretti v. United States*,
    516 U.S. 29 (1995) ..................................................................... 18

*Poe v. Ullman*,
    367 U.S. 497 (1961) .................................................................... 19

*Railway Mail Ass'n v. Corsi*,
    326 U.S. 88 (1945) ..................................................................... 19

*Regional Rail Reorg. Act Cases*,
    419 U.S. 102 (1974) .................................................................... 18

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ..................................................................... 19

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (*en banc*) ...................................... 18, 19

*United States v. Andrews*,
  530 F.3d 1232 (10th Cir. 2008) .................................................................. 9, 12

*United States v. Busher*,
  817 F.2d 1409 (9th Cir. 1987) ........................................................................ 8

*United States v. Gaskin*,
  2002 WL 459005, *9 (W.D.N.Y. Jan. 8, 2002), *aff'd*,
  364 F.3d 438 (2d Cir. 2004)........................................................................... 9

*United States v. Gilbert*,
  244 F.3d 888 (11th Cir. 2001) ...................................................................... 12

*United States v. Kennedy*,
  201 F.3d 1324 (11th Cir. 2000) .................................................................... 15

*United States v. Lazarenko*,
  476 F.3d 642 (9th Cir. 2007) .................................................................. 5, 8, 9

*United States v. Lester*,
  85 F.3d 1409 (9th Cir. 1996) ........................................................................ 15

*United States v. McHan*,
  345 F.3d 262 (4th Cir. 2003) ........................................................................ 12

*United States v. Mongol Nation*,
  132 F. Supp. 3d 1207 (CD Cal 2015), *rev'd on other grounds*,
  693 Fed. App'x. 637 (2017) .................................................................... 17, 18

*United States v. Monsanto*,
  491 U.S. 600 (1989) ...................................................................................... 5

*United States v. Nava*,
  404 F.3d 1119 (9th Cir. 2005) .................................................................. 8, 14

*United States v. Newman*,
  659 F.3d 1235 (9th Cir. 2011) ....................................................................... 5

*United States v. Nicolo*,
  597 F. Supp. 2d 342 (W.D.N.Y. 2009) ........................................................... 6

*United States v. Schlesinger*,
  396 F. Supp. 2d 267 (E.D.N.Y. 2005) ............................................................ 6

iii

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ........................................................................... 20

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 1962 ........................................................................... 18

18 U.S.C. § 1963 ........................................................................... 11, 18

18 U.S.C. § 1963(a)(1)-(3) ........................................................... 5

18 U.S.C. § 1963(d)(1)(A) ........................................................... 17

18 U.S.C. § 1963(e) ..................................................................... 16, 17

18 U.S.C. § 1963(f) ..................................................................... 7

18 U.S.C.  § 1963(l) ..................................................................... 12

18 U.S.C. § 1963(l)(2) ................................................................. 13

18 U.S.C. § 1963(l)(4) ................................................................. 13

18 U.S.C. § 1963(l)(5) ................................................................. 14

18 U.S.C. § 1963(l)(6) ................................................................. 14

18 U.S.C. § 1963(l)(7) ................................................................. 15

21 U.S.C. § 853(n)(6) ................................................................. 14

Fed. R. Crim. P. 32.2 ..................................................................9, 15

Fed. R. Crim. P. 32.2(b)(1)(A) .....................................................5

Fed. R. Crim. P. 32.2(b)(2)(A) .....................................................5

Fed. R. Crim. P. 32.2(b)(2)(B) .....................................................5

Fed. R. Crim. P. 32.2(b)(4)(A) .....................................................5

Fed. R. Crim. P. 32.2(b)(5) ...........................................................5

Fed. R. Crim. P. 32.2(b)(6)(A) .....................................................12

Fed. R. Crim. P. 32.2(c) ................................................................12

Fed. R. Crim. P. 32.2(c)(1) ...........................................................13

Fed. R. Crim. P. 32.2(c)(1)(A) .....................................................13

Fed. R. Crim. P. 32.2(c)(1)(B) .....................................................13

Fed. R. Crim. P. 32.2(c)(2) ...........................................................15

**MISCELLANEOUS**

Advisory Committee Notes to Federal Rules of Criminal Procedure 32.2
    (2000 Adoption) ...........................................................................9, 14, 15

## I.     INTRODUCTION

Over the course of the proceedings in this case, the Court has indicated its concern – and defendant Mongol Nation ("Defendant") has indicated its intent to argue -- that the criminal forfeiture sought by the government in this matter may (or will) implicate certain Constitutional rights, including First Amendment rights of association and free expression, particularly with respect to the government's efforts to forfeit the rights and privileges associated with the federally-registered collective membership marks that have been referred to generally as the Word Mark[1], the Center Patch Image[2], and the Combined Mark[3] (collectively, the

---

[1] The "Word Mark" is defined as any and all legal and equitable rights of any kind or nature associated with or appurtenant to the Collective Membership Mark consisting of the word "Mongols" that, at various times, was or is registered with the United States Patent and Trademark Office ("USPTO") under registration numbers 2916965, 4406187 and 4730806, whether for the purposes of commerce, associative purpose, or any other purpose, whether in connection with promoting the interests of persons interested in the recreation of riding motorcycles or otherwise, and which has been used by Defendant Mongol Nation, among other uses, as the top rocker of the three-piece patch awarded to full-patch and probationary members of the Defendant Mongol Nation.

