Joseph A. Yanny, Esq. (SBN 97979)
Charles Cardinal, Esq. (SBN 322991)
YANNY & SMITH
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 551-2966
Facsimile: (310) 551-1949
jyanny@yannylaw.com

Attorneys for Defendant,
**Mongol Nation**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America<br>        Plaintiff,<br><br>vs.<br><br>Mongol Nation, an unincorporated association,<br>        Defendant. | Case No.: CR 13 00106 DOC<br><br>**DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL IN THE GUILT PHASE**<br><br>**Judge:** Honorable David O. Carter<br>**Courtroom**: 9D |

# TABLE OF CONTENTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES** ……………………………………………….. iii

**INTRODUCTION** ………………………………………………………. 1

**ARGUMENT** ……………………………………………………… 4

    A.    The Government Failed to Prove the Existence of Two Distinct Entities ….. 4

    B.    The Defendant is Legally Incapable of Committing the *Malum in Se* Crimes of Murder and Attempted Murder ……………………………….. 17

    C.    The Racketeering Acts and Conspiracy Alleged Have Not Been Proven Beyond a Reasonable Doubt ……………………………………… 20

**CONCLUSION** ……………………………………………… 28

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ……………………………………………………….. 5

*Brittingham v. Mobil Corp.*
943 F.2d 297, 301 (3d Cir. 1991) ……………………………………….. 6

*Cedric Kushner Promotions, Ltd. v. King*
533 U.S. 158, 161 (2001) ……………………………………… 5, 6, 8, 9, 13

*Cruz v. FX Direct Dealer, LLC*
720 F.3d 115, 121 (2d Cir. 2013) ………………………………………. 6

*Davis v. Mut. Life Ins. Co. of New York*
6 F.3d 367, 377 (6th Cir. 1993) ……………………………………… 5, 10

*Fogie v. THORN Americas, Inc.*
190 F.3d 889, 897 (8th Cir. 1999) …………………………………… 6, 12

*In re Classic Star Mare Lease Litig.*
727 F.3d 473, 492 (6th Cir. 2013) …………………………………… 6, 9

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*
826 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011) ………………………… 7, 19

*In re Winship*
397 U.S. 358 (1970) ……………………………………………………… 27

*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*
    46 F.3d 258, 268 (3d Cir. 1995) ……………………………………………… 7

*Jund v. Town of Hempstead*
    941 F.2d 1271 (2nd Cir. 1991) ……………………………………………… 17

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*
    431 F.3d 353, 361-62 (9th Cir. 2005) ………………………………………….. 7, 9

*Moses v. Martin*
    360 F. Supp. 2d 533, 550 (S.D.N.Y. 2004) ……………………………………… 12

*Padilla v. Gonzalez*
    397 F.3d 1016, 1020 (7th Cir. 2005) …………………………………………… 19

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*
    30 F.3d 339, 344 (2d Cir. 1994) …………………………………………….. 7, 8, 13

*Sever v. Alaska Pulp Corp.*
    978 F.2d 1529, 1534 (9th Cir. 1992) …………………………………………… 12, 13

*State of South Dakota v. Kandaras for Senate Comm.*
    264 N.W.2d 902, 903-04 (S.D. 1978) ………………………………………… 17

*United States v. A&P Trucking Co.*
    358 U.S. 121, 127-28 (1958) ……………………………………………….. 17, 19

*United States v. Computer Sciences Corp.*
    689 F.2d 1181, 1190 (4th Cir. 1982) ……………………………………….... 8

*United States v. Kelso Co.*
    86 F. 304 (N.D. Cal. 1898) ……………………………………………… 18

*United States v. Local*
    807, 118 F.2d 684, 688 (2nd Cir. 1941) …………………………………… 17

*United States v. Najjar*
    300 F.3d 466, 484 (4th Cir. 2002) ……………………………………….. 12

*United States v. Turkette*
    452 U.S. 576, 591 (1981) …………………………………………………. 8

*Williams v. Mohawk Indus., Inc.*
    465 F.3d 1277, 1284 (11th Cir. 2006) …………………………………….... 12

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union*
    639, 883 F.2d 132, 141 (D.C. Cir. 1989) ……………………………….. 10, 11

**STATE CASES**

*Commonwealth v. Punxsutawney St. Passenger Ry.*
    24 Pa.C. 25 (1900) ………………………………………………………… 18

**DOCKETED CASES**

*United States v. Cavazos, et al.*
    Case No. CR 08-1201 …………………………………………….. *passim*

*United States v. Roberts, et al.*
    Case No. CR 13-00751-R-1 ……………………………………… 1, 21

## FEDERAL STATUTES AND RULES

*18 U.S.C. § 1961(3)* ……………………………………………………………… 5

*18 U.S.C. § 1961(4)* ……………………………………………………………… 5

*18 U.S.C. § 1962(c)* ……………………………………….. 2, 5, 6, 7, 8, 10, 12, 17, 18, 19

*18 U.S.C. § 1962(d)* ………………………………………………………... 2, 3, 19

*Fed. R. Crim. P. 29(a)* ……………………………………………………… 4

*Fed. R. Crim. P. 29(c)(1)* …..………………………………………………… 4

*Fed. R. Crim. P. 29(c)(2)* …..………………………………………………… 4

# I.      INTRODUCTION

At the onset it is important to note the actual status of this case; the government brought the instant action in 2013. Although the government clouded the record with a wealth of irrelevant evidence, it only proceeded to the jury with eight alleged racketeering (predicate) acts. Of those eight acts, six dealt with either murder or attempted murder. Of those six acts, the jury acquitted on three and were deadlocked 10-2 in favor of acquittal on a fourth. The jury convicted on the two drug transactions. We believe this motion will establish that under the law and facts of this case, even the few racketeering acts found proven and the conspiracy claim will not survive the strict legal scrutiny that must be applied.

It is also important to remember that the totality of confiscated drugs put into evidence during the course of this case (including their evidentiary packaging and labels) can be placed into a standard grocery bag and still leave enough room for a gallon of milk, a loaf of bread, and a dozen eggs.

This entire case and the investigation which preceded it was spearhead by the Bureau of Alcohol, Tobacco, and Firearms (the "ATF"). This is the same organization that brought the American citizens operation Fast and Furious and the "Stash House" cases – written about in the case of *U.S. v. Roberts*, a copy of which is supplied herewith as Exhibit A. *United States v. Roberts, et al*., CR 13-00751-R-1 (2014). Two of the undercover agents that testified in this case (Jay Dobyns and John "Hollywood" Carr) were involved in those now infamous aforementioned investigations. Former special agent

Dobyns himself successfully sued the ATF – calling it a Corrupt Government Agency. This case is just the most recent intersection of the "Deep State" meeting Main Street.

Back on October 9, 2008, the government brought an indictment against 79 individual persons alleged to be members of the Mongol Nation Motorcycle Club alleging violations, among other charges, of 18 U.S.C. §§ 1962(c) and (d), and seeking the forfeiture of several trademarks registered by Mongols MC. *See United States v. Cavazos, et al., CR 08-1201-ODW.*

Shortly thereafter on October 21, 2008, the United States Attorney's Office of the Central District of California issued a press release in which then United States Attorney Thomas P. O'Brien boasted: "in addition to pursuing the criminal charges set forth in the [CR 08-1201] indictment, *for the first time ever, we are seeking to forfeit the intellectual property of a gang.*" *See* ATF Undercover Investigation Leads to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, The United States Attorney's Office Central District of California, Release No. 08-142, October 21, 2008 (emphasis added). Mr. O'Brien continued: "The indictment alleges that this trademark is subject to forfeiture. We have filed papers seeking a court order that will prevent gang members from using or displaying the name 'Mongols.' *If the court grants our request for this order, then if any law enforcement officer sees a Mongol wearing his patch, he will be authorized to stop that gang member and literally take the jacket right off his back.*" *See Id.* (emphasis added).

All of the 79 individual defendants charged in *Cavazos*, except for an individual who died in custody and another deemed incompetent, entered into a plea agreement with the government, and nearly all of those individuals pled guilty to 18 U.S.C. § 1962(d) (RICO Conspiracy). Additionally, these individuals have all already as part of their plea deals agreed to forfeit their right to display the Marks sought for forfeiture in this current proceeding.

The government brought on February 13, 2013 an indictment in which the government gave notice that it will once again attempt the exact same forfeiture of the exact same Mongols MC collective membership marks. The only difference between *Cavazos* and the instant case is that in this case the government names the entity Mongol Nation, an unincorporated association, as the sole defendant.

Focusing specifically on the guilt phase of the trial at hand, this Court can and should enter a judgment of acquittal because the government has fallen woefully short of adequately proving the requisite elements of a RICO claim. Specifically, the government has failed to establish distinctness between the RICO "enterprise" and the RICO "person" as required by law to reach a conviction under the statute. For this reason alone, a judgment of acquittal is both necessary and proper. Additionally, the defendant Mongol Nation is legally incapable of committing *malum in se* crimes – a great deal of which are alleged in the Indictment and incorporated into the verdict form. The jury has relied on *malum in se* acts for a finding of guilt, thus a judgment of acquittal is both necessary and proper. Lastly, all else aside, the racketeering acts alleged have not been proven by the

Defendant's Motion for a Judgment of Acquittal

government beyond a reasonable doubt. Each one of these arguments is independently

sufficient to secure a judgment of acquittal. They are discussed separately in detail below.

## II.   ARGUMENT

According to the Federal Rules of Criminal Procedure, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which evidence is

insufficient to sustain a conviction. *Fed. R. Crim. P. 29(a)*. Defendant may move for a

judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or

after the court discharges the jury, whichever is later. *Fed. R. Crim. P. 29(c)(1)*.

Furthermore, if the jury has returned a guilty verdict, the court may set aside the verdict

and enter an acquittal. *Fed. R. Crim. P. 29(c)(2)*. If the jury has failed to return a verdict,

the court may enter a judgment of acquittal. *Id.* Thus, regardless if the jury finds guilt or is

declared a hung jury, the court retains the authority to enter a judgment of acquittal. The

defendant made its Rule 29 motion at the end of the government's case, at the end of all

evidence, and immediately after the verdict was announced. The Court noted it, and this is

a memo is support thereof.

## A.   The Government Failed to Prove the Existence of Two Distinct Entities

Both parties have already stipulated on the record that distinctness is a question of

law for the bench to decide. This was conceded by the government on several occasions

both in writing and orally on the record. Whether this is being decided *de novo* as a

question of law for the Court, or as a review of the sufficiency of evidence under Rule 29,

the same rationale for this argument applies. Due to the government's failure to prove the

distinctness requirement for a finding of guilt under RICO, defendant Mongol Nation requests this Court exercise its rightful authority and enter a judgment of acquittal. This case was already originally dismissed for lack of distinctness in 2015. The Ninth Circuit reversed the dismissal because all well plead facts must be presumed true when evaluating pleading. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). However, the government still bears the burden of proving distinctness as true at the trial stage. They have not meet this burden.

Under the RICO statute, a "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." *18 U.S.C. § 1961(3).* An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4).*

"To establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). "Under the 'non-identity' or 'distinctness' requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members." *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 377 (6th Cir. 1993). However, "the need for two distinct entities is satisfied; hence, [§ 1962(c) applies] when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Cedric Kushner*, 533 U.S. at 166. Thus, an individual employee or officer may always be named as the RICO person distinct from the corporate enterprise. This holding does nothing to minimize the distinctness requirement, in that the RICO statute requires charging a person that is distinct from an enterprise under § 1962(c). See, e.g., *Cruz v. FXDirectDealer, LLC,* 720 F.3d 115, 121 (2d Cir. 2013) (distinguishing *Cedric,* holding that an enterprise composed of a subsidiary (the person), employees, and the corporate parent that were alleged to operate as part of a single, unified corporate structure were not sufficiently distinct from the subsidiary person).

Most courts have recognized that the distinctness requirement "would be eviscerated if a plaintiff could successfully plead that the enterprise consists of a defendant corporation in association with employees, agents, or affiliated entities acting on its behalf." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 301 (3d Cir. 1991); see also *Cruz,* 720 F.3d at 121 n.3; *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013) (collecting cases, and noting that "[m]ost courts have rejected the separate-legal-identity theory . . . , reasoning that if a corporate defendant can be liable for participating in an enterprise comprised only of its agents—even if those agents are separately incorporated legal entities—then RICO liability will attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless"); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 897 (8th Cir. 1999) (reviewing cases, and concluding that "to impose liability on a subsidiary for conducting an enterprise comprised solely of the parent of the subsidiary and related businesses would

be to misread the statute"); *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir. 1995) ("a corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating § 1962(c)").

The Ninth Circuit has explicitly recognized that: "if [a RICO] 'enterprise' consist[s] only of [a corporation] and its employees, the pleading [fails] for lack of distinctiveness.*" Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361-62 (9th Cir. 2005). In *Living Designs*, the Ninth Circuit found distinctness between a corporation and an associated-in-fact enterprise composed of that corporation, the law firms it retained, and certain expert witnesses involved in prior litigation between that corporation and the plaintiffs. *Id*. The court noted the fundamental difference between the business of the corporation and the law firms it employed, relying on compelled independence of the law firms, dictated by rules of professional conduct. *Id*. This holding thus hinged on the fact that the law firms had an independent legal duty and existence separate from the corporation. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 826 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011). They were not merely nominally or semantically distinct, the entities and individuals were distinctive. *Living Designs*, 431 F.3d at 361; *see* also *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995) ("a corporate entity [may be] held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself" (citing *Riverwoods Chappaqua Corp. v. Marine*

1    *Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)). In *Riverwoods Chappaqua*, the

2    court specifically stated that "the plain language of section 1962(c) clearly envisions

3    separate entities, and the distinctness requirement comports with legislative intent and

4    policy." *Riverwoods Chappaqua*, 30 F.3d at 344 (2d Cir. 1994). Thus, if an entity is

5    named as a defendant in a RICO action, the enterprise it participates in cannot merely be a

6    reframing of the same entity that is the target of the indictment.

7        The statutory purposes of RICO support this reading. The Supreme Court has held

8    that RICO both protects a legitimate "enterprise" from those who would use unlawful acts

9    to victimize it and also protects the public from those who would unlawfully use an

10   "enterprise" (whether legitimate or illegitimate) as a "vehicle" through which "unlawful ...

11   activity is committed." *Cedric Kushner*, 533 U.S. at 164-65 (citing *United States v.*

12   *Turkette*, 452 U.S. 576, 591 (1981); Nat'l Org. for Women, Inc. v. *Scheidler*, 510 U.S.

13   249, 259 (1994)). "A corporate employee who conducts the corporation's affairs through

14   an unlawful RICO 'pattern ... of activity,' . . . uses that corporation as a 'vehicle,'" id., an

15   entity that associates with or manages itself does not. *See United States v. Computer*

16   *Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982) overruled on other grounds by *Busby*

17   *v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990) ("To be sure, the analogy between

18   individuals and fictive persons such as corporations is not exact. Still, we would not take

19   seriously . . .  an assertion that a defendant could conspire with his right arm, which held,

20   aimed and fired the fatal weapon. A corporation, in common parlance, is not regarded as

21   distinct from its unincorporated divisions either.").

Clear legal rules are difficult to discern from the morass of legal precedent addressing the distinctness requirement in the context of entity defendants. Addressing this conundrum, the Sixth Circuit recently found, "[o]ut of the meandering and inconsistent case law from this and other circuits, as well as the Supreme Court's decision in Cedric Kushner," two important principles emerge:

> (1) individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and (2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity

*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013).

The alleged separate membership and purpose is a distinction without a difference. The prospective members, probationary members, and hang-arounds/associates are defined by, and owe their existence to, the unincorporated association Mongol Nation. Taking the allegations as true, all non-members involved in the Mongols Gang enterprise are acting within the Mongol Nation/Mongols Gang association structure, analogous in all meaningful respects to corporate employees acting within the scope of their employment. Most courts, including the Ninth Circuit, have explicitly recognized that an enterprise that consists only of a corporate defendant and its employees fails for lack of distinctness. *See*, e.g., *Living Designs*, 431 F.3d at 362. Although an unincorporated allegedly criminal

9

Defendant's Motion for a Judgment of Acquittal

organization cannot have "employees," the roles of the prospective members, probationary member, and "hang-arounds" are the functional equivalent. *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union* 639, 883 F.2d 132, 141 (D.C. Cir. 1989) *on reh'g in part*, 913 F.2d 948 (D.C. Cir. 1990) (citing cases) ("Several courts, however, have disallowed a § 1962(c) claim where the relationship among the members of the enterprise association is the relationship of parts to a whole. That is, while the corporate or organizational defendant may itself be a member of the enterprise association, the member of the enterprise association may not simply be subdivisions, agents, or members of the defendant organization."). There is simply no substance to the Mongols Gang enterprise independent of Mongol Nation, an association of its leadership and official membership. *See Davis*, 638 F.3d at 377.

    *Yellow Bus* succinctly presents the logic as to why word games should not be allowed to vitiate the distinctness principle.

> [A]n organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself. Where, as here, the organization is named as defendant, and the organization associates with its member to form the enterprise 'association-in-fact,' the requisite distinctness does not obtain….[A]llowing plaintiffs to generate . . . 'contrived partnerships' consisting of an umbrella organization and its subsidiary parts, would render the non-identity requirement of section 1962(c) meaningless.

*Yellow Bus Lines*, 883 F.2d at 141. The D.C. Circuit "declined to permit such an 'end run' around the statutory requirements." *Id*.

Mongol Nation, when combined with its "unofficial members", is the alleged Mongols Gang. The two are one in the same. Scraping away certain of the alleged Mongol Gang's affiliates, essentially agents of the alleged Mongols Gang/Mongol Nation, does not render Mongol Nation ("official" members) meaningfully different from the alleged Mongols Gang (members and associates). Defendant is the enterprise and the enterprise is (essentially) the defendant.

The government also argues that defendant is distinct from the enterprise it controls because that defendant held a unique legal position within the enterprise. Specifically, defendant controlled the use and display of the Word Image and Rider Image marks. Thus, the government reasons, defendant (unincorporated association of full patched members) enjoys a legal separation from the enterprise, which includes associates of defendant that cannot control the intellectual property underlying the Indictment.

The government carved away from the alleged Mongols Gang what it considers to be a discrete faction – the faction capable of holding the alleged Mongols Gang's property. This technical separation does not establish that Mongol Nation itself was performing a different role within the enterprise to facilitate racketeering activity. Rather, individual Mongols leaders (as alleged in the Indictment) asserted their authority to control the use of the Marks, while defendant Mongol Nation simply, technically, holds a

proprietary interest in the Marks. Therefore, this quality does not render Mongol Nation sufficiently distinct from the alleged Mongols Gang.

The government has relied on the Fourth Circuit case of *Najjar* and the Eleventh Circuit case of *Mowhak Industries* to argue that the asserted distinction between defendant and the enterprise is sufficient. Neither case is particularly persuasive under the facts before this court. In *Najjar*, the government alleged an association in fact enterprise comprising several individuals and two corporations. *United States v. Najjar*, 300 F.3d 466, 484 (4th Cir. 2002). "Thus, the corporation was only one piece of the enterprise, not the enterprise itself." *Moses v. Martin*, 360 F. Supp. 2d 533, 550 (S.D.N.Y. 2004). In *Mohawk*, the complaint alleged that "Mohawk and third-party temp agencies/recruiters have conspired to violate federal immigration laws, destroy documentation, and harbor illegal workers." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006). In both cases the enterprise consisted of multiple distinct legal entities, which existed and had a purpose independent of the defendant itself.

The government has also relied heavily on *Cedric* and similar cases, which hold that an individual person is always distinct from a corporate enterprise, without adequately acknowledging the legal import of charging an individual "person" versus an entity "person." *See*, e.g., *Fogie*, 190 F.3d at 897-98 (citing cases); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) ("[T]the inability of a corporation to operate except through its officers is not an impediment to section 1962(c) suits. That fact poses a problem only when the corporation is the named defendant—when it is both the "person"

Defendant's Motion for a Judgment of Acquittal

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and the "enterprise." In that case, however, *Sever* (which predates both *Cedric* and *Riverwoods Chappaqua* (which was explicitly adopted in by the Supreme Court as the law of the land in *Cedric*)) named the several individual officers as defendants/persons, and APC as the enterprise. Therefore, he has satisfied this allegation requirement."). Under RICO, individuals are necessarily treated differently when courts address whether they are distinct from the enterprise they compose. Individuals are always legally distinct from the enterprise. As briefly noted above, *Sever* predates both *Cedric* and *Riverwoods Chappaqua*. To the extent that *Riverwoods Chappaqua* run contrary to the rationales of *Sever*, *Riverwoods Chappaqua* is controlling as the law of the land. For the multitude of reasons noted above, the same logic simply does not extend to entity defendants. Defendant Mongol Nation is not distinct from the alleged Mongols Gang enterprise.

Throughout this trial, the government has continually failed to establish distinctness between a RICO "person" and a RICO "enterprise." In fact, the government did not even attempt to address this distinctness requirement until their closing argument – which is not evidence.

Without a doubt, there is insufficient evidence in this case to prove the existence of two distinct RICO entities. The only properly admitted evidence that pertained to distinctness indicated just the opposite – the defendant Mongol Nation is one single entity composed of various chapters, levels of membership, designations, and rights and responsibilities. The various members have differing status and rules governing their conduct. In other words, even non-full patch members of the club (prospect members,

probationary members, and hang-arounds/associates) are under the umbrella of the club's rules, control, and association. This can be seen by the government's very own evidence that was entered into the record – exhibit 17 (the Mongols 2005 Constitution), exhibit 141 (the Mongols 2008 Constitution), exhibit 142 (the Mongols 2013 Constitution), and the testimony of all the undercover agents. These documents, that say the defendant's name "Mongol Nation" on the cover page, describe in detail the rules and customs that govern conduct for all levels of the organization. These three Constitutions are consistent over the years and leave no doubt that the defendant is a single unified entity. In addition, there are unwritten customs and practices that complement the Constitution. For example, non-full patch members of the club have designated positions while riding in the motorcycle pack on national "runs" and are also obligated to use certain vocabulary when interacting with others.

The testimony of defendant's witnesses reiterated these facts that show the Defendant is one entity. Doctor Richard Cole, a member of the Mongols Motorcycle Club for thirteen years who goes by the nickname Ritchie Rich, verified the rules and customs stated in the Mongols Constitution. He also verified that there is no difference between Mongols "hang-arounds" and Mongols "associates." These two terms are interchangeable and their synonymous nature is customary within the organization.

Governor Jesse Venture, one of the original members of the Mongols Motorcycle Club and former Sargent at Arms for the South Bay Chapter who goes by the nickname

1
2

Superman, verified the rules and customs in the Mongols Constitution. Governor Ventura also discussed that there are rules for inactive members.

3
4
5
6
7
8

Richard Gutierrez, the Mongols Mother Chapter Secretary of Treasury who goes by the nickname Rags, verified the fact that all levels of the organization, including officers, full-patch members, probate members, probationary members, and hang-arounds/associates are governed by club rules, guidelines, and customs.

9
10
11

Bengy Leyva, a member of the Mongols Motorcycle Club since 2000 who goes by the nickname Secret, reiterated these facts as well.

12
13
14
15
16
17
18
19
20
21
22

Furthermore, EVERY undercover agent from operation Black Rain the government called to testify in this trial reiterated these facts. There is no better evidence that the club is one-single entity composed of various members with differing status and rules governing their conduct than the testimony of undercover agents who infiltrated the club for multiple years. A revisit of the testimony from Darren Kozlowski, Greg Gaioni, and Paul D'Angelo will verify the lack of distinctness proffered by the government. Inadvertently stated or not, from the mouths of the undercover agents themselves, there is no RICO "person" distinct from the RICO "enterprise" in this case.

23
24
25
26
27
28

Indeed, in closing argument, the government acknowledged the fact that testimony from their very own witnesses repudiated any assertion of distinctness between the defendant Mongols Nation and another entity. Realizing this error in their case, the government desperately attempted to challenge the testimony of their very own witnesses – alleging that Greg Gaioni and other undercover agents were "confused" when they

spoke about the organizational makeup of the club. These undercover agents spent roughly three years infiltrating the club; they were not confused. The government cannot erase testimonial evidence through their closing argument; nor can they re-write it. A valiant effort by the prosecution to distance themselves from their very own witnesses was not successful. The record clearly shows that the only testimony regarding the structure of the defendant Mongol Nation is that of a single unified entity. Furthermore, during his testimony on January 8, 2019, special agent Kozlowski specifically referred to on multiple occasions his "prospecting status" within the organization as being a "prospect member". He also stated he could wear the Center Patch before while he was a "prospect member". This once again shows that all differing ranks within the organization are still members and under the same Mongol Nation umbrella. This fact precludes any distinctness as required by the RICO statute. Evidence presented by the defense as well as the government clearly show that RICO distinctness has not been proven beyond a reasonable doubt. Mongols Full-patch members, Mongols probationary members, Mongols prospect members, and Mongols hang-arounds/associates are all Mongols of a sort unified by their common allegiance to the Mongols entity. They have no meaningful existence relevant to this case except as holding a status within the Mongols organization.

It is important to recall that an individual cannot conspire with their right arm to commit a crime. Alleging a conspiracy to commit acts which could not constitute a violation of the RICO statute does not provide a basis for a claim of conspiracy to violate

the RICO statutes. For this reason alone, a judgment of acquittal for both substantive

RICO and RICO conspiracy is necessary and proper.

**B.     The Defendant is Legally Incapable of Committing the *Malum in Se* Crimes of Murder and Attempted Murder**

An entity is legally incapable of committing the *malum in se* "racketeering acts" set

forth in the indictment and incorporated into the verdict form. In the present case, the

defendant is not an individual, but rather an entity formed through association. As such,

defendant Mongol Nation requests this Court exercise its rightful authority and enter a

judgment of acquittal due to the jury finding guilt based solely on *malum in se*

racketeering acts.

In *Jund v. Town of Hempstead*, 941 F.2d 1271 (2nd Cir. 1991), the Court faced,

seemingly as a matter of first impression, a challenge from an unincorporated association

defendant that it was legally incapable of committing the predicate acts which formed the

basis of the 18 U.SC. 1962(c) violation claim against it. *See Id*. at 1284. That Court held:

"Generally in the absence of a clear legislative intent to impose criminal responsibility, an

unincorporated association of persons as an entity *cannot be indicted and convicted of a*

*crime*, since, if a crime is committed, it must be committed by them as individuals. *Id*.

(emphasis added) (citing 7 C.J.S. Associations § 38, at 88-89 (1980); *United States v.*

*A&P Trucking Co.*, 358 U.S. 121, 127-28 (1958) (Douglas, J., dissenting); *United States*

*v. Local* 807, 118 F.2d 684, 688 (2nd Cir. 1941) (Clark, J., concurring); *State of South*

*Dakota v. Kandaras for Senate Comm.*, 264 N.W.2d 902, 903-04 (S.D. 1978)). The

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

indictment alleges that Mongol Nation, unincorporated association, committed ten "racketeering acts" which constitute the predicate acts required for a § 1962 (c) violation.

The racketeering acts allegedly committed by Mongol Nation, an unincorporated association, are as follows: (1) Conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(A); (2) Distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(A); (3) Attempted Murder in violation of California Penal Code §§ 187 and 664 and (4) Murder in violation of California Penal Code § 187.

Nowhere in each of the aforementioned statutes is there language that specifically holds an entity criminally liable for crimes that require specific *mens rea* that results in an act that is *malum in se* as opposed to *malum prohibitum. See 21 U.S.C. § 841*; *California Penal Code §§ 664, 187*. Generally speaking, if a "person" cannot burn in hell or be incarcerated for the consequence of act, they cannot be convicted of it. In fact, it is strange to even ponder a situation where an entity can be found guilty of murder or attempted murder. It is axiomatic that such is not the case. *See United States v. Kelso Co*., 86 Fed. 304 (N.D. Cal. 1898) ("Of course, there are certain crimes of which a corporation cannot be guilty; as, for instance, bigamy, rape, murder, and other offenses, which will readily suggest themselves to the mind."); *Commonwealth v. Punxsutawney St. Passenger Ry*., 24 Pa.C. 25 (1900). Despite the age of these cases, there is no subsequent authority that directly contradicts their conclusions. The lack of authority on the subject lends credence

to the fact that these past cases were so established and axiomatic that there was not need to question and test the holdings further. They remain good law.

Therefore, since Mongol Nation is legally incapable of committing any of the specific intent "racketeering acts" set forth in the indictment and incorporated into the verdict form, these charges should not and cannot be the basis of a conviction, (*see In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 826 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011) (when the indictment fails to state a claim under § 1962(c), any claims under § 1962(d) likewise fails)), and the Court must therefore enter a judgment of acquittal as such acts are the jury's basis for finding guilt.

The government will mostly cite *United States v. A&P Trucking Co.*, 358 U.S. 121, 125 (1958). However, this case actually supports the defendant's position that, while an entity defendant can clearly be held criminally liable for *regulatory* violations (i.e., *malum prohibitum*), it is incapable as a matter of law of committing non-regulatory or "inherently evil", i.e. *malum in se*, crimes. *See*, e.g., *Padilla v. Gonzalez*, 397 F.3d 1016, 1020 (7th Cir. 2005) ("We have acknowledged that the distinction between crimes that involve moral turpitude and those that don't corresponds to the distinction between crimes that are malum in se and those that are malum prohibita . . . specific intent is inconsistent with a crime that is malum prohibitum").

The fact of the matter is the government has failed to cite any case which stands for the proposition that an "organization" can be held guilty of the *malum in se* crimes of murder or attempted murder. This Court should, at a minimum, disregard all the alleged

acts committed by this defendant which are *malum in se* or other specific intent crimes. As

the government has itself admitted, all of those individual members alleged to have

committed those acts have been convicted and sent to prison to pay for their wrongs –

including some of whom were innocent but chose the safe route of a plea deal. As a result,

this Court should exclude all of the allegations of criminal activity by the defendant

Mongol Nation, since the alleged "guilty persons" have already been convicted,

sentenced, and punished as individuals. The defendant Mongol Nation is not responsible

nor capable of committing these acts. Every alleged individual wrongdoing has already

been addressed. For this reason, a judgment of acquittal for this defendant is both

necessary and proper.

## C.   The Racketeering Acts and Conspiracy Alleged Have Not Been Proven Beyond a Reasonable Doubt

In addition to the previous arguments, a judgment of acquittal is necessary and

proper because none of the racketeering acts and conspiracy alleged have been proven by

the government beyond a reasonable doubt.

With respect to all of the drug transactions, it is important to note that nowhere in

the evidence presented in this trial was there anything that one would expect to find from

an organization whose purpose was to manufacture or distribute controlled substances.

The government has indicated on the record that it has five shipping containers of

evidence of allegedly seized during operation Black Rain, which led to both the *Cavazos*

and this current prosecution. Nowhere in discovery or in the evidentiary record were any

of the things one would expect to find from a cartel dealing drugs, such as a "Pay-Owe" sheets or ledgers, cryptic communications from the organization related to drug transactions, or legitimate "Stash-Houses" that can be attributed to this defendant the Mongols Nation Motorcycle Club. In fact, the only evidence indicates that drug dealing was prohibited by the Mongol's rules.

It should also be borne in mind that all of the drugs introduced into the record at trial have twice been very aptly illustrated to fit into a standard grocery bag (even with their original evidentiary packaging and labels included) – leaving enough additional room to fit a gallon of milk, a loaf of bread, and a dozen eggs. All of the drug transactions prosecuted were "controlled-buy" situations orchestrated entirely by the government through undercover agents. One of the government's undercovers, John "Hollywood" Carr, is eloquently written about by Judge Manuel L. Real in the *U.S. v. Roberts* decision which criticizes the ATF and their scandalous practices intended to get their statistics up by framing minorities and people of low income through the use of confidential informants and other under handed tactics. *United States v. Roberts, et al.*, CR 13-00751-R-1 (2014). This perhaps best illustrates the actual "Deep State" looking for a way to justify their budgets, their bonuses, and their existence. This conduct was also done in the hopes of landing a book deal and movie deal after retirement – just like Billy Queen, Jay Dobyns, and the new budding writer Darren Kozlowski, etc. Ironically, one of the AFT agents, Jay Dobyns, in a successful lawsuit against the ATF itself called the agency which spearheaded this operation a corrupt organization.

Also, the Court should bear in mind that there was a slew of violent acts that the government put on evidence regarding. Of that cornucopia, the government chose to proceed to the jury for verdict on only six violent acts. Of these, the jury failed to return a verdict of guilty on four of those acts – leaving only two to address.

With regards to all of the violent acts alleged, there was zero evidence presented of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the sole defendant in this case Mongols Nation Motorcycle Club. The alleged racketeering acts are further addressed individually below.

First, Racketeering Act One, the conspiracy to distribute cocaine and methamphetamine being on a date unknown and continuing through at least on or about May 15, 2018 was improperly designated as a racketeering act. This allegation should be labeled as a separate Count. In addition, there was zero evidence, much less beyond a reasonable doubt, that this defendant engaged in a conspiracy to distributed cocaine or methamphetamine.

Second, Racketeering Act Three was the alleged distribution of methamphetamine on or about November 26, 2006 in Los Angeles County at a Jack-in-the-Box Parking Lot. There is zero evidence of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the defendant Mongols Nation Motorcycle Club through its Mother Chapter or ANY Chapter leadership within the organization, or members thereof. In fact, the alleged individual lawbreaker, David Gill, was kicked out of

the club. This reinforces the notion that the defendant Mongol Nation in no way orchestrated, encouraged, or conspired to carry out this act.

Racketeering Act Four was the alleged murder of Leon Huddleston at Young's Tavern on or about February 14, 2007 in Los Angeles County. There is zero evidence of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the defendant Mongols Nation Motorcycle Club through its Mother Chapter or ANY Chapter leadership within the organization, or members therof. In fact, the alleged individual lawbreakers, Klint Melcer and Jose Montes, were never and are not now members of the Mongols Nation Motorcycle Club. This reinforces the notion that the defendant Mongol Nation in no way orchestrated, encouraged, or conspired to commit this act. Furthermore, there is no evidence in the record that explains how this altercation occurred and who/what provoked it. Without such evidence, murder has not been proven beyond a reasonable doubt on an individual basis, much less on behalf of the club. All of the relevant evidence indicates that this was a spontaneous act of violence without any connection to the Mongols Nations Motorcycle Club at all; or the Collective Membership Marks, coffee cups, mouse pads, etc. etc. that the government is trying to forfeit. There is no evidence that the victim was a member of any rival club and nowhere has it been established in the record that the alleged perpetrators were wearing Mongols gear. By any stretch of the imagination the government has failed to show beyond a reasonable doubt that the defendant carried out this act, or conspired to do so.

Racketeering Act Five was the alleged attempted murder at Nicola's Bar in Los Angeles County on April 8, 2007. This was the act of violence that the jury deadlocked on 10-2 in favor of acquittal. There is zero evidence of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the defendant Mongols Nation Motorcycle Club through its Mother Chapter or ANY Chapter leadership within the organization, or members thereof. Furthermore, the only witness brought forth by the prosecution on this incident, Waldo Salazar, is bound by an immunity agreement and therefore going to say whatever the government desires for fear of being found in violation of his agreement and losing his government job at Immigration and Customs Enforcement. The defendant witness on this incident was Al "the Suit" Cavazos; a man who now although is a convicted felon was convincing to at least 10 of jurors.

The only evidence in the record is that there was a dispute between about 10 knife wielding men from a street clique, which included Zeus Sanchez and Marcelo Garay, and about two Mongols in a parking lot outside Nicola's. That is bolstered by the testimony of Al Cavazos. Also in the record is that ATF agents John Ciccone and Christopher Cervantes were present at the altercation at roughly 2 AM, fully armed, and did nothing to stop the altercation although they easily could have. As a result of the altercation, two of Mr. Ciccone's undercover agents (Kozlowski and Gaioni) avoided a confrontation with Denis Maldonado who suspected them as undercover cops and was scheduled to address them that evening. This was a suspiciously convenient outcome. John Ciccone was runing undercover agents in both the Mongols and the street clique to which the victims of this

altercation were members. Cleary there is not enough evidence to show that the defendant Mongol Nation was guilty of this racketeering beyond a reasonable doubt – this is most likely why the jury held 10-2 for acquittal.

Racketeering Act Six was the alleged attempted murder of Robert Huffman and John Hauser on or about April 6, 2008 at a Mobil Gas Station in Pasadena. There is zero evidence of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the defendant Mongols Nation Motorcycle Club through its Mother Chapter or ANY Chapter leadership within the organization, or members thereof. In fact, nowhere in the evidentiary record is the identity of the perpetrators established, much less any association with the defendant Mongols Nation. This reinforces the notion that the defendant Mongol Nation in no way orchestrated, encouraged, or conspired to commit this act. The only evidence in the record is the fact that the victims were Hells Angels prospects, one of whom identified themselves to the police. Furthermore, there is no evidence in the record that explains how this altercation occurred and who/what provoked it. Exhibit 90, the Mobil Gas Station video of the incident that was admitted into the record, does not come close to showing the entire altercation. The only thing visible from the video is that there were four people in the parking lot outside, two entered inside, and one of them was cut. At worse this was a spontaneous act. Clearly the government did not meet its burden of proof beyond a reasonable doubt.

Racketeering Act Eight was the alleged distribution of methamphetamine on or about June 19, 2008 in Los Angeles County. There is zero evidence of consultation with, direction from, collaboration by, conspiracy with, or orchestration or encouragement by the defendant Mongols Nation Motorcycle Club through its Mother Chapter or ANY Chapter leadership within the organization, or members thereof. This alleged drug deal was not done under the request of any club officers, but rather under the request of law enforcement in an undercover street theater capacity – specifically special agent John "Hollywood" Carr. In fact, undercover agent John "Hollywood" Carr admitted in his testimony that he NEVER interacted with Mother Chapter. The government has failed to meet its burden to show beyond a reasonable doubt that the defendant was involved in any way with this act, much less carried it out or conspired to do so. This was as worst the individual acts of the Lozano brothers.

As the Court has properly noted, Racketeering Act One is merely a subset of Count Two – the RICO Conspiracy – and not a separate racketeering act. None of the evidence presented at trial established that the defendant Mongols Nation Motorcycle Club was in any way engaged in a conspiracy to distribute cocaine, methamphetamine, or other controlled substances. At worst, these were rogue acts of individuals. We reincorporate our arguments above herein regarding the fact that conspiring to engage in actions that cannot, could not, and would not violate the RICO statutes cannot constitute conspiracy to violate the RICO statutes.

Regardless of the jury's finding of "proven" on these aforementioned allegations, an objective analysis of the evidence presented at trial, or lack thereof, leads to the inescapable conclusion that the government did not prove these offenses beyond a reasonable doubt. The high burden of proof for the prosecution in a criminal trial is not a malleable meter that can bend and sway based on the jury's speculation, or as in this case likely a compromise verdict. This standard of proof is a crucial check and balance against government power in our system of jurisprudence. *See In re Winship*, 397 U.S. 358 (1970) (emphasizing that "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.") This Court has a legal and moral obligation to enter a judgment of acquittal in this case because of the government has failed to prove any of the alleged racketeering acts beyond a reasonable doubt.

This prosecution amounts to nothing more than an attempt to find guilt by association. It is a mean-spirited endeavor intended to punish the quote "associates" of people who have been previously found, mostly likely by stipulation and consent decree, to have committed wrongful acts. Guilt by association has never been the law of the land in this country and the RICO statutes did not change that. No perversion of the racketeering laws with a novel Alice in Wonderland theory can lead to that conclusion in a just and Constitutional fashion. It had been the prayer of this defendant and its members

that that matter had been put to bed with the verdicts in the Nuremberg war trials, where it was determined that a race of people cannot be deemed guilty because of the alleged conduct of members of that race.

The one thing that has been proven is that this defendant, the Mongols Nation Motorcycle Club, has not committed any of the acts tried in this case even if rogue individuals did. There is not a shred of evidence that this defendant, Mongols Nation Motorcycle Club, orchestrated any of the behavior complained of in this proceeding. It is not enough and should not be enough to find guilt on an entire entity simply because persons associated with that entity may have committed wrongdoing – if that is all that the law requires then no organization is safe.

## III.    CONCLUSION

The government has failed the prove the required element of distinctness for a conviction under RICO and RICO conspiracy. Furthermore, the defendant Mongol Nation is legally incapable of committing the the *malum in se* crimes of murder and attempted murder alleged in the Indictment and incorporated into the verdict form. As such, the jury cannot rely on these acts as the basis for finding guilt. Lastly, and all else aside, none of the racketeering acts or conspiracy alleged have been proven by the government beyond a reasonable doubt. For the foregoing reasons, a judgment of acquittal is requested and is both necessary and proper under the facts of this case. The defendant relies on these and whatever other additional arguments may be presented at the hearing on this matter.

1

2                              Respectfully submitted,

3

4   Dated: Jan 10, 2019              By:   /s/  *Joseph A. Yanny*

5                                          JOSEPH A. YANNY
                                           YANNY & SMITH
6                                          Attorneys for Defendant, Mongol Nation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28