Case 2:13-cr-00106-DOC Document 376 Filed 02/28/19 Page 1 of 17 Page ID #:3232

Rebecca Tushnet

Harvard Law School

Hauser Hall 520

Cambridge, MA 02138

703 593 6759

rtushnet@law.harvard.edu



FILED
CLERK, U.S. DISTRICT COURT
FEB 28 2019
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, | CASE NO.: CR 13-0106-DOC |
| Plaintiff | |
| vs. MONGOL NATION, | **AMICUS CURIAE BRIEF OF SEVEN LAW PROFESSORS IN SUPPORT OF NEITHER PARTY** |
| Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 4

I. A TRADEMARK AND ITS ASSOCIATED GOODWILL COMPRISE AN INTANGIBLE ASSET, SUBJECT TO FOREFEITURE .................. 5

II. LIMITS ON WHAT GOVERNMENT CAN DO WITH FOREFEITED MARKS. 6

    A. What Happens to the Forfeited Asset? ................................................ 6

    B. Assignment in Gross and Naked Licensing. ........................................ 9

III. THE OWNERSHIP OF A TRADEMARK AND THE RIGHT OF A PERSON TO USE GOODS BEARING THE MARK ARE VERY DIFFERENT MATTERS. ............................................................................ 11

    A. The First Sale Doctrine. ...................................................................... 11

    B. Even Subsequently Created Items Bearing the Mark Would Not Necessarily be Infringing. ................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

Barcamerica Intern. USA Trust v. Tyfield Importers, Inc., 289 F.3d 589 (9th Cir. 2002) .................................................................................................... 10

Burgess v. Gilman, 475 F. Supp. 2d 1051 (D. Nev. 2006) ....................................... 10

Cash Processing Servs. v. Ambient Entertainment, Inc., 418 F. Supp. 2d 1227 (D. Nev. 2006) ................................................................................................... 7

Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175 (9th Cir. 1988) .............. 13

Cohen v. California, 403 U.S. 15 (1971) ................................................................ 15

Cumulus Media, Inc. v. Clear Channel Comm., Inc., 304 F.3d 1167 (11th Cir. 2002) .................................................................................................... 8

Defiance Button Mach. Co. v. C & C Metal Prod. Corp., 759 F.2d (2d Cir. 1985) 10

E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992) ............. 10

Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931 (9th Cir. 2006) .................................................................................................... 8

FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509 (9th Cir. 2010) ............ 10

General Conference Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402 (6th Cir. 2010) ................................................................................................ 14

General Motors LLC v. West Covina Motors, Inc., 2015 WL 12762063 (C.D. Cal. Apr. 13, 2015) ................................................................................................ 13

Hensley Mfg. v. ProPride, Inc., 579 F.3d 603 (6th Cir. 2009) ............................... 14

Husbandry v. California Guild, 334 F. Supp. 3d 1057 (E.D. Cal. 2018) ............... 14

Iancu v. Brunetti, 2019 WL 98541 (Jan. 4, 2019) .................................................. 15

Kassbaum v. Steppenwolf Productions, Inc., 236 F.3d (9th Cir. 2000) ................. 13

Matal v. Tam, —— U.S. ——, 137 S. Ct. 1744 (2017) ................................................. 15

Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45 (S.D.N.Y. 1965) ....................... 9

Mister Donut of America, Inc., v. Mr. Donut, Inc., 418 F.2d 838 (9th Cir. 1969)... 9

Nationwide Mut. Ins. Co. v. Tri-Continental Exchange, Ltd., 2001 WL 34398158 4

New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302 (9th Cir. 1992). 13

PepsiCo, Inc. v. Grapette Co., 416 F.2d 285 (8th Cir. 1969) .................................... 9

Pursuing America's Greatness v. Federal Election Comm'n, 831 F.3d 500 (D.C. Cir. 2016) ............................................................................................................. 15

Radiance Foundation, Inc. v. N.A.A.C.P., 786 F.3d 316 (4th Cir. 2015) ............... 14

Sazerac Brands, LLC v. Peristyle, LLC, 892 F.3d (6th Cir. 2018) .......................... 14

Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073 (9th Cir. 1995) .... 12

Silverman v. CBS Inc., 870 F.2d 40 (2d Cir. 1989) .................................................. 8

Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Board, 502 U.S. 105 (1991) ....................................................................................................... 5

Tally-Ho, Inc. v. Coast Comm. College Dist., 889 F.2d 1018 (11th Cir. 1989) ....... 6

United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 ....................................... 6

United We Stand America, Inc. v. United We Stand, America New York, 128 F.3d 86 (2d Cir. 1997) ................................................................................................. 14

**Statutes**

15 U.S.C. § 1114(1)(a) ............................................................................................ 12

15 U.S.C. § 1127 ....................................................................................................... 8

3 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2008) ............ 8

McCarthy on Trademarks and Unfair Competition § 18:29 (5th ed.) ...................... 5

Restatement (Third) of Unfair Competition § 34 (1995) ........................................ 10

# INTRODUCTION

The signatories to this amicus brief write to offer some assistance to the Court about what trademark law does—and does not—cover.[1] A trademark is a symbol that consumers use to associate goods or services with their source or sponsorship. It is the combination of the symbol and its goodwill produced by the association with the source or sponsor, not the symbol in the abstract, that constitutes the trademark. E.g., Nationwide Mut. Ins. Co. v. Tri-Continental Exchange, Ltd., No. CV–00–12665–JSL(JWJX), 2001 WL 34398158, at *18 (C.D. Cal. Jan. 23, 2001) ("the goodwill associated with a trademark represents an intangible but immeasurably valuable asset"). Trademark rights arise out of use, not registration. This means that the Mongol Nation may hold more unregistered trademarks than the three identified by the government. At the same time, registration does not guarantee the validity of a mark. Trademarks can cease to exist when they are no longer used to identify particular goods or services.

As we will explain, whatever trademarks the Mongol Nation owns are capable of being transferred in a forfeiture proceedings. But those marks would only survive such a transfer under specific circumstances. Nor is it clear that any new owner of the marks would be able to assert those rights against others—including existing Mongol Nation members—who continue to use the term Mongol or the existing logos to describe the current Mongols.

---

[1] We have reviewed the three registered marks that the government points to in its forfeiture order. Two of these marks are currently registered with the U.S. Patent and Trademark Office (Nos. 4830806 and 4406187), and one has been cancelled for failure to file an affidavit of continued use with the PTO (No. 2916965).

# I. A TRADEMARK AND ITS ASSOCIATED GOODWILL COMPRISE AN INTANGIBLE ASSET, SUBJECT TO FOREFEITURE.

There is no barrier to the criminal forfeiture of trademarks as assets as long as the marks are not targeted on expressive grounds. *See* Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Board, 502 U.S. 105 (1991). By analogy, trademarks have been involuntarily transferred in bankruptcy proceedings. However, in such instances, the trademark has been transferred along with the goodwill of the underlying business, as we will discuss further in Section III.A. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:29 (5th ed. 2017). Thus, the answers to the Court's first two questions are "no" and "yes, but with specific consequences" respectively:[2] forfeiture of a trademark is "feasible" to the extent that its purpose is simply to divest defendants of accrued trademark rights, and, depending what the government plans to do with the seized mark, to prohibit others from using the mark commercially. It is not "feasible," however, if its purpose is to allow the government to stop the club and its members from calling themselves Mongols and wearing Mongols gear.

---

[2] "[1] Whether criminal forfeiture of any and all legal and equitable rights of any kind or nature associated with or appurtenant to a collective membership mark violates the First Amendment to the United States Constitution. [2] Whether criminal forfeiture of a collective membership mark is feasible under intellectual property law." Order of January 17, 2019.

5

## II. LIMITS ON WHAT GOVERNMENT CAN DO WITH FOREFEITED MARKS.

If the government intends through forfeiture to stop the club or its members from calling themselves "Mongols," or wearing the Mongols design mark, trademark law will not necessarily do that.

### A. What Happens to the Forfeited Asset?

Several principles of trademark law govern whether trademark rights survive a transfer of ownership.[3] A trademark, unlike a patent or copyright, is not "a right in gross or at large." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918); see also Kern v. Mindsource, Inc., No. 99-16127, 2000 WL 692199, at *4 (9th Cir. May 30, 2000). "Trademark ownership is always appurtenant to commercial activity. Thus, actual and continuous use is required to acquire and retain a protectable interest in a mark." Tally-Ho, Inc. v. Coast Comm. College Dist., 889 F.2d 1018, 1022-23 (11th Cir. 1989).

If an unincorporated association has trademarks in a name and logo for identifying the services of a motorcycle club, it may prevent others from using the marks in confusing ways on related goods and services, but it does not have any title in the word or logo itself. Nor can the government by forfeiture come to own the word or logo apart from the underlying products or services for which those marks function as source-identifiers, any more than it could do so by purchasing the marks in a voluntary transaction. Cash Processing Servs. v.

---

[3] As to the registration that was cancelled for failure to file a Section 8 affidavit pursuant to the Lanham Act, that cannot be revived. Registration requires periodic payment of fees and statements of use or excusable nonuse.

6

Ambient Entertainment, Inc., 418 F. Supp. 2d 1227, 1232-33 (D. Nev. 2006) ("Mustang Ranch" mark for brothel services had been forfeited to the government; only use in connection with brothel was relevant trademark use by the government).

For the registered marks, the covered services are those listed in the registrations, relating to membership in a motorcycle association. If the government does not intend to use the marks for this purpose, or to transfer them to an association dedicated to motorcycles, the marks would be abandoned. Nor could the government simply start using the word or design marks on new products to establish continued use. Trademark law requires that the uses be a continuation of the underlying uses that established the trademark rights in the first place.[4]

### 1. Abandonment.

If the government merely seizes the Mongols marks and makes no use of them, those marks are likely to be abandoned. The Lanham Act provides that

> [a] mark shall be deemed to be "abandoned"....[w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. ... "Use" of a mark means the bona fide

---

[4] We note that the 9th Circuit has held that trademark rights arise only for uses that are lawful. CreAgri, Inc. v. USANA Health Sciences, Inc., 474 F.3d 626, 630 (9th Cir. 2007). Nevertheless, the fact that an entity engaged in unlawful acts does not bar it from acquiring or maintaining trademark rights in connection with lawful aspects of its operations. Cash Processing Services, LLC v. Ambient Entertainment, Inc., 320 Fed. Appx. 494 (9th Cir. 2008) (discussing "Mustang Ranch" mark, forfeited to the government due to unlawful racketeering activity).

use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127. The relevant questions are whether the putative owner has discontinued use and lacks a bona fide intent to resume use. Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931, 937 (9th Cir. 2006); Silverman v. CBS Inc., 870 F.2d 40, 46 (2d Cir. 1989) (finding no bona fide intent when mark-holder had no more than speculative plans to resume use if the market changed). If the government lacks a good faith intent to use or transfer the marks to an entity that will use them for a motorcycle association, abandonment could occur at the time of forfeiture.[5]

When a mark has been abandoned, anyone can use the symbol and can even create a new trademark right using the symbol. Cumulus Media, Inc. v. Clear Channel Comm., Inc., 304 F.3d 1167, 1173 (11th Cir. 2002) ("[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark ...."); McCarthy on Trademarks and Unfair Competition § 17:1 (5th ed. 2017) (an abandoned mark "falls into the public domain and is free for all to use ..."). Thus, if there was seizure and abandonment of the instant marks, the defendants could re-adopt the Mongols marks as trademarks, though their rights would accrue only as of the new first

---

[5] Governmental concerns related to administering a forfeiture can excuse a certain amount of nonuse, though appropriate use must ultimately be resumed for the mark to stay valid. Cash Processing Servs., 418 F. Supp. 2d at 1233-34 (attributing private transferee's intent to use to the government where the trademark and associated property were sold at auction).

8

use date. Members (and anyone else) would be free to use the abandoned words and designs.

### B. Assignment in Gross and Naked Licensing.

The government may intend to transfer or license the trademark to another entity. Consistent with the fundamental principle that a trademark is not a right in the abstract but a right appurtenant to use with specific goods and services, trademark law does not recognize transfers "in gross"—transfers that attempt to transfer a trademark only, without any of the associated "goodwill." It "is well settled ... that no rights [to a mark] can be transferred apart from the business with which the mark has been associated." Mister Donut of America, Inc., v. Mr. Donut, Inc., 418 F.2d 838, 842 (9th Cir. 1969). Goodwill is a broad and inchoate concept, but it generally means some sort of underlying connection to the initial business, whether that's know-how or physical assets or something else.[6]

One example of an assignment in gross is a purported transfer of a mark, but for use on different goods and services. PepsiCo, Inc. v. Grapette Co., 416 F.2d 285, 289 (8th Cir. 1969) ("Where a transferred trademark is to be used on a new and different product, any goodwill which the mark itself might represent cannot legally be assigned."). In another government forfeiture case, the court helpfully explained:

---

[6] In the analogous context of bankruptcy, the test is "whether the assets which are purchased with the name are sufficient to enable the purchaser to 'go on in real continuity with its past.'" Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45, 51 (S.D.N.Y. 1965); see McCarthy, *supra*.

> Where a trademark is assigned as a mere term, without any particular associated good will, the assignment may be ineffective, causing the mark to remain with the purported assignor. Alternatively, the mark may be deemed involuntarily abandoned. One clear requirement that arises from this principle is that a mark cannot be assigned for use by a business with fundamentally dissimilar goods and services.

Burgess v. Gilman, 475 F. Supp. 2d 1051, 1056 (D. Nev. 2006) (citations omitted), aff'd, 316 Fed. Appx. 542 (9th Cir. 2008). "[I]t is not necessary that the entire business or its tangible assets be transferred; it is the goodwill of the business that must accompany the mark." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1289 (9th Cir. 1992). Some courts have found that as long as the transferee's goods or services are essentially the same as the transferor's in type and in quality, then there can be a valid transfer. Defiance Button Mach. Co. v. C & C Metal Prod. Corp., 759 F.2d 1053, 1059, 1060 (2d Cir. 1985); Restatement (Third) of Unfair Competition § 34 (1995) ("In the final analysis, the question is whether the assignee has acquired enough of the assignor's business to maintain continuity in the use of the designation. [A valid transfer occurs] if the expectations of consumers who rely on the presence of the designation after the assignment will be substantially fulfilled."). A license instead of an outright transfer would be subject to the same principles, and would also require ongoing quality assurance and supervision by the licensor. Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 515-16 (9th Cir. 2010); Barcamerica Intern. USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 595–96 (9th Cir. 2002).

Thus, a valid transfer would have to (1) include goodwill and (2) convey the marks to an entity that would use them for a motorcycle club or something sufficiently related. Only if they were not abandoned would the defendants potentially face post-forfeiture infringement claims for using the marks.

### III. THE OWNERSHIP OF A TRADEMARK AND THE RIGHT OF A PERSON TO USE GOODS BEARING THE MARK ARE VERY DIFFERENT MATTERS.

Even if the government maintained trademark rights in the Mongols Nation marks, doing so would not necessarily give it the ability to bar uses of the mark in many contexts, most significantly the wearing of apparel bearing the marks, including by members of the Mongol Nation.

#### A. The First Sale Doctrine.

Because trademark rights are intangible, any existing marked items (not themselves independently subject to criminal forfeiture[7]) would not be forfeited merely because the trademarks had been forfeited. The doctrine of "first sale" allows the owner of legitimately acquired marked goods to use and resell them, no matter what the (current) trademark owner wants.[8] "[T]he right of a

---

[7] The government also seeks forfeiture of already seized "items of tangible personal property" bearing the marks. U.S. v. Mongol Nation, Government's Notice of Motion and Motion for Preliminary Order of Forfeiture Against Defendant Mongol Nation, at 2. Amici don't know whether all existing items bearing the mark have been seized.

[8] The government thus errs in its proposed forfeiture order in lumping together "personal property bearing all or part of the Marks" with the marks themselves, *id.* at 16—while it may make sense to restrain defendants "from taking or attempting any action that might affect the availability, marketability or value of the Marks,"

11

producer to control distribution of its trademarked product does not extend beyond the first sale of the product." Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1074 (9th Cir. 1995).[9]

Simply put, even bad behavior in public by wearers of lawfully purchased marked apparel (whether a red cap or Burberry plaid) doesn't entitle the trademark owner to stop the miscreants from wearing their personal property. To hold otherwise would make trademark owners the arbiters of huge amounts of private conduct, and trademark law has never extended so far.

### B. Even Subsequently Created Items Bearing the Mark Would Not Necessarily be Infringing.

Only uses of a mark in commerce that are likely to cause confusion infringe trademark rights. *See* 15 U.S.C. § 1114(1)(a); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988). The most plausible argument in favor of preventing club members from continuing to use the

---

*id.*, selling or otherwise disposing of personal property bearing the marks would not, because of the first sale doctrine, generally have any effect on the "availability, marketability or value of the Marks" themselves. (In the ordinary case, abruptly stopping sales of goods bearing a mark would likely *devalue* the mark, though this may not be an ordinary case. We make the observation merely to highlight that the marks and goods bearing the marks are distinct legal entities.)

[9] Unsurprisingly, most first sale cases involve attempted resales, not mere continued use, because it is generally so obvious that continued use is lawful. Sometimes, plaintiffs try to evade first sale by pleading that the continued use deceives consumers about whether the trademark owner has given permission or authorization to the reseller. Courts have wisely rejected this attempted workaround. Sebastian, 53 F.3d at 1076. Continued use of existing marked items by club members would fall within the same protections.

12

Mongols marks—if they were successfully transferred to another owner—would be by analogy to a terminated franchisee. See, e.g., General Motors LLC v. West Covina Motors, Inc., No. CV 15–705–JFW (AGRx), 2015 WL 12762063, at *13-14 (C.D. Cal. Apr. 13, 2015) (further noting that the remedy might be damages, not injunction). However, in the usual case, the franchisee sells goods or services to the public under the franchisor's mark, which is not the same thing as organizing for associational purposes. In particular, club or club members' creation of items using the mark for *personal* use, without sale to nonmembers, might well not infringe the rights of the new owner.

More specifically, fair uses do not infringe: Uses that describe the user ("I am a Mongol") may constitute descriptive or nominative fair use. Truthful references to historical affiliations are likely to be nominative fair use (a concept that helps implement First Amendment safeguards within trademark doctrine). New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992); *see also* Kassbaum v. Steppenwolf Productions, Inc., 236 F.3d 487, 493 (9th Cir. 2000) (finding historical references to affiliation with band unlikely to cause confusion). Descriptive use—another type of noninfringing use—is usually distinguished from nominative fair use; nominative use involves a reference to the trademark owner, while descriptive fair use is centered on describing some characteristic of the challenged user. Where there is a historical symbol with a meaning that goes beyond simply linking goods and services to the seller of those goods or services, the two concepts may converge: the challenged user might have to use the trademark in order to successfully describe himself. *See* Sazerac Brands, LLC v. Peristyle, LLC, 892 F.3d 853 (6th Cir. 2018) (finding that a use identifying a historical connection

13

was a descriptive fair use); Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 610 (6th Cir. 2009) (considering such uses to be outside the Lanham Act).

In many cases, trademark law poses no First Amendment problems because false and misleading commercial speech receives no constitutional protection. See, e.g., National Grange of the Order of Patrons of Husbandry v. California Guild, 334 F. Supp. 3d 1057, 1067 (E.D. Cal. 2018). Although some uses may not be sufficiently "in connection with goods or services" within the meaning of the Lanham Act, see Radiance Foundation, Inc. v. N.A.A.C.P., 786 F.3d 316 (4th Cir. 2015),[10] courts have applied the Lanham Act to speech that would in other contexts be deemed "noncommercial," such as the names of churches, see, e.g., General Conference Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402 (6th Cir. 2010), and the names of political parties, see, e.g., United We Stand America, Inc. v. United We Stand, America New York, 128 F.3d 86 (2d Cir. 1997).

Nonetheless, the primary justification for trademark laws is the regulation of commerce: protecting consumers from being deceived in the marketplace and preventing damage to businesses' goodwill by those who pass off their own goods or services as those of another. See, e.g., Matal v. Tam, 137 S. Ct. 1744, 1767-68 (2017) (opinion of four Justices) (emphasizing that trademark's

---

[10] In *Radiance*, the defendant advocacy organization used the plaintiff's mark to criticize the plaintiff. Although the defendant engaged in fundraising and thus operated "in commerce," the court found that there wasn't "a sufficient nexus between the specific use of the marks and the sale, offer for sale, distribution, or advertisement" of any of the defendant's goods or services. 786 F.3d at 326. Under that reasoning, the club and its members wouldn't be subject to the Lanham Act unless they offered goods or services to others under the Mongol marks.

14

restrictions on others' speech depend on a consumer protection rationale); In re Brunetti, 877 F.3d 1330, 1349 (Fed. Cir. 2017), cert. granted sub nom. Iancu v. Brunetti, No. 18-302, ___, S.Ct.___, 2019 WL 98541 (Jan. 4, 2019) (registration bar targeting noncommercial expressive aspects of mark, rather than source-identifying aspects, wasn't legitimate commercial speech regulation).

      Although offering commercial services to the public in competition with the new owner could infringe the rights of that owner, individuals simply wearing Mongols gear or affiliating as a Mongol club would have a tenuous connection to any commercial harms. Even if consumers who viewed club members dressed as Mongols were confused about those members' connection with the new owner, that wouldn't be the same as confusion over the source or sponsorship of goods or services sold in the market, and members' expressive and associational interests in identifying as Mongols are substantial.[11] A person's or group's ability to choose the symbol that represents them is an important part of the freedom of speech. *Tam*, 137 S. Ct. at 1760 ("powerful messages can sometimes be conveyed in just a few words"); Cohen v. California, 403 U.S. 15, 26 (1971); Pursuing America's Greatness v. Federal Election Comm'n, 831 F.3d 500, 510 (D.C. Cir. 2016) (title/name is a "critical"

---

[11] Moreover, and distinct from the usual associational scenario where two private parties spar over the right to use a name, the argument against allowing the club and its members continued use of the marks would be that the government had *made* the use misleading through forfeiture. The context of a surrender to the government reinforces the concerns that arise because use to self-identify as members of an association is not standard commercial use of a trademark.

15

way to identify a group). To prevent the suppression of constitutionally protected speech, any forfeiture order should clearly delineate the effect of forfeiture on the club and club members' rights to continued expressive uses of the Mongols symbols. Even if the marks are validly transferred, the ownership of the marks by a new motorcycle club couldn't prevent members of the current group from describing themselves without treading onto dangerous First Amendment ground.

Dated: February 6, 2019

Respectfully Submitted,

By: /s/Rebecca Tushnet

REBECCA TUSHNET