FILED
CLERK, U.S. DISTRICT COURT

FEB 2 8 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br><br> vs. <br><br> MONGOL NATION, <br><br> Defendant. | Case No. CR 13-0106-DOC-1 <br><br><br><br> ORDER RE MOTION FOR ENTRY OF PRELIMINARY ORDER OF FORFEITURE; MOTION FOR NEW TRIAL; MOTION FOR ACQUITTAL [324], [340], [354] |

Before the Court is the Government's Motion for Preliminary Order of Forfeiture Against Defendant Mongol Nation ("Mot. for POF") (Dkt. 354) and the Mongol Nation's post-trial motions. The Court heard oral arguments on February 28, 2019.

On December 13, 2018, the jury returned a verdict finding the Defendant Mongol Nation, an unincorporated association, guilty of (1) substantive RICO;[1] and (2) RICO conspiracy. *See* Dkt. 320. The guilty verdict triggered the forfeiture phase of trial. On January 11, 2019, the jury returned a Special Verdict finding certain property to be subject to criminal forfeiture, including the rights associated with and appurtenant to collective membership marks and specific items of personal property bearing the marks. *See* Dkt. 353. The jury also found forfeitable ammunition, body armor, and firearms entered into evidence. The Special Verdict capped months of trial and ripened legal challenges to the Government's requested criminal forfeiture. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

The Mongol Nation and its members display specific words and images on leather vests, flags, bandanas, belt buckles, and other property. Some of these words and images are registered with the United States Patent and Trademark Office as a type of trademark called a "collective membership mark." For example, one of the Mongol Nation's registered collective membership marks is the "Combined Mark," consisting of the word "MONGOLS" and the drawn image of a Genghis Khan-type character with sunglasses and a ponytail, riding a motorcycle, with the letters "M.C." appearing below the motorcycle:[2]



---

[1] "RICO" shall be used to refer to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

[2] At various times, the Combined Mark has been registered under Registration No. 4,730,806.

The Mongol Nation and its members use the collective membership marks solely for the purpose of identifying the persons displaying the marks as members of the motorcycle club. Unlike a typical trademark (*i.e.*, "Pepsi" or "Dr. Pepper"), the words and images are not used to distinguish the source or origin of particular goods or services in commerce.[3] They are used only to identify membership in the collective. This type of trademark allows an organization, union, club, or other type of association—be it the National Rifle Association,[4] American Thyroid Association,[5] Christian Deer Hunters Association,[6] International Brotherhood of Teamsters,[7] or Navy Seal Team[8]—to prevent others from using the words or images in a way that violates trademark law, including by creating public confusion about the origin of goods.[9] For example, in 2012 the Hells Angels Motorcycle Corporation filed a lawsuit against Toys "R" Us, Inc. for selling yo-yos with a design confusingly similar to the motorcycle club's "Death Head" collective membership mark.[10]

For more than a decade the United States has expended resources seeking forfeiture of the Mongol Nation's collective membership marks. Why? It is beyond question that the Government has a legitimate interest in attacking the economic roots of a criminal organization like the Mongol Nation.[11] But what does the United States accomplish by seizing control of the intellectual property rights associated with a motorcycle club's associative symbols? The Government's own prior admissions shed light on the objectives underlying more than ten years

---

[3] *See, e.g.,* U.S. Reg. No. 4,730,806 (collective membership mark indicates "membership in an association dedicated to motorcycle riding appreciation"); *see also* 15 U.S.C. § 1127; U.S. PATENT & TRADEMARK OFFICE, TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1302 (8th ed. 2017) (describing purpose of collective membership marks).

[4] Reg. No. 1,323,914, "NATIONAL RIFLE ASSOCIATION OF AMERICA MEMBER," indicating membership in the organization "which promotes good citizenship, safe and proper gun handling, marksmanship for sport and national defense and recreational sport."

[5] Reg. No. 5,207,429, "AMERICAN THYROID ASSOCIATION," indicating "membership in an organization of medical professionals in the field of thyroid research and thyroid diseases."

[6] Reg. No. 2,790,379, "CHRISTIAN DEER HUNTERS ASSOCIATION," indicating membership "in a religious and education association of hunters and others supportive of the religious education of hunters."

[7] Reg. No. 1,994,996, "INTERNATIONAL BROTHERHOOD OF TEAMSTERS," indicating membership in the transportation, maintenance, and handling labor union.

[8] Reg. No. 3,285,473, "SEAL TEAM," indicating membership in an organization of the Department of the Navy that develops and executes military missions involving special operations strategy, doctrine, and tactics.

[9] *See Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980).

[10] *Hells Angels Motorcycle Corporation v. Yomega Corporation et al*, Case No. 2:12-cv-02541-MCE-AC (E.D. Cal. Oct. 10. 2012).

[11] *See Russello v. United States*, 464 U.S. 16, 26 (1983).

of their efforts: The collective membership marks are "potent emblem[s]" used to "generate fear among the general public," and the Government has sought orders to prevent use of "the trademark to create an atmosphere of fear through public display."[12] The Government has stated publicly that it has sought to "stop [a] gang member and literally take [a] jacket right off his back."[13]  The Government is not merely seeking forfeiture of the ship's sails. In this prosecution the United States is attempting to use RICO to change the meaning of the ship's flag.

Now that the preliminary order of forfeiture is before the Court, the Government contends that its request is limited; the Government argues at length about what the requested preliminary order of forfeiture does *not* authorize. *See, e.g.*, Reply ISO Mot. for POF[14] at 25 ("the POF merely forfeits *Defendant's* right to limit use of the Marks—the POF in itself does not confer any right upon the government to do so"); *id.* at 22 ("The government has . . . requested nothing more than the entry of a POF, and it is unreasonable to presume that the mere entry of that order could or would lead to seizures or a reasonable belief that seizures would occur[.]"). But the First Amendment "protects against the Government; it does not leave us at the mercy of *noblesse oblige*" or any promise to use power "responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

The Government has included language in its proposed POF stating that the order "standing alone" does not authorize seizure of property bearing the symbols and that the Government "shall not apply to any Court (other than this Court) requesting seizure or enforcement authority based upon this Order." Dkt. 354-1 at 6. This is not enough to remedy the chilling effect the forced transfer of a symbol to the United States government has on the Mongol Nation, its members, and society at large. The Government has not been forthright with this Court and the public regarding whether the United States can feasibly use the Mongol Nation's collective membership marks or transfer the marks to a third party for their exclusive

---

[12] *United States v. Cavazos, et al.*, Case No. 2:08–cr–1201–FMC (C.D. Cal. Oct. 9, 2008) (Dkt. 248) at 21–22.

[13] ATF Undercover Investigation Leads to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, Release No. 08-142, United States Attorney's Office Central District of California (Oct. 21, 2008), available at https://www.justice.gov/archive/usao/cac/Pressroom/pr2008/142.html.

[14] As defined *infra*.

use.[15] These statements to the Court have been accompanied by public threats made by the United States Attorney regarding the Government's intention to strip vests off members' backs. Most recently, the special agent in charge of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles Field Division, stated that the Government had successfully seized a "unity symbol."[16] Because the forced transfer of symbols to the United States immediately chills the Mongol Nation's and its members' continued rights to display or otherwise use the collective membership marks without fear of legal retaliation or payment of a licensing fee at any point following forfeiture, the forced transfer of the collective membership marks to the United States violates the First Amendment.

The Government's request also violates the Eighth Amendment's Excessive Fines Clause and must be denied on this basis alone. The Mongol Nation is a convicted criminal entity, and its members have pleaded guilty to heinous acts of murder, attempted murder, drug trafficking, and other crimes. But in this case the jury found that the Government did not prove the requisite nexus between the collective membership marks and the substantive RICO offense; the jury found the collective membership marks forfeitable as to RICO conspiracy alone. The forfeiture of the rights associated with a symbol that has been in continuous use by an organization since 1969 is unjustified and grossly disproportionate to this offense. To hold otherwise sets a dangerous precedent that enables the Government to target the associative symbols of organizations it chooses to prosecute for RICO conspiracy. For example, the United States brought multiple RICO actions against James Hoffa and the International Brotherhood of Teamsters ("Teamsters"). *See, e.g., United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 3 F.3d 634, 636 (2d Cir. 1993). The purpose of these prosecutions was to rid the union of "the hideous influence of organized crime." *Id*. Today the Teamsters continue to own and use the INTERNATIONAL BROTHERHOOD OF

---

[15] The Court is skeptical whether the Government could ever find a third-party group of motorcycle enthusiasts who would want to display the Mongol Nation's collective membership marks. The Court discusses feasibility concerns in Section III(A)(4) of this Order.

[16] Federal Jury Orders Mongols Motorcycle Gang to Forfeit Logos, Release No. 18-001, United States Attorney's Office Central District of California (Jan. 11, 2019), available at https://www.justice.gov/usao-cdca/pr/federal-jury-orders-mongols-motorcycle-gang-forfeit-logos.

TEAMSTERS collective membership mark,[17] and the group's more than one million union members display their symbol on clothing, including on vests (albeit fleece, not leather). *See also Timbs v. Indiana*, No. 17–1091, 586 U. S. ____, (2019) (Ginsburg, J.) ("Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, as the Stuarts' critics learned several centuries ago.").

"[T]he district court must avoid unconstitutional results by fashioning forfeiture orders that stay within constitutional bounds." *United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir. 1987). The Court thus DENIES the request for a Preliminary Order of Forfeiture in its current form. ***First***, the requested POF violates the Mongol Nation's and its members' First Amendment rights. ***Second***, the requested POF violates the Eighth Amendment's Excessive Fines Clause.

However, pending the filing of an amended POF consistent with this Order, the Court conditionally GRANTS the Government's request to forfeit all body armor, firearms, and ammunition entered into evidence during trial as well as items of tangible personal property bearing the collective membership marks, including vests or "cuts," patches, clothing and documents, that are currently in the custody of the United States. This requested forfeiture raises no constitutional concerns before an ancillary proceeding is conducted to determine ownership interests in the property.

Moreover, the Court DENIES Defendant's motion for acquittal and motion for a new trial. Having reviewed the evidence presented during trial, the Court declines to overturn the jury's finding by beyond a reasonable doubt that the Mongol Nation is guilty of substantive RICO and RICO conspiracy. And the Court finds no legal basis to overturn the guilty verdict. Consistent with the Ninth Circuit's previous ruling in this case, the evidence demonstrated that the Mongol Nation is distinct from the Mongol Gang; and the Mongol Nation is legally capable of committing the underlying RICO acts. The Mongol Nation is guilty of substantive RICO and RICO conspiracy. The criminal organization is subject to sentencing fines and criminal forfeiture consistent with this Order.

---

[17] Reg. No. 1,994,996.

## I.      Background

Before addressing the parties' arguments, the Court recounts the lengthy history of the Government's attempts to forfeit the property at issue.

### A.      *United States v. Cavazos, et al.*

On October 9, 2008, a federal grand jury returned an indictment as filed in *United States v. Cavazos, et al.*, Case No. 2:08–cr–1201–FMC (C.D. Cal. Oct. 9, 2008) (the "*Cavazos* Indictment") (*Cavazos* Dkt. 1), wherein the Government alleged individual members of the Mongols Motorcycle Club violated RICO and various other criminal statutes. These criminal proceedings lasted five years. Some 79 individuals appeared before three federal district court judges, including before this Court; ultimately 77 of the individuals pleaded guilty.[18]  *See, e.g.*, *United States v. Hector Enrique Gonzalez*, Case No. 2:08-cr-01201-DOC-3.

In Count 85 of the *Cavazos* Indictment, the Government noticed the individual defendants that the United States would seek forfeiture of certain property as part of any sentence, including the "trademark/service mark 'Mongols' (Registration No. 2916965), issued to Mongol Nation, purportedly for use in commerce in connection with promoting the interests of persons interested in the recreation of riding motorcycles.'" *Cavazos* Indictment at 173.

On October 17, 2008, the Government filed an ex parte application for a post-indictment restraining order (*Cavazos* Dkt. 248) to (1) preserve against the sale, transfer, conveyance, or other disposal of a "trademark" registered to "a motorcycle gang known as the 'Mongols' or 'Mongol Nation'"; (2) "enjoin use or display of the trademark by the defendants in this case who control Mongol Nation and those acting on their behalf or in concert with them"; and (3) require the surrender for seizure of property bearing the mark. *Cavazos* Dkt. 248 at 2. The Government argued that the "trademark" was a "potent emblem" used to "generate fear among the general public[.]" *Id.* at 21–22. The Government sought an order to prevent the defendants from "using the trademark to create an atmosphere of fear through public display."[19] *Id.* at 22.

---

[18] During the course of these criminal proceedings, one defendant died and another was found not competent to stand trial; the counts against these defendants were dismissed. *Cavazos* Dkts. 1467, 4745.

[19] The Government also claimed that an injunction restraining defendants' use and display of the "trademark" was justified because the Mongols "obtained their trademark by fraudulently representing to the United States Patent and Trademark Office that it would be used to exploit the recreational activity of motorcycle riding." *Cavazos* Indictment at 22.

On October 21, 2008, the United States Attorney's Office for the Central District of California issued a press release, attributing the following quote to the United States Attorney for the Central District of California: "If the court grants our request . . . then if any law enforcement officer sees a Mongol wearing his patch, he will be authorized to stop that gang member and literally take the jacket right off his back."[20]  That day, Judge Florence-Marie Cooper granted in part the Government's application but denied the Government's request to enjoin defendants or their associates (including family members) from "wearing, using or displaying the Mongols trademark." *See Cavazos* Dkt. 249. On October 22, 2008, the Government filed a subsequent ex parte application for an amended post-indictment restraining order to "clarify what the government is entitled to do to enforce the [October 21, 2008 restraining order]." *Cavazos* Dkt. 225. Judge Cooper entered the amended order. *Cavazos* Dkt. 235.

On March 10, 2009, Ramon Rivera (a member of the Mongols Motorcycle Club who was not charged in the *Cavazos* criminal proceedings) filed a civil complaint against the Government. *Rivera v. Carter*, Case No. 2:09–cv–2435–JC (C.D. Cal. Mar. 10, 2009). Rivera sought declaratory judgment that the RICO statute does not authorize the Government to seize items bearing the collective membership mark;[21] that the mark is protected speech under the First Amendment to the United States Constitution, which protects Rivera's right to wear or display items bearing the mark; and that the *Cavazos* injunction violated the Due Process Clause of the Fifth Amendment to the United States Constitution because Rivera had not been given a hearing to determine whether he was an agent, servant, employee, or family member of any of the *Cavazos* defendants. *Rivera* Dkt. 1 at 4–5.

On July 31, 2009, Judge Cooper granted Rivera's motion for a preliminary injunction. *Rivera* Dkt. 39. The Government argued that Rivera lacked Article III standing to challenge the

---

[20] ATF Undercover Investigation Leads to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, Release No. 08-142, United States Attorney's Office Central District of California (Oct. 21, 2008), available at https://www.justice.gov/archive/usao/cac/Pressroom/pr2008/142.html.

[21] While the Government referred to the mark as a "trademark" in the *Cavazos* Indictment and subsequent applications for injunctions, the Government "revealed for the first time that the mark it sought to forfeit was a collective membership mark" at a June 22, 2009 hearing in the *Rivera* action. *See Rivera* Dkt. 39 at 20.

forfeitability of the registered mark because he had no ownership interest in the mark, and because he was not a party to the criminal action. *Id.* at 4. Judge Cooper rejected the Government's standing arguments and held that Rivera was entitled to challenge the forfeitability because it "directly impacts his personal rights" and because "nobody else has challenged the forfeitability of the mark." *Id.* at 4–5 (citing *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153–54 (9th Cir. 2000)). Judge Cooper also rejected the Government's argument that Rivera was prohibited from bringing the civil action under the RICO statute because he claimed no interest in the mark. *Id.* at 5.

On the merits, Judge Cooper took issue with the forfeitability of a collective membership mark owned by the Mongol Nation, an unincorporated association. Judge Cooper noted that only a RICO defendant's property and his or her interest in the RICO enterprise is forfeitable under the statute. *Id.* at 10. Yet the *Cavazos* indictment charged individual members of the motorcycle club, not the Mongol Nation. *Id.* "Nonetheless, the Government seeks forfeiture of property belonging to the Mongol Nation."[22] *Id.* Judge Cooper held that Rivera satisfied his burden of demonstrating a likelihood of success on the merits because the mark sought to be forfeited "has been and continues to be used exclusively by the Mongol Nation and Mongols Nation, Inc." and as these entities were not defendants in the *Cavazos* Indictment, the Government "cannot seek forfeiture of their collective membership mark." *Id.* at 14–15.

Judge Cooper also made several observations regarding the First Amendment, which the Court repeats in full:

\* \* \*

In light of additional facts disclosed at the hearing for this matter on June 22, 2009, it is now clear that seizure of property bearing the mark at issue would have serious First Amendment implications. At the June 22 hearing, the Government

---

[22] Judge Cooper held that as a separate legal entity from their members, the club maintains exclusive ownership of the mark. *Id.* at 11 (citing Cal. Corp. Code § 18110 ("Property acquired by or for an unincorporated association is property of the unincorporated association and not of the members individually.")). According to Judge Cooper, the Government's evidence affirmed the notion that individual club members do not own any rights in the mark other than their limited license rights that the club may revoke. *Id.* "The Government therefore seeks forfeiture of property belonging entirely to a third party non-defendant." *Id.*

revealed for the first time that the mark it sought to forfeit was a collective membership mark. Previously, in its Ex Parte Application for Post–Indictment Restraining Order, the Government referred to the mark simply as a trademark, which was "purportedly for use in commerce in connection with promoting the interests of persons interested in the recreation of riding motorcycles." (Ciccone Decl. ¶ 4.) In contrast to commercial trademarks, which are used in commerce and generally not entitled to full First Amendment protections, collective membership marks are used by members of an organization to "indicat[e] membership in a union, an association, or other organization." 15 U.S.C. § 1127. The use and display of collective membership marks therefore directly implicate the First Amendment's right to freedom of association.

The Supreme Court has recognized that "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.' This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of America v. Dale,* 530 U.S. 640, 647–48, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). Furthermore, clothing identifying one's association with an organization is generally considered expressive conduct entitled to First Amendment protection. *See Church of American Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 206 (2d Cir. 2004) ("We agree with the District Court that the regalia of the American Knights, including the robe, mask, and hood, are expressive; they are expressive in the way that wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group."); *see also Truth v. Kent School Dist.,* 542 F.3d 634, 651 (9th Cir. 2008) (Fisher, J., concurring) ("There is no question that acts of expressive association are protected forms of speech under the First Amendment.").

If speech is noncommercial in nature, it is entitled to full First Amendment protection, which prohibits the prior restraint and seizure of speech-related materials without a judicial determination that the speech is harmful, unprotected, or otherwise illegal. *Adult Video Ass'n v. Barr*, 960 F.2d 781, 788 (9th Cir. 1992) ("The First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing.").

The evidence currently before the Court further demonstrates that the items the Government seeks to seize are expressive and denote an association with the Mongol Nation. The stated purpose for registering the mark as a collective mark is "to indicate membership in an association of persons interested in the recreation of riding motorcycles." (Welk Decl. in Support of Opp'n, Ex. B.) Plaintiff affirms this purpose, and states his "display of the Image affirms my membership in the Club, [and] symbolizes unity and brotherhood with my friends and fellow Club members." (Rivera Decl. ¶ 11.) Similarly, the current National President of Mongols Nation, Inc. declares that the mark serves "as a means of identifying Club members and symbolizing their common interests and beliefs." (Guevara Decl. ¶ 6.) The Court agrees that the collective membership mark acts as a symbol that communicates a person's association with the Mongol Nation, and his or her support for their views. Though the symbol may at times function as a mouthpiece for unlawful or violent behavior, this is not sufficient to strip speech of its First Amendment protection. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2003) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it . . . . First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end.").

Prohibiting speech of this nature constitutes an attack on a particular viewpoint. *Sammartano v. First Judicial District Court, in and for the County of Carson City*, 303 F.3d 959, 971–72 (9th Cir.2002). In *Sammartano*, the Carson City

courthouse enacted a rule to prohibit admission of those with "clothing, attire or 'colors' which have symbols, markings or words indicating an affiliation with street gangs, biker or similar organizations," because "such clothing or attire can be extremely disruptive and intimidating, especially when members of different groups are in the building at the same time." 303 F.3d at 964. The Ninth Circuit reasoned that the rule singles out bikers and similar organizations for the message their clothing is presumed to convey, and held that the rule impermissibly discriminates against a particular point of view—the view of biker clubs as opposed to garden clubs and gun clubs. *Id.* at 971–72. In this case, the Government targets an even narrower group of individuals, a single motorcycle club. In addition, the Government has been seizing property, which imposes a greater restriction on individual rights than the denial of access to a public facility. Accordingly, the seizure of property bearing a Mongols membership mark should be considered viewpoint-discriminatory.

The Government's ability to seize property bearing the trademark acts as a prior restraint and cannot stand without a judicial determination that the speech is harmful, unprotected, or otherwise illegal. No such determination was ever sought by the Government, and no such determination was ever made by the Court. The seizure of property is also viewpoint or content-based, which triggers strict scrutiny. *See Crawford v. Lungren*, 96 F.3d 380, 384 (9th Cir. 1996) ("If the statute is content-based, we apply strict scrutiny to determine whether the statute is tailored to "serve a compelling state interest and is narrowly drawn to achieve that end."). Though it is arguable whether a compelling reason exists to prevent the display of the Mongols trademark,[10] the seizure of all property bearing the mark cannot be considered the least restrictive alternative. For these reasons, the Court observes that the lack of statutory authority to seize Plaintiff's property is consistent with the First Amendment's right to freedom of association, which acts to protect Plaintiff's right to display the Mongols collective membership mark.

* * *

Rivera v. Carter, No. 2:09-CV-2435-FMC, 2009 WL 8753486, at *10–11 (C.D. Cal. July 31, 2009).

Ultimately, on January 4, 2011, following the death of Judge Cooper, this Court granted Rivera's motion for summary judgment. *Rivera* Dkt. 90. In granting summary judgment, this Court echoed Judge Cooper's holding on the forfeitability of the collective membership mark and observations regarding the Government's affronts to the First Amendment. *See generally id.* Later, this Court determined that the Government's litigation position was not substantially justified because it was contrary to established First Amendment and trademark law and granted Rivera's motion for attorney's fees. *Rivera* Dkt. 113. The Government appealed the order granting attorney's fees, but ultimately voluntarily dismissed the appeal. *Rivera* Dkt. 117.

**B.      *United States v. Ruben Cavazos, aka "Doc"***

Next, the saga returns to the *Cavazos* criminal proceedings described in Section I(A), *supra*. Following the death of Judge Cooper, the criminal proceedings were assigned to this Court and Judge Otis Wright. *Cavazos* Dkts. 3334, 3339. Despite Judge Cooper's order in the related *Rivera* civil case, the Government continued to seek forfeiture of the registered word mark and image mark following the plea agreement of defendant Ruben Cavazos, aka "Doc." *Cavazos* Dkt. 3854. On June 15, 2010, Judge Wright entered the proposed Preliminary Order of Forfeiture without amendment, finding that the government "has established the requisite nexus between the [marks] and the offenses described in Count One of the Indictment." *Id.* On July 20, 2010, the "Mongols Nation Motorcycle Club and its successor, Mongols Nation Motorcycle Club, Inc." filed a motion to vacate the Preliminary Order of Forfeiture, arguing in part that the issue had been resolved in the *Rivera* dispute. *Cavazos* Dkt. 3946 at 26. On September 21, 2010, Judge Wright granted the petition and incorporated and reproduced a substantial portion of Judge Cooper's order on the *Rivera* preliminary injunction verbatim, "[f]inding complete agreement with the analysis[.]" *Id.* at 4–10. Judge Wright vacated the Preliminary Order of Forfeiture and denied the Government's application for an order authorizing seizure of items bearing the marks. *Id.* at 10.

### C. *United States v. Mongol Nation, an Unincorporated Association*

On February 13, 2013, Defendant Mongol Nation (an unincorporated association) was indicted. Dkt. 1. On May 26, 2015, Judge Wright recused himself from the case. Dkt. 88. This matter was eventually transferred to this Court. Dkt. 102. The Court held a status conference on June 22, 2015, and scheduled trial for January 5, 2016. Dkt. 104. The Court also set deadlines for briefing and argument on a renewed motion to dismiss the indictment. *Id.* On September 16, 2015, the Court granted the Mongol Nation's renewed motion to dismiss the indictment. Dkt. 114. The Court held that the indictment failed on distinctiveness grounds. *Id.* at 17 ("[T]here is no meaningful distinction between the association Mongol Nation and the enterprise of the Mongol Gang."). The Court did not reach arguments concerning whether it is proper to premise liability on predicate acts an unincorporated association is not legally capable of committing itself, although the Court "note[d] that the Government could identify no other case where an unincorporated association, or other entity defendant, was held liable for predicate acts of violent crime." *Id.* at 21. The Court dismissed the Indictment on distinctiveness alone.

The Ninth Circuit disagreed. *See* Dkt. 127; *United States v. Mongol Nation*, 693 F. App'x 637 (9th Cir. 2017). Accepting as true the allegations in the indictment, the Ninth Circuit held that this Court erred in concluding that Mongol Nation and the Mongols Gang are not sufficiently distinct. *Id.* at 2. "[B]ecause Mongol Nation was alleged to be part of a larger whole, the Mongols Gang, which is comprised of additional individuals who together form the alleged enterprise, the district court erred by dismissing the indictment on distinctiveness grounds." *Id.* at 3–4. The Ninth Circuit held it would be "premature to address whether the government will ultimately be able to secure forfeiture[.]" *Id.* at 4. "Similarly, the Defendant's constitutional challenge is not ripe for review." *Id.* The Ninth Circuit declined to reach arguments regarding whether it is proper to premise liability on predicate acts an unincorporated association is not legally capable of committing itself. *Id.* "Because some predicate criminal acts can be committed by entities similar to an unincorporated association . . . it would not be futile to remand the indictment for further proceedings." *Id.* at 4–5.

In light of the Ninth Circuit's guidance, especially regarding the ripeness of constitutional and forfeitability challenges, this Court allowed the Government to file the First Superseding Indictment ("FSI") (Dkt. 169) and scheduled trial. The Court afforded each party a full and fair trial.

### D.      Verdicts and Property Sought for Forfeiture

The jury unanimously found the Defendant Mongol Nation guilty of Count One in the FSI: Substantive RICO under 18 U.S.C. § 1962(c). The jury found beyond a reasonable doubt that the Mongol Nation committed two or more racketeering acts within ten years of each other as part of a pattern of racketeering activity.[23] Dkt. 320. Specifically, the jury unanimously found the government proved Racketeering Act One (conspiracy to distribute cocaine and methamphetamine); Racketeering Act Three (distribution of methamphetamine); Racketeering Act Four (murder); Racketeering Act Six (attempted murder); and Racketeering Act Eight (distribution of methamphetamine). *Id.* The jury unanimously found the government did not prove Racketeering Act Two (attempted murder); Racketeering Act Nine (murder); and Racketeering Act Ten (murder). The jury failed to reach a verdict on Racketeering Act Five (attempted murder) but indicated after polling that the jury was 10-to-2 in favor of "Not Proven."[24] The jury also unanimously found the Mongol Nation guilty of Count Two in the FSI: RICO Conspiracy under 18 U.S.C. § 1962(d). *Id.* at 6.

Following the guilty verdict, the jury determined whether certain property is forfeitable in connection with the offenses for which they found the Mongol Nation guilty. The Government sought forfeiture of any and all legal and equitable rights of any kind or nature associated with or appurtenant to three collective membership marks:

>     1.  The Collective Membership Mark consisting of the word "Mongols" (the
>         "Word Mark"):[25]

---

[23] As this Court had done previously in the Mexican Mafia and Aryan Brotherhood criminal RICO trials, the verdict form included language to this effect. *See* Dkt. 320 at 2.

[24] The Government dropped its pursuit of a conviction on Racketeering Act Seven and Racketeering Act Eleven alleged in the FSI.

[25] At various times, the Word Mark was or is registered with the United States Patent and Trademark Office ("USPTO") under registration numbers 2,916,965, 4,406,187, and 4,730,806.



2.   The Collective Membership Mark consisting of the drawn image of a Genghis Khan-type character with sunglasses and a ponytail, riding a motorcycle, with the letters "M.C." appearing below the motorcycle (the "Center Patch Image"):[26]



3.   The Collective Membership Mark consisting of both the Word Mark and the Center Patch Image (the "Combined Mark"):[27]

---

[26] At various times, the Center Patch Image was or is registered with the USPTO under registration numbers 3,076,731 and 4,730,806.

[27] At various times, the Combined Mark was registered with the USPTO under registration number 4,730,806.

In addition to the marks, the Government sought forfeiture of the following items of tangible personal property bearing the Word Mark, the Center Patch Image, or the Combined Mark: vests, patches, clothing, belts, belt buckles, jewelry, lighters, bandanas, stickers, flags or pennants, hats, helmets, documents, accessories, and motorcycle parts.[28] *See id.* at 3–5. And the Government sought forfeiture of all weapons, body armor, firearms, and ammunition entered into evidence. *Id.* at 5–10.

The jury found none of the property forfeitable under Count One for substantive RICO. *Id.* And under Count Two for RICO Conspiracy, the jury found the following items not forfeitable: belts, belt buckles, jewelry, lighters, bandanas, stickers, flags or pennants, hats, helmets, accessories, and motorcycle parts bearing the marks. *Id.* But under Count Two, the jury found forfeitable (1) the Word Mark, Center Patch Image, and Combined Mark; (2) vests, patches, clothing, and documents bearing the marks; and (3) all weapons, body armor, firearms, and ammunition entered into evidence. *Id.*

### E.     Post-Trial Motions

Following the forfeiture-phase verdict, the Government filed the present Motion for Preliminary Order of Forfeiture. On January 21, 2019, the Mongol Nation opposed ("Opp'n to Mot. for POF") (Dkt. 362). On February 11, 2019, the Government replied ("Reply ISO Mot. for POF") (Dkt. 366).

---

[28] The Government dropped its pursuit of notebooks and bags or other storage devices.

On December 27, 2018, the Mongol Nation filed the Motion for New Trial or Mistrial ("Rule 33 Mot.") (Dkt. 324).[29] On January 21, 2019, the Government opposed ("Opp'n to Rule 33 Mot.") (Dkt. 364).[30] On February 11, 2019, the Mongol Nation replied ("Reply ISO Rule 33 Mot.") (Dkt. 367).

On January 10, 2019, the Mongol Nation filed the Motion for Judgment of Acquittal in the Guilt Phase ("Rule 29 Mot.") (Dkt. 340). On January 21, 2019, the Government opposed ("Opp'n to Rule 29 Mot.") (Dkt. 363). On February 11, 2019, the Mongol Nation replied ("Reply ISO Rule 29 Mot.") (Dkt. 368).

## II.  Legal Standard

### A.  RICO Forfeiture

As soon as practical after a verdict or finding of guilty on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. Fed. R. Crim. P. 32.2. Under 18 U.S.C. § 1963, a defendant convicted of racketeering activity shall forfeit to the United States (1) any interest the defendant acquired or maintained as a result of the violation of which it was found guilty; (2) any interest in any enterprise, security of any enterprise, claim against any enterprise, or any property or contractual right of any kind affording a source of influence over any enterprise that the defendant established, operated, controlled, conducted, or participated in the conduct of as part of the offense; and (3) any property constituting or derived from any proceeds that the defendant obtained, directly or indirectly, from racketeering activity. 18 U.S.C. §§ 1963(a)(1)–(3). Property subject to criminal forfeiture includes real property, including things growing on, affixed to, and found in land, as well as tangible and intangible personal property, including rights, privileges, interests, claims, and securities. 18 U.S.C. §§ 1963(b)(1)–(2).

---

[29] Following the filing of the Rule 33 Motion, Defendant filed a series of "supplemental briefs." For the purposes of this Order, the supplemental briefs are incorporated into the Rule 33 Motion as if filed therein. References to docket numbers are provided as needed.

[30] On January 21, 2019, the Government filed a consolidated response to the Mongol Nation's supplemental briefing. Dkt. 365.

### B.      Motion for a Judgment of Acquittal

"A Rule 29 motion is basically a challenge to the sufficiency of the evidence." *United States v. Wong*, No. CR-12-0483 EMC, 2014 WL 923347, at *5 (N.D. Cal. Mar. 5, 2014). "In ruling on a Rule 29 motion, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). "[T]he government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or rule out every hypothesis except that of guilt beyond a reasonable doubt." *U.S. v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (citation and internal quotation marks omitted). However, "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *Id.* at 1167.

### C.      Motion for a New Trial

Federal Rule of Criminal Procedure 33 authorizes the Court, on motion of a defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires." A "motion for a new trial is directed to the discretion of the district judge. It should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981). The defendant has the burden to justify the need for a new trial. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).

### III.      Discussion

Numerous post-trial issues are before the Court. First, the Court addresses the legal questions raised by the Government's requested Preliminary Order of Forfeiture. Second, the Court turns to the Mongol Nation's legal challenges to the guilty verdict, including "distinctiveness" and the Mongol Nation's capacity to commit violent crimes as an unincorporated association. Third, the Court resolves the Mongol Nation's fact-intensive and procedural attacks on the guilty verdict such as whether the racketeering acts were proven beyond a reasonable doubt.

### A.  Forfeitability of the Collective Membership Marks

The Mongol Nation raises several challenges to the requested Preliminary Order of Forfeiture, including challenges under the First, Fifth, and Eighth Amendments.

### 1.  First Amendment

The Mongol Nation argues that the requested forfeiture violates the First Amendment because the Constitution protects the display of insignia by club members as this communicates the fact of their association with the organization. Opp'n to Mot. for POF at 3. According to Defendant, "[i]t is the essence of protected speech to proclaim one's association or affinity with an organization by wearing or displaying distinctive clothing, words, or images." *Id.* The Mongol Nation argues that the seizure of this material is a prior restraint on speech. *Id.* Because the Government is seizing the specific marks, the Mongol Nation argues this attack is content-based. *Id.* at 4. Defendant contends that the First Amendment does not permit restriction on speech because some members of a group committed violent acts. *Id.* And according to the Mongol Nation, seizure of items bearing the marks cannot be upheld on the ground that the members "may have other means to express their message." *Id.* at 6. The Mongol Nation argues that forfeiture of the collective membership marks would have a chilling effect on free speech and association. *Id.*

The Government argues that entry of the POF is a procedural step that must be entered to provide a vehicle by which third parties may "pursue substantive issues of ownership" that will "inform any constitutional analysis[.]" Reply ISO Mot. for POF at 23. With regards to constitutional standing, the Government argues that the Mongol Nation cannot invoke associational standing to advance the constitutional (or any other) claims of its individual members in their absence. *Id.* at 14. The Government argues that the Court should follow the "general rule requiring individuals with potential constitutional claims to present those claims themselves." *Id.* Regardless of associational standing, according to the Government, the Mongol Nation has not met its burden demonstrating that the First Amendment is violated by entry of the POF. *Id.* at 21. The Government "agrees" that the seizure of personal property bearing the collective membership marks may implicate important Constitutional issues. *Id.* at

22. But the Government argues that it has not requested an order authorizing such seizures. *Id.* Rather, the forfeiture order strips "Defendant of the property and exclusivity rights associated with the collective membership marks." *Id.* at 24. According to the Government, neither is speech. *Id.* The Government argues that even if the property rights associated with the collective membership marks are speech, Defendant has failed to articulate any action or threatened action that will result from entry of the POF. *Id.* at 25. "[T]he POF merely forfeits *Defendant's* right to limit use of the Marks—the POF does not confer any right upon the government to do so." *Id.* at 25 (emphasis in original). Accordingly, the Government argues that reliance on prior restraint cases is misplaced because the Government has "neither asked for seizure authority in the proposed POF, nor indicated that it intends to do so." *Id.*

### a.   Standing

Article III of the United States Constitution gives federal courts jurisdiction only over cases and controversies, and the doctrine of standing identifies disputes appropriate for judicial resolution. Article III standing requires a plaintiff to have suffered an injury in fact, for there to be a causal connection between the injury and conduct complained of, and that the injury will be redressed by a favorable decision. *Lujan v. Defends of Wildlife*, 504 U.S. 555, 560–61 (1992). "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 563 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734–35. (1972)). The Constitution empowers federal courts to hear actual cases and not render advisory opinions. *See United Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947); *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240–41 (1937); *see also United States v. Kaczynski*, 551 F.3d 1120, 1124 (9th Cir. 2009) ("Kaczynski cannot . . . bring a justiciable as-applied claim at the present time based upon the possible future actions of the government.").

The Supreme Court of the United States has explained that standing requirements are somewhat relaxed in First Amendment cases. *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984); *see also Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically

toward a finding of standing.") (internal quotation marks and citations omitted)). In the most

general sense, a plaintiff must have suffered an injury or threat of injury that is "credible," not

"imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298

(1979). Because "[c]onstitutional challenges based on the First Amendment present unique

standing considerations," plaintiffs may establish an injury in fact without first suffering a

direct injury from the challenged restriction. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir.

2010). In such pre-enforcement cases, the plaintiff may meet constitutional standing

requirements by "demonstrat[ing] a realistic danger of sustaining a direct injury as a result of

the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.

289, 298 (1979).

The First Amendment issues are ripe. The Government is requesting the forced transfer

of the rights associated with the club's symbols to the United States. There is a realistic danger

that the transfer of the rights associated with the symbol to the Government will have a chilling

effect, restrain speech, and limit associational rights, especially in light of the Government's

own statements about its objectives. The Court does not agree that the Federal Rules of

Criminal Procedure require entry of the POF and notice to third parties before the First

Amendment challenges can be resolved. As the Government notes, Federal Rule of Criminal

Procedure 32.2 provides the procedural process by which third parties (including individual

members) can assert their *ownership* interests in the property sought to be forfeited. Mot. for

POF at 12–13. But the question before the Court is not one of ownership. The Mongol Nation,

an unincorporated association, owns the collective membership marks. As discussed *supra*, the

entity intervened in previous legal proceedings to declare its ownership of the marks. Any

attempt to assert otherwise at this stage is unavailing. Ownership is not dispositive of First

Amendment standing. Individual members of the motorcycle group will be harmed by the

forfeiture of the collective membership marks because they use the marks as members of the

collective and face future repercussions for infringing use of the symbols after title vests in the

United States. The Court does not need to send notice or engage in "pre-hearing discovery" to

reach this conclusion.

Moreover, if the Court agreed with the Government's procedure-based arguments, it is not clear that individual members of the Mongol Nation would ever have the ability to assert their constitutional rights in an ancillary proceeding. It is well established that, "[i]n an ancillary proceeding, a court may dismiss a third-party petition for lack of standing." *United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009) (citing Fed. R. Crim. P. 32.2(c)(1)(A)); *see, e.g., United States v. French*, 822 F. Supp. 2d 615, 618 (E.D. Va. 2011). To establish standing under § 1963 and Rule 32.2, a claimant "must show that he has a colorable ownership or possessory interest" in the subject property. (*Id.* at 2 (quoting *Arevalo v. United States*, No. 05–110, 2011 WL 442054, at *3 (E.D. Pa. Feb. 8, 2011)). Because the individual members of the Mongol Nation Motorcycle Club have already claimed they do not own the collective membership marks, they would not have standing to participate in any ancillary proceeding under the federal rules. *See United States v. Rosga*, 864 F. Supp. 2d 439, 451 (E.D. Va. 2012) ("Petitioners' scant factual allegations prove, at most, that O'Neill, Kaczmarek, and Barboza possessed nominal authority over collectively held property bearing the AOA or OMC insignia. Without claiming to have ever possessed or actively controlled the property, however, and having failed to plead any facts substantiating their claims of unique dominion, Petitioners' allegations are insufficient to demonstrate a plausible 'right, title, or interest' in the contested property. Accordingly, Petitioners lack standing, and their claims must be dismissed."); *see also* Reply ISO Mot. for POF at 17 ("anyone who wants to claim an interest in property described in a POF may file a petition in the ancillary proceeding, but that does not mean that he or she has standing to pursue that claim."). The Government conflates ownership with First Amendment standing. The individual Mongol Nation members cannot be left without any opportunity to assert their constitutional rights.

It is beyond question that the Mongol Nation may assert First Amendment constitutional rights on its own behalf because, although an unincorporated association, the entity owns the collective membership marks at issue and will be injured by the Government's request to forfeit the rights associated with its use of associative symbols. *See NAACP v. Button*, 371 U.S. 415, 428 (1963); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375 (2010)

("Citizens United has standing—it is being injured by the Government's enforcement of the Act."). The Mongol Nation also has standing to assert the corresponding rights of its members. *Id.* ("We also think petitioner has standing to assert the corresponding rights of its members."); *Nat. Res. Def. Council, Inc. v. E.P.A.*, 507 F.2d 905, 911 n.6 (9th Cir. 1974) ("We note that, in most instances where standing has been accorded to an organization, it is to an unincorporated association whose members, individually and collectively, themselves constitute the organization.").

As set forth in *Hunt v. Washington State Apple Advert. Comm'n*, an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. 432 U.S. 333, 343(1977). The Mongol Nation's members would have standing to sue in their own right due to the chilling effect the Government's forced transfer of the symbols would have on their continued use of the marks, and the Court does not require their direct participation in this lawsuit to evaluate those harms. The Court sees no benefit in further delaying resolution of the paramount constitutional issues presented by the Government's requested forfeiture, and Supreme Court precedent establishes that the Mongol Nation has standing to pursue these challenges on its own behalf and on behalf of its members.

### b. Collective Membership Marks

Before addressing the First Amendment challenges, it is important to understand the nature of the intangible property the Government seeks to forfeit. A collective membership mark is unique in that it is a type of trademark merely used to identify membership in a particular collective group or organization, cooperative, or association.[31] 15 U.S.C. §§ 1127,

---

[31] "[F]ederal law does not create trademarks." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (citation omitted). Trademarks and their precursors have ancient origins, and "trademarks were protected at common law and in equity at the time of the founding of our country." *Id.* For most of the 19th century, trademark protection was the province of the States. *Id.* Congress stepped in to provide a degree of national uniformity, passing the first federal legislation protecting trademarks in 1870. *Id.* The foundation of current federal trademark law is the Lanham Act, enacted in 1946. *Id.* "[N]ational protection of trademarks is desirable," the Supreme Court has explained, "because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Id.* (citation omitted). Federal registration helps to ensure that

1054; 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:101 (5th ed.). Collective membership marks are unique in that they are used solely for the purpose of identifying the person displaying the mark as a member of a collective, not to distinguish the source or origin of particular goods or services. *See* TMEP § 1302 (8th ed. 2017). Neither the collective nor its members use the collective membership mark to identify and distinguish goods or services; rather, the sole function of such a mark is to indicate that the person displaying the mark is a member of the organized collective group.[32] *Id*. Although collective membership marks are different from the typical trade and service marks identifying the source of goods and services, they are registered and enforced under the Lanham Act in generally the same manner and with the same effect as are trademarks.[33] *See* 15 U.S.C. § 1127. Under the Lanham Act, governmental entities may own, register, and enforce trademarks, including collective membership marks. *See* 15 U.S.C. § 1054 (authorizing "nations, States, municipalities, and the like" to register collective marks).[34]

Here, the collective membership marks at issue indicate "membership in an association dedicated to motorcycle riding appreciation," *see* U.S. Reg. No. 4,730,806, and the Government admits they are used "to indicate that the user of the mark is a member of a particular

---

trademarks are fully protected and supports the free flow of commerce. *Id*. The Government seeks all rights associated with the collective membership marks, not just rights conferred by federal registration. Reply ISO POF at 8 n.4.

[32] A collective organization may itself use trademarks and service marks to identify its goods and services, as opposed to collective trademarks and service marks or collective membership marks used by the collective's members. TMEP § 1305.

[33] Section 5(b) (Title 15, sec. 85) of the Trademark Act of 1905 prohibited registration of "any design or picture that has been or may hereafter be adopted by any fraternal society as its emblem, or any name, distinguishing mark, character, emblem, colors, flag, or banner adopted by any institution, organization, club, or society[.]" *See Ex Parte Jerusalem*, 109 U.S.P.Q. (BNA) ¶ 248 (Com'r Pat. & Trademarks Apr. 25, 1956). A comparable provision does not appear in the Lanham Act. In commenting on this omission in testimony concerning a bill predecessor to the Act, a congressperson noted that "[t]he only marks now which are registrable are those which are physically attached to merchandise. There are . . . marks of agricultural associations, union labels, and all that sort of thing, which are entitled to registration, but which cannot be registered under the existing law, and the purpose of this is to make them registrable." House Hearings on H. R. 9041, 75th Cong., 3d Sess., p. 119. The Chairman of the Committee inquired, "Fraternal organizations would come under that?" The congressperson replied, "They would; yes sir." *Id*. In subsequent rulings it has been held that "[i]t seems obvious that the effect of the change in the legislation was to permit fraternal societies and other organizations to register their names and insignia so that the registration could be used to prevent registration of such names or insignia to others who might use them commercially, rather than to have the Patent Office rely on its own knowledge of all of such names and insignia to carry out the prohibitory provisions in the prior Act. Such marks are not trademarks in the ordinary sense of the term, but they are nevertheless identifying and distinguishing marks which are registrable under the specific terms of the statute." *Ex Parte Jerusalem*, 109 U.S.P.Q. (BNA) ¶ 248 (Com'r Pat. & Trademarks Apr. 25, 1956).

[34] Indeed, the United States has registered collective marks, such as the word mark "AIRBORNE A A" and the "Airborne Design," described as shaded circles with plain single line squares and quadrilaterals, which indicates membership in the United States Army 82d Airborne Division. *See* Reg. No. 2,487,176. See also "NAVY SEALS," Reg. No. 3,285,473.

organization." Reply ISO Mot. for POF at 6. Motorcycle riding is, of course, an activity enjoyed by a large number of law-abiding citizens and does not indicate support of the commission of crimes. The collective membership marks do not have the same underlying purpose of a traditional trademark, which is used to distinguish goods or services in commerce.

### c.   Forfeiture of the Collective Membership Marks

The requested preliminary order of forfeiture of the Mongol Nation's collective membership marks violates the First Amendment.

There is no doubt that the display of word marks or symbols on a body or leather vest is pure speech. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) ("Tattoos are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection.").  Freedom of speech also protects the individual's "interest in self-expression." *Consol. Edison Co. of New Yorkv. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 534 n.2 (1980). The First Amendment presupposes that the freedom "to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503–04 (1984).

Clothing identifying one's association with an organization is generally considered expressive conduct entitled to First Amendment protection. *See Church of American Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 206 (2d Cir. 2004) ("We agree with the District Court that the regalia of the American Knights, including the robe, mask, and hood, are expressive; they are expressive in the way that wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group."); *see also Truth v. Kent School Dist.,* 542 F.3d 634, 651 (9th Cir. 2008) (Fisher, J., concurring) ("There is no question that acts of expressive association are protected forms of speech under the First Amendment."). This protection is afforded to members of a collective notwithstanding the actions of the organization.  The display of insignia by motorcycle members "communicate[s]

the fact of their association with this particular kind of organization." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 972 (9th Cir. 2002).

As Judge Cooper held ten years ago, the collective membership marks act as a symbol that communicates a person's association with the Mongol Nation, and his or her support for their views. The very definition of a collective membership mark highlights the associative expression this type of property affords. *See* TMEP § 1302. The Mongol Nation's and its members' right to express their identity through the noncommercial display of symbols constitutes speech subject to First Amendment protections.

The First Amendment prohibits the Government from using RICO forfeiture laws to chill this expression. The Court views as disingenuous the Government's argument that the POF is merely a procedural step divesting the Mongol Nation of its legal rights to enforce exclusive use of the symbols, implicating no other harm to the entity or its members. "The First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*" or any promise to use power "responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). It is important to acknowledge the Government's own statements regarding the marks and why they have spent years seeking forfeiture of the rights associated with these symbols. As the United States Attorney for the Central District of California stated in October 2008: "If the court grants our request . . . then if any law enforcement officer sees a Mongol wearing his patch, he will be authorized to stop that gang member and literally take the jacket right off his back."[35] The Government has described the marks as "potent emblem[s]" used to "generate fear among the general public" and "create an atmosphere of fear through public display."[36] Most recently, the special agent in charge of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles Field Division, stated, "We are proud our work resulted in their unity symbol, the

---

[35] ATF Undercover Investigation Leads to Federal Racketeering Indictment and Arrest of 61 Members of So. Cal.-Based Mongols Outlaw Motorcycle Gang, Release No. 08-142, United States Attorney's Office Central District of California (Oct. 21, 2008), available at https://www.justice.gov/archive/usao/cac/Pressroom/pr2008/142.html.

[36] *United States v. Cavazos, et al.*, Case No. 2:08–cr–1201–FMC (C.D. Cal. Oct. 9, 2008) (Dkt. 248).

Mongol patch, being forfeited."[37] The Government has lost credibility when it now suggests the sole purpose of more than a decade of prosecution is only to limit the Mongol Nation's ability to bring infringement lawsuits against other entities. In the ATF special agent's own words, the Government is after the club's unity symbol. The forced transfer of the legal rights associated with these symbols to the United States government presents immediate harms and chills the Mongol Nation's and its members' right to display the marks given the Government's threats and seizure attempts. The Government's attempt to seize symbols has chilling effects on speech nationwide. After title vests in the Government, this Court has serious concerns about future United States Attorneys in different districts and circuits using the rights associated with these symbols in harmful ways. The forced transfer of a collective membership mark has lasting chilling effects despite representations made to this Court.

The current POF—which would vest title in the United States—functions as a prior restraint on future speech. Any system of prior restraints of expression bears a heavy presumption against its constitutional validity. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1962). In order to justify a prior restraint, the government must demonstrate that the restraint is justified without reference to the content of the speech, and is narrowly tailored to serve a compelling governmental interest. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 571 (1976).

The requested forfeiture also functions as a content-based restriction on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). The Government specifically seeks ownership of the rights associated with the word "MONGOLS" and the image of a Genghis Khan-type character with sunglasses and a ponytail, riding a motorcycle, with the letters "M.C." appearing below the motorcycle. The Government seeks to strip the Mongol Nation of the rights associated with this symbol because it is a "potent emblem" that stokes "fear in the public." *Cavazos* Dkt. 248 at 21–22. The Constitution demands that content-based restrictions on speech be presumed invalid and that the

---

[37] Federal Jury Orders Mongols Motorcycle Gang to Forfeit Logos, Release No. 18-001, United States Attorney's Office Central District of California (Jan. 11, 2019), available at https://www.justice.gov/usao-cdca/pr/federal-jury-orders-mongols-motorcycle-gang-forfeit-logos

Government bear the burden of showing their constitutionality. *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004). This is a demanding standard. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011).

      The Government's interest in punishing a criminal entity, including through forfeiture of weapons, body armor, ammunition, and other assets that play a financial role in the operation of a racketeering enterprise, is appropriate. The Government also has an "undisputed compelling interest in ensuring that criminals do not profit from their crimes." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 119 (1991). But the First Amendment requires that the Government's chosen restriction on speech be "actually necessary" to achieve its interest. *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (citation omitted). The Government has argued that it has a strong interest in the forfeiture of these marks because they are "potent emblem[s]" used to "generate fear among the general public." *Cavazos* Dkt. 248 at 21–22. RICO allows for less speech-restrictive means by which the Government can dismantle a criminal entity, such as the seizure of financial assets. Regardless of how "potent" a symbol may be, or how much "fear" a symbol generates, the Government cannot justify the restriction of this speech, especially given the symbols' purely associative purpose. Though the symbol may at times function as a mouthpiece for unlawful or violent behavior, this is not sufficient to strip speech of its First Amendment protection. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2003) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it . . . . First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end.").

      Moreover, the Government's interest in dismantling a criminal organization is not sufficiently tied to the reality of their forfeiture request. There is no evidence that forfeiture of collective membership marks will lead to a less violent or capable criminal organization. The Government admits that the Mongol Nation does not profit from the sale of merchandise bearing the symbols in commerce. The Mongol Nation will continue to use violent means to protect its insignia after the loss of intellectual property rights. And it is not even clear that forfeiture of the marks would strip the Mongol Nation of its exclusive rights to the collective membership marks,

given that the marks may be deemed abandoned immediately upon their forced transfer in gross to the United States.[38]  The Government's request does not justify the chilling effect the POF has on expression. As this Court has held before, not everything repugnant is unconstitutional. And what does the Government plan to do with tattoos of the Word Mark and Center Patch Image on members' backs, arms, or other body parts? *See* Trial Ex. 35.

That certain individual members of the Mongol Nation displayed the symbols while committing violent crimes or were rewarded with other patches for the commission of crimes does not justify the Government's attempt to bootstrap a conviction of the motorcycle club into censorship of uncharged members and supporters.[39] "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft*, 535 U.S. at 253.

The Supreme Court decision in *Alexander v. United States*, 509 U.S. 544 (1993) (Rehnquist, J.) does not change the analysis. In that case, the Supreme Court held that seizing and destroying expressive materials pursuant to RICO's criminal forfeiture provision did not constitute an unconstitutional prior restraint on speech as opposed to a permissible criminal punishment. *Id.* at 549.  According to Alexander, the forfeiture order imposed a complete ban on his future expression. *Id.* The Supreme Court disagreed:

> "By lumping the forfeiture imposed in this case after a full criminal trial with an injunction enjoining future speech, petitioner stretches the term 'prior restraint' well beyond the limits established by our cases. To accept petitioner's argument would virtually obliterate the distinction, solidly grounded in our cases, between prior restraints and subsequent punishments."

*Id*, at 549–50. The Supreme Court explained that "the RICO forfeiture order in this case does not forbid petitioner from engaging in any expressive activities in the future, nor does it require him to obtain prior approval for any expressive activities." *Id*. at 550–51. The Supreme Court held that the RICO forfeiture provision calls for the forfeiture of assets because of the financial role they play in the operation of the racketeering enterprise. *Id.* Thus the statute is "oblivious to

---

[38] *See infra*, Section III(A)(4).
[39] The evidence showed that many members of the Mongol Nation who have never been charged with crimes, including former Navy Seal and Minnesota Governor Jesse Ventura, displayed the collective membership marks on vests.

the expressive or nonexpressive nature of the assets forfeited; books, sports cars, narcotics, and cash are all forfeitable alike under RICO." *Id.*

Here, the marks at issue are solely used to represent membership in a group and are not a source of economic benefit to the club through the sale of any goods in commerce. And following entry of the POF, the Mongol Nation and its members will not be free to engage in "any expressive activities in the future"—because the Government cannot overturn their decades-long campaign to strip jackets off members' backs or charge licensing fees for use of the symbols, the Mongol Nation and its members will immediately experience a chilling effect tied to that specific speech. The rights associated with these symbols will vest in the United States and expose the club and its members to potential legal action, licensing fees, or continued attempts to obtain seizure authority. This is a far cry from *Alexander* and a clear prior restraint on speech. *See id.* ("the RICO forfeiture order in this case does not forbid petitioner from engaging in any expressive activities in the future, nor does it require him to obtain prior approval for any expressive activities."); *see also Kaczynski*, 551 F.3d at 1128–29 ("the government's interest is unrelated to the restriction of free expression, and the incidental effect on expression from selling redacted originals but providing the author with complete copies is no greater than essential to further that interest because he is not otherwise precluded from communicating the ideas expressed therein.").

The Government argues that because it has inserted language in the POF that the order "standing alone" does not authorize seizure of property not already in the Government's possession, there are no adverse effects on any Constitutional rights of either the Mongol Nation or its members. Reply ISO Mot. for POF at 21. "[I]t is unreasonable to presume that the mere entry of [the POF] could or would lead to seizures or a reasonable belief that seizures would occur as a result of the POF." *Id.* at 22. The Government claims its prosecution has a narrow objective to prevent the Mongol Nation from suing other entities who attempt to use the marks in a confusing way. *Id.* But the Government does not adequately address the chilling effect of the forced transfer of the symbols to the United States; the Government's public statements about stripping jackets off members' backs and seeking a "unity symbol"; the Government's

repeated requests for seizure authority; or the Government's indications to this Court that the United States intends to use or license the club's symbols.

### 2.  Eighth Amendment

The Government's request violates the Eighth Amendment and must be denied on this basis alone.

The Mongol Nation argues that the forfeiture order is disproportionate to the gravity of the offenses and therefore violates the Eighth Amendment. Defendant repeats the argument it made during trial: this prosecution is de minimis because the totality of confiscated drugs put into evidence can be placed into a standard grocery bag. Opp'n to Mot. for POF at 9. The punishment "takes away what has been in existence and used for 50 years over a small amount of narcotics that were seized over a roughly thirteen-year time period." *Id.* at 10. According to the Mongol Nation, this is a disproportionate punishment. *Id.* Defendant also claims the punishment is cruel and unusual under the Eighth Amendment. In support of this contention, the Mongol Nation argues the forfeiture of intellectual property is "highly unusual and highly unnatural" and is cruel because it is "robbing the identity of the entire club." *Id.* at 12. According to Defendant, "this penalty is essentially the death penalty for the organization." *Id.*

According to the Government, the Mongol Nation's Eighth Amendment arguments are premature. Reply at 28. The Government concedes that as an element of sentencing, criminal forfeiture is subject to an excessiveness analysis because it is punitive in nature. *Id.* (citing *United States v. Bajakajian*, 524 U.S. 321, 333–34 (1998). But the Government argues that because Defendant disputes the ownership rights of the collective membership marks, there is a possibility of no constitutional violation if a third party succeeds in asserting ownership rights. *Id.* "If, on the other hand, Defendant ultimately is determined (for the third time) to be the sole owner of the Marks, that determination will have been made at the conclusion of the ancillary proceeding[.]" *Id.* The Government acknowledges that "[t]here is little judicial authority addressing the timing of an excessiveness analysis in a criminal forfeiture setting (all of it in district courts, and none of relevance in the Ninth Circuit)," but contends that the courts that have addressed the issue have deferred the excessiveness analysis until after the entry of the

POF. *Id.* at 29. Under the excessiveness analysis, the Government argues that the evidence the jury heard and saw during trial demonstrated that the Mongols criminal enterprise was exactly the type of corrupt organization the RICO Act was intended to address. *Id.* at 30–31 (summarizing evidence). The Government argues that given RICO's critical role in holding corrupt organizations accountable for their crimes, courts have held that Congressional intent is entitled to deference in conducting the excessiveness analysis. *Id.* at 32.

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Taken together, these Clauses place "parallel limitations" on "the power of those entrusted with the criminal-law function of government." *Timbs v. Indiana*, No. 17–1091, 586 U. S. ____, (2019) (Ginsburg, J.) (citations omitted). Directly at issue here is the phrase "nor excessive fines imposed," which "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Alexander*, 509 U.S. at 558 (citing *Austin v. United States*, 509 U.S. 602, 609–610 (1993)). A fine is unconstitutionally excessive if (1) the payment to the government constitutes punishment for an offense, and (2) the payment is grossly disproportionate to the gravity of the defendant's offense. *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998). The Government has sought to punish the Mongol Nation by proceeding against it criminally, *in personam*; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination. *Id.* at 331–32.

In a February 2019 decision regarding civil *in rem* forfeiture, the Supreme Court held 9-0 that the Excessive Fines Clause is an incorporated protection applicable to the states under the 14th Amendment's due process clause. *Timbs*, 586 U. S. ____, (2019). In so holding, the Supreme Court elaborated on the history of the Clause:

> "The Excessive Fines Clause traces its venerable lineage back to at least 1215, when Magna Carta guaranteed that '[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement . . . .' §20, 9 Hen. III, ch. 14, in 1 Eng. Stat. at Large 5 (1225) . . . . Despite Magna Carta, imposition of excessive fines

persisted. The 17th century Stuart kings, in particular, were criticized for using large fines to raise revenue, harass their political foes, and indefinitely detain those unable to pay . . . For good reason, the protection against excessive fines has been a constant shield throughout Anglo-American history: Exorbitant tolls undermine other constitutional liberties. Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, as the Stuarts' critics learned several centuries ago. *See Browning-Ferris*, 492 U.S. at 267.  Even absent a political motive, fines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' for 'fines are a source of revenue,' while other forms of punishment 'cost a State money.' *Harmelin v. Michigan*, 501 U. S. 957, 979, n.9 (1991) (opinion of Scalia, J.) ('it makes sense to scrutinize governmental action more closely when the State stands to benefit'). This concern is scarcely hypothetical. See Brief for American Civil Liberties Union et al. as Amici Curiae 7 ('Perhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue.'). . . . Protection against excessive punitive economic sanctions secured by the Clause is, to repeat, both 'fundamental to our scheme of ordered liberty' and 'deeply rooted in this Nation's history and tradition.' *McDonald*, 561 U.S., at 767 (internal quotation marks omitted; emphasis deleted).

*Timbs*, 586 U. S. ____, slip. op. at 3–6.

Applying the Excessive Fines analysis to criminal RICO, the Ninth Circuit's guidance in *United States v. Busher*, 817 F.2d 1409 (9th Cir. 1987) regarding the breadth of the statute's forfeiture provision is prescient. The Ninth Circuit noted that the purpose of RICO was "to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Id*. at 1412 n.4 (citing *Russello*, 464 U.S. at 26 (1983)); S. Rep. No. 617, 91st Cong., 1st Sess. 76 (1969); 116 Cong. Rec. 819 (1969) (remarks of Senator Scott); *id*. at 591–92 (remarks of Senator McClellan)). But the Ninth Circuit warned that RICO's breadth and

-34-

inflexibility counsels caution, for 'no penalty is per se constitutional.'" *Busher*, 817 F.2d at 1414 (citing *Solem v. Helm*, 463 U.S. 277, 284 (1983)).

We apply the gross disproportionality test to determine Constitutional excessiveness. *Bajakajian*, 524 U.S. at 327–28. In deciding whether the forfeiture before it was grossly disproportional to the offense, the *Bajakajian* Court considered (1) the seriousness of the offense triggering forfeiture; (2) whether the property was related to any other illegal activity; (3) whether the defendant fit into the class of persons for whom the statute was principally designed; (4) the maximum sentence and fine that could have been imposed for the offense under then-mandatory United States Sentencing Guidelines; (5) the statutory maximum sentence and fine; and (6) the harm caused by the underlying offense. *Id*. at 337–40, 339 n.14.

Here, the jury unanimously found the marks were not forfeitable under Count One for substantive RICO. The jury unanimously found the marks forfeitable under Count Two for RICO conspiracy alone. RICO conspiracy (Section 1962(d)) criminalizes conspiring to violate substantive RICO (Section 1962(c)). Section 1962(c), in turn, makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. *Salinas v. United States*, 522 U.S. 52, 63 (1997) (citation omitted). It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself. *Id*.

Forfeiture of the rights associated with and appurtenant to collective membership marks is harsh and grossly disproportionate. In this case, the RICO conspiracy is a serious offense.[40] Nonetheless, the collective membership marks were acquired in 1969 upon first use and have been maintained through continuous use for decades. The symbols have immense intangible, subjective value to the Mongol Nation and its members. Indeed, numerous members have

---

[40] The offense is serious, despite Governor Jesse Ventura's testimony that the organizations that should be held liable for RICO conspiracy are the Republican and Democratic political parties, which is why he remains an independent.

permanently tattooed the images on their backs and elsewhere. And the connection between the rights associated with intangible property and the RICO conspiracy is attenuated. The jury's finding of a requisite nexus is understandable given RICO's extraordinary breadth. But in evaluating Constitutional excessiveness, the Court notes that the Government did not introduce any evidence connecting the use of intellectual property rights to an overt act. Individual Mongol Nation members may have displayed the symbols while committing crimes, but the defendant association did not use the rights associated with the collective membership marks in furtherance of those acts. Evidence showed that certain wings and other patches were awarded to members, but the Mongol Nation did not use intellectual property rights to prevent hangarounds from wearing symbols they did not earn. And the collective membership marks are not the fruits of any illegal activity. They were legally acquired via first use in 1969 and were legally maintained via continuous use. *See Bajakajian*, 524 U.S. at 338 ("The money was the proceeds of legal activity and was to be used to repay a lawful debt .").

The Court also notes that dozens of individual Mongol Nation members pleaded guilty in connection with several of overt acts. The defense witnesses at trial included a Mongols member who is serving multiple life sentences for committing murder in aid or racketeering, among his offenses. The Government has secured prison sentences and significant forfeiture of the criminal organization's assets and property, including motorcycles. And as a result of the conviction in this case, the Government will secure forfeiture of weapons, ammunition, body armor, and items of personal property seized during raids. The Government will also pursue fines at sentencing. Given the punishments already secured by the United States, the forfeiture of the collective membership marks is grossly disproportionate to the gravity of the RICO conspiracy.

To hold otherwise sets a dangerous precedent. Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, "as the Stuarts' critics learned several centuries ago." *Timbs*, 586 U. S. ____, slip. op. at 6. Allowing the Government to forfeit the rights associated with and appurtenant to purely associative symbols of organizations it chooses to prosecute is a slippery slope. The Court notes the Government has for the first

time sought forfeiture of the rights associated with the symbol of a largely Latino motorcycle club. The Government has not sought symbols in previous prosecutions against high-ranking members of rival motorcycle clubs, unions, churches, sports leagues, and fraternities.[41] The Government apparently has not chosen to pursue the Hells Angels' symbols despite a lawsuit filed by that motorcycle club against Toys "R" Us. This in no way suggests that the Mongol Nation is not a criminal organization deserving of significant punishment for the harms it has caused numerous victims. And the Court notes again that dozens of individual persons were convicted and are currently serving prison sentences for their crimes. But the Court finds the Government's creative forfeiture request to be unjustified and grossly disproportionate to the RICO conspiracy offense.[42]

Forfeiture of collective membership marks is violative of the Excessive Fines Clause. Accordingly, the Motion for a Preliminary Order of Forfeiture is DENIED so long as it requests forfeiture of the collective membership marks, and not merely weapons, ammunition, body armor, and specific items of property seized during the ATF raids.

### 3.    Fifth Amendment

The Mongol Nation argues that the requested Preliminary Order of Forfeiture would allow the Government to deprive individuals of their liberty and property without due process of law in violation of the Fifth Amendment to the United States Constitution. Opp'n to Mot. for POF at 7. The Mongol Nation's primary contention is that the collective membership marks are not owned by the Mongol Nation, but are rather owned by the members and "merely held in trust by the club for the benefit of the individual users." *Id.* According to Defendant, if the POF

---

[41] *See, e.g.,* Undercover Operation Targets SDSU Campus; 96 Arrested on Drug-Related Charges Fraternity Members Advertised Cocaine Sales Using Text Messages, News Release, Drug Enforcement Administration (May 6, 2008), https://www.dea.gov/sites/default/files/divisions/sd/2008/sd050608p.html. *See also* Jordan B. Woods, Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs, 17 Mich. J. Race & L. 303 (2012).

[42] The Court rejects the Government's argument that the deferential nature of the *Bajakajian* test weighs against a finding of gross disproportion. Reply ISO Mot. for POF at 32. Even in light of RICO's breadth, Congress has not clarified its intent to allow forfeiture of collective membership marks in gross. And the Court notes that Congress can address the ability of an organization like the Mongol Nation to maintain federal rights associated with trademarks. For example, the Lanham Act contains provisions that bar certain trademarks from the principal register. A trademark cannot be registered if it is "merely descriptive or deceptively misdescriptive" of goods, § 1052(e)(1), or if it is so similar to an already registered trademark or trade name that it is "likely ... to cause confusion, or to cause mistake, or to deceive," § 1052(d). *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017).

is entered, "[n]ot a single unindicted member of the defendant organization . . . has the opportunity to call witnesses, cross examine government witnesses, or argue their case." *Id.* at 8.

The Court is baffled by Defendant's argument. On July 20, 2010, the "Mongols Nation Motorcycle Club and its successor, Mongols Nation Motorcycle Club, Inc." intervened in a criminal proceeding and filed a motion to vacate a Preliminary Order of Forfeiture, arguing in part that because it owned the collective membership mark, the District Court erred in allowing forfeiture as to the individual. *Cavazos* Dkt. 3946 at 26. Now Defendant claims it does not own the mark, but merely owns title to the mark. If ownership of the collective membership marks were genuinely at issue, the Court would follow the Federal Rules of Criminal Procedure to determine the ownership interests and afford individuals due process, including a hearing and evidence.

Defendant's due process argument based on ownership is circular. The Mongol Nation argues that an ancillary hearing as set forth in the Federal Rules of Criminal Procedure should not be held because the Preliminary Order of Forfeiture violates the Constitution and must be denied outright. The Mongol Nation then argues that the Preliminary Order of Forfeiture violates due process because it does not afford members an ancillary hearing as set forth in the Federal Rules of Criminal Procedure. The Court agrees that the Constitutional issues must be resolved immediately, and that the members have First Amendment rights associated with the marks that may be resolved without their direct participation. But denial on due process grounds related to ownership, which would be evaluated during an ancillary proceeding, is not proper at this time. The Court would determine whether every member has an ownership interest in the collective membership mark, and whether the Mongol Nation merely holds title to the marks, at an ancillary forfeiture hearing. This process is not necessary because the requested Preliminary Order of Forfeiture violates the First and Eighth Amendments.

### 4.    Collective Membership Marks in Gross

The requested POF must be denied for the reasons stated above. Because this appears to be a matter of first impression, the Court provides the following observations regarding the

feasibility of any transfer of the collective membership marks and whether RICO allows for the forced transfer of this property in gross.

There is no doubt that RICO authorizes the forfeiture of both tangible and intangible property, including rights, privileges, interests, claims, and securities. 18 U.S.C. § 1963(b)(2). As the Government argues, the criminal forfeiture of rights and interests in intangible property is not unique to RICO forfeitures. Reply ISO POF at 4 (listing statutes). Indeed, the forfeiture of such intangible rights and privileges is fairly common. For example, as Amicus points out, federal courts have authorized the forfeiture of licenses including: a medical license used by a doctor to distribute controlled substances; a pharmacist's license used to distribute illegal drugs; and a liquor license used to run a business where cocaine was distributed. Amicus Curiae Brief, Stefan D. Cassella[43] (Dkt. XX) at 7 (citing *United States v. Dicter*, 198 F.3d 1284 (11th Cir. 1999); *United States v. $7708.78 in U.S. Currency*, 2011 WL 3489835, *3 (S.D. Miss. Aug. 9, 2011); *United States v. Carrie*, 206 Fed. Appx. 920 (11th Cir. 2006)).

And the forfeiture of intangible intellectual property under RICO can include, at least in some instances, the forced transfer of trademarks. For example, in *Cash Processing Servs. v. Ambient Entm't, Inc*., 418 F. Supp. 2d 1227, 1229 (D. Nev. 2006), the court described prior criminal RICO forfeiture proceedings that resulted in the government's seizure of a brothel's "Mustang Ranch" trademark. In 1999, AGE Enterprises and AGE Corporation were convicted of racketeering. *Id.* at 1229 (citing *United States v. A.G.E. Enterprises, Inc*., 15 F. App'x 439 (9th Cir. 2001)). On July 12, 1999, an order of forfeiture granted the government twenty million dollars, all the stock, interests in and assets of the accounts receivable, and real property owned by the corporate defendants, including the Mustang Ranch trademark.[44] *Id.* The

---

[43] Amici Stefan D. Cassella was Deputy Chief of the Justice Department's Asset Forfeiture and Money Laundering Section and the Chief of the Asset Forfeiture and Money Laundering Section in the U.S. Attorney's Office in Baltimore, Maryland. He now serves as an expert witness and consultant to law enforcement agencies and the private sector as the CEO of AssetForfeitureLaw, LLC.

[44] Upon this Court's review of the Special Jury Verdict in *United States v. A.G.E. Enterprises, Inc.,* Case No. CR-N-95-049-HDM (July 9, 1999) (Dkt. 246), it does not appear that the Government specifically listed the trademark for forfeiture. Rather the Government listed specific real property. *See also* Preliminary Order of Forfeiture (Dkt. 247) (listing real property but not explicitly referring to trademark).

Government eventually sought to sell the "World Famous Mustang Ranch trademark" on eBay. *Id.* at 1230. Considerable goodwill remained in the mark at that time.[45] *Id.* at 1234 n.6.

But the forced transfer of a trademark has unique requirements and consequences that other intangible property like a license do not involve. The "property rights" or protections accorded a trademark owner "can only be understood in the context of trademark law and its purposes." *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir. 1980). A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods. *Id.* As Amicus point out, a trademark (unlike a patent or copyright) is not a "right in gross or at large." Amicus Curiae Brief, Seven Law Professors[46] (Dkt. XX) at 6 (citing *United Drug Co. v. Theodore Rectanus co.*, 248 U.S. 90, 97 (1918)). "Trademark ownership is always appurtenant to commercial activity." *Id.* (citing *Tally-Ho, Inc. v. Coast Comm. College Dist.*, 889 F.2d 1018, 1022–23 (11th Cir. 1989)). As a result, a trademark "is a very unique type of property" and is "not property in the ordinary sense, but only a word or symbol indicating the origin or source of a product [or service]." *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581 (2d Cir. 1990). The owner of the mark "acquires the right to prevent his goods [or services] from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks." *Id.* There are "no rights in a trademark beyond these." *Id.* In other words, a trademark owner has a property right "only insofar as is necessary to prevent consumer confusion as to who produced the goods [or services] and to facilitate differentiation of the trademark owner's goods [or services]." *Int'l Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir. 1980).

---

[45] Footnote 6 of the opinion provides in full: "Furthermore, we note that considerable goodwill remains in the 'world famous' Mustang Ranch mark. [Bureau of Land Management] attorney Alf Brandt testified that seemingly valueless items, such as the health inspection certificate for the brothel's hot tub, sold for hundreds of dollars in the Government auctions. In addition, the numerous entities that have attempted to use the trademark and litigate for their rights in the mark testify to the exceptional goodwill associated with the Mustang Ranch brothel."

[46] Amici are professors of intellectual property law and have submitted their brief in support of neither party. The professors are Stacey L. Dogan of Boston University School of Law; Mark A. Lemley of Stanford University Law School; Jessica Litman of the University of Michigan School of Law; Mark P. McKenna of Notre Dame Law School; Jennifer E. Rothman of Loyola Law School, Los Angeles; Jessica Sibley of Northeastern University School of Law; and Rebecca Tushnet of Harvard University Law School. Institutions have been provided for identification purposes only.

Consistent with this fundamental principle, trademark law "does not recognize transfers 'in gross'—transfers that attempt to transfer a trademark only, without any of the associated 'goodwill.'" Amicus Curiae Brief, Seven Law Professors at 9. It is "well settled . . . that no rights [to a mark] can be transferred apart from the business with which the mark has been associated." *Id.* (citing *Mister Donut of America, Inc., v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969)). It is not necessary that the entire business or its tangible assets be transferred; it is the goodwill of the business that must accompany the mark. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992). The purpose behind requiring that goodwill accompany the assigned mark is to maintain the continuity of the product or service symbolized by the mark and thereby avoid deceiving or confusing consumers. *Id.* Goodwill means some sort of underlying connection to the initial business and in the bankruptcy context has been described as "assets which are purchased with the name [that] are sufficient to enable the purchaser to 'go on in real continuity with its past.'" *See Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 51 (S.D.N.Y. 1965); *see also Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993) ("Although the definition of goodwill has taken different forms over the years, the shorthand description of goodwill as 'the expectancy of continued patronage' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business.") (citation omitted).

In addition to this requirement that a transfer include both the marks and the associated goodwill, if a trademark is not continuously used it may be deemed "abandoned." The Lanham Act provides that "[a] mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use[.]" 15 U.S.C. § 1127. When a mark has been abandoned, anyone can use the symbol and can even create a new trademark right using the symbol. *See Cumulus Media, Inc. v. Clear Channel Comm., Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002) ("[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark[.]"). Critically, trademark law requires that the uses be a continuation of the underlying uses that established the trademark rights in the first place. Some courts have found that as long as a transferee's goods or services are essentially the same as the

transferor's in type and in quality, then there can be a valid transfer. *Defiance Button Mach. Co. v. C&C Metal Prod. Corp.*, 759 F.2d 1053, 1059–60 (2d Cir. 1985).

The collective membership marks at issue indicate "membership in an association dedicated to motorcycle riding appreciation," *see* U.S. Reg. No. 4,730,806, and the Government admits they are used "to indicate that the user of the mark is a member of a particular organization." Reply ISO Mot. for POF at 6. This is not the same underlying purpose of a traditional trademark, which is used to distinguish goods or services in commerce and has associated and calculable goodwill. Here, the goodwill associated with the Mongol Nation collective membership marks is the Mongol Nation's identity and club membership, just as the goodwill associated with the Christian Deer Hunters Association is the identity of that specific religious and education association of hunters; or the goodwill associated with the Teamsters is the identity of that union; or the goodwill associated with the PGA Professional is membership in that group of golfers. The expectancy of continued patronage is that the collective membership marks will continue to represent membership in and association with those groups.

Again, for a transfer of a trademark to be valid the transfer must be accompanied by the associated goodwill. Any transfer in gross (without the associated goodwill) is legally invalid. The decision in *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) is instructive on this point. In that case, the appellant-judgment-debtor managed and promoted musical groups for entertainment under the registered trade name "Vito and the Salutations." 746 F.2d at 928. The holder of an unsatisfied monetary judgment against the appellant-debtor obtained an order of attachment and sale of the trade name. *Id.* The order directed the United States Marshal to "attach whatever proprietary interest the judgment debtor . . . may have or claim to have in the registered name 'Vito and the Salutations' and to sell same at public auction forthwith to satisfy [the money judgment]." *Id.* at 928–29. The sale was advertised and the Marshal auctioned the appellant's trade name to the plaintiff, and he bought it in for the nominal sum of $100. *Id.* at 929. On appeal, the judgment debtor contended that a trade name or mark per se is not a type of property which can be attached or sold at execution auction. *Id.* The Second Circuit noted that a sale of a trade name or mark divorced from its goodwill is characterized as an "assignment in

gross," and that registered trade names or marks may not be validly assigned in gross. *Id*. "Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Id*. In the case of a service mark, confusion of the public and consumers would result "if an assignee offered a service different from that offered by the assignor of the mark." *Id*. (citing *Money Store v. Harris Corp. Finance, Inc.*, 689 F.2d 666 (7th Cir. 1982)). As to the Vito and the Salutations mark, the court held that the entertainment services were *unique to the performers* and that there was neither continuity in management nor quality and style of music; "if another group advertised themselves as Vito and the Salutations, the public could be confused into thinking that they were about to watch the group identified by the registered trade name." *Id*. at 930. Thus the Second Circuit held that a trade name in gross is not "property" within the meaning of the applicable New York statute. *Id*. at 931.

The same principles may apply here to the RICO forfeiture provision, 18 U.S.C. § 1963(b)(2), and applicable state law.[47] In California, courts apply a three-part test to determine whether a property right exists: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). The collective membership marks in gross may fail on the second prong.

The POF is the first step in a forced transfer of the collective membership mark from the Mongol Nation to the United States (all right, title, and interest in property "vests in the United States," 18 U.S.C. § 1963(c)). But the collective membership marks would be forcibly transferred to the United States in gross because the goodwill associated with the marks cannot be transferred. What the Mongol Nation collective membership marks represent is membership in the Mongol Nation motorcycle club, which will continue to exist after this case. Unlike the Mustang Ranch trademark that had associated goodwill that was transferable in the brothel

---

[47] It is unclear to the Court whether the Government contends that under forfeiture law, what constitutes "property" for the purposes of RICO is a matter of state law or "solely a matter of federal law." Reply ISO Mot. for POF at 5 (citing *United States v. Ben-Hur*, 20 F.3d 313, 317 (7th Cir. 1994) and 7 (citing *Alexander v. United States*, 509 U.S. 544 (1993)).

industry, the Mongol Nation marks' goodwill is inextricably intertwined with identification with and membership in the Mongol Nation motorcycle club. It may not be legally possible to maintain continuity or prevent confusion in the public when the Mongol Nation will continue to exist after forfeiture.  Separately, the Mongol Nation may be able to reacquire the rights associated with its symbols if the Government abandoned the marks after any forfeiture.

### B. Forfeiture of Weapons, Ammunition, Body Armor, and Specific Property

None of the above analysis applies to the Government's requested forfeiture of weapons, body armor, ammunition, and items of personal property currently in the possession of the Government as a result of the ATF raids. This property is clearly forfeitable under 18 U.S.C. 1963. The Government may file an amended POF following entry of this order removing the requested forfeiture of the rights associated with the collective membership marks. This POF will trigger the ancillary proceeding regarding ownership interests in these items of specific property, including vests and guns.

### C. Acquittal in Guilt Phase

The Court next turns to the legal arguments raised by the Mongol Nation in connection with the guilt phase of trial: First, whether the Government proved the requisite element of distinctiveness between the RICO person (the Mongol Nation) and the RICO enterprise (the Mongols Gang); and second, whether an unincorporated association is capable of committing murder and attempted murder.

### 1.    Distinctiveness

As alleged by the Government in the FSI, the "Mongol Nation" is an unincorporated association comprised of official or full-patch members of the Mongols Gang. FSI at 11. The Mongols Gang includes both the Mongol Nation (or the official/full-patch members) and prospective members, probationary members, and hangarounds. *Id.* at 2. This Court dismissed this prosecution on September 16, 2015, finding that the indictment failed on distinctiveness grounds. Dkt. 114 at 17 ("[T]here is no meaningful distinction between the association Mongol Nation and the enterprise of the Mongol Gang."). The Ninth Circuit reversed. *See* Dkt. 127; *United States v. Mongol Nation*, 693 F. App'x 637 (9th Cir. 2017) ("[B]ecause Mongol Nation

was alleged to be part of a larger whole, the Mongols Gang, which is comprised of additional individuals who together form the alleged enterprise, the district court erred by dismissing the indictment on distinctiveness grounds."). Defendant acknowledges the Ninth Circuit's reversal but argues that the Government failed to prove RICO's distinctiveness requirement. Rule 29 Mot. at 4.

According to Defendant, the RICO "person" (the Mongol Nation) is the same as the RICO "enterprise" (the Mongols Gang). *Id.* at 11. The Mongol Nation argues that the Government "carved away" from the Mongols Gang what it considers to be a "discrete faction"—the faction capable of holding the alleged property. *Id.* But Defendant argues that this "technical separation does not establish that Mongol Nation itself was performing a different role within the enterprise to facilitate racketeering activity." *Id.* Rather, the Mongol Nation is one single entity composed of various chapters, levels of membership, designations, and rights and responsibilities, and is not distinct from the Mongols Gang. *Id.* at 13. According to the Mongol Nation, the Mongols Constitutions and the testimony of undercover agents proved that non-full-patch members of the club, including prospects, probationary members, and hang-arounds, are under the umbrella of the club's rules, control, and association. *Id.* at 13–14. For example, Doctor Richard Cole, aka Ritchie Rich, testified to the rules and customs stated in the Mongols Constitution and stated there is no difference between Mongols "hang-arounds" and Mongols "associates." *Id.* at 14. Governor Jesse Ventura also discussed rules for inactive members. *Id.* at 15. Richard Gutierrez, aka Rags, testified that all levels of the organization, including officers, full-patch members, probate members, probationary members, and hangarounds/associates are governed by club rules, guidelines, and customs. *Id.* And the Mongol Nation argues that undercover agents Darren Kozlowski, Greg Gaioni, and Paul D'Angelo verified the lack of distinctiveness proffered by the Government. *Id.* at 15. Defendant argues the record clearly shows that the only testimony regarding the structure of the defendant Mongol Nation is that of a single unified entity. *Id.* at 16.

The Government responds that the evidence the jury considered at trial was "entirely consistent" with the Ninth Circuit's characterization of the underlying allegations. Opp'n to

Rule 29 Mot. at 10. The Government argues that Special Agent Kozlowski testified about his own efforts and those of Special Agents Gaioni, D'Angelo, and Carr to infiltrate the organization, and demonstrated that as a hang-around, prospect, and then full-patch member there was a highly structured role-based organization that distinguished between members and non-members. *Id.* at 10–11. According to the Government, this testimony alone sufficiently described the distinctiveness of the Mongol Nation within the larger organization. *Id.* at 11. Beyond Kozlowski, "[a]ll of these witnesses were consistent in describing the distinction between full-patch members and non-member associates and hangarounds." *Id.* The Government points to evidence about crimes committed by members acting in concert with non-member associates, like Aaron Collins, who shot at Los Angeles County Sheriff's Deputy Ian Stade on May 25, 2012, while in the company of Mongols member Carlos Mercado; and Austin Melcer, who beat Leon Huddleston to death with Mongols member Jose Norberto Montes on February 14, 2007. *Id.* And the Government argues that the Mongol Nation itself set forth in its Constitution that prospects are not full-patch members of the Mongol Nation. *Id.* at 12 (citing Ex. 17).

"[T]o establish liability under [RICO] one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). A RICO claim might fail on distinctiveness grounds where the "[entity] was the 'person' and the [entity], together with all its employees and agents, were the 'enterprise,'" *id.* at 164 (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)). As alleged in the FIS, that principle does not describe this case. *Mongol Nation*, 693 F. App'x at 638 (9th Cir. 2017). The Ninth Circuit held that as alleged, the "Mongol Nation is a subset of the alleged enterprise, which consists of legally distinct and separate persons in addition to the Defendant." *Id.* "When reviewing whether these entities are distinct, "the only important thing is that [the enterprise] be either formally ... or practically ... separable from the individual" RICO person." *Id.* (citation omitted). The Ninth Circuit has "previously rejected the argument that there is no distinction between the officers, agents and

employees who operate a corporation and the corporation itself because a corporate officer can be a person distinct from the corporate enterprise." (citation and internal quotations omitted). As alleged, the Mongol Nation and Mongol Gang are distinct "because the Mongol Nation was alleged to be part of a larger whole, the Mongols Gang, which is comprised of additional individuals who together form the alleged enterprise." *Id.*

The evidence is entirely consistent with the Ninth Circuit's holding. The Mongol Nation was proven to be an entity comprised of full-patch members. The evidence proved there are additional individuals including probationary members, prospects, and hangarounds. The Mongol Constitution clarifies that prospects are not full-patch members of the Mongol Nation. Ex. 17. Under the Ninth Circuit's holding, the Government has proven the Mongol Nation is distinct from the Mongols Gang. The Court denies the Mongol Nation's request for acquittal on distinctiveness grounds.

## 2.    Whether Mongol Nation is Legally Capable of Racketeering Acts

The Mongol Nation argues that an entity is legally incapable of committing the *malum in se* racketeering acts set forth in the indictment and incorporated into the verdict form. Rule 29 Mot. at 17. Defendant cites *Jund v. Town Hempstead*, 941 F.2d 1271 (2d Cir. 1991), wherein according to Defendant the Second Circuit held that an unincorporated association of persons as an entity cannot be indicted and convicted of a crime, since, if a crime is committed, it must be committed by them as individuals. *Id.* According to Defendant, it is "strange to even ponder a situation where an entity can be found guilty of murder or attempted murder." *Id.* at 18. The "lack of authority" on the subject "lends credence to the fact" that a district court held in 1898 that there are certain crimes, including murder, of which a corporation cannot be guilty. *Id.* (citing *United States v. Kelso Co.*, 86 Fed. 304 (N.D. Cal. 1898)). Mongol Nation argues that because it is legally incapable of committing any of the specific intent "racketeering acts" set forth in the indictment and incorporated into the verdict form, these charges should not and cannot be the basis of a conviction. *Id.* at 19. Moreover, Defendant notes that all of the individual members alleged to have committed the racketeering acts have been convicted. *Id.* at 20.

The Government responds that the Second Circuit decision in *Jund* and the statutory language in RICO stand for the opposite of Defendant's contention. Opp'n to Rule 29 Mot. at 13–14. According to the Government, the Second Circuit held that an unincorporated association was capable of holding property and therefore falls within the definition of a person for the purposes of RICO. *Id.* at 14. Thus corporations, companies, associations, firms, partnerships, societies, and joint stock companies fall under the statute. *Id.* The Government also notes the Second Circuit's reliance on the Supreme Court decision in *United States v. A&P Trucking Co.*, 358 U.S. 121 (1958). *Id.* at 15. In that case, the Government argues the Supreme Court addressed the criminal liability of a partnership and specifically held that "the business entity cannot be left free to break the law merely because its owners, stockholders … partners … do not participate in the infraction." *Id.* (citing 358 U.S. at 126). Thus according to the Government, the *A&P Trucking* Court specifically rejected the same *mens rea* argument made by the Mongol Nation when it held that "corporations and associations, no matter how organized "can be guilty of 'knowing or 'willful' violation of regulatory statutes through the doctrine of respondeat superior." *Id.* (citing 358 U.S. at 125). And the Government argues that the Defendant's reliance on 19th Century case law is unavailing in the face of the RICO Act, enacted in 1970. *Id.* at 16. The Government notes that the title of that act itself specifically identifies its focus as "Organizations." *Id.* Moreover, the Government argues that there is a "much more direct basis" for the culpability of the Mongol Nation because the defendant organization in this case "did not merely acquiesce or adopt the crimes of its members and associates." *Id.* Rather, the Mongol Nation "advocated and rewarded those crimes" including by awarding a murder patch and "Respect Few Fear None" patches to members for violent crimes. *Id.*

As the Ninth Circuit noted in this case, some predicate criminal acts can be committed by entities similar to an unincorporated association. *Mongol Nation*, 693 F. App'x at 638 (citing *A&P Trucking Co.*, 358 U.S. at 125–26). But the Ninth Circuit left the issue to this Court's consideration in the first instance. *Id.* The Court agrees with the Government that an

unincorporated association including the Mongol Nation can be held liable for each RICO predicate act alleged in the indictment.

Corporate criminal responsibility sheds light on the issues before this Court. A corporation is a legal entity that may act only through its agents, including officers, directors, and employees. See, e.g., *United States v. Cincotta*, 689 F.2d 238, 241, 242 (1st Cir. 1982), cert. denied, 459 U.S. 991 (1982); *United States v. Richmond*, 700 F.2d 1183, 1195 n.7 (8th Cir. 1983). Congress may constitutionally impose criminal liability upon a business entity for acts or omissions of its agents within the scope of their employment. *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004 (9th Cir. 1972) (citing *A & P Trucking Co.*, 358 U.S. at 125–26; *New York Central & Hudson R. R. Co. v. United States*, 212 U.S. 481 (1909); *cf. United States v. Illinois Central R. R. Co.*, 303 U.S. 239 (1938)). Such liability may attach without proof that the conduct was within the agent's actual authority, and even though it may have been contrary to express instructions. *Id.* (citing *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 204–05 (3d Cir. 1970); *New York Central & Hudson R. R. Co. v. United States, supra*, 212 U.S. at 493; *Standard Oil Co. v. United States*, 307 F.2d 120, 127–28 (5th Cir. 1962); *United States v. Armour & Co.*, 168 F.2d 342, 343–44 (3d Cir. 1947); *Egan v. United States*, 137 F.2d 369 (8th Cir. 1943)). Actual authority can be either express or implied. Restatement (Second) of Agency § 7 (1958). It is not necessary for the government to prove that the act was authorized by the corporation formally or in writing. *See* 1A Fed. Jury Prac. & Instr. § 18:05 (6th ed.).

The Court sees no meaningful distinction between corporate criminal responsibility and liability of unincorporated associations. The Supreme Court addressed the criminal liability of a partnership and specifically held that "the business entity cannot be left free to break the law merely because its owners, stockholders … partners … do not participate in the infraction." *Id.* (citing 358 U.S. at 126). Defendant provides no basis for veering from this path as to unincorporated associations. As this Court instructed the jury, it is not enough that various members and associates were involved in spontaneous criminal acts as an individual or as a small group of individuals. In other words, the spontaneous rogue acts of individual members

and associates do not create guilt for an association. However, to the extent that an illegal act was committed at the express or implied direction of the leadership of the defendant Mongol Nation, the entity may be found guilty. This is entirely consistent with corporate criminal responsibility, and is precisely what Congress intended in passing RICO, which expressly targets criminal organizations.

### D.   New Trial

The Mongol Nation moves for a new trial on several bases: (1) because the Court did not admit Defense Exhibit D-7, an August 9, 2006 ATF Report; (2) the jury instruction on Spontaneous Violent Acts contains language unfairly prejudicial; (3) the cooperation between the former Mongol Nation President Ruben Doc Cavazos and the Government was never produced; (4) the names of confidential informants were never disclosed to defense counsel before or during trial; (5) there was an overwhelming amount of uncorroborated hearsay statements made during the testimony of the Government's witnesses; (6) the Government "lied" during their closing argument by stating that the Mongol Nation's collective membership mark application says only full-patch members are members of the club; (7) there is insufficient evidence in the record to establish the requisite nexus between the property sought for forfeiture and the offenses; and (8) the Government referred to the Mongol Nation as a "gang" constantly throughout the trial. *See generally* Rule 33 Mot.

Federal Rule of Criminal Procedure 33 authorizes the Court, on motion of a defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires." A "motion for a new trial is directed to the discretion of the district judge. It should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). The defendant has the burden to justify the need for a new trial. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986)

The Mongol Nation has not met its burden. None of their arguments is persuasive. Briefly, the Court addresses each respective complaint in writing but incorporates the discussion during oral arguments in full: (1) Defendant never offered any evidentiary basis for the admissibility of Exhibit D-7 and cites none in the motion; (2) Defendant cites no authority

for its objection, and as discussed, the instruction accurately reflects the law; (3) the plea agreement was offered at trial to cross-examine a defense witness called by the Mongol Nation and counsel should have had a copy of the agreement; (4) Defendant was afforded a full and fair trial and was allowed to cross the witnesses about the investigation; (5) Defendant does not point to a single hearsay statement to support its contention, and the Court instructed the jury on inadmissible hearsay; (6) the record shows that the Mongol Nation is distinct from the enterprise, including excerpts from the Mongol Constitution; (7) the Court is denying forfeiture of the collective membership marks and the items of personal property, and there is no doubt a nexus between RICO conspiracy and the weapons, ammunition, and body armor seized; and (8) the Court instructed the jury on the use of "gang" and limited its use throughout trial as much as practically possible.

## IV.   Disposition

The First Amendment and Eighth Amendment permanently prohibit the Government's request to forfeit the rights associated with the collective symbols. Accordingly, the Court DENIES the requested forfeiture of collective membership marks.

The Court tentatively GRANTS the requested forfeiture of weapons, ammunition, body armor, and specific property seized during the ATF raids pending the filing of an amended request consistent with this order.

The Court DENIES the Mongol Nation's motion for acquittal and motion for a new trial. The Court SETS the sentencing hearing for April 24, 2019, at 1:30 p.m.


DATED:      February 28, 2019

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE