NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
CHRISTOPHER BRUNWIN (Cal. Bar No. 158939)
Assistant United States Attorney
Violent and Organized Crime Section
   1400 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone:  (213) 894-6166/4242
   Facsimile:  (213) 894-3713
   E-mail:     Steven.Welk@usdoj.gov
                Christopher.Brunwin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        vs.<br><br>MONGOL NATION,<br> an unincorporated association,<br><br>        Defendant. | No. CR 13-106(A)-DOC<br><br>**GOVERNMENT'S SECOND AMENDED APPLICATION FOR PRELIMINARY ORDER OF FORFEITURE AGAINST DEFENDANT MONGOL NATION (COLLECTIVE MEMBERSHIP MARKS ONLY)**<br><br><u>**Sentencing:**</u><br>**Date: May 17, 2019**<br>**Time: 7:30 a.m.**<br>**CTRM: 9D** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND PROCEDURAL HISTORY ...................................3

    A.    Substantive and Procedural Authority ...................................................3

    B.    The Limited Scope of the Requested Preliminary Order of Forfeiture (Collective Membership Marks) ...........................................................3

II.   ARGUMENT..............................................................................................5

    A.    The Government's Amended Forfeiture Request Re: the Marks .........5

    B.    The Instant Forfeiture Request is Narrowly Tailored to Accomplish the Goals of the RICO Act Without Implicating or Affecting First Amendment Rights................................................................................6

        1.    *Rights and Interests Associated with Collective Membership Marks are Forfeitable Property*...................................................6

        2.    *The "Purposely Broad" Scope of RICO Criminal Forfeiture*....8

        3.    *The First Amendment Implications Suggested By the Forfeiture of "All Rights and Privileges" Associated with the Marks* ......10

        4.    *The POF(Marks) Will Implement a Mandatory Element of Defendant's Sentence* ...............................................................12

    C.    The Requested Forfeiture Is Not An Excessive Fine.........................16

        1.    *The Requested Forfeiture Is Proportional to the Gravity of the Conviction for RICO Conspiracy* .........................................16

        2.    *The Combination of Fines and the Requested Forfeiture Cannot Be Considered Constitutionally Excessive* ..............................22

III.  CONCLUSION...........................................................................................24

i

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Alexander v. United States,*
   509 U.S. 544 (1993) ............................................................. *passim*

*Ex parte Supreme Shrine of the Order of the White Shrine of Jerusalem,*
   109 USPQ 248 (Comm'r Pats. 1956)........................................ 7

*Int'l Order of Job's Daughters v. Lindeburg and Co.*
   633 F.2d 912 (9th Cir. 1980)................................................. 7

*Jacob Siegel Co. v. FTC,*
   327 U.S. 608 (1946) ........................................................... 7

*K-Mart Corp. v. Cartier, Inc.,*
   485 U.S. 176 (1988) ........................................................... 7

*Matal v. Tam,*
   ___ U.S. __, 137 S.Ct. 1744 (2017) ...................................... 7

*Rummel v. Estelle,*
   445 U.S. 263 (1980) ........................................................... 21

*United Drug Corp. v. Theodore Rectanus Co.,*
   248 U.S. 90 (1918) ............................................................. 7

*United States v. Acuna,*
   313 F. App'x. 283 (11th Cir. 2009) ....................................... 18, 19

*United States v. Bajakajian,*
   524 U.S. 321 (1998) ........................................................... 16, 18

*United States v. Busher,*
   817 F.2d 1409 (9th Cir. 1987) .............................................. *passim*

*United States v. Najjar,*
   300 F.3d 466 (4th Cir. 2002) ............................................... 18-19

*United States v. Segal,*
   495 F.3d 826 (7th Cir. 2007) ............................................... 18, 19

*United States v. Turkette*,
    452 U.S. 576 (1981) ........................................................................... 17

## STATUTES AND RULES

15 U.S.C. § 1054 ................................................................................ 6-7
18 U.S.C. § 981(a)(1)(G) ........................................................................ 8
18 U.S.C. § 1962 .................................................................. 6, 8, 17, 23
18 U.S.C. § 1963 ........................................................................... *passim*
18 U.S.C. § 1963(a) ................................................................... 3, 12, 23
18 U.S.C. § 1963(b)(2) ............................................................................ 8
18 U.S.C. § 1963(e) ................................................................................ 3
18 U.S.C. § 1963(f) .............................................................................. 13
Fed. R. Crim. P. 32.2 ............................................................................. 5
Fed. R. Crim. P. 32.2(b)(1)(A) ............................................................... 3
Fed. R. Crim. P. 32.2(b)(2)(A) ............................................................... 3
Pub.L. 104-237, § 2, Oct. 3, 1996, 110 Stat. 3100 ............................. 20

## MISCELLANEOUS

*Trademark Manual of Examining Procedures* § 1302.01 ...................... 7
*Trademark Manual of Examining Procedures* § 1303 .......................... 7
*Trademark Manual of Examining Procedures* § 1303.2 ....................... 7
*Trademark Manual of Examining Procedures* § 1304.1 .................... 6, 7

iii

By this application, the government requests that the Court enter the proposed Preliminary Order of Forfeiture (Collective Membership Marks) ("POF(Marks)") lodged contemporaneously herewith, against defendant Mongol Nation ("Defendant"), prior to the sentencing hearing scheduled for May 17, 2019, pursuant to Fed. R. Crim. P. 32.2 ("Rule 32.2"); 18 U.S.C. § 1963; the guilty verdict entered against Defendant on December 13, 2018 on Counts One and Two of the First Superseding Indictment ("FSI"); and the jury's Special Verdict re Forfeiture against Defendant, entered on January 11, 2019.  This is the government's third request for a preliminary order of forfeiture ("POF") in this case, but only the second such request relating to the three collective membership marks found by the jury to be subject to forfeiture.[1]  The second and instant requests follow the Court's granting in part and denial in part of the government's first such request (DN 354) in an order of February 28, 2019.  DN 389 (the "February 28 Order").[2]

The proposed POF(Marks) is narrowly tailored to carry into effect the mandatory forfeiture required by 18 U.S.C. § 1963 and the jury's forfeiture verdict, while accommodating concerns articulated in the February 28 Order.  The proposed order limits the forfeiture of Defendant's rights and interests in the Marks to the very specific statutory and common law rights that grant Defendant the

[1]  The intervening request, relating solely to the items of tangible personal property found to be subject to forfeiture by the jury, was granted, and the POF (Tangible Property) entered, on March 29, 2019, as Docket Number ("DN") 416.

[2]  The Court, in the February 28 Order, denied the government's application for a POF to the extent that it included *all* rights and privileges associated with the three collective membership marks described in the memorandum (the "Marks").  By this application, the government is seeking a very narrow forfeiture order that the government believes satisfactorily addresses (and eliminates) the constitutional concerns expressed by the Court in the February 28 Order, and were the bases for the partial denial of the original application.

1

ability to exercise and enforce exclusive use of and control over the Marks.  The POF(Marks) places no restraints or limitations on the display or use of the Marks by Defendant or its individual members.  The effect of the POF(Marks), if entered, will simply extinguish Defendant's statutory and common law rights to prevent others from using or displaying the Marks through legal process.

The entry of the proposed POF(Marks) is requested pursuant to 18 U.S.C. § 1963(a) and (e), and Rule 32.2(b)(2)(A).  This application is supported by Defendant's conviction, the jury's findings in the Special Verdict re Forfeiture that the Marks are subject to forfeiture, the matters set forth in the accompanying Memorandum of Points and Authorities, and any argument the Court may entertain in any hearing on this application.

DATED: April 25, 2019          NICOLA T. HANNA
                               United States Attorney
                               LAWRENCE S. MIDDLETON
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               STEVEN R. WELK
                               CHRISTOPHER BRUNWIN
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

# I.

## INTRODUCTION AND PROCEDURAL HISTORY

### A.      Substantive and Procedural Authority

The government will not repeat here the comprehensive discussion set out in its original application for POF (DN 354) or its Reply in support of that application (DN 366) concerning the substantive and procedural statutes and rules governing criminal forfeiture.  In short, those rules require that a preliminary order of forfeiture be entered promptly (and in no event later than the time of sentencing) following the conviction of a defendant where a jury has made a finding that the property sought for forfeiture has the required nexus to one or more underlying crimes of conviction.  *See, generally,* 18 U.S.C. § 1963(a) and (e); and Rule 32.2(b)(1)(A) and (2)(A).  The government incorporates its prior briefing on those requirements as if set forth in full here.

### B.      The Limited Scope of the Requested Preliminary Order of Forfeiture (Collective Membership Marks)

In its first application (DN 354), the government sought a preliminary order of forfeiture applicable to *any and all* rights and interests associated with or appurtenant to three collective membership marks identified herein and in the POF(Marks) as the "Word Mark,"[3] the "Center Patch Image," [4] and the "Combined

---

[3]  "Word Mark" means the collective membership mark consisting of the word "Mongols" that, at various times, was or is registered with the United States Patent and Trademark Office ("USPTO") under registration numbers 2916965, 4406187 and 4730806, and which has been used by Defendant, among other uses, as the top rocker of the three-piece patch awarded to full-patch and probationary members of Defendant.

[4] "Center Patch Image" means the collective membership mark consisting of the drawn image of a Genghis Khan-type character with sunglasses and a ponytail, riding a motorcycle, with the letters "M.C." appearing below the motorcycle that, at various times, was or is registered with the USPTO under registration numbers

Mark"[5] (collectively, the "Marks"). In its February 28 Order, this Court found that the forfeiture requested by the government would violate the First and Eighth Amendments to the Constitution.

This amended request is designed to mitigate those constitutional concerns. Specifically, it is calculated to avoid *any restriction or limitation* on the rights of Defendant or its individual members to express their views or beliefs, or associate freely, as guaranteed by the First Amendment to the United States Constitution. At the same time, the forfeiture requested here will deny Defendant the statutory and common law protections afforded to holders of collective membership marks who have *not* been convicted of using their marks in furtherance of a criminal racketeering offense. If the proposed POF(Marks) is entered, Defendant and its individual members will continue to enjoy their right to use and display the Marks in whatever lawful manner they choose, but will forfeit the privilege of being allowed to invoke the laws and judicial authority of the United States to prevent others from using and displaying the Marks. That is: they will lose only the legally enforceable rights conferred to them as holders of intellectual property. The government will seize no tangible property, however, and Defendant's rights of expression will be unaffected.

Neither Defendant, in its opposition to the government's original application for preliminary order of forfeiture (DN 362), nor the Court, in its February 28

---

3076731 and 4730806, and which has been used by Defendant, among other uses, as the center patch of the three-piece patch awarded to full-patch, probationary and prospective members of Defendant.

[5] "Combined Mark" means the collective membership mark consisting of both the Word Mark and the Center Patch Image that, at various times, were or are registered with the USPTO under registration number 4730806, and which has been used by Defendant, among other uses, as the top rocker and center patch of the three-piece patch awarded to full-patch and probationary members of Defendant.

Order, suggested that the government had failed to establish the forfeitability of the Marks pursuant to Rule 32.2 or § 1963. Indeed, this Court's March 29 entry of the POF (Tangible Property), without objection from Defendant, confirms that the government established its entitlement to the forfeiture ordered by the jury on statutory grounds. For the reasons explained below, the narrowly tailored forfeiture order requested by this application serves the important government interests sought to be secured by Congress in enacting the criminal forfeiture provisions of § 1963, while protecting the First and Eighth Amendment rights of Defendant and its individual members in the continued use and display of the Marks, and should be entered as part of Defendant's sentence.

## II.

## ARGUMENT

### A.    The Government's Amended Forfeiture Request Re: the Marks

The government's January 14 application sought a preliminary order that was admittedly broad, forfeiting *all* right, title and interest of Defendant in the Marks, without defining the scope or extent of the forfeiture, or how the government might seek to enforce any final order.

In light of the constitutional concerns raised by the Court, the government has amended its preliminary forfeiture request so that it is narrowly tailored to the interest the government seeks to forfeit: specifically, the rights of Defendant to prevent others, either through legal process or otherwise, from using or displaying the Marks, or any portion of them. The proposed POF(Marks) does not force the transfer of title to the Marks to the United States. It confers no seizure authority on the government. It does not give the government the ability to restrict or limit in any way the use or display of the Marks by Defendant or its members, or forbid Defendant or its members from using or displaying the Marks, or in any way engaging in any expressive acts or conduct in the future. It does not require Defendant or its members to obtain prior approval from the government (or anyone

5

else) before engaging in any expressive activities involving the Marks.  It will not permit the government to impose any type of fee, licensing or otherwise, on the use or display of the Marks.  It places no restriction or limitation on any person or entity's right to utilize the Marks in any exercise of associational rights.  It does not vest in the government any rights of affirmative enforcement regarding future use or display of the Marks by Defendant, its members, or anyone else.

In short, the proposed order presents none of the constitutional concerns identified by this Court in its February 28 Order.  What it *does* do is carry into effect explicit Congressional intent that a defendant convicted of a violation of the RICO Act be held accountable through the mandatory criminal forfeiture of property found by the jury to have the required nexus to an underlying, qualified crime of conviction under § 1962.

**B.**   **The Instant Forfeiture Request is Narrowly Tailored to Accomplish the Goals of the RICO Act Without Implicating or Affecting First Amendment Rights**

*1.*   *Rights and Interests Associated with Collective Membership Marks are Forfeitable Property*

As the Court explained in the February 28 Order, "a collective membership mark is unique in that it is a type of trademark used to identify membership in a particular collective group or organization, cooperative or association." *Id.* at 24. "Unlike traditional trademarks, they do not distinguish the source or origin of goods of services." *Id.* at 25.  Nevertheless, they are registered and enforced, and the rights and interests associated with them protected, by the Lanham Act. *Id.*

Among the most significant protections afforded collective membership marks by federal and state trademark law is the ability of owners of such marks to "protect their marks from use by others.  Established trademark law provides for exclusive possession or control and a legitimate claim to exclusivity." *See generally Trademark Manual of Examining Procedures* ("TMEP") § 1304.1; 15

6

U.S.C. § 1054 ((providing for registration of collective membership marks "in the same manner and with the same effect as . . . trademarks, . . . and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks"); *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 185 (1988) (trademark law confers private rights of exclusion).[6]  However, neither the statutory and common law rights to exclusivity relating to trademarks, nor the protections afforded those rights, are absolute.

Despite the unique characteristics of collective marks, the statutory and common law rights applicable to them are not substantively different from those related to traditional, commercial trademarks.  In either context, those rights constitute intangible property within the meaning of both state and federal law. *See United Drug Corp. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918); *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612 (1946) (trademarks are "valuable assets"); and TMEP, §§ 1302.01, 1303 and 1303.2 (describing generally the rights associated with ownership of collective membership marks).  *See also Matal v. Tam*, __ U.S. __, 137 S.Ct. 1744, 1751 (2017) ("Federal law does not create trademarks[, which] have ancient origins, and [] were protected at common law and in equity at the time of the founding of our country.") (citations omitted); and *Int'l Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912, 916 (9ᵗʰ Cir. 1980) (trademarks, including collective membership marks, are established under state law).  Section 1963, governing the criminal forfeiture of property from a

---

[6]  *See* TMEP, § 1304.1, citing *Ex parte Supreme Shrine of the Order of the White Shrine of Jerusalem*, 109 USPQ 248 (Comm'r Pats. 1956) ("Registration of [collective membership] marks fills the need of collective organizations who do not use the symbols of their organizations on goods or services but who still wish to protect their marks from use by others.").  "[A] collective mark is *owned* by a collective entity even though the mark is *used by* the members of the collective." TMEP § 1304.1 (emphasis in original).

7

defendant convicted of violations of the RICO Act, explicitly authorizes the forfeiture of, among other things, "tangible and intangible personal property, including rights, privileges, interests, claims and securities." 18 U.S.C. § 1963(b)(2).

### 2. The "Purposely Broad" Scope of RICO Criminal Forfeiture

The Ninth Circuit has recognized that § 1963's purpose is not to limit the type of property subject to forfeiture following a conviction under § 1962, but to expand it. *See United States v. Busher*, 817 F.2d 1409, 1412 (9th Cir. 1987) ("Section 1963 is purposely broad[, its purpose being] to provide new weapons of unprecedented scope for an assault on organized crime and its economic roots"). *Busher* is illuminative where, as here, a proposed RICO criminal forfeiture suggests important constitutional issues, because the *Busher* Court had occasion to address the balance between the mandatory nature of RICO criminal forfeiture under § 1963, and the common responsibility of the government and the court to protect a convicted defendant's constitutional rights.

Until the passage of the USA PATRIOT Act, the criminal forfeiture provisions § 1963 were the most expansive in the United States Code, extraordinary in their scope, and intended to target specific types of criminal conduct. *See Busher,* 817 F.2d at 1413 ("[F]orfeiture [pursuant to § 1963] is not limited to those assets of a RICO enterprise that are tainted by use in connection with the racketeering activity, but rather extends to the convicted person's entire interest in the enterprise").[7] *Busher* noted, for example, that § 1963 was the first modern Act of Congress to "impose forfeiture as a criminal sanction directly" upon a convicted criminal defendant rather than through separate *in rem* civil forfeiture proceedings. *Id.* at 1412 n.4. It further noted that the statute coupled this broad forfeiture authority with an "extraordinarily broad range of activities" that could

---

[7] That distinction now belongs to 18 U.S.C. § 981(a)(1)(G), which contains even broader forfeiture provisions triggered by violations related to terrorism.

8

serve a predicate acts for a RICO conviction.  *Id.* at 1413.  That combination, the Court observed, created a spectrum, at one end of which is the "paradigmatic racketeering enterprise"; and, at the other end, "an otherwise legitimate business, consisting of as few as two isolated predicate acts of relatively minor consequence, but which nevertheless amount to a RICO violation."  *Id.*  The *Busher* Court went on to state that "forfeiture of the enterprise where the conduct in question falls close to [the legitimate business] end of the spectrum may well take more than the constitution allows."  *Id.*

Here, the jury concluded that forfeiture should be ordered only with respect to Defendant's conviction on Count Two of the First Superseding Indictment -- the RICO conspiracy (DN 350) -- and while it was not asked in the guilt phase special verdict form to make specific findings as to most of the overt acts alleged in the First Superseding Indictment ("FSI") on which the government offered evidence during trial, the jury did find that the government had proven five of the racketeering acts alleged in support of Count One of the FSI.  Each of those five racketeering acts was re-alleged (and proven) as an overt act in support of the conspiracy count.  Thus, notwithstanding the absence of specific findings in support of the guilty verdict on the conspiracy count, the jury in fact made specific findings that Defendant was legally and criminally culpable for the following specific racketeering/overt acts: the murder of Leon Huddleston on February 14, 2007, in which Huddleston was beaten to death (DN 311 at 4), alleged first at paragraph 41, and re-alleged at paragraph 72 of the FSI; the attempted murder of Robert Huffman and John Houser on April 6, 2008, in which one of the victims was stabbed in the back (*id.*), alleged first at paragraph 43, and re-alleged at paragraph 92 of the FSI; two specific narcotics transactions that occurred, respectively, on November 26, 2006 (involving the sale of more than a pound of methamphetamine) and June 19, 2008 (involving the sale of more than a pound of methamphetamine in the course of providing armed security for a 20-kilogram

9

cocaine transaction) (DN 311 at 3, 5), alleged first at paragraphs 40 and 45, and re-alleged at paragraphs 69 and 97 of the FSI; and a drug distribution conspiracy, alleged at paragraph 38 of the FSI, that commenced as early as August 17, 2006 (paragraph 67) (the earliest drug violation alleged as an overt act in furtherance of the conspiracy), and "continu[ed] through at least on or about May 15, 2018," a period of more than 11 years.  (DN 311 at 3).

The jury's findings on these specific criminal acts obviously place Defendant far closer to the "paradigmatic racketeering enterprise" end of the *Busher* spectrum than the "legitimate business" end, which has a significant and substantive effect on the applicable constitutional analysis.  At the same time, the government does not dispute that the unique nature of the Marks, and the extent to which their display and use reasonably can be considered expressive for the reasons explained in the February 28 Order, is also significant.  Ultimately, however, the fact that the Marks have an expressive element does not mean that all of the rights and privileges associated with them are exempt from forfeiture on constitutional grounds.

> 3.    *The First Amendment Implications Suggested By the Forfeiture of "All Rights and Privileges" Associated with the Marks*

In discussing the First Amendment implications of the proposed forfeiture of all of the rights and privileges associated with the Marks, both this Court, in its February 28 Order, and Judge Cooper, in her July 31, 2009 order granting a preliminary injunction in *Rivera v. Carter*, CV 09-2435 FMC (which order is quoted at length in the February 28 Order), focused on (1) the expressive nature of the Marks; and (2) the effect on expression that was likely to result from the seizure (or threat of seizure) of items bearing the Marks from individual gang members, and the forced transfer of ownership of the Marks to the government.

Judge Cooper found that the use and display of the Marks directly implicated the First Amendment right to freedom of association (DN 389 at 10), a

finding echoed by this Court (*id.* at 22).  Both Judge Cooper and this Court found that the wearing of "clothing identifying one's association with an organization is generally considered expressive conduct entitled to First Amendment protection." *Id.* at 10, 26.  Judge Cooper noted that "if speech is non-commercial in nature [as she found the Marks were], it is entitled to full First Amendment protection, which prohibits the prior restraint and seizure of speech-related materials without a judicial determination that the speech is harmful, unprotected, or otherwise illegal" (*id.* at 11), a proposition also echoed by this Court.  *Id.* at 27.  Finally, Judge Cooper concluded in the July 31, 2009 Order that the government's "*seizure of property* bearing a Mongols membership mark should be considered viewpoint-discriminatory" and that such seizures "act[ed] as a prior restraint," rendering such seizures violative of the First Amendment.  *Id.* at 12 (emphasis added).  She opined that "seizure of all property cannot be considered the least restrictive alternative." *Id.*

This Court denied the government's January 2019 request for a POF relating to the Marks because of the First Amendment implications of a "forced transfer" of the rights associated with the Marks to the government, concluding that "the transfer of the rights associated with the symbol to the Government will have a chilling effect, restrain speech, and limit associational rights." *Id.* at 22.  It found that individual members of the Mongols gang would be harmed by the forfeiture because they would "face repercussions from infringing use of the symbols after title vests in the United States" (*id.*), and that the "forced transfer of the symbols would have [a chilling effect] on [the members'] continued use of the marks." *Id.* at 24.[8]

---

[8]  *See also, id.* at 28 ("The forced transfer of the legal rights associated with these symbols to the United States government presents immediate harms and chills" the rights of Defendant and its members to display the marks.).

Those concerns are eliminated by the narrowly-tailored relief requested by the government here. Entry of the POF(Marks) will not transfer any rights in the Marks to the government. The government will neither assume ownership of the Marks nor gain the ability to enforce any rights associated with the Marks. The POF(Marks) does not effect a "forced transfer in gross to the United States." February 28 Order at 30. Members of the Defendant will be allowed to continue to use and display the Marks without apprehension of "legal retaliation or payment of a licensing fee at any point following forfeiture." *Id.* at 5. This will include their freedom to tattoo the Marks on their "backs, arms or other body parts" (*id.* at 30), a right that would not have been affected even by the government's original request. Finally, the POF(Marks) will not chill the exercise of First Amendment rights by Defendant or its members because the order will not reasonably support a belief that the government will seize property bearing the Marks as a result of the order. The government seeks no such seizure authority, and will not do so.

### 4. *The POF(Marks) Will Implement a Mandatory Element of Defendant's Sentence*

The entry of the POF(Marks) carries into effect a punishment determined by Congress to be appropriate under the circumstances presented here, and prevents Defendant's avoidance of the mandatory forfeiture resulting from the jury's findings of guilt and a nexus between Defendant's RICO conviction and the Marks. The forfeiture of Defendant's statutory and common law trademark rights to enforce exclusivity fall well within the scope of rights or interests subject to forfeiture under § 1963, and are properly imposed in addition to appropriate fines. *See* § 1963(a) (providing for both fines *and* forfeiture).

That the government will not own or be in a position to sell the rights sought to be forfeited here does not mean that the rights should not be forfeited, or are exempt from forfeiture. Congress recognized that property subject to criminal forfeiture under the statute would sometimes include rights and interests that the

government could not sell or use, and included specific language clarifying that a convicted RICO defendant's interest in such property was nevertheless subject to criminal forfeiture. *See* § 1963(f) ("Any property right or interest not exercisable by, or transferable for value to, the United States shall expire and shall not revert to the defendant, nor shall the defendant or any person acting in concert with or on behalf of the defendant be eligible to purchase forfeited property at any sale held by the United States.").

Equally clear is that the mere existence of an expressive component or use of forfeitable property does not exempt the property from criminal forfeiture under § 1963. The proper inquiry under those circumstances is whether the forfeiture – in application -- constitutes an appropriate punishment for criminal conduct for which the defendant has been found culpable, or an inappropriate prior restraint on expression protected by the First Amendment. *See Alexander v. United States*, 509 U.S. 544, 550 (1993). In *Alexander*, defendant was convicted of RICO violations arising from predicate acts consisting of obscenity violations. Following his conviction, the court ordered the forfeiture, pursuant to § 1963, of defendant's business and a collection of expressive material that the government had seized from him, including material that formed a basis for the obscenity charges. The defendant argued that the forfeiture violated the First Amendment as a prior restraint on speech, and was therefore not a permissible criminal punishment. *Id.* at 548. The Supreme Court disagreed.

"The term 'prior restraint' is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Id.* at 550 (citation omitted; emphasis in original). The *Alexander* Court held that the forfeiture order in that case was not a prior restraint because, despite the fact that it authorized the forfeiture and destruction of expressive materials, it "[did] not *forbid* [defendant] to engage in any expressive activities in the future, nor [did] it require him to obtain prior

13

approval for any expressive activities.  It only deprive[d] him of specific assets that were found to be related to his previous racketeering violations." *Id.* at 550-51 (emphasis in original).  Nothing in the *Alexander* forfeiture order restrained the defendant from "go[ing] back into the adult entertainment business tomorrow, and sell[ing] as many sexually explicit magazines and videotapes as he like[d], without any risk of being held in contempt for violating a court order." *Id.* at 551.  The forfeiture order therefore imposed neither any legal impediment to – nor prior restraint on – defendant's ability to "engage in any expressive activity he chooses." *Id.*  Central to that holding was the fact that "the assets in question were ordered forfeited not because they were believed to be obscene, but because they were directly related to [defendant's] past racketeering violations . . . .  The RICO statute is oblivious to the expressive or nonexpressive nature of the assets forfeited[.] . . . [A] contrary scheme would be disastrous from a policy standpoint, enabling racketeers to evade forfeiture by investing the proceeds of their crimes in businesses engaged in expressive activity." *Id.* at 551-52 (emphasis added).

*Alexander* stands for the proposition that, in sentencing a defendant convicted under the RICO Act, a district court has a dual responsibility to impose mandatory forfeiture required by § 1963, but fashion the forfeiture order in a manner that avoids violating the defendant's First Amendment rights.  The fact that forfeiture of particular property suggests potential constitutional issues does not mean that the defendant is exempted from the forfeiture of its interest in that property.  While the factual setting here is not identical to that in *Alexander*, the concepts at issue are the same.

Like the forfeiture order in *Alexander*, the POF(Marks) does not prevent Defendant or its members from engaging in expressive conduct in the future, or require them to obtain permission to engage in such activities.  The POF(Marks), like the POF(Tangible Property) entered on March 29, 2019, forfeits rights and interests found by the jury to have been related to the racketeering conspiracy of

which Defendant was convicted, without placing future restrictions on the use and display of the Marks.  Like the defendant in *Alexander*, Defendant here (and its members) will be free to continue using and displaying the Marks as they always have.

The only restriction imposed by the proposed POF(Marks) is Defendant's loss of its ability to use the laws and courts of the United States to prevent other individuals and entities from using the Marks.  And while that is a property right with indisputable value to Defendant, it does not arise to the level of a right guaranteed by the First Amendment (or the Eighth, as discussed below), and the potential use of the Marks by others imposes no restraint or limitation on the rights of Defendant and its members to express themselves through their own use and display of the Marks, which can continue unabated.  Simply put, the forfeiture of the right of exclusivity – through the POF(Marks) -- is an appropriate criminal punishment for the racketeering acts (including murder, attempted murder and drug trafficking) of which Defendant was found guilty, and "preserve[s] the distinction between prior restraints and subsequent punishments."  *Alexander*, 509 U.S. at 553-54.

The *Alexander* Court summarily rejected as counterintuitive the argument that while the imposition of stiff criminal penalties for obscenity was consistent with the First Amendment, as was the forfeiture of expressive materials as punishment for criminal conduct, "the combination of the two somehow result[ed] in a violation of the First Amendment."  *Id.* at 557-58.  Here, given of the jury's findings that Defendant bears culpability for numerous predicate acts of racketeering, including "such traditionally heinous acts of organized crimes such as murder" (*Busher*, 817 F.2d at 1413), and the fact that the POF(Marks) will have no limiting effect on Defendant's future use and display of the Marks, this Court should reach the same conclusion.

15

### C.      The Requested Forfeiture Is Not An Excessive Fine

#### 1.      The Requested Forfeiture Is Proportional to the Gravity of the Conviction for RICO Conspiracy

A criminal forfeiture violates the excessive fines clause of the Eighth Amendment only if the forfeiture is grossly disproportionate to the gravity of the offense. *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998). In establishing this standard, the *Bajakajian* Court identified six factors that a court should consider in determining the proportionality of a forfeiture: (1) the seriousness of the offense triggering forfeiture; (2) whether the property was related to any other activity; (3) whether the defendant fit into the class of persons for whom the statute was principally designed; (4) the maximum penalties that could have been imposed under the then-mandatory Sentencing Guidelines; (5) the statutory maximum sentence and fine; and (6) the harm caused by the underlying offense of conviction. *Id.* at 337-340, 339 n.14.

In the February 28 Order, this Court determined that the government's original forfeiture request relating to the Marks was "harsh and grossly disproportionate (February 28 Order at 35); that the Marks were symbols of "immense intangible, subjective value to [Defendant] and its members" (*id.*); and that the connection between the rights associated with the Marks and the RICO conspiracy was "attenuated." *Id.* at 36. It further concluded that "given the punishments already secured by the United States, the forfeiture of the collective membership marks [would be] grossly disproportionate to the gravity of the RICO conspiracy." *Id.*

The opinions in *Busher* and *Alexander* are instructive here, despite pre-dating *Bajakajian*, because both addressed how the excessive fines clause should be applied to criminal forfeiture orders entered pursuant to § 1963. The *Busher* Court emphasized – as would the Supreme Court in *Alexander* – the fact that Congress's reason for enacting the "purposely broad" forfeiture authority in § 1963

16

was to punish a defendant convicted of having violated § 1962; to extract a penalty that reflected the seriousness of the underlying offense of conviction without offending constitutional principles. *Busher*, 817 F.2d at 1413-14.[9]  And while both *Busher* and *Alexander* recognized that § 1963 forfeitures were subject to an excessiveness analysis, both also made clear that the mere existence of a potentially excessive result did not bar the imposition of a forfeiture sanction that served the goals of the statute without exceeding constitutional limits.

Since "no penalty is *per se* constitutional," a sentencing court's task is to "avoid unconstitutional results by fashioning forfeiture orders that stay within constitutional bounds." *Busher*, 817 F.2d at 1414-15.  Noting that the excessiveness analysis "embodies fluid concepts that vary in application with the circumstances of each case" (*id.*), the *Busher* Court expanded on its earlier "spectrum" analogy, holding that

> The court should be reluctant to order forfeiture of a defendant's entire interest in an enterprise that is essentially legitimate where he has committed relatively minor RICO violations not central to the conduct of the business and resulting in relatively little illegal gain in proportion to its size and legitimate income.  Conversely, if illegal activity accounts for all or almost all of an enterprise's activity, or an interest in an enterprise was acquired entirely or almost entirely with ill-gotten funds, it would not normally violate the eighth amendment to order forfeiture of all defendant's interest in that enterprise.

*Id.* at 1415-16.  The *Busher* Court's emphasis on the economic aspects of an underlying conviction are a function of the facts in that case, but the framework of the analysis – that is, that the proportionality of a RICO forfeiture should take into

_____

[9]  *See also United States v. Turkette*, 452 U.S. 576, 588 (1981), in which the Supreme Court cited the Congressional declaration of the purpose of the RICO Act -- "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."

account the convicted RICO defendant's placement on the spectrum between a "paradigmatic racketeering enterprise" and an "otherwise legitimate business" -- is sound, and entirely consistent with the analysis later articulated in *Bajakajian*.

*Alexander* focused even less on the economic gains resulting from the defendant's commission of the predicate acts he was found to have committed, but on the nature of the enterprise itself, observing "[i]t is somewhat misleading, we think, to characterize the racketeering crimes for which [defendant] was convicted as involving just a few materials ultimately found to be obscene," especially since the defendant had been convicted of creating and managing what the district court described as "an enormous racketeering enterprise." *Alexander*, 509 U.S. at 559. The proper inquiry, the Court held, was not how much money defendant generated, but whether "in the light of the extensive criminal activities which [defendant] apparently conducted through this racketeering enterprise over a substantial period of time," the forfeiture was excessive. *Id.*

Post-*Bajakajian*, courts considering the potential excessiveness of RICO forfeitures have focused at least as much on the nature and extent of the underlying criminal activity as on the economic gain realized by the defendant. *See, e.g., United States v. Acuna*, 313 F. App'x. 283, 299 (11th Cir. 2009) (forfeiture of $642 million not excessive; person who headed gambling operation was in the class of persons at whom the statute was aimed, the maximum fine was twice the gross gain, and a pattern of money laundering violations "harms society by impeding law enforcement's efforts to track ill-gotten gains"); *United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007) (forfeiture of defendant's entire interest in RICO enterprise, including portion untainted by the criminal activity, was not excessive in light of the massive, long-running scheme involving mail and wire fraud, embezzlement and conspiring to impede the Internal Revenue Service); and *United States v. Najjar*, 300 F.3d 466, 486 (4th Cir. 2002) (RICO forfeiture of entire business and all of its assets not excessive where business – a car theft and chop

18

shop operation -- was "conceived in crime and performed little or no legitimate business activity").

Defendant here is not a business.  It offered neither goods nor services to the public or its members.  The crimes in which it engaged bore no resemblance whatsoever to the bloodless financial crimes committed by the convicted defendants in *Busher, Acuna, Segal or Najjar*, or the obscenity crimes committed in *Alexander*.  The crimes here were more serious, and included the unjustified taking of at least one human life, the attempted taking of at least two more, and the prolific distribution of methamphetamine, a particularly dangerous illegal drug, over more than a decade.  The evidence presented by the government at trial showed that Defendant -- this "fraternal" organization – *rewarded acts of murder and physical assault* with emblems intended to be prominently displayed on the gang member's costume.  The evidence established that this organization is built on and fueled by violent crime against, and threats of violence directed toward, human victims, sometimes for no other reason than the color of the victim's clothing or skin.  It is an organization that takes enormous pride in its reputation as "a bunch of mad dudes riding around on bikes clubbing everybody."  *See* Trial exhibit 126b.

The seriousness of the drug-trafficking component of Defendant's conviction is significant.  Congress has recognized that methamphetamine is a particularly dangerous drug, with a particularly pernicious impact on communities.  In 1996, Congress found that "[m]ethamphetamine is a very dangerous and harmful drug.  It is highly addictive and is associated with permanent brain damage in long-term users. . . .  [The] increased use [of methamphetamine] has led to devastating effects on individuals and the community, including a dramatic increase in deaths associated with methamphetamine ingestion; and an increase in criminal activity associated with the illegal importation of methamphetamine and precursor compounds to support the growing appetite for this drug in the United

States.  Illegal methamphetamine manufacture and abuse presents an imminent public health threat that warrants aggressive law enforcement action . . . ."  Pub.L. 104-237, § 2, Oct. 3, 1996, 110 Stat. 3100.

The Mongols gang is exactly the type of corrupt organization the RICO Act was intended to address, as demonstrated by the video clips in which Mongols national president Ruben Cavazos and national vice-president Ruben Cavazos, Jr. explained the organization's mentality and public face (*see* Trial exhibits 41 (Cavazos) ("We're the ones your mom said to watch out for.  We're the ones you have to hide your daughters from.") and 42 (Cavazos, Jr.) ("We're not trying to be choir boys.  We're not trying to be Boy Scouts.  *We are what everybody fears*." (emphasis added)); the video clips in which Mongols members Mike Munz and Steven Fiero talked about the consequences of not showing proper fealty to the Mongols (*see* Trial exhibits 36 (Munz) ("I don't care if you give me respect because you fear me or because you like me, but I want respect and I'm going to get it in one way or another.") and 38 (Fiero) ("I'm what they call a club enforcer.  When there's people out there that don't really agree with what has to be taken care of, I make sure that they agree with it.  I don't take no for an answer."[10]); and the recordings of gang meetings in which Cavazos bragged about the gang's reputation for violence, and how proud he was of that reputation.  *See* Trial exhibits 126a ("You guys have a pretty fierce reputation and I think a lot of people are afraid to fuck with you guys, you know what I mean?  It's the truth, bro; the Mongols got a pretty fierce reputation out there, brother.  And I think a lot of people are afraid."), 125b ("Hey, we walk places, and people park; people get the

---

[10] *See also* Trial exhibit 39, also featuring Fiero: "I love to kick ass.  I will come at you with a smile, but I will fight you just because it's cloudy outside, you know what I mean?  That's what I like to do."  The testimony at trial established that Fiero, like Munz, was a prominent figure in the Mongols enterprise, eventually becoming the national vice-president of the Defendant.  *See* Trial exhibit 72-4.

fuck out of the way.  And they get the fuck out of the way because of the history of this club") and 126b ("Let me tell you something, we got a killer reputation, bro, across the fucking U.S. . . .  It even surprises me sometimes how much fucking people either respect or fear us, you know, and that's because of everything you guys have done.  Let me tell you something, I'm amazed that at the tip of Florida and Australia, people have heard about us . . . .  And I gotta tell you, bro, I got a lot of pride, bro, when I go over there, it's like, everybody goes, that's the dude – he heads *all those fuckin' psychos*.  They think we're just a bunch of mad dudes riding around on bikes clubbing everybody," a statement that provoked several unidentified members to respond "we are.").  (Emphasis added).

Juxtaposed against that evidentiary backdrop is the narrowly-tailored relief sought in the POF(Marks), by which the government seeks nothing more than an order from this Court denying this convicted Defendant the opportunity to take advantage of the societal rules and norms towards which it demonstrates nothing but open and hostile contempt.  This Court acknowledged in the February 28 Order that Defendant is "a criminal organization deserving of significant punishment for the harm it has caused numerous victims."  February 28 Order at 37.  The possibility that even the limited relief afforded in the POF(Marks) may not "lead to a less violent or capable criminal organization" (*id.* at 29) is not the point.  As Justice Powell stated in discussing the standards to be applied in determining constitutional excessiveness, "[t]he inquiry focuses on whether a [defendant] deserves such punishment, not simply on whether punishment would serve a utilitarian goal."  *Rummel v. Estelle*, 445 U.S. 263, 288 (1980) (dissent).  This Defendant does not deserve to retain the legal protections afforded by federal and common law relating to the exclusive use of and control over the Marks.  While the Constitution may require that it and its members be allowed to continue identifying themselves as members of this criminal organization, it certainly does

21

not require that they retain the right to enlist the assistance of the government and the courts to keep others from using these symbols.

### 2. The Combination of Fines and the Requested Forfeiture Cannot Be Considered Constitutionally Excessive

On page 36 of the February 28 Order, the Court noted that "dozens of individual Mongol Nation members pleaded guilty in connection with several of [the] overt acts," and that among the witnesses at trial was "a Mongols member who is serving multiple life sentences for committing murder in aid of racketeering." The Court further noted that the government "has secured prison sentences and significant forfeiture of *the criminal organization's assets and property*, including motorcycles. And as a result of the conviction in this case, the Government will secure forfeiture of weapons, ammunition, body armor and items of personal property seized during raids." *Id*. (Emphasis added). After noting, correctly, that "the Government will also pursue fines at sentencing," the Court stated "given the punishments already secured by the United States, the forfeiture of the collective membership marks is grossly disproportionate to the gravity of the RICO conspiracy." *Id*.

In fact, the only assets of the Defendant that have been forfeited to the government to date are those items listed in the POF(Tangible Property), entered on March 29, 2019. The government has not forfeited a single motorcycle from this Defendant. It has forfeited no money or property beyond the personal property described in the POF(Tangible Property).[11] The forfeitures obtained by the government prior to this prosecution were obtained not against Defendant, but against individual members of the Mongols who were either criminal defendants in *Cavazos*, individual civil claimants in *in rem* administrative and civil judicial proceedings against specific property, or both. The government's attempts to

---

[11] Defendant, through counsel, has indicated more than once that Defendant does not claim to own any of the property described in the POF(Tangible Property).

forfeit the Word Mark and Center Patch Image in *Cavazos* were unsuccessful because Defendant here – determined by Judges Cooper, Wright, and this Court to be the sole owner of the Marks – was not a defendant in that earlier case.

Section 1963(a) calls for three separate categories of punishment for a defendant convicted of a violation of § 1962: imprisonment; fines; and forfeiture. As this Court has pointed out many times over the course of this case, no one is going to jail as a result of this conviction. But that's exactly the point of the RICO Act. As Justice Souter explained in the *Alexander* dissent, the RICO Act was enacted to hold corrupt *organizations* accountable for their crimes, consequences that those organizations had traditionally avoided:

> Earlier steps to combat organized crime were not successful, in large part because traditional penalties targeted individuals engaged in racketeering activity rather than the criminal enterprise itself. Punishing racketeers with fines and jail terms failed to break the cycle of racketeering activity because the criminal enterprises had the resources to replace convicted racketeers with new recruits.

*Alexander*, 509 U.S. at 561-62 (Souter, *concurring in the judgment and dissenting in part*).

This case confirms Justice Souter's point. As demonstrated by the evidence presented at trial, the criminal conviction and imprisonment of nearly eighty individual members of the Mongols in *Cavazos*, and the forfeiture of property from those defendants and others, did nothing to slow down, much less stop, the operation of the Mongols criminal enterprise. Even if Defendant's claim during trial that all of the "bad apples" indicted in *Cavazos* were immediately expelled from the gang -- a claim belied by the presence of numerous of those individuals on the gang's "Brothers Behind Bars" web page – the gang's well-established pre-*Cavazos* pattern of drug trafficking, murder and assault continued unabated, often through the addition of new recruits who stepped into the vacancies created by those convictions. In other words, until the conviction in this case, Defendant

avoided *any* punishment for its crimes.  The imposition of fines and the limited forfeiture of rights associated with the Marks requested here, cannot be considered constitutionally excessive under the circumstances.

## III.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court enter the proposed POF(Marks) lodged contemporaneously herewith at or before sentencing.[12]

DATED: April 25, 2019          NICOLA T. HANNA
                               United States Attorney
                               LAWRENCE S. MIDDLETON
                               Assistant United States Attorney

                               _____/s/_____
                               STEVEN R. WELK
                               CHRISTOPHER BRUNWIN
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

---

[12]  The government incorporates by this reference the portion of its original application for POF setting out the procedures relating to entry and notice of the POF, the ancillary proceeding, entry of the Final Order of Forfeiture, and the requirements that forfeiture be referenced at Defendant's sentencing hearing and referenced in the Judgement and commitment Order.

24