Joseph A. Yanny, Esq. (SBN 97979)
Andrea Ales, Esq. (SBN 330928)
Christopher E.  Chaney (SBN 328679)
**YANNY & SMITH**
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 551-2966
Facsimile: (310) 551-1949
jyanny@yannylaw.com

Victor Sherman (SBN 38483)
Mark Bernheim (SBN 167289)
**LAW OFFICES OF VICTOR SHERMAN**
11400 Olympic Blvd.
Los Angeles, CA 90230
Phone: (424) 371-5930
Fax: (310) 399-9029
ssvictor@aol.com

Attorneys for Defendant,
**MONGOL NATION**

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 13-CR-106 |
| Plaintiff, | |
| v. | NOTICE OF MOTION AND MOTION FOR NEW TRIAL; TO DISMISS THE INDICTMENT FOR GOVERNMENT MISCONDUCT;  OR FOR OTHER APPROPRIATE RELIEF; DECLARATIONS; EXHIBITS |
| MONGOL NATION, | |
| Respondent. | Date: February 28, 2022 Time: 1:30 p.m. Place: Courtroom of the Hon. David O. Carter |

TO THE CLERK OF THE COURT AND TO THE UNITED STATES AND ITS

DESIGNATED ATTORNEY:

PLEASE TAKE NOTICE that on February 28, 2022, or as soon thereafter

as counsel may be heard, defendant Mongol Nation will move this court to either

dismiss the Indictment or order a new trial on the basis of newly discovered evidence.  Defendant further seeks the refund of fines and penalties post-judgment, as well as an award of the attorneys' fees incurred in defending this case to date.

New evidence now shows that the prosecution completely invaded the defese camp in this case.  As has now come to light, the president of Mongol Nation and the individual who most personified and was responsible for the organization's interests was meeting with and cooperating with the lead investigator, ATF Special Agent John Ciccone.  It is hard to imagine a more egregious invasion of attorney-client privilege or a a more cavalier dismissal of due process rights.

Dated: December 10, 2021

Respectfully submitted,
YANNY & SMITH
LAW OFFICES OF VICTOR SHERMAN

By:  *Joseph A. Yanny*
JOSEPH A. YANNY,
Attorneys for Defendant,
MONGOL NATION

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Beach of the Invasion of his Rights to Counsel and Due Process, the Indictment Should Be Dismissed or  Defendant Should Receive a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   The Effect of Having Santillan Invade the Defense Camp Destroyed any Ability to Defend Against the Charges . . . . . . . 8

    C.   Santillan's Self-Interest Has Overwhlemed any Confidence in the Proceedings Below; the Membership of the Mongols Has Been Betrayed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.   The Remedy in this case Requires either the Dismissal of  the Indictment or a New Trial; in either Case, Defendant Seeks a Refund of Attorney Fees Incurred in addtion to $500,000 in Fines and Penalities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                      <u>Page(s)</u>

*Black v. United States*,

385 U.S. 26 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Coplon v. United States*,

191 F.2d 749 (D.C. Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*County of Los Angeles v. Superior Ct.*,

222 Cal. App. 3d 647 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fisher v. United States*,

425 U.S. 391 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Glasser v. United States*,

315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Terkeltoub*,

256 F. Supp. 683 (S.D.N.Y. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kyles v. Whitley*,

514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,9

*Maine v. Moulton*,

474 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McPartland v. ISI Inv. Services, Inc.*,

890 F. Supp. 1029 (M.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*O'Brien v. United States*,

386 U.S. 345 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Richards v. Jain*,

168 F. Supp. 2d 1195 (W.D. Wash. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Silverthorne Lumber Co. v. United States*,

251 U.S. 385 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1   *State v. Lenarz,*

2   22 A.3d 536 (Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3   *State of Delaware v. Robinson,*

4   2018 WL 2085066, Case No. 1411017691 (Sup. Ct. Del. May 1,2018). . . . . . . . . 9

5   *United States v. Augurs,*

6   427 U.S. 47 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

7   *United States v. Beasley,*

8   582 F.2d 337 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9   *United States v. Bellrichard,*

10  779 F.Supp. 454 (D.Minn. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11  *United States v. Bagley,*

12  473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13  *United States v. Butler,*

14  567 F.2d 885 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15  *United States v. Danielson,*

16  325 F.3d 1054 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17  *United States v. DeCologero,*

18  530 F.3d 36 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19  *United States v. Endicott,*

20  869 F.2d 452 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21  *United States v. Hampton,*

22  775 F.2d 1479 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23  *United States v. Horn,*

24  811 F. Supp. 739 (D.N.H. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25  *United States v. Kulczyk,*

26  931 F.2d 542 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

27  *United States v. Kahn,*

28  472 F.2d 272 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,12

*United States v. Levy*,
577 F.2d 200 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11,13,14

*United States v. Librach*,
602 F.2d 165 (8th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,12

*United States v. Lincoln*,
630 F.2d 1313 (8th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Mastroianni*,
749 F.2d 900 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Marshank*,
777 F. Supp. 2d 1507 (N.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Peters*,
468 F. Supp. 364 (S.D. Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Posner*,
637 F. Supp. 456 (S.D. Fla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Scrushy*,
721 F.3d 1288 (11th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Terzado-Madruga*,
897 F.2d 1099 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12

*United States v. Zarzour*,
432 F.2d 1 (5th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wheat v. United States*,
486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Other Authorities

Federal Rules of Criminal Procedure 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   *Statement of Facts***

This case, as the Court is aware, is a racketeering case brought against the Mongol Motorcycle Club.  The case was previously dismissed in 2015 as having improperly pled the RICO enterprise.  Doc. No. 114.  This order was reversed by the Ninth Circuit in 2017.  Doc. Nos. 127-28.

The case went to trial beginning in October 2018 on the basis of a superseding indictment filed earlier that year.  Defendant was found guilty after 24 days of trial.  As to the forfeiture issue, a jury was reconvened and reached a verdict after a forfeiture phase stretched into 27 days.  Eventually, there came to be good reason to question the relationship between the lead investigator, John Ciccone, and the lead representative of defendant, its president, David Santillan.

Over the years, there have been a number of incidents in which Santillan has appeared to have had a get-out-of-jail pass compliments of ATF agent Ciccone.  For example, both Santillan and his wife, Annie, became involved in an altercation at the Hilton Palm Spring in 2018.  During the incident, Annie viciously beat another woman around the face while David Santillan threw a beer can that hit a security guard, causing bruising and lacerations.  Although the Santillans were both arrested and booked for assault, they were released without legal consequences.  See Declaration of Joseph Yanny, attached hereto, at ¶ 22, Exhibit 3.  In his attached Declaration (see ¶ 4), Mark Torres, a member of the Mongols Motorcycle Club, recalls overhearing Ciccone and David discuss during the trial that the Palm Springs incident had been handled without legal consequence.  See Declaration of Mark Torres at ¶ 4.

There have been a number of other incidents where Santillan's connection to Ciccone appears to have spared him any legal consequences from his actions.  For instance, after David Santillan got into a fight at a race track, he was taken into custody and, as in Palm Springs, was released with no consequences.  On another

occasion, Santillan (who is a convicted felon) was stopped at a strip club for major misconduct.  Once again, there was no subseuent official action taken.  The only feasible explanation is that he was immune from prosecution so long as he worked for Agent Ciccone and the federal government.

Moreover, in the months just prior to the trial, when Santillan represented the Mongols Nation as its president, the government most needed his assistance to deliver it a judgment of over $500,000 in fines and penalties.  Among Santillan's motivations to facilitate that result was an extremely bad automobile accident that occured when Santillan was intoxicated on drugs and alcohol. While driving his wife's new Mercedes-Benz, he totaled the car by flipping it and careening into multiple parked cars that he had damaged alongside the road.   Again, Santillan was given a pass, despite having prior DUI convictions.

Despite being initially detained by law enforcement, Santillan was once again inexplicably released – despite being a convicted felon, having prior DUIs, and being the president of the Mongols Motorcycle Club.

Despite these miraculous escapes from legal consequences, it still came as a shock when the Court notified counsel that there were rumors that jurors had seen Ciccone, the lead investigator, cozying up with Santillan, the defendant's president, at a local coffee shop.  Although this raised the specter of the prosecution having invaded the defense camp, Santillan successfully deflected the concerns from defense counsel that his behavior had raised.  Even though Santillan proved somewhat evasive, he was also the public face of the defendant as well as its primary representative and decision-maker for purposes of its defense.

What remained too incredible to believe was that the client's legal representative was also a confidential informant who was compromising the entirety of the defense strategy and presentation.

Nevertheless, Santillan as the primary representative of the Mongol Nation made many decisions that were adverse to the defendant's interests or were

2

seemingly designed to protect the prosecution's interests.  Among the examples of such defendant sabotage was Santillan's last minute insistence that the defense remove witnesses John Ciccone, Roger Pinney, and Santillan, himself, from the witness list.  Santillan and Ciccone, however, were essential witnesses for the defense.  As counsel advised Santillan, the case was severely compromised if Ciccone and others could not be called. Santillan's instructions were creating a conflict of interest.  See Declaration of Joseph Yanny at ¶ 21;  Exhibit 4.

As it turns out, Agent Ciccone and the ATF had a storied history of infiltrating motorcycle clubs and recruiting informants and fabricating charges. See Order by Judge Manual Real in *United States v. Roberts*, CR13-00751, dated May 30, 2014.   Through these informants, Ciccone is alleged by mororcycle club members to have manufactured crimes and increased his own statistics for obtaining forfeitures and convictions.  Ciccone's ambitious gambits are displayed to some extent in the book, *Under and Alone*, which portrays the travails of undercover agent Billy Queen who was part of Ciccone's detail.  Even though he has never worked undercover, Ciccone is reputedly a strong proponent of using undercover agents and confidential informants, even when these sources of information have proved too compromised to support a conviction.

There was no substantive evidence of Santillan's corruption and invasion of the defense team until earlier this year, more than two years after the decision in *United States v Mongol Nation* in February 2019.  What has come to light are video recordings and text messages in which Santillan's wife, Annie, reveals that her husband, David, has been an informant who has been working with the government all along.  Annie has since provided a video of a conversation that her daughter recorded of her talking on the phone with Santillan, which lays out the sordid tale.

In the video, David Santillan is audibly crying, most likely drunk, saying he is broken and begging forgiveness from Annie.  As he continues, Santillan reveals that what he is most afraid of is that Ciccone will retire in a year.  As David

1  explained, without Ciccone, there will no longer be any protection for either him or

2  Annie.

3       John [Ciccone] told me already I have one year, one year, he's retiring,

4       he's retiring, after one year he's done.  And he can't protect me, he

5       told me, so we have to have an exit strategy, he told me, I don't know

6       if he told you that, [starting to overlap with Annie speaking] I have

7       one year to get my shit right....  I can't protect you anymore, I swear to

8       god....

9  See Declaration of Joseph Yanny at ¶¶ 4-5,  Exhibits 1(a)(transcript); Declaration

10 of Andrea Ales, attached hereto, (verifying accuracy of transcript) [The defense

11 will provide a digital recording of this conversation on request].  In a text message,

12 Annie explained that because her husband has "been working with the government

13 [the] entire time is why he felt so comfortable to do what he does[.]  [H]e is simply

14 a CI[;] in other words he is a rat."  Exhibit 2.  See Declaration of Mark Torres,

15 attached hereto, authenticating speakers in the video.

16      This change in circumstances, which rendered Santillan virtually hysterical

17 in recent months, is illustrative of the genuine fear that David Santillan had of

18 crossing Ciccone throughout the trial.  Santillan's clear motives were to get out of

19 the way, remove roadblocks and help Ciccone and the prosecution perfect their

20 case.

21 **II.**    ***Argument***

22     ***A.***    ***Because of the Invasion of his Rights to Counsel and Due Process,***

23        ***the Indictment Should Be Dismissed or Defendant Should Receive a***

24        ***New Trial***

25      Unlike a motion for judgment of acquittal, a motion for a new trial under

26 Rule 33 does not require the court to view the evidence in the light most favorable

27 to the verdict.  Instead, it may weigh the evidence and evaluate the credibility of

28 witnesses.  *United States v. Bellrichard*, 779 F.Supp. 454, 456 (D.Minn. 1991).  It

"should be granted if the evidence weighs sufficiently heavily against the verdict so that a serious miscarriage of justice may have occurred." *Id*. (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)).

Where the issue is one of new evidence, a defendant will prevail where he or she is able to satisfy a five-part test:

1)    evidence must be newly discovered;

2)    failure to discover evidence sooner must not be result of lack of diligence on defendant's part;

3)    evidence must be material to issues at trial;

4)    evidence must be neither cumulative nor merely impeaching; and

5)     evidence must indicate that new trial would probably result in acquittal.

*United States v. Kulczyk*, 931 F.2d 542 (9th Cir. 1991).

If, however, the new trial motion is based on an alleged *Brady* violation, a new trial is warranted if the evidence is "material" in that there is a "reasonable probability ... sufficient to undermine confidence in the outcome" that the evidence would have changed the result. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); see also *Kyles v. Whitley*, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that in Rule 33 motions involving alleged Brady materials, a defendant must show that a reasonable probability exists that, had the evidence been disclosed, the result of the trial would have been different).

Here, Annie Santillan's revelations about her and her husband's status as informants was not revealed until this year, more than two years after the verdict. As a legal entity controlled by the Santillans, defendant Mongol Nation had no ability to discover the evidence any sooner than Annie's disclosure.  Clearly, the issues involved here – control of the Mongol nation and the Mongol's responsibility for the charged RICO violations – were material to the prosecution.

At the same time, the evidence is clearly unique, relevant and not merely impeaching. *Kulczyk*, 931 F.2d 542.  Without Santillan's efforts to aid the prosecution, there is simply no reasonable way to conclude that, without the obstruction that this completely compromised party conducted in secret, the result of the trial would have not have been different. *Kyles*, 514 U.S. at 434-35.

Because of Annie Santillan's relevations earlier this year, the membership of Mongol Nation have only just discovered how David Santillan's many scrapes with law enforcement were absolved and covered up by Agent Ciccone as a quid pro quo for Santillan's service, not only as an informant, but also as a mole in the defense camp, capable of bending the proceedings and verdict to the advantage of the government.  In return for his service, Santillan never suffered consequences for his criminal conduct.  He also accrued further benefits as well.

**B.**    ***The Effect of Having Santillan Invade the Defense Camp Destroyed any Ability to Defend Against the Charges***

The evidence of misconduct in this case and the prejudice that followed is summarized as following:

1.    Throughout the proceedings, Santillan was agent of the government who controlled the Mongols litigation, including the defense witness list, in order to advantage the government.

2.    In exchange for their cooperation, Santillan and his wife's acts of misconduct were ignored by the legal system.  They were allowed to walk free from charges of assualt, weapons charges and driving under the influence.

3.    Neither Santillan nor the government revealed his dual role.

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court may grant a defendant's motion for a new trial based on newly- discovered evidence within three years of the verdict.  Newly discovered evidence "need not relate directly to the issue of guilt or innocence to justify a new trial, but may be

1  probative of another issue of law." *United States v. Beasley*, 582 F.2d 337, 339

2  (5th Cir.1978).  Accordingly, issues that go to *Brady* violations involving the

3  withholding of information from the defense and prosecutorial misconduct are ripe

4  grounds for a new trial based on newly-discovered evidence. *United States v.*

5  *Scrushy*, 721 F.3d 1288, 1304, 1308 (11th Cir. 2013).

6      "It is well established that an accused does not enjoy the effective aid of

7  counsel if he is denied the right of private consultation with him." *Coplon v. United*

8  *States*, 191 F.2d 749, 757 (D.C. Cir. 1951).  Here, the principle representative of

9  defendant was simultaneously a pipeline to the lead investigator and prosecution.

10  Clearly, there could be no due process where the defendant's interests were

11  commingled and subsumed by those of the prosecution.

12  **C.**     ***Santillan's Self-Interest Has Overwhelmed any Confidence in the***

13          ***Proceedings Below; the Membership of the Mongols Has Been***

14          ***Betrayed***

15      Because the Government's infiltration of the defense camp goes to

16  the integrity of the entire proceeding, the charges against the defendant should be

17  dismissed or the case should be set for a new trial with a new, untainted

18  prosecution team, one that also does not include Agent Ciccone as its lead

19  investigator.  *O'Brien v. United States*, 386 U.S. 345, 345-46 (1967) (vacating and

20  remanding for new trial where agents overheard confidential information on

21  wiretap, even though the information had not been passed along to the prosecuting

22  attorneys); *Black v. United States*, 385 U.S. 26, 29 (1966); *United States v. Levy*,

23  577 F.2d 200, 208-10 (3d Cir. 1978); *Coplon*, 191 F.2d at 760; *United States v.*

24  *Marshank*, 777 F. Supp. 2d 1507, 1519-20 (N.D. Cal. 1991); *United States v.*

25  *Peters*, 468 F. Supp. 364, 366 (S.D. Fla. 1979); *State of Delaware v. Robinson*,

26  2018 WL 2085066, Case No. 1411017691 (Sup. Ct. Del. May 1, 2018).

27      While it may be that only Agent Ciccone was directly aware of Santillan's

28  cooperation and invasion of the defense camp, *Kyles* holds that the prosecution is

under an obligation to learn of material or exculpatory evidence known to the others acting on the government's behalf in the case, including the law enforcement. 514 U.S. at 437. Where "a member or confidant of the defense team acts effectively as an informant for the government regarding defense preparation and strategies in the case," this type of "intrusion by the government on the confidential relationship between a criminal defendant and his attorney, either electronically or through an informant, violates a defendant's Sixth Amendment right to counsel in addition to trodding on his due process rights." *United States v.* , 2010 WL 2541881, at *3 (S.D. Fla. 2010). *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970). It is just the sort of "glaring government intrusion" that "warrant[s] court intervention." *United States v. Posner*, 637 F. Supp. 456, 459-60 (S.D. Fla. 1986).       "[A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby  dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 171 (1985) (finding Sixth Amendment violation where prosecution used informant to obtain investigatory material without counsel being present). See also *Fisher v. United States*, 425 U.S. 391, 402 (1976) ("Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged.").  The prosecution's secret intrusion offends both the Fifth and Sixth Amendments." *In re Terkeltoub*, 256 F. Supp. 683, 685 (S.D.N.Y. 1966).

Because the newly discovered evidence of Santillan's membership in the prosecution team was withheld from the defense both before, during and after the trial, the defense cannot be held to need to demonstrate that the evidence probably would have resulted in an acquittal. *United States v. Augurs*, 427 U.S. 47, 111 (1976); *United States v. Librach*, 602 F.2d 165, 169 (8th Cir. 1979); United States v. Kahn, 472 F.2d 272, 287 (2d Cir. 1972). Even without a finding that the Government obtained and used privileged information, the Court should grant a new trial based on the fact that defendant's new evidence affords reasonable

grounds to question the integrity of the verdict, including evidence that goes to prosecutorial misconduct." *United States v. Endicott*, 869 F.2d 452, 455, 1989 WL 16692 (9th Cir. 1989). Whether the nondisclosure is a result of negligence or design, the taint on the trial is no less if other government agents, rather than the prosecutor, were guilty of nondisclosure.  Indeed, it is the character of the evidence, not the character of the prosecutor, that determines whether there has been misconduct and a defendant's *Brady* rights have been violated.  *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978).

Where the prosecution obtains tainted information, such as learning of the entirety of the defense strategy because the defendant's principal witness is secretly part of the prosecution camp, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the challenged evidence derived from a lawful source independent of the illegal conduct.  *United States v. Terzado-Madruga*, 897 F.2d 1099, 1115 (11th Cir. 1990); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

"The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S. 60, 76 (1942) (superseded by statute on other grounds).  Accordingly, as in this case, there is a per se violation of the Sixth Amendment where "there is a knowing violation of the attorney-client relationship and where confidential information is disclosed to the government." *United States v. Levy*, 577 F.2d 200, 208 (3d Cir. 1978); see also *State v. Lenarz*, 22 A.3d 536, 542 (Conn. 2011) (holding that there is a rebuttable presumption of prejudice when the prosecution reads "privileged materials containing trial strategy," even when the prosecutor's conduct is unintentional). In this case, the defendant's main representative was a conduit to the prosecution, regularly sharing defense strategy with the lead investigator over morning coffees.

This was a patent violation of due process and attorney-client privilege amounting to serious misconduct, regarless of whether the prosecutors in charge of the case can be proved to have been personally aware.  Once a defendant demonstrates that confidential communications were conveyed as a result of government intrusion into the attorney-client relationship, it is the Government's burden "to show that the defendant was not prejudiced; *that burden is a demanding one*." *United States v. DeCologero*, 530 F.3d 36, 64 (1st Cir. 2008). The Government (not the defense) bears the burden of proving that "there has been and there will be no prejudice to the defendants as a result of these communications." *United States v. Mastroianni*, 749 F.2d 900, 908 (1st Cir. 1984).  "The burden on the government is high because to require anything less would be to condone intrusions into a defendant's protected attorney-client communications." *Id.*  See also *United States v. Danielson*, 325 F.3d 1054, 1059 (9th Cir. 2003) ("[T]he government has the 'heavy burden' of proving nonuse of [the] trial strategy information."); *Terzado-Madruga*, 530 F.3d at 1114 (challenged evidence is only admissible if the prosecution can show "that it derived from a lawful source independent of the illegal conduct.").

When prosecutorial misconduct is involved and the misconduct has deprived the defendant of basic rights, the defendant does not have to demonstrate that the evidence probably would have resulted in an acquittal. *Augurs*, 427 U.S. at 111; *Librach*, 602 F.2d at 169; *Kahn*, 472 F.2d at 287.  If any information obtained by the prosecution or it agents was tainted by improperly obtained defense strategy, it does not matter that the remainder was lawfully obtained.  It becomes the government's burden to prove that none of the evidence it relied on was derived directly or indirectly from the privileged information. See *United States v. Hampton*, 775 F.2d 1479, 1485-86 (11th Cir. 1985).  In light of the fact that the prosecution's lead investigator was meeting daily with the defendant's president during trial, this would seem an insurmountable challenge.

Even when the government claims to have had general knowledge of defense strategy, this is not equivalent to having an informant who can expose and impart defense tactics, strategy, and problems. Under such circumstances, the government cannot be said to have met its burden of showing that there has been and will be no prejudice to the defendants as a result of the government's misconduct. *United States v. Horn*, 811 F. Supp. 739, 751-52 (D.N.H. 1992), rev'd on other grounds, see 29 F.3d 754, 758 (1ˢᵗ Cir. 1994). See also *Richards v. Jain*, 168 F. Supp. 2d 1195, 1209 (W.D. Wash. 2001) (disqualification of counsel appropriate where taint on the proceedings could not be removed because "disclosure of privileged information cannot be undone."); *County of Los Angeles v. Superior Ct.*, 222 Cal. App. 3d 647, 657-58, 271 Cal. Rptr. 698,705 (Ct. App. 1990) ("Having become privy to an opposing attorney's work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case.").

### D. The Remedy in this case Requires either the Dismissal of the Indictment or a New Trial; in either Case, Defendant Seeks a Refund of Attorney Fees Incurred in addition to $500,000 in Fines and Penalties.

Because defendant seeks to set aside the entirety of the proceedings based on governmental misconduct, defendant, Mongol Nation, anticipates that the reversal of its conviction will also result in a retraction of the Court's half million money judgment against it. In addition, Mongol Nation believes that it is entitled to a refund of more than a million dollars for what it has been foced to expend to date on what turns out to have been corrupt litigation.

For the Court to do any less than reimburse defendant's monetary losses ignores that defendant's claims are impossible to quantify. In retrospect, it is highly unlikely that a court can "arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial

discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself." *Levy*, 577 F.2d at 208-10 (finding that "the only appropriate remedy is the dismissal of the indictment" where there was actual disclose of defense strategy, especially when the trial has already taken place).

This Court is in no position to conclude how the defection of the defense's primary witnesses were benefitting the government through the subtleties of pretrial discussions with potential witnesses, selection of jurors, and the dynamics of trial itself. *Levy*, 577 F.2d at 208-10 (finding that "the only appropriate remedy is the dismissal of the indictment" where there was actual disclosure of defense strategy, especially when the trial has already taken place). "[I]t is highly unlikely that a court can . . . arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself." *Levy*, 577 F.2d at 208-10 (finding that "the only appropriate remedy is the dismissal of the indictment" where there was actual disclose of defense strategy, especially when the trial has already taken place).

In the alternative to dismissal, the verdict should be vacated and the case retried with a new prosecution team. See *Wheat v. United States*, 486 U.S. 153, 160 (1988) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."). See also *McPartland v. ISI Inv. Services, Inc.*, 890 F. Supp. 1029, (M.D. Fla. 1995) (disqualifying attorneys due to disclosure of confidential information).

No matter what, defendant has been deprived of important constitutional rights, and must be made whole following the reversal of the improper proceeding that the government and its agents brought below. The defendant thus demands the vacating of the award of a $500,000 judgement and an award of defendant's

attorney's fees incurred so that they may once again be avaiable to afford defendant the representation to be able to fully defend against the unsupported charges in this case.

## CONCLUSION

For the foregoing reasons, defendant seeks either dismissal or a new trial, in addition to the return of attorney's fees and reversal of all fines and penalties. While defendant anticipates issues because the case is currently being appealed, this motion is being filed to preserve the Court's jurisdiction under Rule 33, Fed.R.Crim.P.

Dated: December 10, 2021    Respectfully submitted,
             YANNY & SMITH
             LAW OFFICES OF VICTOR SHERMAN


         By: *Joseph A. Yanny*
             JOSEPH A. YANNY,
             Attorneys for Defendant,
             MONGOL NATION

# DECLARATION OF ANDREA ALES

## <u>DECLARATION OF ANDREA ALES</u>

I, Andrea Ales, declare as follows:

1.    I am over the age of 18 years old. I am an attorney licensed in the State of California. I am an associate for Yanny & Smith, and we represent the Defendant, Mongol Nation ("Club").

2.    I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.    On or about July 2021, the Club sent us text messages from Annie Santillan which also includes the Video of David Santillan and Annie Santillan. A true and correct copy of the video is submitted herewith as **Exhibit 1**. A true and correct copy of Annie's text messages are submitted herewith as **Exhibit 2**.

4.    On or about December 4, 2021, I prepared the transcript to the video of David and Annie (**Exhibit 1**). I listened and watched the video multiple times before typing the transcript. A true and accurate copy of the transcript that I prepared is submitted here as **Exhibit 1(a)**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on December 10, 2021.



Andrea X. Ales

DECLARATION OF ANDREA ALES
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

# DECLARATION OF MARK TORRES

## DECLARATION OF MARK TORRES

I, Mark Torres, declare as follows:

1.      I am over the age of 18 years and a resident of California. I am a member of the Mongols Motorcycle club.

2.      I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.      I attended the US v. Mongols Nation trial from November 2018-Feburary 2019 to support the club.

4.      One day while I was at the court house to watch the trial, I was standing with Dave Santillan outside the courtroom against the window, when ATF John Ciccone approached us. Mr. Ciccone asked David, "Is that Palm Springs thing ok now?" with a smirk and David said, "Yes."

5.      On or about July 4, 2021, a video of David and his wife, Annie Santillan, was sent to me by Annie, submitted herewith as **Exhibit 1**. I watched the video. It was a video of Annie Santillan talking to David, while he was on speaker phone. I knew it was David's voice and I knew that it was Annie in the video because I have known them for a decade. I recognized David's voice because I have known him for over a decade. David was crying and it was clear that he was intoxicated by the slurring of his voice. I recognized Annie in the video because I have known her for over a decade. It was also clear that David exposed himself to being a rat. In the motorcycle culture, when someone talks about being protected by a law enforcement, it is known that that person is a confidential informant.

6.      Submitted herewith is **Exhibit 1(a),** which is a transcript of Exhibit 1. **Exhibit 1(a) Transcript to Exhibit 1**

1:12 – David: John told me already I have one year, one year, he's retiring, he's retiring, after one year he's done

1:20 – David: and he can't protect me, he told me, so we have to have an exit strategy, he told me, I don't know if he told you

1

DECLARATION OF MARK TORRES
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

that, (starting to overlap with Annie speaking) I have one year to
get my shit right

1:28 – Annie: David ok, okay so with that said, with that said,

1:32 – David: I can't protect you anymore, I swear to God Annie

7.     On or about July 4, 2021, David's wife, Annie, sent me a text message in a group chat with Romero Prado and David Santillan, which included the video (Exhibit 1). The text message is submitted herewith as **Exhibit 2**. In the text message Annie tells us that David has been a confidential informant for the government this "entire time". It is clear from Annie's text message and the video, that David is a rat.

8.     **Exhibit 2**:

"You guys need to see this video David has obviously been to seeing you guys this whole entire time it is to my surprise as well if it has been working with the government is all entire time is why he felt so comfortable to do what he does he is simply a CI in other words he is a rat"

"And I want you both to know that this message just went out to the rest of the people that I have contact with. The damage David caused to my family because of his drug abuse alcoholism has caused so much So much pain and on all of us I can no longer support this person has turned into a delusional human being with no rational thinking.
More videos to come. You can either hear for me are you going to hear about it"

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on December 10 , 2021.

Mark Torres

# DECLARATION OF JOSEPH A. YANNY

## **DECLARATION JOSEPH A. YANNY**

I, Joseph A. Yanny, hereby declare the following:

1.     I am an attorney licensed in the State of California. I represent the Defendant, Mongol Nation (herein after "Mongols" and "Club") in this action. Additionally, I was lead counsel for the Mongols in the US v Mongol Nation trial, tried in November 2018 – February 2019, for racketeering and racketeering conspiracy.  I offer this declaration in support of the Mongols Rule 33 Federal Rules Criminal Procedure, motion for new trial, motion for dismissal, and other remedies.

2.     I have personal knowledge of all facts stated herein this declaration except those stated on information or belief, and those I believe to be true. If called to testify, I could and would testify competently thereto.

3.     During the period of my representation of the Mongols the President of the Mongols was David Santillan (herein after "David" or "Santillan"). David was my primary contact with the Mongols throughout the course of my representation. David had complete and total control over the administration of the Mongols. David has been fortunate enough to have been married to Mrs. Annie Santillan for a number of decades. They have a number of children and grandchildren together and had supposedly operated a business together as Annie's Bail Bonds. It was put in Annie's name because being a convicted felon, David could not run a bail bonds business.

4.     David was removed from his position as President and kicked out from the Club "Out Bad" all in July 2021 when they received **Exhibit 1**, submitted herewith (exhibit 1(a) is the transcript that I had prepared a true and accurate transcription to exhibit 1, which is submitted herewith). **Exhibit 1** is a video made at Annie's direction and transmitted by her to members of the Club, Mark Torres and Romero Prado. The full audio and video is available to the Court and the prosecution. I recognize I had known both David and Annie for the better part of

1

DECLARATION OF JOSEPH A. YANNY
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

seven years and recognize their voices in this tape and Annie's likeness. We are informed that it was actually filmed by the Santillans' daughter.

**5.    Exhibit 1(a) Transcript to Exhibit 1**

> 1:12 – David: John told me already I have one year, one year, he's retiring, he's retiring, after one year he's done…

> 1:20 – David: …and he can't protect me, he told me, so we have to have an exit strategy, he told me, I don't know if he told you that, (starting to overlap with Annie speaking) I have one year to get my shit back

> 1:28 – Annie: David ok, okay so with that said, with that said,

> 1:32 – David: I can't protect you anymore, I swear to God Annie

6.    It became clear that he was a confidential informant. Text messages sent to Mr. Torres and Mr. Prado, herein as **Exhibit 2**, were more reasons on top of the video that made it clear, David was a confidential informant ("CI") or as his wife puts it a "rat" all along. **Exhibit 2** is submitted herewith.

7.    **Exhibit 2**:

> "You guys need to see this video David has obviously been to seeing you guys this whole entire time it is to my surprise as well if it has been working with the government is all entire time is why he felt so comfortable to do what he does he is simply a CI in other words he is a rat"

DECLARATION OF JOSEPH A. YANNY
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

"And I want you both to know that this message just went out to the rest of the people that I have contact with. The damage David caused to my family because of his drug abuse alcoholism has caused so much So much pain and on all of us I can no longer support this person has turned into a delusional human being with no rational thinking.
More videos to come. You can either hear for me are you going to hear about it"

8.     David was the controlling member of the defense team at all times until July 2021 when he was kicked out of the Club. It became clear that there were serious questions about the sanctity of the defense team, infiltration of the defense team by one of Ciccone's previously unknown CI's (David), and sabotage of the defense. The reasons for the concerns will be more fully understood by the time you are done reading the declaration and the memo.

9.     The defense team consisted of me as lead counsel, associate Charles Cardinal, (law clerk) Andrea Ales, (law clerk and technical support) Drew Viney, and Pro Hac Attorney Vice Stephen Stubbs. The defense team was all controlled by David Santillan, the President of the Mongols and a confidential informant of John Ciccone for reasons we will establish, we believe the AUSAs in this case knew of this arrangement. We are informed and believe this constitutes unethical and impermissible prosecutorial misconduct rendering a new trial essential to due process.  We believe as well that this conduct justifies dismissal of all charges for prosecutorial misconduct and an order requiring restitution (over $.5 million) and damages (attorneys fees incurred over of $1 million).

10.    The government prosecutors were Steven Welk and Christopher Brunwin. The prosecution was headed up by ATF Special Agent John Ciccone (herein after "John" or "Ciccone"). Ciccone attended every day of trial and sat with the prosecution team. Ciccone headed up a multiple decade campaign by the ATF to

DECLARATION OF JOSEPH A. YANNY
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

infiltrate, control, and take down various motorcycle clubs ("MC") including the Mongols, the Vagos, the Hells Angels, the Bandidos, etc. etc. etc.

11.    Infiltrating these MCs became Ciccone's "life's work" and a very lucrative proposition for all law enforcement personnel involved. I have been aware of John Ciccone for well over a decade, having run into him in my representation of the Vagos MC.

12.    The career path for ATF agents working under Ciccone was very interesting. Focusing first and foremost upon the undercovers ("UCs"), after being trained dozens of UCs were assigned to infiltrate rival MCs and other entities. After a year or so the UCs gained acceptance and became fully accepted members of these rival MCs. The UCs effectively got to party for anywhere to 3-7 years before they were pulled to become witnesses in various prosecutions against both MC individuals and MC entities. After the prosecutions were completed the UCs usefulness as an undercover agent was spent. So typically, the various UC agents spent the balance of their time working at their desk for the government until they qualified for their pensions and health benefits for life. After fully retiring from government employ, the dream career paths for the UCs typically involves getting a decent ghost writer to listen to your stories rendered not under oath, memorializing them in print and seeing how many copies you can sell. The talented story tellers sell tons of books and if the contents (truthful or not) of the unsworn stories is interesting enough the former UC can even land themselves a multiple million-dollar movie deal as well.

13.    It was established at the trial that it is customary for Mr. Ciccone to handle and smooth things over for his UCs and CIs when there is trouble. One example of that came up in trial when Mr. Ciccone's UCs SAs Kozlowski and Gaioni, while still prospects with the Mongols, got into a public fight, were injured, and got out of legal jam with Mr. Ciccone's assistance. Mr. Ciccone who was

"shadowing" the incident took care of any problems for them and got them medical attention; it is part of the protocols.

14.    SA Ciccone used UCs and CIs to stir trouble between rival MCs. When there was "blood on the floor" SA Ciccone had justification to increase his annual budget to hire more undercovers, engage more CIs and turn over ready-made cases to the prosecution teams.

15.    David was in his younger years convicted of a federal felony. As is typical, he has to be careful about what he does and doesn't do.  Since I began representing the Mongols in this matter, Mr. Santillan has had multiple run-ins with the law of the type which would put anyone else in jail if not prison, unless they had a "Guardian Angel" somewhere in the system.

16.    I am informed of four incidents that I will mention. One incident, was in or about 2011. Mr. Ciccone and Mr. Santillan, along with others, were at a bar/strip joint known as Nicola's. There was an incident of some sort where Mr. Santillan, who as a convicted felon, engaged in serious misconduct. Mr. Ciccone was present at least during processing of Mr. Santillan and again no charges were brought against Mr. Santillan.

17.    The second incident was when David was at the Santa Anita race track sometime after 2016. David and Annie got into a massive fight at the Santa Anita race track resulting in them initially being taken into custody. Ultimately, nothing happened to them as a result of the incident and the matters were smoothed over.

18.    The third incident was on or about April 22, 2018, in Palm Springs wherein both David and wife Annie got into a physically altercations with people at a hotel during which David threw a dangerous object hitting one of the employees of the hotel seriously injuring her and requiring multiple stitches to close the wound on his head. David was initially stopped by law enforcement, but there were no legal

consequences. During the course of the trial, Mark Torres, a member of the Mongols, overheard Ciccone and David discussing the Palm Springs incident.

19.     The fourth incident while David was the Mongols President and nothing happened to him occurred in 2018 when he got into a serious wreck while intoxicated. It was not his first DUI. He flipped a brand-new Mercedes 500 convertible, totaling it, and seriously damaging 4 other vehicles at night, drunk and loaded. He had no legal consequences as a result. Anyone else with his record and history would have been in prison.

20.     On or about May 25, 2018, I had a conversation with prosecutor Christopher Brunwin on speaker phone in front of my legal team. Mr. Brunwin informed me that David had gotten into trouble in Palms Spring. I asked Mr. Brunwin how he knew this, and he said "Ciccone had informed him."

21.     On or about May 25, 2018, Mr. Brunwin sent me a follow up email attaching the Palms Springs report. The email is submitted herewith as **Exhibit 3**.

22.     There was an exchange of written and telephonic communications with myself and David before and during the 2018 Trial. The upshoot of those communications was that David refused to allow me to call to the witness stand, either David, Ciccone, or other critical witnesses. There were other critical witnesses that he refused to permit me to call as well that I considered essential to an adequate defense on the issue of guilt. The two emails that I have access to regarding the matter are submitted herewith as **Exhibit 4**. It is my belief that these were activities by David who was at that point a CI for the government that seriously jeopardized the Mongols case.

23.     At all times I actually intended to call David because he was an essential witness. I had hoped that I had time to convince him to take the stand for the benefit for the Club and hoped that he would live out his responsibilities as the representative of the Mongols during the course of the trial. Unfortunately, David

acted out towards the defense team in a very intimidating manner that could not be disclosed to the Court without jeopardizing the client's defensive posture.

24.     Another incident that did not make sense at the time was one morning during trial, before the jury was brought into the courtroom. Judge Carter brought to our attention that he was somewhat troubled by something that had come to his attention. Judge Carter stated that one of his Marshals had brought to his attention that some of the jurors were conversing about the fact that David and Ciccone were seen at Starbucks near the courthouse having morning coffee before going to Court for trial.

25.     I asked David about this incident and he said it was nothing and none of my business. However, during the course of the trial David made many client decisions that made no sense, which protected the ATF and worked to the detriment of the Club.

26.     In addition, as the trial began, David started isolating me from the rest of the Club and isolated the rest of the Club from the trial. In addition, David reached a deal with Judge Carter, unbeknownst to me, that only two Mongols could be present in the courtroom. Ergo, no one else from the Club was able to monitor what was occurring.

27.     On or about February 2019, at the last hearing regarding arguments for the forfeiture of the trademark, I was dismissed as counsel. I had no other contact with the Club until I was transmitted copies of the David and Annie video (**Exhibit 1**) and the text messages from Annie to Mark Torres and Romero Prado (**Exhibit 2**).

28.     On or about July 2021, I watched the video of David and Annie, submitted herewith as **Exhibit 1**, which I received from the Client. I am informed that the video was sent to the Client (specifically, Mark "Menace" Torres and Romero "Santos" Prado). It was not until then, I talked with the Club and they informed me that David had never communicated about the witness list or witnesses

to be called at trial. Therefore, the email string submitted herewith as **Exhibit 4**, shows that David did not make decisions with the Club like he told me he did. No one in the Club was copied on that email regarding witnesses. In his email he stated phrases such as, "After careful review with my chapter," and "Please respect our decision."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on December 10, 2021.


*Joseph A. Yanny*
Joseph A. Yanny

DECLARATION OF JOSEPH A. YANNY
IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO DISMISS
THE INDICTMENT FOR GOVERNMENTAL MISCONDUCT
CASE NO. CR 13 00106

# EXHIBIT 1

Video of David Santillan and Annie Santillan
(Lodged with the Court)

# EXHIBIT 1A

Transcript to the Video of David Santillan and Annie Santillan

00:01 – Annie: You just, when I called you right now you're crying you wanted to come back you wanted to do this

00:04 – David: I love you, I love you, you're my everything, you're my ride or die, you're my everything. But you're taking in a point why I wanna why I wanna snap Annie, I wanna .. I'm breaking right now, I'm fucking breaking, you're breaking my heart,

00:18 – David: I can't even fucking do this anymore, I can't be on the streets no more, I'm done, I'm broken, I can't do this no more, I'm trying, I can't be strong, I'm acting like a punk, I'm trusting (?), but it can only take someone so far

00:34 – David: My brothers are like fucking calling me like whats up with you whats wrong, like you gotta keep it together get it together and I don't know what to do, I feel like a punk

00:44 – Annie: David you're calling the nation, getting them involved, having everybody cut me off of everything, and I don't care David because I don't want to be part

00:52 – David: It's not about that,

00:53 – Annie: I don't want to be a part of that world anymore David, are you willing

00:56 – David: I'm good (slurring) without it doing without them, like we'd be fucking do it exit strategy n'tim (Slurring)

1:01 – Annie: Okay, okay

1:02 – David: We make it sooner than later and I can't do it right now because we need to just get our fucking shit right

1:11 – Annie: David ok really quick,

1:12 – David: John told me already I have one year, one year, he's retiring, he's retiring, after one year he's done…

1:20 – David: …and he can't protect me, he told me, so we have to have an exit strategy, he told me, I don't know if he told you that, (starting to overlap with Annie speaking) I have one year to get my shit right

1:28 – Annie: David ok, okay so with that said, with that said,

1:32 – David: I can't protect you anymore, I swear to god (slurring) Annie … (Annie talking over him, can't hear David)

1:35 – Annie: Ok ok ok wait, are you ready to go get help for drinking and drugs?

EXHIBIT 1A

1:39 – David: yes

1:40 – Annie: promise?

1:42 – David: One hundred, on Mila's life

1:43 – Annie: ok, are you willing cause I'm going to take this bitch down, either way so you're going to come back knowing what I'm going to do or you can stay where the fuck you are right now and fucking help her or try

1:54 – David: (slurring) fucking please, fucking please, do you (slurring)

1:56 – Annie: David! Listen to me, I'm taking this bitch down, an eye for a fucking eye, you come after my kids, I'm come out punching bitch, I'm telling you right now, she fucked with the wrong boss ass bitch, you wanted a boss ass bitch, I'm calling shoots right now ok so with that fucking said

2:11 – David: (slurring) I love you

2:13 – Annie: (talking over David) with that said this bitch is going down, the balls already in motion

2:16 – David: (interrupts her) do you, do you, I don't give a fuck

2:19 – Annie: (talking while David is talking) okay

2:19 – David: I don't give a fuck about this bitch, I rather save my married , and my fucking livelihood, and my wife (slurring) I love you

2:26 – Annie: David you have a lot of mending to do

2:29 – David: I have a lot of mending fences to do, I already know, I've been knowing, and you know what kills me the most, that (slurring) Hunter and Freddy turned their backs on me (slurring) and David

2:20 – Annie: You turned your back… No no no no

2:42 – David: I spent $20,000 on fucking David to fucking stay out of fucking jail

2:47 – Annie: David the kids don't care about monetary things

2:50 – David: It's not about that but I still (slurring) care about

2:52 – Annie: They don't care, you know what they want, they want love, they want a father,

EXHIBIT 1A

# EXHIBIT 2

Text message from Annie Santillan to the Club

EXHIBIT 2



You guys need to see this video David has obviously been to seeing you guys this whole entire time it is to my surprise as well if it has been working with the government is all entire time is why he felt so comfortable to do what he does he is simply a CI
In other words he is a rat



  

iMessage

       

EXHIBIT 2



And I want you both to know that this message just went out to the rest of the people that I have contact with. The damage David has caused to my family because of his drug abuse alcoholism has caused so much So much pain and on all of us I can no longer support this person has turned into a delusional human being with no rational thinking.
More videos to come. You can either hear for me are you going to hear about it

  iMessage 

       

# EXHIBIT 3

5/25/18 Email from Christopher Brunwin to Joseph Yanny

 Gmail                                                    **Andrea Ales <andreaales.yannylaw@gmail.com>**

---

## Fwd: CR 13-106-DOC
1 message

---

**Joe Yanny** <joeyanny@gmail.com>                                  Thu, Jul 22, 2021 at 2:56 PM
To: andreaales <andreaales@yannylaw.com>


---------- Forwarded message ---------
From: **Brunwin, Christopher (USACAC)** <Christopher.Brunwin@usdoj.gov>
Date: Fri, May 25, 2018 at 6:44 PM
Subject: CR 13-106-DOC
To: Joe Yanny (joeyanny@gmail.com) <joeyanny@gmail.com>, Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>


Joe,

I am attaching a copy of the report we discussed earlier.

Have a god weekend.

CB

213/894-4242


--

JOSEPH YANNY
SENIOR PARTNER

         *TRIAL LAWYERS*

               *BUSINESS LAWYERS*

YANNY & SMITH
A LAW CORPORATION
1801 CENTURY PARK EAST, SUITE 2400
LOS ANGELES, CALIFORNIA  90067
TELEPHONE: (310) 551-2966
FACSIMILE: (310) 551-1949

WWW.YANNYLAW.COM

CONFIDENTIALITY NOTICE THIS E-MAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. THIS COMMUNICATION MAY CONTAIN MATERIAL PROTECTED BY THE ATTORNEY - CLIENT PRIVILEGE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION, OR ANY OF ITS CONTENTS, IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE REPLY TO THE SENDER AND DELETE THE ORIGINAL MESSAGE AND ANY COPY OF IT FROM YOUR COMPUTER OR FACSIMILE SYSTEM.

---

 **13-106 Report re ADW 4-22-18.pdf**
1038K

EXHIBIT 3

# EXHIBIT 4

10/25/18 - 10/26/18 Email between Joseph Yanny and David Santillan

 Gmail

**Andrea Ales <andreaales.yannylaw@gmail.com>**

---

## Fwd: Amended Witness List Demand
4 messages

---

**Joe Yanny** <joeyanny@gmail.com>                                               Thu, Oct 25, 2018 at 1:45 PM
To: Dieutinh Yanny <dieutinhyanny@gmail.com>, "andreaales@yannylaw.com" <andreaales.yannylaw@gmail.com>, Charles
Cardinal <ccardinal.yannylaw@gmail.com>, Drew Viney <dviney.yannylaw@gmail.com>

---------- Forwarded message ---------
From: **Joe Yanny** <joeyanny@gmail.com>
Date: Thu, Oct 25, 2018 at 1:43 PM
Subject: Amended Witness List Demand
To: David Santillan <davsantillan@yahoo.com>

Dave...
  I'm responding here to your email of 2 days ago about our witness list. Your demand to delete Roger, you and especially
Ciccone from the witness list puts me in a near impossible position.
  Roger has already indicated that he will simply refuse to testify and claim his 5th Amendment Right to silence. I don't
want that so I will not likely even try call him. However, leaving him on the list makes the Feds shy away from him which is
desirable. Additionally, I have "Secret" who can give me what I really need from Roger about Laughlin in any event.
   As to calling you, I've already told you that I'm not going to call you if you refused even though it puts me in very difficult
position. Having you on the list is essential if at some point we needed to call you for anything. We shouldn't throw that
possibility away. Having you on the list does no harm.
   The one witness that you demand that I take off the list that creates a serious potential conflict for me is John Ciccone.
Without his testimony we have no chance of winning this case. I've explained in detail the reasons on many occasions.
This whole prosecution and the disputes between The Mongols and The HA is a contrived effort from the ATF's John
Ciccone. Nearly all of the helpful discovery was signed off on by Ciccone. There is no way to undermine their case at an
evidentiary level without calling Ciccone. Ciccone ran all of the UCs and CIs.
   If I can't call him, the case can't likely be won. You are asking me to take a chance on throwing the ability to win the
case on culpability.That falls below my duty to act as a zealous advocate. This creates a serious potential conflict of
interest. I don't want to be the target of a charge of inadequate representation. Please call me to discuss?
   I have a dental appointment at 4 pm today. Respect Few Fear None. Love and Respect, Joe


On Tue, Oct 23, 2018 at 4:16 PM DAVID SANTILLAN <davsantillan@yahoo.com> wrote:
  Joe

  After careful review with my chapter and the constant harassment by law enforcement we would like to put you on
  notice regarding witness list. I've brought this concern up to you twice already and now we want to move forward.
  Effective immediately I need you to file an ammendenig defendant witness list with the following changes: please
  remove David Santillan, Roger Penney and John Ciconne. I told you time and time again I did not wish to testify or be
  open for the government to put me on the stand. You still went and put me on the list without my permission. Please
  respect our descion. It will not make or break the case removing 3 names of the witness list. Call to discuss if you have
  any questions.

  David
--

JOSEPH YANNY
SENIOR PARTNER

 **Y&S**      _TRIAL LAWYERS_

_BUSINESS LAWYERS_                          EXHIBIT 4

**Yanny & Smith**
**A Law Corporation**
**1801 Century Park East, Suite 2400**
**Los Angeles, California 90067**
**Telephone: (310) 551-2966**
**Facsimile: (310) 551-1949**

**WWW.YANNYLAW.COM**

CONFIDENTIALITY NOTICE This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney - client privilege. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and delete the original message and any copy of it from your computer or facsimile system.


--

JOSEPH YANNY
SENIOR PARTNER

 **Y &S**

*Trial Lawyers*

*Business Lawyers*

**Yanny & Smith**
**A Law Corporation**
**1801 Century Park East, Suite 2400**
**Los Angeles, California 90067**
**Telephone: (310) 551-2966**
**Facsimile: (310) 551-1949**

**WWW.YANNYLAW.COM**

CONFIDENTIALITY NOTICE This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney - client privilege. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and delete the original message and any copy of it from your computer or facsimile system.

---

**Joe Yanny** <joeyanny@gmail.com>             Sat, Dec 4, 2021 at 11:52 AM
To: "andreaales@yannylaw.com" <andreaales.yannylaw@gmail.com>

[Quoted text hidden]

---

**Joe Yanny** <joeyanny@gmail.com>             Sat, Dec 4, 2021 at 11:53 AM
To: "andreaales@yannylaw.com" <andreaales.yannylaw@gmail.com>


---------- Forwarded message ---------
From: **DAVID SANTILLAN** <davsantillan@yahoo.com>
Date: Fri, Oct 26, 2018 at 1:43 PM
Subject: Re: Amended Witness List Demand
To: Joe Yanny <joeyanny@gmail.com>

EXHIBIT 4

Joe

Per our conversation please remove me (David Santillan) from witness list.


David Santillan


Sent from Yahoo Mail for iPhone

[Quoted text hidden]
[Quoted text hidden]

---

**Joe Yanny** <joeyanny@gmail.com>                                        Sat, Dec 4, 2021 at 11:54 AM
To: "andreaales@yannylaw.com" <andreaales.yannylaw@gmail.com>


---------- Forwarded message ---------
From: **Joe Yanny** <joeyanny@gmail.com>
Date: Fri, Oct 26, 2018 at 5:20 PM
Subject: Re: Amended Witness List Demand
To: DAVID SANTILLAN <davsantillan@yahoo.com>


   Done.. As per our discussion, I left Ciccone.. Thanks, Joe
[Quoted text hidden]
[Quoted text hidden]


EXHIBIT 4