E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CHRISTOPHER BRUNWIN (California State Bar Number 158939)
Assistant United States Attorney
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4242
    Facsimile: (213) 894-3713
    E-mail:   Christopher.Brunwin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-106(A)-DOC |
|---|---|
| Plaintiff, | UNITED STATES' SECOND SUBMISSION IN OPPOSITION TO DEFENDANT'S SECOND MOTION FOR A NEW TRIAL |
| v. | |
| MONGOL NATION, | Date:  October 6, 2022 |
| An unincorporated association, | Time:  3:00 p.m. |
| Defendant. | Location:   Courtroom of the Hon. David O. Carter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Christopher Brunwin, hereby files its Second Submission in Opposition to Defendant's Second Motion for a New Trial.

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 22, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


     /s/Christopher Brunwin
CHRISTOPHER BRUNWIN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**PAGE**

TALBE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

III. BACKGROUND.....................................................2

IV.   ARGUMENT......................................................19

      DEFENDANT HAS NOT MET ITS BURDEN..............................19

V.    CONCLUSION....................................................25

## TABLE OF AUTHORITIES

**Federal Cases**:                                                                     **PAGE(S)**

United States v. Chapman,
  851 F.3d 363 (5th Cir. 2017) ...................................... 20

United States v. Felix,
  425 F.2d 240 (9th Cir. 1970) ...................................... 20

United States v. George,
  420 F.3d 991 (9th Cir. 2005) ................................. 20, 23

United States v. Kulczyk,
  931 F.2d 542 (9th Cir. 1991) ................................. 20, 23

Wilke v. United States,
  422 F.2d 1298 ..................................................... 20

**Federal Rules**:

Fed. R. Crim. Proc. 33(b)(1)...................................... 20

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.   <u>INTRODUCTION</u>

Years after the jury convicted defendant Mongol Nation of racketeering and racketeering conspiracy, defendant moved for a new trial, claiming that its national president, David Santillan ("Santillan"), had been a confidential informant who disclosed defendant's trial strategy to the government during the 2018 trial. Days of testimony from numerous witnesses have proven defendant's claim to be untrue.  There is not a single witness or piece of evidence that supports defendant's claim.  Because this is defendant's only claim, now proven to be wholly without merit, its motion for a new trial must be denied.

II.  <u>RELEVANT LAW</u>

A motion for new trial requires the defendant to show: (1) evidence that is newly discovered; (2) failure to discover the evidence sooner was not due to a lack of diligence; (3) the evidence was material to trial issues; (4) the evidence was not cumulative or merely impeaching; and (5) a new trial would probably result in an acquittal.

Here, defendant did not, and cannot, point to any newly discovered evidence, because its claims about Santillan were not true, and its attempts to elicit testimony about the Mexican Mafia or arguments within the defense group did not change that.  Moreover, there was no showing, or even argument, that a new trial would result in an acquittal.  That element is significant here, because the jury verdicts in this case were supported by weeks of testimony, exhibits and videos showing endless crimes -- murders, shootings, stabbings,

1

scalping, riots, narcotics transactions, and attacks on law enforcement, as well as the rewards for those crimes, including the skull and crossbones patch for committing murder on behalf of the gang.  Without question, a new trial in this case would include even more of those crimes -- more assaults, more murders, and more riots, because there are more, many more.

Defendant brought its Motion without support and based on claims that were not true.  It does not establish any basis for a new trial, and it must now be denied.

III. <u>BACKGROUND</u>

A.   <u>Procedural Background</u>

The background for this case is set forth in the United States' Trial Brief and Opposition to Defendant's Motion for Judgment of Acquittal.  CR 186, 363.  In sum, the Ninth Circuit remanded the matter on July 11, 2017, after the Court dismissed the original indictment on September 16, 2015.  CR 114, 127, 128.  The Grand Jury returned the First Superseding Indictment on May 17, 2018.  *See* First Superseding Indictment (CR 169).

The First Superseding Indictment charged defendant with racketeering in violation of Title 18 of the United States Code, Section 1962(c), and conspiracy to commit racketeering offenses in violation of Title 18 of the United States Code, Section 1962(d). The FSI also included forfeiture allegations.  *Id*.

B.   <u>Trial</u>

Trial began on October 30, 2018, and continued through December 13, 2018, when the jury convicted defendant on both counts, which charged racketeering and RICO conspiracy.  CR 310, 311.

2

At trial, the government presented testimony from approximately 28 witnesses, including undercover Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), local law enforcement officers, and other percipient witnesses to the charged offenses.  Specifically, the government offered testimony from each of the undercover ATF agents who had infiltrated the Mongols during the Black Rain investigation.  Special Agents Daren Kozlowski, Greg Gaioni, Paul D'Angelo, and John Carr all testified.  Retired Special Agents William Queen, who worked undercover during Operation Ivan, and Jay Dobyns also testified, as did numerous local law enforcement officers, percipient witnesses, and victims of violent crimes committed by the defendant and its members, including a person who had been beaten unconscious by the Mongols and another who witnessed the Mongols stab his friend to death.  *See* Witnesses Called at Trial, dated December 13, 2018 (CR 312).

Retired Special Agent Queen specifically testified about the Mongols having cut the scalp off a victim and thereafter displayed the scalp on a Mongols banner.  A photograph of the scalp was admitted into evidence.  The jury also watched surveillance videos of numerous shootings and stabbings committed by Mongols members.  Those included videos of Mongols members stabbing a victim in his face, Mongols beating a man after they had knocked him unconscious in a parking lot, and Mongols members chasing and shooting more victims.  Jurors saw the muzzle flash when Mongols shot the victims.  The jury also heard testimony about Mongols members having shot law enforcement officers and killed Officer Shaun Diamond.  It also heard testimony from Mongols member Christopher Ablett, who bragged about having murdered the president of the Hells Angels, by shooting and

stabbing him on the street in San Francisco.  Defendant actually identified some 50 witnesses for trial and presented testimony from Mongols members, retired ATF agents, and persons it designated as expert witnesses.  Defendant also compelled the appearance of several Mongols members who then refused to testify and, instead invoked their 5th Amendment right against self-incrimination.  *See* Witnesses Called at Trial (noting witnesses who invoked their 5th Amendment right against self-incrimination) (CR 312).

On December 13, 2018, the jury returned verdicts and convicted defendant on all the counts charged, racketeering and RICO conspiracy.  See Minutes, dated December 13, 2018 (CR 310).  On January 11, 2019, the jury returned its findings on the forfeiture of several categories of property, pursuant to the conviction on Count Two of the FSI.  CR 350, 353.  The Court denied defendant's previous new trial motion on February 28, 2019.

Defendant filed its Notice of Appeal on May 29, 2019.  CA No. 19-50176 (CR 440, 441).  The United States filed its Notice of Appeal on June 13, 2019.  CA 19-50190 (CR 453, 454).  The appeals have been briefed and are scheduled for hearing on September 23, 2022.

C.   Defendant's Current Motion for New Trial

Defendant filed this Motion for New Trial on December 10, 2021, almost exactly three years after the verdict.  (CR 535).  It noticed the hearing more than two months later, on February 28, 2022 (CR 535), and, even then, after two months and after the government filed its Opposition, on February 14, 2022, defendant moved to delay the hearing on its Motion for several months more, until June 6, 2022. Defendant's Motion for Continuance (CR 540).  Defendant claimed that

it needed those months to "gather additional evidence and locate witnesses." *Id*.

In requesting that continuance, defendant also recognized that its Motion for New Trial did not support a new trial or other relief. Instead, defendant asserted that its "moving papers do not need to prove their case before they have an opportunity to have a hearing." Motion for Continuance, at 4 (CR 540). Even then, on May 23, 2022, defendant filed a Reply brief that was incoherent, but again asserted that it had no burden "to demonstrate anything until the evidentiary hearing is finished." Defendant's Reply, at 2 (CR 542). Defendant also claimed that it only needed to show "cause for the Court to investigate." *Id.*, at 7 (CR 542).

D.    The Hearings on Defendant's Motion

On June 6, 2022, the Court conducted the first of several evidentiary hearings and received testimony from Annie Yumiko Santillan ("A. Santillan"). See Reporter's Transcript ("R.T."), dated June 6, 2022. A. Santillan immediately refuted defendant's Motion and testified that she made recorded statements about her husband, Santillan, because he had been unfaithful and was not sober. A. Santillan testified repeatedly that she wanted to "hurt him and destroy him." R.T., at 32:7-12. She testified, "I would have said anything to hurt him." *Id.* A. Santillan also testified that she knew of only three occasions that her husband had spoken with SA Ciccone and that each of those was in public and with other Mongols present. R.T., at 40:1-18. She stated that there were never any private conversations. *Id.* Her testimony was:

Q:    You said that other Club members were with David on at least some of the occasions where you saw him conversing with Mr. Ciccone.

5

A:   No, I said they were always with him on any of the
conversations that he had with him.

Q:   Okay, which --

A:   I never -- David was never alone.

6/6/22 R.T., at 44:3-9.

A. Santillan also repeatedly stated that she made her statements
to hurt and "destroy" her husband in front of the other Mongols.
6/6/22 R.T., at 52:13-22 ("The motive was to hurt him.  To destroy
him --."; and "I was literally trying to destroy him.").

On June 28, 2022, A. Santillan again testified to the facts she
had described on June 6, 2022.  *See* 6/28/22 R.T. Vol. 1.  Hence, she
testified that, despite her recorded statement, she did not have any
personal knowledge that Santillan was a "CI or a rat."  6/28/22 R.T.
Vol. I 45:1-22.  She testified that she had never spoken to SA
Ciccone or "anyone from the government" and that anytime Santillan
met with SA Ciccone or the ATF had been at Mongols events and in
front of all the other Mongols, like National Runs.  *Id*.  She also
testified that SA Ciccone would show up and talk with "whoever was in
charge," including Santillan, because he was the Mongols "national
president."  6/28/22 R.T. Vol. I 46:1-25.  She affirmed that any
meeting was "never in private."  Rather, it was "[a]lways public."
6/28/22 R.T.  Vol. I 47:5-21.  She repeated that there were no
private meetings and stated "It's always … done with members … in
front of the clubhouse.  It was at National Runs … there was always
brothers around."  6/28/22 R.T. Vol. I 49:8-25.

A. Santillan also testified that no one from the government or
the ATF had ever assisted her or Santillan to avoid prosecution for

6

1  any criminal conduct.  She specifically contradicted the

2  representations attached to defendant's Motion.  6/28/22 R.T. Vol. I

3  52:14-55:15.  When asked if anyone from the government intervened

4  with the disposition of charges, she answered, "No.  No one."  *Id.*

5  When questioned about defense counsel's representations that the

6  Santillans had been allowed to "walk free" from prosecution, she

7  explicitly denied that and stated, "I would know because I got 'em

8  out of jail, bailed 'em."  A. Santillan specifically testified, "I

9  know that we –– we got 'em out of jail.  I own a bail bonds company

10 so he was bailed out.  There was no assistance."  6/28/22 R.T. Vol. I

11 56:14-24.  She also specifically stated, contrary to defendant's

12 representations, "he's gone to court on all of those," that Santillan

13 had been prosecuted and had been required "to pay fines and do

14 community service … we had to take a misdemeanor, and we had to do

15 community service."  She testified repeatedly, "There was no

16 assistance."  6/28/22 R.T. Vol. I 55:1-56:22.

17      Defendant next called Santillan, and Santillan also contradicted

18 each of the representations defense counsel had attached to

19 defendant's Motion.  6/28/22 R.T. Vol. I 63:10.  Santillan responded

20 to claims that he had been meeting with SA Ciccone at Starbucks in

21 the mornings by saying, "That's an absolute lie."  6/28/22 R.T. Vol I

22 91:9-23.  Santillan also stated that he had elected not to testify at

23 trial because a senior Mongols member and "most of my cabinet were

24 against me testifying –– or any Mongols, for that matter.  We never

25 take the stand."[1]  6/28/22 R.T. Vol I 93:9-23.  Santillan stated that

26

27      [1] The record of Witnesses Called at Trial reflects that
   defendant sought to elicit testimony from at least four Mongols
28 members who refused to testify and invoked their 5th Amendment right
   against self-incrimination at trial.  (CR 312).

he was against Roger Pinney testifying "[b]ecause he's 'out bad' from our club," and that his testimony would have been "irrelevant.  It wasn't part of our trial, our case."  6/28/22 R.T. Vol I 98:5-11.  Santillan stated that he did not want to testify, because "I don't want to self-incriminate about stuff I already knew about the club." 6/28/22 R.T. Vol II 5:14-15.  He repeated his concern about self-incrimination over "illegal activity that I may have been involved with in the past."  Santillan also stated that "Nobody wanted to testify":

> Q.   He was on the witness list; was he not?
>
> A.   You put him on the list.  I didn't.  Joe, you put a hundred people on the list.  I didn't know half of them who they were. Nobody showed up.
>
> Q.   You didn't put anybody on the witness list?  I did.  Isn't that right?
>
> A.   Yeah, and I didn't even know half the people you put on there.

6/28/22 R.T. Vol II 18:8-19:9.[2]

Santillan later stated that "It was like pulling teeth trying to get anybody on the stand," that "[n]obody wanted to testify.  Why would you?  … It's the lifestyle."  6/28/22 R.T. Vol II 27:25-28:6. When asked about SA Ciccone being called to testify, Santillan repeatedly told defense counsel, "You left him on the witness list.

---

[2] Santillan's stated 5th Amendment concern was immediately demonstrated when the Court asked a question about the 2002 riot in Laughlin, Nevada.  In response, Santillan stated, "Somebody shot a gun behind me.  I know who it was.  I'm not going to say who it was," and the Court asked Santillan if he did not want to say based on a 5th Amendment concern.  6/28/22 R.T. Vol II 25:20-25.  The Court later described the Court's own concern about "the spectacle of you [Santillan] continually taking the Fifth Amendment in front of this jury or prior and the breadth of the questions the Government would certainly ask you …"  9/7/22 R.T. Vol I 19:25-20:3.

1  You could have called him when we voted right before Christmas during

2  the break before we rested, including your daughter was part of --

3  raising her hand not to badger him on the stand … Joe, you left him

4  on the witness list.  You could have called him with or without me."

5  6/28/22 R.T. Vol II 28:14-20.  Santillan also testified that he never

6  spoke with Ciccone "other than public events, and it was brief with

7  brothers around me."  6/28/22 R.T. Vol II 31:7-8.

8         The hearing resumed on June 29, 2022.  Santillan was then asked

9  for the first time, on cross-examination, whether he was an

10  informant, and he answered directly, "No, sir."  6/29/22 R.T. Vol I

11  29:21-23.  Santillan also testified that retired Montebello Police

12  Officer Christopher Cervantes was not his "handler," despite defense

13  counsel having represented that they "believed" he was.  *See*

14  Defendant's Reply Brief, Ales Decl. ¶ 4 (CR 542).  Santillan also

15  testified that he brought police reports regarding his arrests and

16  charges against him, and that he had received "[z]ero assistance"

17  from the government on his criminal cases.  6/29/22 R.T. Vol I 30:4-

18  22.  He also restated his own and other Mongols' concerns about self-

19  incrimination and acknowledged the fact that SA Ciccone had actually

20  been named on each of the witness lists filed by the defendant in the

21  case.  6/29/22 R.T. Vol I 31:19-32:25; *see also*, Defendant's Witness

22  Lists, dated October 26, 2018, November 14, 2018, and November 27,

23  2018 (CR 222, 253 and 275).

24         Santillan specifically testified:

25     Q.    And when you referred to "inappropriate conduct," is it
   fair to say that you meant you were never acting as an informant for
26  Agent Ciccone at that time?

27     A.    That's correct.

28     Q.    Or at any time; is that fair to say?

A.   That's correct.

Q.   And you were never acting as an informant for the ATF at any point?

A.   Ever.

Q.   Or any other federal or state agency?

A.   Ever.

6/29/22 R.T. Vol I 33:16-34:1.[3]

Santillan testified that he did not meet with SA Ciccone at Starbucks, and that he had only run into Ciccone one time –– "[t]hen that was it." 6/29/22 R.T. Vol I 34:2-9. He also testified that one of the concerns for the defense in calling SA Ciccone as a witness was that defense counsel would behave unprofessionally after having claimed he wanted to "tear off his head and shit down his throat" –– referring to retired Special Agent Ciccone. 6/29/22 R.T. Vol I 38:6-12 ("Yeah. 'shit down his throat' and berate 'em, yes.").[4] Santillan testified that defense counsel's argument about the Mongols' war with the Hells Angels was counsel's own "conspiracy theory," because the Mongols had "been at war with the Hells Angels for four decades." 6/29/22 R.T. Vol I 40:1-19. He stated that SA Ciccone's testimony would have "put the last nail in the coffin for the club … It wound not have helped." 6/29/22 R.T. Vol I 45:10-13.

---

[3] Santillan repeatedly testified that he was not an informant for the ATF or any other state or federal agency. 6/29/22 R.T. Vol I 37:13-17, 47:21-48:21 (stating that he never acted as an informant for ATF or any other federal or state law enforcement agency).

[4] Defense counsel found it appropriate to state that he had said he wanted to "pop his [referring to SA Ciccone] eyeball and piss in his skull." 6/29/22 R.T. Vol I 58:17-19.

1  Santillan repeatedly testified that he was never an agent of the

2  government.  6/29/22 R.T. Vol I 56:6-22 ("No, never.").  He testified

3  that he never passed information to SA Ciccone or anyone for the

4  government about the trial.  6/29/22 R.T. Vol I 51:9-17 ("Absolutely

5  not.").  He did not pass information to the government about

6  witnesses, witness lists or trial strategy.  6/29/22 R.T. Vol I

7  51:18-22 ("No."), 54:8-18 ("No, I did not.").  Also, Santillan

8  testified that he and his wife were not allowed to "walk free" from

9  charges of assault, weapons charges, and driving under the influence,

10  contrary to the representations defendant submitted.  6/29/22 R.T.

11  Vol I 52:5-17 ("Not true.").

12  Santillan also testified about his conflicts with defense

13  counsel during the trial and that the conflict owed to the fact that

14  defense counsel had borrowed $35,000.00 from him and another Mongols

15  member, and counsel had given Santillan a check that "bounced," so

16  that Santillan was "on the hook for that money."  6/29/22 R.T. Vol II

17  14:11-23.  Santillan testified that he had brought the bounced checks

18  and noted that those checks had been submitted to the Court at the

19  end of the trial.  6/29/22 R.T. Vol II 15:1-12; *see also*, Statement

20  of Candor, dated May 16, 2019 (attaching bank checks for $5,000 and

21  $3,000) (CR 436).

22  He also testified that the evidence presented at trial against

23  the Mongols was "super strong" and specifically described one of the

24  stabbings that had been captured on surveillance video and played for

25  the jury as an example.  6/29/22 R.T. Vol II 16:4-17:10. Santillan

26  testified about his actual prior convictions and, again, testified

27  that he had not received assistance from the government on his

28  criminal cases.  6/29/22 R.T. Vol II 19:22-20:23.

The Court next heard testimony from retired Special Agent John
Ciccone on June 29, 2022.  Defense counsel questioned SA Ciccone at
length about his career and training as a law enforcement agent.
Defense counsel asked Ciccone if he had been running "some type of
investigation" on Maravilla in April 2007.  Contrary to defense
counsel's theory, the answer was "no" (6/29/22 R.T. Vol II 37:17-21),
and SA Ciccone repeatedly corrected the inaccuracies in defense
counsel's questions.  Specifically, SA Ciccone corrected defense
counsel about the shooting at Laughlin, Nevada in 2002:

 Q.   Did you have any operations, informants, or agents either
infiltrate or attempting to infiltrate the Hells Angels at the time?

   THE COURT:  In 2002?

   MR. YANNY:  2002.

   THE WITNESS:  I did not.

   THE COURT:  Okay.  Now ask him about the Mongols.

BY MR. YANNY:

 Q.   What about the Mongols?

 A.   No.

6/29/22 R.T. Vol II 48:14-24.

 Defense counsel later asked the same thing again:

 Q:   Did you have any undercovers in any other clubs besides the
Mongols at that time?

 A:   We didn't have any undercovers in the Mongols at that time.

 …

 Q:   So you had no agents infiltrating the Mongols or the Hells
Angels or the Vagos or any other Motorcycle Club at that time that
you were infiltrating?

 A:   No.

1    6/29/22 R.T. Vol II 54:1-25.

2         Defense counsel asked the same thing again, later:

3         Q:   Well, were there times where you had undercovers in both

4    the Hells Angels and the Mongols simultaneously?

5         A:   I've never had that.

6    6/29/22 R.T. Vol II 56:5-7.

7         Defense counsel then made another request for a continuance,

8    prior to the hearing scheduled for July 22, 2022.  7/22/22 R.T. Vol I

9    96:8.  That request was denied, and the Court summarized SA Ciccone's

10   testimony to have stated "that your contacts were public in nature;

11   that you're contacting David Santillan because he's the president of

12   the Mongols.  On those contacts, Santillan would always come out with

13   somebody else."

14             THE WITNESS: His – his security team.

15             THE COURT:  Security.

16             And whatever that was, on the indicative pieces of evidence

17   that I would examine would be his roll-up with the news reports –

18   female news reporter who apparently wants to cover the Mongols – and

19   there's a brief interchange between you and Santillan.

20             Is that typical?

21             THE WITNESS:  Yeah.  And – and the other members that were

22   with 'em.

23             THE COURT:  Sure.

24   7/22/22 R.T. Vol I 48:8-25.

25        The Court specifically asked SA Ciccone if the events were all

26   public, and SA Ciccone answered, "Yes.  They're at public events:

27   Meetings, parties, um, different size events, runs."  7/22/22 R.T.

28   Vol I 48:8-25.  The Court also explained that the Court understood

1   that there would be testimony from ATF (referring to ATF SSA Susan

2   Raichel) "that there were no formal documents, apparently, or

3   indication of any payments made to Santillan.  Is that correct?"; and

4   SA Ciccone answered, "Yes."  7/22/22 R.T. Vol I 49:10-17.

5        Further:

6             THE COURT:  Okay.

7             And when you're talking to Santillan, you said, basically,

8   to me a few moments ago, "Keep your people" –- you know – basically,

9   from committing violent acts and, basically, no issues; in other

10  words, stop the violence.

11            Is that correct?

12            THE WITNESS:  Yes.

13  7/22/22 R.T. Vol I 49:18-24; see also 52:6-14.

14       SA Ciccone testified that the tactic had been attempted with the

15  Hells Angels and possibly the Vagos, and he considered it to be

16  "effective for public safety –- and it was used with everybody that

17  we came in contact with."  7/22/22 R.T. Vol I 72:7-73:6.

18       The Court also asked if there had been any formal discussions in

19  which SA Ciccone offered Santillan protection, and SA Ciccone

20  answered, "No."  7/22/22 R.T. Vol I 50:7-12.  SA Ciccone also

21  testified that he did not have any conversation or receive any notice

22  from the defense that they were not going to call him as a witness

23  (7/22/22 R.T. Vol I 81:1-4)[5] and agreed with the Court's

24  characterization that he had only a "random bump-in" encounter with

25  Santillan at the nearby Starbucks (7/22/22 R.T. Vol I 83:13-19).

26

27  _____

28       [5] SA Ciccone also testified, again, that Santillan did not pass
    any trial information to him during the trial.  7/22/22 R.T. Vol III
    37:11-17.

                                    14

Ciccone also testified that he did not have any involvement in the disposition of criminal cases against Santillan (7/22/22 R.T. Vol I 89:7-16; *and* 7/22/22 R.T. Vol III 37:1-17), and the Court subsequently noted, "I don't see that he's gotten a break" (7/22/22 R.T. Vol I 93:14-17).

Defense counsel then attempted to put forth another unsupported claim that David Santillan was actually an "unindicted co-conspirator" in another indictment.  7/22/22 R.T. Vol II 32:19-21 ("My point is, sir, I believe that David Santillan, the president of the Mongols Motorcycle Club, is UICC 39.").  The government then produced the case agent, FBI SA Joseph Talamantez, and, contrary to defense counsel's assertion, SA Talamantez testified that "UICC 39" was not David Santillan.  He also testified that David Santillan was not "UICC 38" or any of the other UICCs in the indictment.  7/22/22 R.T. Vol II 39:20-44:10 (THE COURT: "Are any of the UICCs in this Indictment David Santillan?"  THE WITNESS:  "No.").

ATF Supervisory Special Agent Susan Raichel then testified that she had reviewed the ATF database, which had records back to 2002, and determined that "David Santillan has never been an informant for ATF."  She affirmed there was no record of him as a CI, and he had never been a CI, as far back as 2002.  7/22/22 R.T. Vol III 63:7-12.

Defense counsel then stated his belief that Santillan was being "handled" by Montebello Police Officer Christopher Cervantes. 7/22/22 R.T. Vol III 52:6-8.  The following Monday, July 25, 2022, retired Officer Cervantes appeared, and the Court asked him, "Is Santillan a rat?  A cooperator?  I'm asking you that:  Is Santillan a cooperator?" and Cervantes answered, "No, sir."  7/25/22 R.T. Vol I 16:1-6.  Further:

1          THE COURT:  This has one focus:  Is Santillan a government

2   informant?  That's the focus.

3          You can ask him if he paid him money.  All fair game. Okay?

4          MR. YANNY:  I don't think they did.

5          THE COURT:  Well, ask him.

6   BY MR. YANNY:

7   Q.   Did you guys ever pay David Santillan?

8   A.   No.

9   7/25/22 R.T. Vol I 17:11-19.

10      Defense counsel asked Cervantes if Cervantes and SA Ciccone were

11  "protecting David [Santillan] in some capacity," and Cervantes

12  answered, "No."

13         THE COURT:  Let's broaden that.

14         Any memory of the ATF, DEA, task force, um, any member of

15  any federal authority, to your knowledge, protecting him in some way?

16         THE WITNESS:   No, sir.

17  7/25/22 R.T. Vol III 19:19-20:3.

18      On August 25, 2022, defendant called Ralph Rocha, but Rocha

19  invoked his 5th Amendment rights and refused to testify.  8/25/22

20  R.T. Vol. I 5-6.  Defendant then called its co-counsel, Stephen

21  Stubbs, who claimed that Santillan had said he met multiple times

22  with SA Ciccone.  8/25/22 R.T. Vol. I 44:1-6.  Stubbs described two

23  incidents in 2017 and 2018, when he and other Mongols were present,

24  including the "Mother Chapter" (8/25/22 R.T. Vol. I 40:6-42::6), and

25  Stubbs testified that he was not aware of any agreements of "any kind

26  of cooperation allegedly between Santillan and ATF or any kind of

27  government agency." (8/25/22 R.T. Vol. I 63:12-16).  Stubbs claimed

28  Santillan had embezzled money, and he also testified that defense

16

counsel had borrowed money from Santillan, and that defense counsel
had "submitted a number of false statements" to the court and engaged
in a "dishonest scheme" to show that the defendant would not be able
to pay a fine at sentencing.  8/25/22 R.T. Vol. I 92:21-99:6; *and*
Statement of Candor (read into record) (CR 436).  Stubbs also
acknowledged that defense counsel had challenged his credibility,
accused him of falsifying documents, and acknowledged that Stubbs had
been censured by the Nevada State Bar.  8/25/22 R.T. Vol. II 8:1-
9:25.

Santillan testified again on September 7, 2022.  At that time,
the Court questioned Santillan, and he testified to the same facts as
he had previously, including one encounter with SA Ciccone at
Starbucks (9/7/22 R.T. Vol. I 17:9-16), and the fact that he never
worked as an informant, never received any payment or legal
protection, including from Montebello (9/7/22 R.T. Vol. I 18:24-
19:9).  Santillan testified that he had explained his reasoning for
why he did not want to testify, and the Court acknowledged the Court
would be concerned about "the spectacle of you continually taking the
Fifth Amendment in front of this jury or prior and the breadth of the
questions that the government would certainly ask you …"  9/7/22 R.T.
Vol. I 19:24-20:3.  SA Ciccone also testified again on September 7,
2022.  He stated that he was not asked to testify at the trial, and
he also testified again about public safety contacts with the
Mongols.  9/7/22 R.T. Vol. I 26:23-27:25.  Ciccone testified that to
his knowledge no local agencies had opened any investigation or used
Santillan as an informant, including Montebello, and he was not aware
of any cooperation with Santillan.  9/7/22 R.T. Vol. I 32:1-33:2.  In
response to defense counsel's questions, SA Ciccone testified that he

had not threatened Santillan with "potential indictment for extortion with La Eme" or discussed "cooperative extortion efforts. 9/7/22 R.T. Vol. I 78:16-21.

The Court then allowed defense counsel to question Santillan again, and counsel immediately chose to question Santillan yet again about the Mexican Mafia and counsel's asserted belief that Santillan was an unindicted co-conspirator in another case. Santillan testified:

> You got together with her, and that's why I got served right here, because you thought I was a rat on that case. And I'm not a rat on that case. I told you that. And I'm not an unindicted co-conspirator either, and it was proven. The investigator told me they know who it is. And it's not me. It was somebody locked up in the county jail, April of 2014. I was not in the county jail … What does anything from Eme have to do with the video, Joe? Nothing. Not a g*ddamn thing. So why start dragging it out -- dragging it out. Everybody's testifying, I'm not a f*cking rat. How much more are you going to drag it out it out? Seven more days? Come on, Joe. That hard up for money? … You owe me $35,000. I paid your f*cking debt to my club brother. I have proof, too, all of it. My club brothers know. I don't know why they even have you here. You found a way to monetize on the club and bring this frivolous motion. That's what this is about. You have an axe to grind with me, personally and Bobby D, because I embarrassed you and you know.

9/7/22 R.T. Vol. I 100:1-101:14.

Santillan also repeatedly denied ever having provided information to SA Ciccone. 9/7/22 R.T. Vol. I 102:15-16; 106:13-16 ("I did not give any information."). He denied that he had embezzled money. 9/7/22 R.T. Vol. I 122:11-22 ("That's incorrect. Wrong. Wrong. Show me the paperwork."). Santillan also told defense counsel, "You're the thief. You welsh on your promises and your loans, you deadbeat." 9/7/22 R.T. Vol. I 123:2-4. He also denied having conversations with SA Ciccone in Laughlin, Nevada (9/7/22 R.T.

18

Vol. I 124:16-21), and the Court then asked, specifically, about

defense counsel's theory about Laughlin, Nevada in 2002:

> THE COURT:  So Ciccone doesn't have anything to do with stirring this up then?

> THE WITNESS:  Not at all.

> THE COURT:  Then why was this defense floated in front of jury?  You had to be part of this group discussion?

> THE WITNESS:  Because Mr. Conspiracy entrepreneur over here wants to lay it out thick and make things more than they really are.  I had an issue with him ever since he started this whole thing – these conspiracy theories that never – He never proved anything.  They were never factual.  They were just his theories … based on talking to old biker dudes.

9/7/22 R.T. Vol. I 126:2-127:3.

The government then presented testimony from Sergeant Omar

Rodriguez of the Montebello Police Department, Detective Ivania

Farias of the Los Angeles County Sheriff's Department and Sergeant

Jerrod Lewis of the Long Beach Police Department.  They testified

that they had searched the records of their departments and found no

records of any agreements or cooperation for Santillan.  9/7/22 R.T.

Vol. I 129:6-130:7.  The government also submitted that ATF SSA Susan

Raichel had again checked the ATF database of confidential informant

records and again reported the same result, that David Santillan has

never been an ATF informant from 2002 to 2022.  Declaration of Susan

Raichel (Exhibit 20).

IV.  ARGUMENT

### DEFENDANT HAS NOT MET ITS BURDEN

Ninth Circuit law requires that a defendant seeking a new trial

on the ground of newly discovered evidence must show: (1) evidence

that is newly discovered; (2) that the failure to discover the

alleged evidence sooner was not due to a lack of diligence; (3) the evidence was material to trial issues; (4) the evidence was not cumulative or merely impeaching; and (5) a new trial, if granted, would probably result in acquittal. *United States v. George*, 420 F.3d 991, 1000 (9th Cir. 2005) (new trial motion denied under Rule 33(b)(1)); *citing, United States v. Kulczyk*, 931 F.2d 542, 549 (9th Cir. 1991) (holding "evidence that would merely impeach a witness cannot support a motion for new trial.") [6].

Defendant did not make that showing when it filed its Motion. It submitted only hearsay statements and unsupported declarations from defense counsel, which is not sufficient for a new trial motion. *United States v. Felix*, 425 F.2d 240, 242 (9th Cir. 1970) (new trial motion denied where "evidence" submitted "was principally hearsay and therefore inadmissible."); *Wilke v. United States*, 422 F.2d 1298, 1299, n. 1 (9th Cir. 1970) (*per curiam*) ("This information was of course hearsay and as such provided no support for a new trial motion[.]"); *United States v. Chapman*, 851 F.3d 363, 382 (5th Cir. 2017) (representations from defense counsel were inadmissible hearsay and a motion for new trial may not be based on inadmissible evidence."). Defendant, nonetheless, claimed that it did not need to make any showing prior to a hearing. Specifically, when it moved for a continuance on February 14, 2022, defendant stated that its "moving papers do not need to prove their case before they have an opportunity to have a hearing." Defendant's Motion for Continuance (CR 540). Then, in its Reply on May 23, 2022, defendant claimed,

---

[6] Rule 33(b)(1) provides that the court may not grant a motion for a new trial while an appeal is pending. Fed. R. Crim. Proc. 33(b)(1). The court can deny a motion, but it cannot grant a motion until the appellate court remands the case.

again, that it had no burden "to demonstrate anything until the evidentiary hearing is finished" and claimed that it only needed to show "cause for the Court to investigate."  Reply, at 7 (CR 542). That is not the law, but, ultimately, defendant's very publicized claims were not true.

The government submitted that the claims were not true, and the Court has now heard testimony and received evidence from numerous state and federal law enforcement officers, from the ATF, FBI, Montebello Police Department, Los Angeles County Sheriffs Department, Long Beach Police Department, as well as Santillan and A. Santillan. Even though defendant has the burden of proof, the testimony from the witnesses was that Santillan was not a confidential informant, and he did not provide trial information to the government.  Defendant's claims were never true, and defendant, therefore, did not meet its burden under Rule 33(b)(1).

1.  <u>Defendant Has Not Shown Newly Discovered Evidence</u>.

Defendant did not show any newly discovered evidence to support a motion for new trial.  His claims about Santillan were false, and the witnesses testified that they were false.  Hence, his Motion fails.

As discussed, witnesses repeatedly testified, and often in response to questions directed by the Court, that Santillan was not a confidential informant and did not provide information to the government at trial.  7/25/22 R.T. Vol I 17:11-19 (THE COURT: "This has one focus:  Is Santillan a government informant?  That's the focus.").  A. Santillan, Santillan, retired ATF Special Agent John Ciccone, retired Montebello Police Officer Christopher Cervantes, ATF Supervisory Special Agent ("SSA") Susan Raichel all testified that

1    this was not true.  SSA Raichel, Montebello Police Sergeant Omar
2    Rodriguez, Los Angeles County Sheriff Deputy Ivania Farias, and Long
3    Beach Police Department Sergeant Jarrod Lewis also testified that
4    they conducted searches, and there are no records of any agreements
5    with Santillan.  FBI SA Joey Talamantez testified, as well, that
6    Santillan was not "UICC 38," "UICC 39" or any other "unindicted co-
7    conspirator" in his case.  Defendant's claims about Santillan were
8    not true and, therefore, do not show new evidence.

9        In response to defendant's allegations, the witnesses also
10   testified and offered documentation to show that Santillan did not
11   receive any assistance from the government for any of the criminal
12   cases against him.  Defendant did not respond to that testimony, even
13   after the Court advised about the conclusion.  See 7/22/22 R.T. Vol I
14   93:14-17 {"I don't see that he's gotten a break"}.  Witnesses also
15   testified that trial information was not passed to the government.
16   Defendant did not meet its burden to show newly discovered evidence.

17       Defense counsel's questions and witnesses about the Mexican
18   Mafia and other issues also would not be newly discovered evidence.
19   First, those matters did not appear relevant to the matter raised,
20   and second, the matters related to events that would have occurred,
21   if ever, years before, in 2009 or 2010.  Similarly, testimony about
22   arguments within the defense team or votes about witnesses to call
23   would also have involved events before or, at the latest, during the
24   trial in 2018, and, therefore, also not new evidence.  Even law
25   enforcement contacts at Mongols runs were described as incidents that
26   occurred before, in some instances, years before trial.  They were
27   also in the presence of many other members -- even hundreds of other
28   members and, also, would not be "newly discovered evidence."

1    Ultimately, defendant did not show any newly discovered
2    evidence.

3    2.    Defendant also Did Not Show that It was Diligent.

4    The second element on a motion for new trial requires the
5    defendant to show that its failure to discover evidence was not due
6    to a lack of diligence. *United States v. George*, 420 F.3d at 1000
7    (lack of diligence and documents were not material and merely
8    impeachment); *United States v. Kulczyk*, 931 F.2d at 549 (Lack of
9    diligence where defendant failed to inform the court about inability
10   to locate witnesses and evidence was merely impeachment).  In this
11   case, defendant's representations about Santillan were untrue and,
12   therefore, do not meet any elements for the Motion.

13   3.    Defendant Did Not Show New Evidence that was Material to
14         Trial Issues, Not Cumulative or Merely Impeaching.

15   The third and fourth elements require defendant to show that new
16   evidence that would have been material to trial issues, and that it
17   would not be cumulative or merely impeaching. *United States v.*
18   *George*, 420 F.3d at 1000 (evidence did not support defendant's motion
19   for a new trial where the evidence was not material and merely
20   impeachment evidence).  Again, defendant did not show any newly
21   discovered evidence, so his Motion also did not show these elements.

22   4.    Defendant Did Not Show that a New Trial would Probably
       Result in Acquittal.

23   Defendant also did not show that a new trial would probably
24   result in an acquittal. *United States v. George*, 420 F.3d at 1000;
25   *United States v. Kulczyk*, 931 F.2d at 549.  The Motion fails on that
26   basis as well.

27   The jury convicted the defendant on both counts charged,
28   racketeering and RICO conspiracy.  As discussed, it did so after

23

weeks of testimony from many witnesses about the unending crimes this
defendant, and crimes that the defendant and its members continue to
commit to this day.  At trial, the jury heard testimony from retired
Special Agent Daren Kozlowski, who infiltrated the Mongols as an
undercover officer during Operation Black Rain.  The jury also heard
testimony from each of the other undercover ATF Special Agents, Greg
Gaioni, Paul D'Angelo, and John Carr.  In addition, the jury heard
extensive testimony from retired ATF Special Agent William "Billy"
Queen, who infiltrated the Mongols during Operation Ivan, and retired
Special Agent Jay Dobyns.  This testimony included descriptions of
murders, shootings, stabbings, an actual scalping (supported by
photographic evidence), riots, narcotics transactions, and attacks on
police officers.  The jury also watched numerous videos of shootings
and stabbings committed by Mongols members and associates.  It heard
Christopher Ablett testify in detail about how he killed the
president of the Hells Angels in San Francisco, and testimony about a
man who was beaten to death with a pool cue in a bar in Lancaster,
and another who was dragged out of a bar in Merced, California and
stabbed in the parking lot, where he died.  The jury watched
surveillance video of a Mongol member slashing a victim's face, and
another man who was ambushed leaving a restaurant, beaten unconscious
and kicked in his head as he lay helpless at the feet of Mongols
members and associates.  The jury saw and heard members of
defendant's leadership, bragging of the gang's reputation for
violence and mayhem, and the importance of expanding the scope of
that reputation throughout the world.  It saw methamphetamine, guns,
knives, and bullets sold and used by the gang.  It learned that the
Mongols have an actual skull and crossbones murder patch, and it saw

the murder patch and heard testimony that the patch was awarded to members who killed for the organization.  It saw their "wings" patches and "Respect Few Fear None" patch.  It heard about racketeering and conspiracy many, many times over, and, ultimately, the jury convicted the defendant of both racketeering and conspiracy to commit racketeering, because it saw and heard direct evidence from numerous witnesses -- including witnesses who had been called by defendant -- that showed defendant had been committing those crimes for decades and continued to commit them.

Santillan was correct when he said that the evidence at trial was "super strong."  6/29/22 R.T. Vol II 16:4-17:10.  It was.  A new trial would be even more so, because it would contain evidence of more murders, more shootings, more drugs, and just many more crimes.  It would include more, because the Mongols do not stop.  They attack unaware people outside bars and restaurants and beat, shoot, and stab them.  That was shown at trial, and it still happens.  They shoot police officers.  They kidnap and murder women.  They deal drugs.  Like Santillan testified, "It's the lifestyle."  6/28/22 R.T. Vol II 27:25-28:6.  It is what they do.  There were more federal convictions last week in Tennessee.  *United States v. Frazier, et al.*, CR 17-130.

Ultimately, and especially based on the evidence in this case, it cannot be said that a new trial would probably result in an acquittal.  Defendant has shown nothing to oppose that conclusion, and the Motion fails on this basis as well.

V.   CONCLUSION

The United States, thus, respectfully submits that defendant has not met its burden to support a new trial, and the Motion must be denied.