Joseph A. Yanny (SBN 97979)
Andrea X. Ales (SBN 330928)
**YANNY & SMITH**
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 551-2966
Facsimile: (310) 551-1949
jyanny@yannylaw.com

Victor Sherman (SBN 38483)
LAW OFFICES OF VICTOR SHERMAN
11400 Olympic Blvd.
Los Angeles, California 90230
Telephone: (424) 371-5930
Facsimile: (310) 399-9029
ssvictor@aol.com

Attorneys for Defendant, **MONGOL NATION**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>            Plaintiff, )<br><br>        v. )<br><br>MONGOL NATION, )<br>    An unincorporated association, )<br><br>            Defendant. )<br>_____ ) | Case No.: CR 13-106(A)-DOC<br><br>DEFENDANT'S BRIEF<br><br>Date: October 6, 2022<br>Time: 3:00 p.m.<br>Location: Courtroom of<br>Honorable David O. Carter |

## Table of Contents

I.      GOVERNING PRINCIPLES …………………………………....1

II.     FACTS…………………………………………………………3

        A. The Meeting…………………………………………...6

        B. Lil Dave's Run-Ins with the Law……………………………11

        C. Mr. Ciccone and Mr. Santillan's Unique Relationship………12

        D. Mr. Ciccone and Mr. Santillan's Meetings…………………..14

        E. "He can't protect me anymore"…………………………15

        F. Hide the Pea Under the Shells Game…………………………21

        G. Discovery Request…………………………………….…...23

III.    CONCLUSION……………………………………….………..24

i

## Table of Authorities

Cases:

*Berger v. United States*, 295 U.S. 88 (1935)………………………………………1

*N.L.R.B. v. Pacific Grinding Wheel Co., Inc.*, 572 F.2d 1348 (9th Cir. 1978)..3

*United States v. Levy*, 2010 WL 2541881, at *3 (S.D. Fla. 2010)……………2

*United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970)………………………2

Rules:

California Rules of Professional Conduct 2-100………………………………..1

California Rules of Professional Conduct 4-2…………………………………..1

Federal Rules of Appellate Procedure 12.1…………………………………..2

Federal Rules of Criminal Procedure 33……………………………………..2

Federal Rules of Criminal Procedure 37………………………… ..………...2

## I.   <u>**GOVERNING PRINCIPLES**</u>

In a criminal case, the United States is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  The Government may prosecute with earnestness and vigor – indeed, it should do so. But, while it may strike hard blows, it is not at liberty to strike foul ones. It is as much the duty of the Government to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger v. United States*, 295 U.S. 88 (1935).

While representing a client, a member shall not communicate DIRECTLY OR INDIRECTLY about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer. California Rules of Professional Conduct 2-100(a). See also California Rules of Professional Conduct 4-2(a), which states: "Representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented

by another lawyer in the matter, unless the lawyer has the consent of the other

lawyer." To what extent a prosecution team may engage in continued "law

enforcement activities" against an indicted (or even unindicted) criminal defendant

is a complex question that is typically decided on a case-by-case basis. However,

where "a member or confidant of the defense team acts effectively as an informant

for the government regarding defense preparation and strategies in the case,' this

type of "intrusion by the government on the confidential relationship between a

criminal defendant and his attorney, either electronically or through an informant,

violates a defendant's Sixth Amendment right to counsel in addition to trodding on

his due process rights." *United States v. Levy*, 2010 WL 2541881, at *3 (S.D. Fla.

2010); *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970).

We remind the Court of the provisions to Federal Rules of Criminal Procedure

33 and 37 together with Federal Rules of Appellate Procedure 12.1. What is before

this Court still is whether it will seek remand of sufficient jurisdiction to determine

this motion. If the District Court states that it would grant Defendant's motion or

that the motion raises a substantial issue, the Court of Appeals may remand for

further proceedings but retains jurisdiction unless it expressly dismisses the appeal.

Fed. Rules of Appellate pro. Rules 12.1; Fed Rules of Crim. Pro Rule 33(b) and

37(b). The Court of Appeals is currently set to hear oral arguments on the fully

briefed cross appeal by the Government and the Defendant, this Friday, September 23, 2022, at 0900 pdt, in courtroom 1, Pasadena, United States Court of Appeals for the 9th Circuit.

Also significant in this Court's deliberation is the application of the Adverse Inference Rule. In effect, the Adverse Interference Rule provides that where evidence should be available and provided, but however, is not provided, an adverse inference is to be drawn against the party controlling such evidence that if produced it would be adverse to their cause. *N.L.R.B. v. Pacific Grinding Wheel Co., Inc.*, 572 F.2d 1348 (9th Cir. 1978).

## II.    **FACTS**

One of the main people this motion must focus on is John Ciccone ("Ciccone" or "Mr. Ciccone"). It is our understanding that Mr. Ciccone joined the ATF in or about 1990 and climbed the ranks. It is our understanding that Mr. Ciccone retired from full-time Government service in or about December 31, 2021, less than a month after the instant motion was filed, despite being eligible for retirement much sooner. As an aside, prosecutor Steven Welk also retired from Government service sometime in August of 2021, a matter of months after the newly discovered evidence which gave rise to this instant motion for new trial and dismissal was published by Mrs. Annie Santillan, the estranged wife of David Santillan. That

- 3

newly discovered evidence was a video that Mrs. Santillan had made of conversation between herself and her then estranged husband, David Santillan (the former President for the Mongols Motorcycle Club for approximately 13 years) (See Exhibits 1 and 1A). Mr. Brunwin is the sole remaining prosecutor from the trial of the instant matter who remains as counsel of record for the prosecution. David Santillan ("Santillan" or "Mr. Santillan" or "Lil Dave" or "Dave" or "David") joined the Mongols Motorcycle Club ("Mongols" or "Club") on October 23, 1997. In or about 1999, Santillan was convicted of a federal felony unrelated to club activities and went to prison for wire and mail fraud charges which could have netted him as much as a 20-year in federal prison. Mr. Santillan did not take the matter to trial and reached a Plea Deal.  As a result of his deal, Mr. Santillan somehow ended up doing slightly less than one year at the Club Fed Lompoc Federal Correctional Facility. We do not know and never have had Mr. Santillan's papers related to that Plea Deal. Upon Santillan's early release, he affiliated again with the Club climbing the ranks. At some point during this timeframe and continuing to present, Mr. Ciccone and Mr. Santillan established and continued a "relationship" of a yet murky and unknown nature. That murky relationship continued even after Mr. Santillan rose to the Presidency, during the US v. Cavazos prosecution, the US v. Mongol nation prosecution and investigation, and

the appeals therefrom. When Mr. Santillan became President of the Mongols in July of 2009, he was clearly part of the defense team and controlled all the litigation related decision-making for the Club. Mr. Ciccone has admitted in his testimony before this Court and in his debrief to the FBI (Exhibit 17) the existence of this relationship. Mr. Ciccone has stated in his testimony and in Exhibit 17 that the nature of his relationship with Santillan was such that Santillan may have been paid money or become an informant. That relationship between Ciccone and Santillan continued at least until the date of Santillan's expulsion from the Mongols as "out bad." Subsequent to Santillan's departure from the Mongols, Santillan has been seen in December 2021, with known and admitted ATF deputized officer, Christopher Cervantes ("Cervantes"), who testified the meeting was at a Bowling alley in the greater metropolitan area.

On a parallel track, another player named Ralph Guy "Perico" Rocha ("Rocha" or "Mr. Rocha") at some time climbed through the ranks of the Mexican Mafia, known as LA EME ("EME"). We don't know when he was convicted; we do not have discovery, but it is believed he was convicted sometime in the late 1990s, and according to a debrief (Exhibit 13), he was released in 2007. According to the debrief of Rocha, he initially stayed uninvolved with EME affairs for a while after his release in 2007.

At some point in time, Rocha re-entered the EME business world and was, amongst other things, extorting monies or "collecting taxes" from community drug dealers, individuals, legitimate businesses, and others. As stated above, Lil Dave, after his early release from federal prison, continued his association with the Mongols and began climbing the ladder within the organization. Ciccone continued doing what he does, infiltrating the Mongols, and eventually became the chief investigating officer in a case styled, US v. Cavazos (Case No.CR 08-1201), against some 80 members of the Club, in approximately August 2008. Lil Dave was not one of the defendants indicted. At this time, Lil Dave became a member of the Mongols' governing body, "Mother Chapter," and was named a National Officer. Lil Dave announced his intention to run for president and, according to his testimony, was elected International President in July 2009 (See David Santillan's Testimony, June 28, 2022, page 86, line 5).

## A. **The Meeting**

In a slightly different but related universe, there was also a gentleman named Arturo "Art" Garcia ("Art" or "Mr. Garcia") who was an entrepreneur and co-owner of a business frequented by the Mongols known as the House Lounge. Art and the House Lounge resided within an EME territory which was presided over by Rocha from around 2008 to 2015. Art and the House Lounge

- 6 -

were compelled by neighborhood customs and practices to pay taxes to Rocha, who collected those taxes on behalf of EME (See testimony of Arturo Garcia, August 25, 2022). Mr. Garcia was forced to arrange a meeting between Rocha and the President of the Mongols, who, as of late 2009, was David Santillan (See Exhibit 13 at paragraph 59; See Testimony of Art Garcia, August 25, 2022). A section of Exhibit 13 says: "59. […] Art Garcia presented several extortion opportunities to [Rocha]. At one point Art Garcia offered to bring in the "Mongols" (Outlaw Motorcycle gang) to help out on the extortion plans.[…] 60. [Rocha] and Art Garcia met with President of "Mongols."" (See Exhibit 13). Art's testimony stated that "Ralph Rocha requested…what they call a "sit down" with the national president of the Mongols... David Santillan… in Denny's Whitter…" (See Art Garcia Testimony Page 36, Line 3. At that meeting, between Lil Dave and Rocha, it was agreed and conspired that Lil Dave would cooperate with EME to collect taxes by extorting various people as agreed. Mr. Garcia was an involuntary associate of Rocha and acted out of fear of damage to his property and physical harm to him or his family. Furthermore, according to the testimony of Mr. Garcia, at the meeting, Lil Dave and Rocha acted as the principals and Art acted as Rocha's "shadow," while another Mongol brother named "Hawk" acted as Lil

Dave's shadow. Mr. Garcia further testified that after the meeting he made periodic payments to Mr. Santillan until Mr. Garcia's arrest in 2014 or 2015.

Subsequent to the meeting between Lil Dave, the president of the Mongols, and Rocha, where the parties conspired and agreed to a pattern of extortion, Rocha was arrested and charged pursuant to a felony State of California Information for conspiracy and extortion in late November 2009. Mr. Rocha, not desirous of returning to prison, began negotiating with State, Federal, and local law enforcement agents (including Special Agent John Ciccone and Montebello Detective Christopher Cervantes, who were Federal ATF Task Force members) between January 10 and January 19, 2010. The memorialization of a debrief of those interviews has been introduced into evidence as exhibit 13 and provides proof of the interaction between Mr. Rocha and Mr. Santillan. Both officers, Special Agent Ciccone and Detective Cervantes were therefore aware of conspiracy between Santillan, as an individual, and EME through Mr. Rocha to commit extortion, etc., as of 2010. Also present at the Rocha debriefs were Deputy Kay and Deputy Brandon of local law enforcement who were also members of the Federal Task Force. It is believed that Mr. Rocha's cover as a CI was blown sometime between late 2013 and 2015 upon the arrest of Mr. Garcia for crimes ordered by Mr. Rocha.

- 8

Law enforcement entered into various immunity arrangements with Mr. Rocha in exchange for his debrief (See Exhibit 13; See also Exhibits 18 and 18A). Videotapes of the entire Rocha debrief exist, although the defense has not been provided with all of them. One video that the defense had from a prior case shows Mr. Ciccone telling Mr. Rocha the following:

"Now we have other things going on that could collaborate other things, so there may be lots of stuff that we already know that we want to see you know we want to hear from you, you get what we're saying? We're more at your level now on what was happening out on the street, based off of our investigations, you know, and I can give you one example, you know, Chris and I, just came off working the Mongols for 4 years, we knocked those guys down a year ago on a RICO. You're probably aware of that. And we know you were meeting with them. Ok, we covered meetings where you were there. So, we know specific stuff like that. So when you're talking to us, this is the time where you gotta be straight up with us because there's going to be things we know about. We gotta have that, we gotta have that trust right now. So when we get out on the street we know that that's already there."

(See Exhibit 18A, Timeframe 0:50). The video continues to show the interview, and Mr. Rocha responded to Ciccone that he:

"… went to one meeting with the Mongols [… at] Dennys…"

- 9

(See Exhibit18A, Timeframe 2:29). Ciccone goes on to say in the video:

> "…and you have the immunity letter so we can't use it against you…"

(See Exhibit 18 and 18A, Timeframe 4:42).

Back to the chronology, after Rocha and Santillan came to an agreement on the planned conspiracy to extort, money was being paid to Mr. Santillan on a regular basis until Mr. Garcia was arrested in 2015. The vast majority of these payments took place long after Rocha became a Confidential Informant run by and protected by ATF Special Agent John Ciccone and company.

Subsequent to Mr. Rocha's debrief (Exhibits 13, 18, and 18A) with Mr. Ciccone and company, Mr. Rocha entered into a Plea agreement with the state of California, County of Los Angeles, in which Mr. Rocha was obligated to cooperate as a Confidential Informant for John Ciccone's ATF (See Exhibit 16). This was the first evidence of the Government's "Hide the Pea Under the Shells Game," which has been used to suppress evidence in this case and we must presume in others. The upshot of such agreements, is that the Confidential Informant, Confidential Source, or whatever you want to call this source of information, enters a Plea Deal with an ATF Task Force member entity and then gets run and protected by the ATF itself. We ask the Court to take notice that in most Confidential Informant arrangements, the informant, whether it be Whitey Bulger, Ralph Rocha, or David Santillan, remains free to earn from certain

criminal activities with immunity in order to be an effective source of information

with a cover. Following Mr. Rocha's Plea agreement (Exhibit 16), he continued to

work on the streets as if nothing happened, but was acting as a Confidential

Informant for the ATF reporting directly to Mr. Ciccone. Near the time that Art

Garcia was arrested Mr. Rocha's cover had been blown on the streets and he went

into hiding although Lil Dave continued to receive his share of taxes pursuant to

his agreement with EME as negotiated by Mr. Rocha on their behalf.

## B. Lil Dave's Run-Ins with the Law

During this period of time, in addition to being guilty of extortion, conspiracy to

extort, and other crimes, Mr. Santillan had four run-ins with the law that we know

of.

One was in 2011 at Nicolas Gentleman's Club, in which he was arrested as a

felon in possession of a controlled substance and a firearm. Both Mr. Santillan and

his companion at the time walked with no consequences.

On another occasion, he was arrested for a fight at Santa Anita Raceway in

2015, in which he assaulted someone with a knife. Again, no charges were

brought.

On another occasion, Dave was arrested for a radical auto accident while under

the influence of both alcohol and drugs near his home, in which multiple vehicles

were destroyed. Mr. Santillan fled the scene of the accident but did no jail time and only lost his license for a brief period of time.

On at least one other occasion, in 2018, Santillan was arrested in Palm Springs in a hotel for assaulting a staff member with a deadly weapon. Mr. Santillan had indicated those charges had been dismissed, but his testimony here stated that he still has a case pending as the five-year anniversary of the incident approaches.

These are the incidents that we know of, but there may well be more. Significantly, Special Agent Ciccone testified that within 24 hours of each scrap that Mr. Santillan had with the law, Mr. Ciccone was informed of it usually in the morning by one of the members of the task force, who were full time members of the sister local law enforcement agencies.

## C. **Mr. Ciccone and Mr. Santillan's Unique Relationship**

Furthermore, Mr. Ciccone indicated that his relationship with Mr. Santillan was different than with any other bikers. In Mr. Ciccone's testimony he testified that he did not have the phone numbers to other bikers, nor could he name another biker that he had a similar relationship he had with Dave.

"Question: Did you have the telephone numbers of any of these other men that you named: Sedio, Rags, Spooky, Santos, Bobby D, Largo?

Answer: No.

- 12

Question: Did you give any of them your phone numbers?

Answer: No."

(See Testimony of John Ciccone, September 7, 2022, page 56, line 11).  His

relationship with Dave was unique. Despite Mr. Ciccone and Mr. Santillan

protestations to the contrary, Mr. Ciccone knew of Lil Dave's EME conspiracy

with Rocha from late 2009 to extort (See Exhibit 13). Lil Dave was deathly afraid

of being indicted. Both Lil Dave and Mr. Ciccone have acknowledged that fear on

his part. In a text message between Mr. Yanny and Mr. Santillan, Mr. Santillan

says "… You wanted to get me caught up so I can get indicted in the future…"

(See Exhibit 5).  In an email between Mr. Yanny and Mr. Santillan, Mr. Santillan

says "…After careful review with my chapter and the constant harassment by law

enforcement we would like to put you on notice regarding witness list…please

remove David Santillan… and John Ciccone…" (See Exhibit 4). Furthermore,

when asked about his relationship with Mr. Santillan, Mr. Ciccone stated, "… You

have to understand that we have an open communication, him and I. It's a respect

thing…[W]e work them and we put the criminals in jail. Especially with [David

Santillan], he's the national president, you know, everything is under his watch. He

doesn't want to go to prison." (See Exhibit 10B, Timeframe 12:28; See Exhibit

10C).

### D. **Mr. Ciccone and Mr. Santillan's Meetings**

In 2013, the instant indictment against the Mongols Motorcycle Club, Mr. Santillan was present at the initial appearance and posted the not guilty plea on the unincorporated association. Also present at that initial appearance were the prosecutors in this case and Special Agent John Ciccone. As of 2013, the Government knew that Mr. Santillan was both the face of the Club and controlled the Club. Despite this, Mr. Ciccone continued his regular meetings with Mr. Santillan, and those continued at least until the date of Mr. Santillan's separation from the Club in the summer of 2021. Subsequent to that separation we know that Mr. Santillan continued his association with law enforcement specifically meeting with at least with Detective Christopher Cervantes (See Exhibit 3). By virtue of the testimony of Stephen Stubbs, Robert Rodriquez, Agent Ciccone himself, and Mr. Santillan, we know that Santillan continued his regular meetings with Ciccone, whether it be at the Courthouse (Starbucks), or at a Club party or Club run, etc.. Mr. Rodriquez and Mr. Stubbs indicated that Lil Dave would go off on meetings by himself with Mr. Ciccone. In addition, this Court itself had brought up a particular incident between Mr. Ciccone and Mr. Santillan's meeting at Starbucks. Additionally, Mr. Stubbs testified that Mr. Santillan informed him that he and Ciccone had been meeting every morning at Starbucks until the Judge scolded the

- 14

parties about it. Mr. Stubbs did not make his first appearance in this case until

November 28, 2018, and had not been present for much, if any, of the trial until

that point.

Whatever the relationship between these two, it was bad enough that this Court

found itself compelled to admonish the parties about the meetings between Mr.

Ciccone and Mr. Santillan at Starbucks in the mornings after it had been brought to

the Court's attention by one of the Marshals. Stubbs' testimony is:

> "We were—we were at a Starbucks and Mr. Ciccone came into the Starbucks
> and then Dave told me that THEY HAD BEEN MEETING EVERY DAY AT
> STARBUCKS before trial until Judge Carter told them not to…"

(emphasis added) (See Stubbs' Testimony, August 25, 2022, Page 44, Line 2).

## E. **"He can't protect me anymore"**

Subsequent to the trial, it became apparent that, in addition to Mr. Ciccone

protecting Mr. Santillan from extortion and extortion conspiracy charges involving

his dealings with EME, Mr. Santillan was embezzling money from his own club.

According to Mr. Stubbs' testimony as general counsel for the Club, it is estimated

that Mr. Santillan was misappropriating in the neighborhood of $80,000 a month

from his own Club. Mr. Stubbs stated Mr. Santillan was taking "…at least 80,000 a

month…" (See Stubbs Testimony Page 79, Line 5). That is based on both Mr.

- 15

Stubbs and Mr. Santillan's testimony that Club members were paying $100 a month. According to Mr. Stubbs' testimony, as general counsel, when Mr. Santillan was no longer running the Club, they were making $120,000 a month. Mr. Santillan was reporting both to the Club and the Court, $40,000 a month in income, and there was never anything left over. It is hard to believe that the ATF would not have been aware of that.

However, whatever the relationship was between Agent Ciccone and Mr. Santillan, Mr. Santillan became sufficiently concerned as the end of 2021 approached, as he stated to his wife:

> "John told me already I have one year, one year, he's retiring, he's retiring, after one year he's done…AND HE CAN'T PROTECT ME, HE TOLD ME, so we have to have an exit strategy, he told me, I don't know if he told you that… I have one year to get my shit right…"

(emphasis added) (See Exhibit 1 A , Timeframe 1:12). Clearly, Mr. Santillan is more likely to be telling the truth when he is under the influence than when he is under oath. When someone shows you who they are, believe them. "In vino veritas." Mr. Santillan did not use the word "Club," he used the word "me." If he was worried about John Ciccone protecting the Club, why did he need an exit strategy from the Club? Mr. Rocha had successfully executed his exit strategy from

- 16

EME and is now paid and protected by the Federal Government at the tax payers expense.

Despite the protestation by Mr. Ciccone, Mr. Santillan, and Mrs. Santillan to the contrary, the disclosures in Exhibit 1, Exhibit 1A, and Exhibit 2, probably more accurately establish the facts. We think the Court has been able to gather that perjury does not seem to bother Mr. Santillan much at all, and his statements to his wife, in Exhibit 1, prove the old maxim "in vino veritas" truer than ever. This relationship between Santillan and Ciccone became more than should be permitted by law. It is no wonder the prosecutors told Mr. Ciccone at one point to "dial back" whatever it was that Ciccone and Santillan were doing. As members of the Bar, they both understood that they were skating on thin ice.  Unsurprisingly, neither the prosecutors nor Mr. Ciccone ever committed to a writing (that we know of) any admonitions about communications between Mr. Santillan and Mr. Ciccone.

In addition to being protected from serious legal problems for felony DUI, felon in possession of a firearm, narcotic violations, and multiple assaults with a deadly weapon, Mr. Santillan was protected by Mr. Ciccone, with whom he had a special relationship. Mr. Ciccone was made aware of any legal problems Mr. Santillan had within 24 hours of them occurring. In addition, we ask the court to take judicial notice of the Superseding Indictment in this case, which includes

nearly a dozen overt and predicate acts committed during Mr. Santillan's reign as President of the Mongols, despite his testimony under oath that no such things accord during his reign.

Mr. Ciccone testified that during his time investigating the Mongols every President of the Club similarly situated to Mr. Santillan, had been personally indicted for Racketeering, despite the ATF having no evidence of their personal involvement in any of the drug dealings, homicides, attempted homicides, etc. As Mr. Santillan would put it, Special Agent Ciccone, while not necessarily paying Lil Dave, was clearly "…protect[ing] me…"

In exchange, Mr. Santillan betrayed his Club and knowingly threw the case on culpability (See Exhibit 4- email between Mr. Yanny and Mr. Santillan; Exhibit 5 and Exhibit 6- text messages between Mr. Yanny and Mr. Santillan; Exhibit 7- text messages between Mr. Stubbs and Mr. Santillan). "Win or lose it doesn't matter Judge Carter will rule in are favor on the 2nd phase if it goes there. Its about 1st Amendments rights at the end. He keeps mentioning it." (See Exhibit 7). Furthermore, Mr. Stubbs testified that:

> "We were threatened by Dave. He literally told us that if we called him, there would be repercussions, and he didn't say what those were. But Dave Santillan threatened us if we called him or Ciccone to the stand."

- 18

(Stubbs Testimony Page 53, Line 17). According to Dave everyone was afraid to testify, including him. Not only was David Santillan involved in extortion, that Mr. Ciccone was aware of, but Mr. Ciccone did not proceed with an extortion complaint and Mr. Santillan knew that Ciccone was holding that over his head the entire time. It makes sense why Mr. Santillan was afraid of being indicted. As stated above, Mr. Ciccone knew of this because Mr. Ciccone said this on the TV Show, Trafficked:

> "You have to understand that we have an open communication, him and I. It's a respect thing. That's all I can really explain it... He doesn't want to go to prison."

(See Exhibit 10C). Again, if we look at Mr. Santillan's text message with Mr. Yanny, we see that Mr. Santillan was worried about getting indicted:

> "As far as me testifying…You wanted to get me caught up so I can get indicted in the future."

(See Exhibit 5).

Additionally, Mrs. Santillan, despite her post reconciliation defenses of her husband, laid out the nature of the relationship between Mr. Santillan and the ATF when in exhibit 2, she stated to members of the Club Mother Chapter:

- 19

"…David has obviously been…[deceiving] you guys this whole entire time, it is to my surprise as well [that he] has been working with the government… [this] entire time [. It] is why he felt so comfortable to do what he does [.] He is simply a CI, in other words he is a rat…"

(See Exhibit 2). Winning this novel and one-of-a-kind case was extremely important to Special Agent Ciccone. Many of the ATF agents that Mr. Ciccone has run on the Mongols and or the Hells Angels, after retirement, have written books, become professional witnesses, and even signed movie deals about their work. A one-of-a-kind victory would certainly be a desirable addition to Mr. Ciccone's resume when seeking his book deal, movie deal, and expert witness fees.

In exchange for "protection" from a multitude of sins, Mr. Santillan, whether or not compensated, was happy to accommodate Special Agent Ciccone in this regard. There clearly was a quid pro quo that adversely impacted the honest administration of a Governmental function, to wit: a fair trial in the case of US v. Mongol Nation. Due, in large part, to incomplete discovery that would permit impeachment of perjury and inaccurate testimony, neither party has absolute proof of their allegations. This is compounded by the fact that the Government played a lot of "Hide the Pea Under the Shells Game" during this and other cases. There was queen for a day agreements (none of which were produced) and the entering of

- 20

plea deals such as Mr. Rocha by task force members such as LA county (exhibit 16) requiring state convicted felons to cooperate with and become Confidential Informants for federal entities such as the ATF. There was also outright concealment of evidence related to this case by other US attorneys in other cases so that relevant information to this dispute would not be discovered. However, in the immortal words of one southern jurist whose name I cannot remember, "one does not need to be a doctor of veterinarian medicine to know when there is a dead skunk in the road. The unfortunate part for the Government is that we can all still smell."

## F. **Hide the Pea Under the Shells Game**

Whatever the relationship was, the prosecutors thought that the relationship between Ciccone and Santillan needed to be dialed back. Mr. Ciccone testified:

"We had a meeting where I advised the U.S. attorneys that, hey, these are some of the things that we've been doing with these guys and the communications I've had with Dave during these events. I wanted them to know that for one. And, two, we figured he was going to be the face of this case. So they just said, hey, don't have any more—or try not to have any more contact with him…" (See Testimony of John Ciccone, June 29, 2022, page 74, line 1).

Furthermore, it was stated in the Ciccone interview, exhibit 17:

- 21

"SA Ciccone was asked about the timeframe of his contacts with Lil Dave. SA Ciccone stated that his contacts with Lil Dave would have ended in approximately 2013 or 2015. During this time, SA Ciccone was either involved in a trial or an appeal of a Mongols investigation. SA Ciccone stated that around this time, he was asked by the United States Attorney's Office to cease all communication with Lil Dave. SA Ciccone stated that the directive was followed, and that his contacts with Lil Dave ceased."

(See Exhibit 17). However, the testimony of Ciccone, Lil Dave, Stubbs, and Robert Rodriquez bare out that those contacts did not cease and continued the entire time the trial was going on, the appeals were pending, and anytime there was a Club event. Even the prosecutors knew that what was going on was improper.

Because of the Hide the Pea Under the Shell Game that the Government has played with the prosecution, the Court instructed the prosecution and the ATF to do a thorough search of all of the various related law enforcement entities to see if one of them had opened Mr. Santillan as CI or informant of some sort. Their attempts at that were woefully inadequate and fell far below what would be required to satisfy that task

## G. <u>Discovery Request</u>

We have requested discovery from Mr. Ciccone, Mr. Santillan, Mrs. Santillan, and the Federal Government, and none produced any documents. We do not have any documents produced from our request. We do not have the benefit of discovery, although it was requested from the Government or Mr. and Mrs. Santillan through which we could have verified or refuted statements. See the following Docket entries where the proof of service for Ciccone, Mr. Santillan, and Mrs. Santillan were filed as an exhibit, along with an exhibit showing a discovery request email to Mr. Brunwin: Docket 552-1, Exhibit 16 – John Ciccone Proof of Service; Docket 542-2, Exhibit 6 – Discovery Request to Government; Docket 546-1, Exhibit 15 – Mr. and Mrs. Santillan's Proof of Service. Furthermore, attached is a true and correct copy of the Subpoena to Ciccone requesting documents, submitted herewith as EXHIBIT A; attached is a true and correct copy of the Subpoena to Mr. Santillan requesting documents, submitted herewith as EXHIBIT B; and attached is a true and correct copy of the Subpoena to Mrs. Santillan requesting documents, submitted herewith as EXHIBIT C.

The Government concealed other evidence from the defense in this case, especially the FBI 302, which eventually became exhibit 17, to wit: the debrief of Agent Ciccone. That was produced in another case US v. Rodriguez (Case No.

- 23

18CR00173), and sealed for some reason. We knew the existence of the document as far back as the first hearing in this matter from Attorney Meghan Blanco. Even though it was unsealed by Judge Wu in his case on July 27, 2022, it was not until August 15, 2022, that Mongols' counsel was not made aware of the Order that unsealed the document, and it was not until the day before the rescheduled testimony for Santillan and Ciccone when we had access to the document.

## III.   <u>CONCLUSION</u>

What is extremely clear is that Lil Dave was more than willing to breach his duties to his brothers and his Club which he led, whether it be exhibit 7 where at Laughlin he ran instead of aiding his brothers under attack or permitting his attorneys to zealously advocate on behalf of their client, Mongol Nation, in the trial on the issue of culpability (See again Exhibit 4, Exhibit 5, Exhibit 6, and Exhibit 7) by calling him and John Ciccone to the stand. They were the only two witnesses who could address about every overt and predicate act set forth in the Superseding Indictment, to wit: Santillan and Ciccone.

It would be nice to be able to trust and believe in the Government in this case. However, this is an adventure brought to us by the ATF. These are the same folks that brought you the Randy Weaver shoot-out, the Fast and the Furious escapade, the "Stash House" cases, and the Dobyns v. US case (where the ATF

was found to be a corrupt organization and guilty of attempting to kill one of their own agents and burn down his house, putting his family at risk). Many of the various ATF agents involved in the Stash House cases, the Dobyns v. US controversies, testified in the case that brings us here today. They were intimately involved in the infiltration investigation and prosecution of the Mongol Nation and other entities.

The issues presented here by this motion are not suspectable to customary analysis. This case involves issues of legal ethics and professional responsibility. In the legal ethics setting, even an appearance of impropriety should be adequate for the granting of a remedy. Using that old southern maxim, even the severe aroma of impropriety should be adequate for remedies to be granted. It is one thing for law enforcement to interact with lower-level informants. But where law enforcement is potentially extorting the leader (with litigation control authority) of a group to adversely impact the defense of the group by its leader or through its leader, the line has been crossed. In those situations, there is only one remedy that is adequate, to wit: a new trial (with dismissal for misconduct); or, at a minimum, further detailed hearings to determine the full extent of Government misconduct.

Dated: September 22, 2022                                   Respectfully submitted,

                                                                                    /s/ Joseph A. Yanny