[2] The "Center Patch Image" is defined as any and all legal and equitable rights of any kind or nature associated with or appurtenant to the Collective Membership Mark consisting of the drawn image of a Genghis Khan-type character with sunglasses and a ponytail, riding a motorcycle, with the letters "M.C." appearing below the motorcycle, that, at various times, was or is registered with the USPTO under registration numbers 3076731 and 4730806, whether for the purposes of commerce, associative purpose, or any other purpose, whether in connection with promoting the interests of persons interested in the recreation of riding motorcycles or otherwise, and which has been used by Defendant Mongol Nation, among other uses, as the center patch of the three-piece patch awarded to full-patch, probationary and prospective members of the Defendant Mongol Nation.

[3] The "Combined Mark" is defined as any and all legal and equitable rights of any kind or nature associated with or appurtenant to the Collective Membership Mark consisting of the Word Mark and the Center Patch Image, that, at various times,

1

"Marks"), and items of personal property bearing all or part of any of the Marks. The government, for its part, has provided repeated assurances that it is fully aware of and sensitive to both the Defendant's right to raise and litigate these issues (to the extent it has standing to do so) and the need for the Court to address any of these important Constitutional issues in a manner that will ensure that no such rights will be violated, but be timed so that the issues are addressed under circumstances where the real parties in interest are before the Court and the issues adequately articulated within the meaning of Article III of the Constitution.

The Court and the parties have had several discussions about the process by which the potential Constitutional issues might be addressed by the Court, both on and off the record, but have not had an opportunity to fully develop and identify the relevant issues.  Below, the government presents its analysis of the Constitutional issues that may arise in future proceedings in this case, the point at which the government contends such issues will be ripe for adjudication, and how it recommends the Court address them for the benefit of all parties with a potential stake in the outcome of that adjudication.

## II.   CONVICTION AND THE FORFEITURE PHASE

### A.   The Conviction of Defendant

On December 13, 2018, the jury rendered its verdict finding Defendant guilty of Counts One (substantive RICO) and Two (RICO conspiracy) of the First Superseding Indictment (the "FSI").  In doing so, it unanimously concluded that the government had proven beyond a reasonable doubt: first, that Defendant had

---

was or is registered with the USPTO under registration numbers 3076731 and 4730806, whether for the purposes of commerce, associative purpose, or any other purpose, whether in connection with promoting the interests of persons interested in the recreation of riding motorcycles or otherwise, and all or part of which has been used by Defendant Mongol Nation, among other uses, as the top rocker and center patch of the three-piece patch awarded to full-patch, probationary and prospective members of the Defendant Mongol Nation.

2

committed five of the racketeering acts alleged in Count One, specifically, (1) the murder of Leon Huddleston in Lancaster, California on February 14, 2007; (2) the attempted murder of two Hells Angels prospects in Pasadena on April 6, 2008; (3) a conspiracy to distribute cocaine and methamphetamine; and (4) two distinct methamphetamine transactions that occurred, respectively, on November 26, 2006, and June 19, 2008; and second, that defendant was guilty of the RICO conspiracy alleged in Count Two that included, as overt acts, not only the racketeering acts found to have been proven (listed above), but five additional killings, nine assaults (either beatings, stabbings or shootings), and six separate drug transactions involving methamphetamine or cocaine, including a seizure of more than 13 kilograms of cocaine on May 7, 2009, and a staged transaction involving 20 kilograms of cocaine on June 19, 2008, during which a Mongols member sold an undercover agent 62 grams of methamphetamine.

In addition, there was detailed testimony at trial concerning the October 28, 2014 shotgun murder -- by a Mongols member -- of Shaun Diamond, a Pomona police officer who was executing a court-authorized search warrant, and the May 25, 2012 shooting -- by a Mongols associate -- of Los Angeles Sheriff's Department Deputy Ian Stade, also during the execution of a court-authorized search warrant, which likely would have resulted in the death of Deputy Stade had the round not been stopped when it struck the gun he was holding near his head.

The evidence presented at trial also included numerous instances of typical organized crime/gang activity, including recorded statements by two of defendant's national presidents warning Mongols members to use caution while discussing criminal activity on the telephone; detailing the gang's conflict with the Mexican Mafia over taxation of Mongols drug trafficking activity, and negotiations between the groups; and stressing the need for gang members to commit acts of violence and intimidation to demonstrate the gang's strength and dominance, and expand its sphere of influence into areas across the United States and overseas.

3

The jury also heard extensive testimony and other evidence about the commonplace illegal carrying and use of firearms, and the willingness of members of the Defendant to use firearms to intimidate, terrorize and assault not only members of rival motorcycle and street gangs, but members of the general public. Finally, the jury heard about the gang's rewards system for members who engaged in acts of violence on the gang's behalf, from the skull and crossbones murder patch, to the actual awarding of Respect Few Fear none patches to the perpetrators of the April 8, 2008 attempted murder of two Hells Angels prospects in Pasadena, and the awarding of the right to have the Mongols "full patch" tattooed on the back of a member's head as a reward for having shot two rival gang members.

**B.** **The Forfeiture Phase of the Trial**

> *1.* *The Jury's Determination of What Property is Forfeitable and Entry of the Preliminary Order of Forfeiture*

The jury has been instructed to return on January 8, 2019, to hear the post-conviction forfeiture phase of the trial. The government has already provided a detailed outline of the procedures applicable to post-conviction proceedings in its filing of November 20, 2018 (Docket No. ("DN") 264), which it will not repeat in full here. As explained in that filing, the more important of the procedural rules governing the forfeiture phase are that it (and any forfeiture ordered as a result) is an element of Defendant's sentencing; the parties are permitted, but not required to present additional evidence and argument, but the jury may rely upon the evidence presented during the guilt phase of the trial; the defendant's guilt is not to be re-litigated or re-argued; the government's burden is preponderance of the evidence; and the sole issue to be addressed by the jury is whether the government has established the requisite nexus between the crimes of conviction and the property sought for forfeiture.

4

In a RICO case, the nexus determination (set out at Rule 32.2(b)(1)(A) and (5)) requires the jury to determine whether the property sought for forfeiture falls into one or more of the three categories of property subject to forfeiture following a RICO conviction: (1) any interest that Defendant acquired or maintained as a result of the violations of which it was found guilty; (2) any interest in any enterprise, security of any enterprise, claim against any enterprise, or any property or contractual right affording a source of influence over any enterprise that Defendant established, operated, controlled, conducted, or participated in the conduct of as part of any offense of conviction; and (3) any property constituting or derived from any proceeds that Defendant obtained, directly or indirectly, from racketeering activity.  18 U.S.C. § 1963(a)(1)-(3).

If the jury finds that the government has established the required nexus with respect to specific property, prompt entry of a Preliminary Order of Forfeiture ("POF") describing that property is mandatory.  Rule 32.2(b)(2)(A).[4]  The effect of the POF is to forfeit any interest Defendant may have in the property described therein.  It is "preliminary" not as to Defendant – whose interest in the property listed in the POF must be forfeited and becomes final at the time of sentencing[5] --

---

[4]  *See also United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied."); *United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011) (following *Monsanto*: "When the Government has met the requirements for criminal forfeiture, the district court must impose criminal forfeiture, subject only to statutory and constitutional limits"); *id.* ("[T]he district court has no discretion to reduce or eliminate mandatory criminal forfeiture"); and *United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007) ("Upon a finding that the property involved is subject to forfeiture, a court must promptly enter a preliminary order of forfeiture without regard to a third party's interests in the property").

[5]  *See* Rule 32.2(b)(2)(B)) (the forfeiture is not truly final in a global sense until the existence and validity of any potential third party rights have been determined in the ancillary proceeding); *see also* Rule 32.2(b)(4)(A) ("If the [POF] directs the

5

but as to any third parties who may claim an interest in the property, but who are not defendants and therefore have not had an opportunity to present any such claim. The potential interests of these third parties are determined in the post-POF ancillary proceeding, as discussed below.

>    2.    *Defendant's Potential Objections to the Entry of the POF*

A defendant cannot object to the entry of a POF on the ground that the property at issue does not belong to it. *United States v. Schlesinger*, 396 F. Supp. 2d 267, 273 (E.D.N.Y. 2005); *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (in the forfeiture phase of the trial, the court "is not to consider potentially thorny issues concerning third party ownership of property sought to be forfeited;" if the Government establishes the required nexus to the offense, the convicted defendant's interest in the property must be forfeited; if the property belonged to a third party, he will have an opportunity in the ancillary proceeding to make that claim). And while the government is unaware of the full range of arguments Defendant might make in its attempt to avoid the forfeiture sought here, Defendant has foreshadowed what some of its arguments will be. For the reasons explained below, however, none of them, including the threatened Constitutional challenges, are properly addressed at the time the government requests entry of the POF.[6]

---

defendant to forfeit specific property, it remains preliminary as to third parties until the ancillary proceeding is concluded under Rule 32.2(c).").

[6] That being said, and as addressed in detail below, Defendant's recent filings indicate that even Defendant does not contend that any of its own Constitutional rights are implicated by the forfeiture sought by the government. Rather, Defendant argues that the Constitutional rights of its *members* will be implicated. The government contends that Defendant lacks standing to advance the Constitutional claims of its individual members, whose rights in the Marks – if any – are materially distinct from any rights Defendant may have, and necessarily will be determined either in the post-POF ancillary proceeding, or in proceedings relating to enforcement of any Final Order of Forfeiture ("FOF"). More

6

Defendant has suggested something akin to an "impossibility" argument – *i.e.*, that there are characteristics of the Marks (and the rights and privileges associated with them) that purportedly make it impossible or impractical for them to be forfeited to the government.  *See, e.g.,* DN 263 at 2 (forfeiture of the Marks is "both illogical and improper"; government's "desire to seize the [Marks] is legally flawed and practically problematic"); 3 (expressing Defendant's "serious doubts as to whether [the Marks] can legitimately be seized by the Government"); and 5 ("Government's forfeiture theory would actually result in an unrestricted use of the [Marks] being thrust into the public domain, [rendering the forfeiture] futile"); *see also* DN 272 at 2 (government's forfeiture theory "violat[es] basic principles of trademark law").  None of these arguments has any relevance to the forfeitability of the Marks or the rights and privileges associated with them.  Rather, they relate to what the government may or may not be able to do with the Marks *after* the forfeiture is ordered, which is speculative and unripe, as the government has made no request for authority to do anything to enforce a forfeiture order that has yet to be fully adjudicated, much less entered.

Second, Defendant's "impossibility" argument – which the government contends is entirely unfounded on the merits -- is foreclosed by the plain language of § 1963(f), which provides "any property right or interest not exercisable by, or transferable to, the United States, shall expire and shall not revert to defendant, nor shall the defendant or any person acting in concert with or on behalf of the defendant be eligible to [acquire it]."  In other words, even if the government

---

importantly, those individual members have a fundamental right to make their *own* Constitutional arguments *on their own behalf*, but will not be permitted to intervene in the case until the ancillary proceeding.  That is one of the reasons that the government urges this Court, on the basis of well-established standards of Article III and prudential standing, to defer its consideration of any Constitutional issues until those issues have been adequately articulated and the real parties in interest are before the Court.

7

cannot use or sell the Marks once forfeited, Defendant nevertheless will be divested of any ownership or control it currently holds or has the ability to exercise with respect to the Marks. Forfeiture is therefore not "futile" even if the Marks are useless to the government, as Defendant's interest in them, and any rights and privileges associated with that interest, will have been extinguished.

In any event, this argument cannot prevent the entry of a POF should the jury determine that any property is subject to forfeiture.

### C. The Ancillary Proceeding and Entry of the Final Order of Forfeiture

#### 1. The Ownership Determination

In order for property to be criminally forfeited (that is, as a condition precedent to the entry of a FOF), there must be a determination by the Court that the property listed in the POF belongs to Defendant. *Lazarenko,* 476 F.3d at 647. However, where a defendant is convicted of either substantive RICO or RICO conspiracy – and Defendant here has been convicted of both – the defendant's entire interest in the RICO enterprise must be forfeited. *Alexander v. United States*, 509 U.S. 544, 562 (1993) ("a RICO conviction subjects the violator not only to traditional, thought stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963"); *United States v. Busher*, 817 F.2d 1409, 1413 (9th Cir. 1987) (the forfeiture provisions of '1963 are "purposely broad . . .[,] designed to totally separate a racketeer from the enterprise he operates"; "forfeiture is not limited to those assets of a RICO enterprise that are tainted by use in connection with racketeering activity, but rather extends to the convicted person's entire interest in the enterprise."); *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005).

In other words, the Court need not define Defendant's interest before entering the POF because it is impossible as a matter of law for Defendant to retain any interest in property as to which the requisite nexus has been shown. "Thus, the

ancillary proceeding has become the forum for determining the extent of the defendant's forfeitable interest in the property." Rule 32.2, Advisory Committee Notes, 2000 Adoption. Rule 32.2 establishes the "more sensible procedure [whereby] the court, once it (or a jury) determines that property was involved in the criminal offense for which the defendant has been convicted, [orders] the forfeiture of whatever interest a defendant *may have* in the property *without having to determine exactly what that interest is*." *Id.* (emphasis added).[7]

2.     <em>Determining Defendant's Ownership Interest</em>

a.     <strong>Defendant's shifting position on ownership of the Marks</strong>

Defendant has argued both that it is and is not the owner of the Marks. In a filing of November 20, 2018, for example, Defendant argued that "the collective membership marks sought for seizure by the Government are not owned by the Defendant Mongol Nation." DN 263 at 2. This argument, unsupported by any legal authority in the filing in which it was made, also lacks any factual support, and is barred by the doctrine of collateral estoppel.[8] Here, not only were the Marks

---

[7] The deferral of the ownership determination serves both the letter and spirit of the forfeiture scheme. *See United States v. Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008) (once forfeitability is determined, the court does not – "and indeed may not" -- determine ownership; that issue is deferred to the ancillary proceeding); *Lazerenko*, 476 F.3d at 648; *United States v. Gaskin*, 2002 WL 459005, at *9 n.4 (W.D.N.Y. Jan. 8, 2002) (ownership is a question for the court alone to determine in the ancillary proceeding), *aff'd,* 364 F.3d 438 (2d Cir. 2004).

[8] Collateral estoppel, also known as issue preclusion, applies where (1) an issue necessarily decided in a previous proceeding is identical to the one which is sought to be re-litigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom the doctrine is asserted was a party or in privity with a party at the first proceeding. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000). Once an issue is actually litigated, the adjudicating court's determination is conclusive in subsequent suits, even if based on a different cause of action. *In re Berr*, 172 B.R. 299, 306 (9th Cir. BAP 1994).

9

registered with the USPTO in the name of Defendant, the Defendant succeeded in defeating the government's prior attempt to forfeit the Marks by arguing to another Court in this district that it (Defendant) was the sole owner of the Marks. *See United States v. Cavazos*, Final Order Vacating the Preliminary Order of Forfeiture Re: Trademarks, DN 4481, June 28, 2011, at 7 (finding that the Marks were not the property of any convicted defendant in that case, and therefore were not subject to forfeiture because "the club [*i.e.*, the defendant here – Mongol Nation] maintains exclusive ownership of the Marks," and was not a defendant in that case, leading the Court "regrettably [to] conclude that it must grant the Petition to Vacate or Amend the Preliminary Order of Forfeiture").

In support of its petition in *Cavazos*, Defendant argued precisely the opposite of what it said in its November 20, 2018 filing here, namely that "only an organization, not any individual, can own a collective membership mark" (*Cavazos* DN 3946 at 25); "as a matter of law, an individual cannot own a collective membership mark[;] only the organization in which the mark symbolizes membership can own the mark" (*id.* at 26);  "the Club acquired the Marks by first use long before any of the crimes alleged in the Indictment and long before Cavazos became a member" (*id.*); and, "as a separate legal entity from [its] members, the club maintains exclusive ownership of the mark" (*id.* at 27). Defendant supported its argument in *Cavazos* with citations to numerous authorities.

More importantly, Defendant repeated the arguments it advanced in *Cavazos* concerning ownership of the Marks *in this case*. *See* Defendant's Motion to Dismiss, DN 14, in which Defendant, relying upon the same authorities upon which it relied in *Cavazos*, argued that "the government cannot obtain forfeiture of the Marks because collective membership marks can be owned only by the organization to whom the Marks symbolize membership" (*id.* at 12); "[b]y their very nature, collective membership marks are owned by organizations, not

10

individuals" (*id.* at 13); "as a matter of law, [] individuals cannot own a collective mark (*id.*); "the Marks are not owned [by] the individuals" (*id.*); and "[o]nly the Club, not any individual member, has ever owned the Marks" (*id.* at 14).

Judge Wright's determination of the ownership of the Marks in *Cavazos* was necessarily decided in the *Cavazos* ancillary proceeding, is identical to the issue of ownership presented here, was actually and vigorously litigated by both the government and Defendant (satisfying the identity of parties requirement), and resulted in a final judgment on the merits, in which Defendant prevailed. The government's claim in *Cavazos*, as here, was that the Marks were subject to forfeiture pursuant to 18 U.S.C. § 1963. The only difference between *Cavazos* and this case is that Defendant was not charged in *Cavazos*, but stands convicted of both substantive RICO and RICO conspiracy here. Defendant should not be allowed to re-litigate its ownership of the Marks.

### b. Defendant's shifting corporate form

Nor can Defendant revive its unsuccessful argument made earlier in this case that the petitioner in *Cavazos*, or the "real" owner of the Marks, is or was some other entity and therefore not this defendant. All of the Marks were acquired by and/or held in the name of Mongol Nation, an unincorporated association.[9] A

---

[9] *See* trial exhibit 67-21 (Word Mark acquired and registered in the name of Mongol Nation, an unincorporated association); exhibit 68-21 (Center Patch Image, same); exhibit 69-8 (Word Mark re-registered in the name of Mongols Nation Motorcycle Club, LLC ("MNMC"), a California limited liability corporation organized on April 17, 2012 by president David Santillan, the Defendant's designated representative at the trial here, but which corporation has since been suspended, according to the California Secretary of State's website); and exhibit 71-9 (Combined Mark registered in the name of MNMC, a "California corporation," but signed again by Santillan. The application for the registration of the Combined Mark was filed with the USPTO on August 20, 2014, 18 months after the filing of the Indictment in this case, just over a year after Defendant's arraignment, and approximately eight months after the Court (Judge Wright) issued an order in this case rejecting Defendant's argument that it was a corporate entity

detailed recitation of the Defendant's unsuccessful attempts to avoid both this prosecution and the forfeiture of the Marks through shifts in corporate identity was set out in the government's opposition to Defendant's first motion to dismiss in this case.[10]

### 3. Determination of Potential Third Party Ownership Claims

The post-POF ancillary proceeding is governed by Rule 32.2(c) and 18 U.S.C. § 1963(l). It gives third parties who claim a legally viable ownership interest in the property described in the POF their first opportunity to come forward and have their claims adjudicated by the Court.[11] Rule 32.2(b)(6)(A) requires the government to give direct notice to "any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding," and to publish notice to any potential third party claimants

and therefore not the defendant named in the Indictment. *See* DN 22 (denying motion to dismiss case and instructing the Clerk's Office "to correct the defendant's name by deleting David Santillan, President of Mongol Nation, LLC, and adding the correct name: Mongol Nation, an Unincorporated Association.").

[10] *See* DN 19. Attached to the Welk Declaration as exhibit A is a true and correct copy of the relevant excerpt from that filing, which is incorporated herein by this reference.

[11] *See Andrews*, 530 F.3d at 1236 (the purpose of the ancillary proceeding is determine if any third party has an interest in the forfeited property and to amend the order of forfeiture accordingly); *United States v. McHan*, 345 F.3d 262, 275 (4th Cir. 2003) (ancillary proceeding tests a third party's claim of an ownership interest; it is not a civil forfeiture proceeding in which the government is seeking to forfeit a third party's interest in property); *United States v. Gilbert*, 244 F.3d 888, 909 (11th Cir. 2001) (ancillary proceeding creates an orderly procedure whereby third parties who claim their property interests have been forfeited in a criminal case can "challenge the validity of the forfeiture order and establish their legitimate ownership interests"; discussing legislative history).

whom the government has not identified (or cannot identify).  The defendant against whom the POF is entered is not permitted to participate in the ancillary proceeding.  *See* § 1963(l)(2) ("any person, *other than the defendant*, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property.  The hearing shall be held before the court alone, without a jury." (Emphasis added.)

If any third party files a timely ancillary petition asserting an interest in the property described in the POF, "the court must conduct an ancillary proceeding." Rule 32.2(c)(1).  That hearing "shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition.  The court may consolidate the hearing on the petition with a hearing on any other petition filed by a person other than the defendant under this subsection." § 1963(l)(4).  However, Rule 32.2(c)(1)(A) provides that a petition may be dismissed for lack of standing, failure to state a claim, or "any other lawful reason," and Rule 32.2(c)(1)(B) provides that prior to a hearing on a petition, the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure.  The exercise of either of these options will delay a hearing beyond the 30-day window suggested in the Rule.[12]

---

[12]  As noted above, the defense has argued that the individual members of the Defendant have some sort of independent ownership interest in the Marks.  Setting aside for the moment the fact that Defendant lacks standing to make that argument here for a variety of reasons, individuals who have made that argument in similar cases have had their petitions dismissed on standing grounds by every Court that has considered the question.  Should any third parties attempt to make such an argument here, the government will move to dismiss the petition(s) on the grounds of lack of standing and failure to state a justiciable claim.

13

Should there be a petition hearing, the petitioner may testify and present evidence and witnesses on his own behalf, and cross-examine witnesses who appear at the hearing.  Likewise, the government may present evidence and witnesses in rebuttal to the petitioner's evidence and in defense of its claim to the property, and cross-examine witnesses who appear at the hearing.  In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case that resulted in the entry of the POF.  § 1963(l)(5).

The petitioner bears the burden of proof in the ancillary proceeding to prove by a preponderance of the evidence either that

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title or interest renders the [POF] invalid in whole or part because the right, title or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) The petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

§ 1963(l)(6); *Nava*, 404 F.3d at 1125 (in ancillary proceeding, "the petitioner bears the burden of proving his right, title, or interest") (interpreting similar provision in 21 U.S.C. § 853(n)(6)).  Petitioners may not argue that the entry of the POF was improper or not adequately supported by the evidence at trial.  *See* Advisory Committee Note to Rule 32.2 ("[The ancillary proceeding] does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property.").

Whether a third party petitioner has a valid right, title or interest in the property described in the POF is determined according to state law; federal law

14

determines whether any such interest is subject to forfeiture. *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996) (court looks to state law to see what interest the claimant has in the property and looks to the federal statute to see if that interest is subject to forfeiture); *see also United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000).

When all third party petitions have been adjudicated, the court must enter an FOF by amending the POF as necessary to account for any third-party rights. If no third party files a timely petition, the Rule provides that the POF becomes the FOF if the court finds that the defendant (or any combination of defendants convicted in the case) had an interest in the property that is forfeitable under the applicable statute.[13] The defendant may not object to the entry of the FOF on the ground that the property belongs, in whole or in part, to a codefendant or a third party; nor may a third party object to the final order on the ground that the third party has an interest in the property. Rule 32.2(c)(2). "In making the determination [whether the defendant is the owner of the property described in the POF], the court may rely upon reasonable inferences. For example, the fact that the defendant used the property in committing the crime and no third party claimed an interest in the property may give rise to the inference that the defendant had a forfeitable interest in the property." Rule 32.2, Advisory Committee Notes, 2000 Adoption.

Section 1963(l)(7) provides that "following the court's disposition of all petitions filed under this subsection, or if no such petitions are filed following the expiration of the period provided in paragraph (2) for the filing of such petitions, the United States shall have clear title to property that is the subject of the [POF] and may warrant good title to any subsequent purchaser or transferee."

---

[13] For practical purposes, the government intends to submit a separate FOF in the event that no timely ancillary petitions are filed.

15

**D.     The Constitutional Issues Are Not Yet Ripe, and Will Not Be Until Both Entry of an FOF and the Commencement of Enforcement Proceedings By the Government in Furtherance of that Order**

*1.     Article III and Prudential Standing*

As mentioned above, Defendant has argued strenuously that the government's forfeiture efforts will invariably result in the violation of the First Amendment rights of its individual members, none of whom are parties to this action, nor will be unless they intervene as ancillary petitioners.  Should any third parties intervene but be unsuccessful in their claims of ownership as to the Marks -- which result the government anticipates for the reasons detailed above -- the forfeiture will be complete.

At that point, the government will have forfeited the Marks and the rights and privileges associated with them.  However, the entry of the FOF, standing alone, will not necessarily implicate any Constitutional rights, including those of the members of the Defendant, because the entry of the FOF does not necessarily carry with it any seizure or other enforcement authority relative to the Marks.  Section 1963(e) provides:

> Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited *upon such terms and conditions as the court shall deem proper*.  Following the entry of an order declaring the property forfeited, *the court may, upon application of the United States*, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited.

(Emphasis added).

16

While Defendant has made repeated abstract claims that the forfeiture sought by the government here will result in the wholesale violation of the First and Fifth Amendment rights of its members, it has, to date, failed to articulate exactly how that would occur.  To the extent that its claims arise from a belief that the government will commence seizures of personal property bearing the Marks immediately upon entry of either a POF or FOF, there is no basis whatsoever for that erroneous belief.  The government has provided repeated assurances to the Court on the record that it has no intention of enforcing any forfeiture orders relating to the Marks without specific authority from the Court, particularly with respect to seizures of personal property not already in government custody.[14]

The truth of the matter is that the Constitutional issues that the Defendant is so eager to raise here with respect to the Marks are not yet ripe for adjudication, and will not be until (1) the Marks are found by the jury to be forfeitable as a result of Defendant's conviction; (2) the rights of all potential third party claimants to the Marks have been adjudicated; (3) the Marks are forfeited to the government; *and* (4) the government, pursuant to the plain language of  § 1963(e), seeks an order allowing it to enforce the forfeiture order against someone other than the defendant.  To address the Constitutional rights of unknown and absent individuals before such a request is even made, is inconsistent with this Court's own prior

---

[14] The seizures of personal property that were the subject of extensive litigation in *Cavazos* and *Rivera v. Carter*, CV09-2435 DOC (JCx), offer no basis for such a belief, either.  Those seizures were made pursuant to specific seizure authority granted by the Court under § 1963(d)(1)(A), which authority was subsequently withdrawn.  As this Court found earlier in this case, the justiciability of the Constitutional issues in *Rivera* "was predicated on the existence of a post-indictment restraining order found to be unnecessary to preserve the availability of the Marks for forfeiture. . . . . No restraining order has been issued [in this case]." *United States v. Mongol Nation*, 132 F. Supp. 3d 1207, 1218 (CD Cal 2015), *rev'd on other grounds*, 693 Fed. App'x. 637 (2017).

rulings, the applicable authority of the Ninth Circuit, and Article III of the Constitution.

Among the arguments made by Defendant when it moved to dismiss this case in 2015 was that the forfeiture allegation should be dismissed and the government barred from pursuing forfeiture because any forfeiture of the Marks would constitute a violation of the First Amendment. This Court firmly rejected that argument, stating that "there are many possible outcomes in the course of trial, conviction, and *enforcement of any potential forfeiture*, such that any adjudication of the constitutional issues would essentially constitute an advisory opinion." *Mongol Nation*, 132 F. Supp. 3d at 1217.

The Ninth Circuit agreed, finding that "it would be premature to address whether the government will ultimately be able to secure forfeiture under 18 U.S.C. § 1963 as part of the sentence in the event that the Defendant is convicted under 18 U.S.C. § 1962." *Mongol Nation*, 693 Fed. App'x at 638, *citing Libretti v. United States*, 516 U.S. 29, 39 (1995). The panel went on to state, "[s]imilarly, the Defendant's constitutional challenge is not ripe for review." *Id., citing Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (*en banc*).

*Thomas* arose from a claim by residential landlords that the enforcement of Alaskan housing laws intended to prevent discrimination on the basis of marital status would violate their rights of free speech and free exercise of religion under the First Amendment. The Court declined to reach that issue, however, because it found that the pre-enforcement challenge brought by the plaintiffs presented a threshold issue of justiciability, and that the issue was unripe for determination. *Thomas* stands as a primer on the law of the Ninth Circuit on standing and ripeness in the context of a First Amendment pre-enforcement challenge.

The Court began its analysis by quoting the Supreme Court's opinions in *Regional Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974) and *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), to the effect that "ripeness is

18

'peculiarly a question of timing,' designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" 220 F.3d at 1138.

> Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III. Although ripeness, like other justiciability doctrines, is "not a legal concept with a fixed content or susceptible of scientific verification," the Supreme Court has observed that the doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."

*Id., quoting Poe v. Ullman*, 367 U.S. 497, 508 (1961) and *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).

The *Thomas* Court characterized ripeness as "standing on a timeline," and noted that some commentators had come to the conclusion that the two (standing and ripeness) were indistinguishable (*id.*), but concluded

> Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional "case or controversy," that the issues presented are "definite and concrete, not hypothetical or abstract." In assuring that this jurisdictional prerequisite is satisfied, we consider whether . . . the alleged injury is too "imaginary" or "speculative" to support jurisdiction.

*Id.* at 1139, *quoting Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945) and *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Moreover, while the Supreme Court has

> acknowledged before that the concept of Article III standing has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, certain basic principles have been distilled from our decisions. To establish an Article III case or controversy, a litigant first must clearly demonstrate that he

19

has suffered an injury in fact.  That injury, we have emphasized repeatedly, must be concrete in both a qualitative and temporal sense.  The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical.

*Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quotation marks and citations omitted).

The government believes that the appellate panel's reliance on *Thomas* in the instant case was significant, because of the inherently speculative nature of the Constitutional issues that Defendant sought to raise pre-trial, and continues to attempt to raise at every stage of these proceedings.  The alleged injury here, as defined by the Defendant in its own filings – not, incidentally, to the Defendant itself, but to its individual members -- is that the ability of those members to display and otherwise make use of the Marks in their individual capacities will be impaired in some way at some unknowable future date, resulting in a chilling or denial of their ability to exercise their First Amendment rights.  But both the existence and nature of any alleged injury, as well as the timing of any such injury, is entirely speculative, and will remain so until the government (1) obtains a final order of forfeiture against the Marks (which is not certain to occur); (2) decides how it wants to enforce any such order; *and* (3) makes a formal request to this Court for authority to carry out those enforcement plans.  It is only at that point in time that the potential injury to the members of the Defendant, if any, will be both apparent and ripe for adjudication.

Once the government makes such a request, members of the Defendant may request permission to intervene in the proceedings, and the Court will undoubtedly allow such intervention.  At that time, the Court, as it has indicated it intends to do, may well choose to call for *amicus* briefing on the potential First Amendment consequences of whatever relief the government may choose to seek.

1   Until that time, however, any discussion of potential Constitutional issues is
2   a purely academic exercise and, from the Court's perspective, can result in nothing
3   other than an advisory opinion.  Any briefing and/or adjudication prior to a
4   government request for enforcement authority for a forfeiture order necessarily
5   will require third parties (that is, parties other than the government) to guess at
6   what enforcement authority the government might someday request, and whose
7   rights might be implicated.  The government obviously is under no obligation to
8   speculate about how it might choose to enforce a forfeiture order that may
9   eventually be entered in this case – and it has no intention of doing so voluntarily -
10  - nor can it be compelled to reveal or speculate about its future plans for
11  enforcement once a forfeiture order is entered.  Most importantly, however, given
12  the fact that the plain language of the governing statute grants this Court the
13  authority to determine, on the government's motion, what enforcement will be
14  permitted under any forfeiture order that might be entered, there is simply no
15  reason for the Court to "entangle [it]self in [an] abstract disagreement" about the
16  potential Constitutional implications of some undefined, hypothetical injury of an
17  unknown nature that would affect unidentifiable individuals. *Abbott Laboratories*,
18  387 U.S. at 148.

19      Compounding the esoteric nature of any such inquiry is the fact that
20  Defendant lacks standing to litigate the issue it repeatedly references in its filings.
21  Should the Marks be forfeited as requested by the government, Defendant will be
22  divested of all rights and privileges associated with the Marks.  It is a "fundamental
23  restriction on [a federal Court's] authority that in the ordinary course, a litigant
24  must assert his own legal rights and interests, and cannot rest his claim to relief on
25  the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693,
26  707 (2013) (internal quotations marks and citations omitted).  A generalized
27  grievance, "no matter how sincere, is insufficient to confer standing." *Id.* at 706.
28  Article III standing "is not to be placed in the hands of concerned bystanders, who

21

will use it simply as a vehicle for the vindication of value interests." *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

## III.   CONCLUSION

For the reasons explained above, the government urges the Court to defer consideration of any purported Constitutional issues relating to the forfeiture in this matter until the forfeiture process is complete, the ownership rights of all parties in interest have been fully adjudicated, and such issues are properly brought before the Court by parties with standing to raise them.

DATED: December 21, 2018     NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
STEVEN R. WELK
CHRISTOPHER BRUNWIN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA